# Exhibit A

**Prospectus Supplement**
(To Prospectus dated July 30, 1998)



# Republic of Venezuela

## *U.S. $500,000,000*

## *13⅝% Global Bonds due 2018*

*Interest payable February 15 and August 15*

## Issue price: 97.639%

Interest on the 13⅝% Global Bonds due 2018 (the "Global Bonds") is payable semi-annually in arrears on February 15 and August 15 of each year, commencing on February 15, 1999. The Global Bonds will be direct, unsecured, general and unconditional obligations of the Republic of Venezuela ("Venezuela" or the "Republic"). The Global Bonds will mature on August 15, 2018 and will not be redeemable prior to maturity or entitled to the benefit of any sinking fund. All payments of principal and interest on the Global Bonds will be made in U.S. dollars without deduction for or on account of taxes imposed by the Republic, subject to the exceptions described under "Description of the Debt Securities—Taxation; Additional Amounts" in the Prospectus dated July 30, 1998 (the "Prospectus").

The Global Bonds will be represented by one or more global securities (each, a "Book-Entry Security") registered in the name of the nominee of The Depository Trust Company ("DTC"). Beneficial interests in the Book-Entry Securities will be shown on, and transfers thereof will be effected only through, records maintained by DTC as depositary for the accounts of its accountholders (including Morgan Guaranty Trust Company of New York, Brussels office, as operator of the Euroclear System ("Euroclear"), and Cedel Bank, *société anonyme* ("Cedel Bank")). Except as described herein, Global Bonds in definitive form will not be issued. See "Global Clearance and Settlement" and "Description of the Global Bonds" in this Prospectus Supplement and "Description of the Debt Securities—Global Securities" in the Prospectus.

The Global Bonds are offered for sale only in those jurisdictions where it is legal to make such offers. Application has been made to list the Global Bonds on the Luxembourg Stock Exchange.

**THE GLOBAL BONDS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS SUPPLEMENT OR THE PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

|  | Price to Public(1) | Underwriting Discounts and Commissions(2) | Proceeds to the Republic(1)(3) |
|---|---|---|---|
| Per Global Bond | 97.639% | 0.875% | 96.764% |
| Total | $488,195,000 | $4,375,000 | $483,820,000 |

(1)  Plus accrued interest, if any, from August 6, 1998.
(2)  The Republic has agreed to indemnify the Underwriters against certain liabilities, including liabilities under the Securities Act of 1933, as amended.
(3)  Before deduction of expenses payable by Venezuela, estimated at U.S. $850,000.

The Global Bonds offered hereby are offered by the Underwriters, as specified herein, subject to receipt and acceptance by them and subject to their right to reject any order in whole or in part. It is expected that the Global Bonds will be ready for delivery in book-entry form only through the facilities of DTC on or about August 6, 1998.

# J.P. Morgan & Co.

## Credit Suisse First Boston

### ABN AMRO Incorporated

July 30, 1998

**THE UNDERWRITERS MAY ENGAGE IN TRANSACTIONS THAT STABILIZE, MAINTAIN OR OTHERWISE AFFECT THE PRICE OF THE GLOBAL BONDS, INCLUDING OVER-ALLOTMENT, STABILIZING AND SHORT-COVERING TRANSACTIONS IN THE GLOBAL BONDS AND THE IMPOSITION OF A PENALTY BID, DURING AND AFTER THE DATE HEREOF FOR A DESCRIP-TION OF THESE ACTIVITIES, SEE "UNDERWRITING" IN THIS PROSPECTUS SUPPLEMENT.**

The Republic, having made all reasonable inquiries, confirms that this Prospectus Supplement together with the Prospectus contains all information with respect to the Republic and the Global Bonds which is material in the context of the issue and offering of the Global Bonds, and that such information is true and accurate in all material respects and is not misleading, that the opinions and intentions expressed herein are honestly held and that, to the best of the knowledge and belief of the Republic, there are no other facts the omission of which would make any such information or the expression of any such opinions and intentions misleading. The Republic accepts responsibility accordingly. This Prospectus Supplement and the Prospectus are being furnished solely for use by investors in connection with their purchase of Global Bonds and for listing purposes.

No dealer, salesperson or other person has been authorized to give any information or to make any representations other than those contained or incorporated by reference in this Prospectus Supplement, and any information or representation not contained or incorporated by reference in this Prospectus Supplement must not be relied on as having been authorized by or on behalf of the Republic or by or on behalf of any of the Underwriters. The delivery of this Prospectus Supplement at any time does not imply that the information contained or incorporated by reference in this Prospectus Supplement is correct at any time subsequent to the date of this Prospectus Supplement or the date of the documents incorporated by reference herein.

The distribution of this Prospectus Supplement or any part hereof and the offer, sale and delivery of any Global Bonds may be restricted by law in certain jurisdictions. Persons into whose possession this Prospectus Supple-ment comes are required by the Republic to inform themselves of and to observe any such restrictions. This Prospectus Supplement does not constitute, and may not be used in connection with, an offer or solicitation by anyone in any jurisdiction in which such offer or solicitation is not authorized or in which the person making such offer or solicitation is not qualified to do so or to any person to whom it is unlawful to make such offer or solicitation.

**TABLE OF CONTENTS**
**Prospectus Supplement**

|  | Page |
|---|---|
| Summary of the Offering | S-3 |
| Use of Proceeds | S-5 |
| Description of the Global Bonds | S-5 |
| Global Clearance and Settlement | S-9 |
| Taxation | S-11 |
| Underwriting | S-14 |
| Validity of the Global Bonds | S-15 |
| Authorized Representative | S-15 |
| General Information | S-15 |

**Prospectus**

| Available Information | 4 |
|---|---|
| Official Statements | 4 |
| Enforcement of Civil Liabilities | 4 |
| Incorporation of Certain Documents by Reference | 5 |
| Use of Proceeds | 5 |
| Introduction | 6 |
| Republic of Venezuela | 11 |
| The Venezuelan Economy | 15 |
| Principal Sectors of the Venezuelan Economy | 43 |
| Financial System | 56 |
| Public Finance | 64 |
| Public Debt | 68 |
| Description of the Debt Securities | 76 |
| Plan of Distribution | 87 |
| Validity of the Debt Securities | 88 |
| The Banco Central Undertaking | 89 |
| Tables and Supplementary Information | 90 |

## SUMMARY OF THE OFFERING

*The following summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this Prospectus Supplement and the Prospectus.*

**Issuer** . . . . . . . . . . . . . . . . . .   Republic of Venezuela

**Title of Security** . . . . . . . . . . .   13⅝% Global Bonds due 2018

**Aggregate Principal Amount** . . .   U.S.$500,000,000

**Maturity Date** . . . . . . . . . . . . .   August 15, 2018

**Interest Rate** . . . . . . . . . . . . . .   13⅝% per annum

**Interest Payment Dates** . . . . . . .   February 15 and August 15 of each year, commencing February 15, 1999

**Issue Price** . . . . . . . . . . . . . . .   97.639% of principal amount

**Payment of Principal and**
**Interest** . . . . . . . . . . . . . . . . .   Principal of and interest and additional amounts, if any, on the Global Bonds will be payable in U.S. dollars or in such other coin or currency of the United States of America as at the time of payment is legal tender for the payment therein of public and private debts and will be made available at the office of the Fiscal Agent (as defined herein) in The City of New York as set forth in the Prospectus under "Description of the Debt Securities—Global Securities". So long as the Global Bonds are represented by a Book-Entry Security (as defined below), payment of principal thereof and interest and additional amounts, if any, thereon to investors shall be made through the facilities of DTC as set forth under "Description of the Global Bonds—Form, Denomination and Registration" and "—Payment" in this Prospectus Supplement and under "Description of the Debt Securities—Global Securities" in the Prospectus.

**Status** . . . . . . . . . . . . . . . . . .   The Global Bonds will constitute direct, unconditional and general obligations of the Republic and will rank *pari passu* without any preference among themselves. The payment obligations under the Global Bonds will at all times rank at least equally with all other payment obligations of Venezuela relating to unsecured and unsubordinated External Public Debt of the Republic. See "Description of the Debt Securities—Status of the Debt Securities" in the Prospectus.

**Negative Pledge** . . . . . . . . . . . .   The Global Bonds will contain certain covenants, including, without limitation, restrictions on the incurrence of certain Liens. See "Description of the Debt Securities—Negative Pledge" in the Prospectus.

**Default** . . . . . . . . . . . . . . . . . .   The Global Bonds will contain events of default, the occurrence of which may result in the acceleration of the Republic's obligations under the Global Bonds prior to maturity. See "Description of the Debt Securities—Default; Acceleration of Maturity" in the Prospectus.

**Markets** . . . . . . . . . . . . . . . . .   The Global Bonds are offered for sale in those jurisdictions in the United States, Europe and Asia where it is legal to make such offers. See "Underwriting" in this Prospectus Supplement and "Plan of Distribution" in the Prospectus.

**Fiscal Agent** . . . . . . . . . . . . . .   The Global Bonds will be issued pursuant to a Fiscal Agency Agreement, dated as of August 6, 1998, between the Republic and The Chase Manhattan Bank, as fiscal agent, paying agent, transfer agent and registrar (the "Fiscal Agent").

**Form** . . . . . . . . . . . . . . . . . . .   The Global Bonds will be issued in book-entry form and represented by one or more global securities (collectively, the "Book-Entry Security") in fully

registered form, without coupons, which will be deposited with a custodian for, and registered in the name of a nominee of DTC in New York, New York, for the accounts of its direct and indirect participants, including Euroclear and Cedel Bank. Beneficial interests in the Book-Entry Security will trade in DTC's Same-Day Funds Settlement system, and secondary market trading activity in such interests will therefore settle in same-day funds. Beneficial interests in the Book-Entry Security will be shown on, and the transfer thereof will be effected only through, records maintained by DTC and its participants. Except in limited circumstances, definitive Global Bonds will not be issued in exchange for beneficial interests in the Book-Entry Security. See "Description of the Global Bonds—Form, Denomination and Registration" and "—Definitive Global Bonds" and "Global Clearance and Settlement" in this Prospectus Settlement and "Description of Debt Securities—Global Securities" in the Prospectus.

**Book-Entry System** . . . . . . . . .   Upon the issuance of the Book-Entry Security, DTC or its nominee will credit, *on its book-entry registration and transfer system, the respective principal* amounts of the Global Bonds represented by the Book-Entry Security to the accounts of institutions that have accounts with DTC or its nominee ("DTC Accountholders") that shall be designated by the Underwriters. Ownership of *beneficial interests in the Book-Entry Security will be limited to DTC* Accountholders or persons that may hold interests through DTC Accountholders. Ownership of beneficial interests in the Book-Entry Security will be shown on, and the transfer of that ownership will be effected only through, records maintained by *DTC* or its nominee (with respect to interests of DTC Accountholders) and on the records of DTC Accountholders (with respect to interests of persons other than *DTC* Accountholders). Investors may elect to hold interests in the Book-Entry Security through any of DTC, Cedel Bank or Euroclear if they are accountholders of such systems, or indirectly through organizations which are accountholders in such systems. Cedel Bank and Euroclear will hold interests on behalf of their accountholders through their respective U.S. depositaries, which in turn will hold such interests in accounts as accountholders of DTC. See "Description of the Global Bonds—Form, Denomination and Registration" and "— Definitive Global Bonds" and "Global Clearance and Settlement" in this Prospectus Supplement and "Description of the Debt Securities—Global Securities" in the Prospectus. The laws of certain jurisdictions require that certain persons take physical delivery of securities in definitive form. Such limitations and such laws may impair the ability to transfer beneficial interests in the Book-Entry Security.

**Taxation** . . . . . . . . . . . . . . . .   Except under certain circumstances, principal of and interest on the Global Bonds is payable without withholding or deduction for or on account of any present or future taxes, duties, fees or other charges, of whatever nature, imposed or levied by the Republic or by any country, municipality or other political subdivision or taxing authority therein or thereof ("Taxes"). See "Taxation—Venezuelan Taxation" and "—United States Taxation" in this Prospectus Supplement and "Description of the Debt Securities—Taxation; Additional Amounts" in the Prospectus.

**Governing Law** . . . . . . . . . . . .   The laws of the State of New York, except with respect to the authorization and execution of the Global Bonds, which will be governed by the laws of the Republic.

## USE OF PROCEEDS

The net proceeds from the sale of the Global Bonds will be used for the general purposes of the Republic, including the refinancing of domestic and external indebtedness of the Republic. The net proceeds from the sale of the Global Bonds, taking into account all related costs and fees, will equal approximately U.S. $482,970,000.

## DESCRIPTION OF THE GLOBAL BONDS

*The following description of the particular terms of the Global Bonds offered hereby supplements, and to the extent inconsistent therewith, replaces the description of the general terms and provisions of the Debt Securities (as such term is used in the Prospectus) set forth in the Prospectus to which description reference is hereby made.*

The Global Bonds are to be issued under a fiscal agency agreement between the Republic and The Chase Manhattan Bank, as fiscal agent (the "Fiscal Agent"), dated as of August 6, 1998 (the "Fiscal Agency Agreement"). Copies of the Fiscal Agency Agreement and the form of Global Bond have been filed as exhibits to the Registration Statement relating to the Global Bonds of which this Prospectus Supplement is a part. The following description and the description under "Description of the Debt Securities" in the Prospectus summarize certain terms of the Global Bonds and the Fiscal Agency Agreement. Such summaries do not purport to be complete and are qualified in their entirety by reference to such exhibits. Wherever particular defined terms of the Fiscal Agency Agreement are used and not otherwise defined herein, such defined terms are incorporated herein by reference.

The Global Bonds, which are to be issued in an aggregate principal amount of U.S. $500,000,000, will bear interest from August 6, 1998 at the rate set forth on the cover page of this Prospectus Supplement and will mature at par on August 15, 2018. Interest on the Global Bonds will be payable semi-annually in arrears in equal installments on February 15 and August 15 of each year, commencing February 15, 1999, to the persons in whose names the Global Bonds are registered at the close of business on the preceding February 1 or August 1, as the case may be. Interest will be calculated on the basis of a 360-day year, consisting of twelve 30-day months. The Global Bonds are not redeemable prior to maturity and are not entitled to the benefit of any sinking fund. The Global Bonds will constitute a separate series of debt securities issued under the Fiscal Agency Agreement, which provides for the issuance of debt securities in one or more series as may be authorized from time to time by the Republic.

The Republic may replace the Fiscal Agent at any time, subject to the appointment of a replacement fiscal agent. The Fiscal Agent is not a trustee for the holders of the Global Bonds and does not have the same responsibilities or duties to act for such holder as would a trustee. The Republic may maintain deposit accounts and conduct other banking transactions in the ordinary course of business with the Fiscal Agent.

### Form, Denomination and Registration

The statements set forth in this Prospectus Supplement in this section under this subsection and under "—Definitive Global Bonds" and in the section entitled "Global Clearance and Settlement" include summaries of certain rules and operating procedures of DTC, Euroclear and Cedel Bank that affect transfers of interests in the Book-Entry Security (as defined below).

The Global Bonds will be issued in fully registered form, without coupons. Each Global Bond will be issued in book-entry form and represented by one or more global securities (collectively, the "Book-Entry Security") registered in the name of Cede & Co. ("Cede"), as the nominee of DTC, for the accounts of its accountholders. The Book-Entry Security will be held by the Fiscal Agent as custodian for DTC.

The Book-Entry Security may not be transferred except as a whole by DTC to a nominee of DTC or by a nominee of DTC to DTC or another nominee of DTC or by DTC or any such nominee to a successor of DTC or a nominee of such successor. So long as Cede is the registered owner of the Book-Entry Security representing Global Bonds, Cede will be considered the sole owner or holder of the Global Bonds represented by the Book-Entry Security for all purposes under the Fiscal Agency Agreement.

Except as described below under "—Definitive Global Bonds", definitive Global Bonds will not be issued in exchange for beneficial interests in the Book-Entry Security.

Euroclear and Cedel Bank will initially hold Global Bonds on behalf of their accountholders through their respective depositaries, which are accountholders in DTC. Transfers within DTC, Euroclear and Cedel Bank will be in accordance with the usual rules and operating procedures of the relevant system. Cross-market transfers between investors who hold or who will hold Global Bonds through DTC and investors who hold or who will hold Global Bonds through Euroclear and Cedel Bank will be effected in DTC through the respective depositaries of Euroclear and Cedel Bank, subject to certain restrictions. The Chase Manhattan Bank ("Chase Manhattan") will initially act as common depositary for Euroclear and Cedel Bank. See "Global Clearance and Settlement".

Upon the issuance by the Republic of the Global Bonds, DTC will credit, on its book-entry system, the respective principal amounts of the Global Bonds represented by the Book-Entry Security to the accounts of DTC's accountholders (the "DTC Accountholders"). The accounts to be so credited shall be designated by the Underwriters. Purchases of Global Bonds under the DTC system must be made by or through Direct Accountholders (as defined below). Owners of beneficial interests in the Book-Entry Security may hold Global Bonds directly through DTC in the United States or through Euroclear or Cedel Bank in Europe, if they are accountholders in such systems, or indirectly through organizations which are accountholders in such systems. Such beneficial interests will be in denominations of U.S. $1,000 and integral multiples thereof. Owners of beneficial interests in the Book-Entry Security will not receive written confirmation from DTC of their purchase, but each beneficial owner is expected to receive written confirmation providing details of the transaction, as well as periodic statements of its holdings, from DTC (if such beneficial owner is a Direct or an Indirect Accountholder (each as defined below)) or from the Direct or Indirect Accountholder through which such beneficial owner entered into the transaction (if such beneficial owner is not a Direct or Indirect Accountholder). Transfers of ownership interests in Global Bonds are expected to be effected by entries made on the books of DTC Accountholders acting on behalf of beneficial owners. The deposit of Global Bonds with DTC and the registration of such Global Bonds in the name of Cede or another nominee of DTC will not effect any change in beneficial ownership. The laws of some states require that certain purchasers of securities take physical delivery of such securities in definitive form. Such laws may impair the ability to transfer beneficial interests in the Global Bonds.

"Direct Accountholders" include securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations, as well as the Underwriters. Access to the DTC system is also available to others such as securities brokers and dealers, banks and trust companies that clear through or maintain a custodial relationship with a Direct Accountholder, either directly or indirectly ("Indirect Accountholders"). The rules applicable to DTC and its accountholders are on file with the Commission.

The Republic expects that conveyance of notices and other communications by DTC to Direct Accountholders, by Direct Accountholders to Indirect Accountholders and by Direct Accountholders and Indirect Accountholders to beneficial owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. In addition, neither DTC nor Cede will consent or vote with respect to Global Bonds. The Republic has been advised that DTC's usual procedure is to mail an omnibus proxy to the Republic as soon as possible after the record date with respect to such consent or vote. The omnibus proxy would assign Cede's consenting or voting rights to those Direct Accountholders to whose accounts the Global Bonds are credited on such record date (identified in a listing attached to the omnibus proxy).

Euroclear or Cedel Bank, as the case may be, will take any action permitted to be taken by a holder under the Fiscal Agency Agreement or the Global Bonds on behalf of a Euroclear or Cedel Bank accountholder only in accordance with its relevant rules and procedures and subject to its depositary's ability to effect such actions on its behalf through DTC.

The Republic has been advised that DTC will credit the accounts of Direct Accountholders with payment in amounts proportionate to their respective holdings in principal amount of interests in the Book-Entry Security as shown on the records of DTC. The Republic has been advised that DTC's practice is to credit Direct Accountholders' accounts on the applicable payment date unless DTC has reason to believe that it will not receive payments on such date. The Republic expects that payments by Direct Accountholders and Indirect Accountholders to beneficial owners of the Global Bonds will be governed by standing customer instructions and

customary practices, as is now the case with securities held for the accounts of customers. Such payments will be the responsibility of such Direct Accountholders and Indirect Accountholders.

## Further Issues

The Republic may from time to time without the consent of holders of the Global Bonds create and issue further bonds, having terms and conditions the same as those of the Global Bonds, or the same except for the amount of the first payment of interest and the issue price, which may be consolidated and form a single series with the Global Bonds.

## Payment

Payment of principal of and interest on the Global Bonds will be made to Cede, the nominee for DTC, as the registered owner. The principal of and interest on the Global Bonds will be payable in U.S. dollars or in such other coin or currency of the United States of America as at the time of payment is legal tender for the payment therein of public and private debts.

Upon receipt of any payment of principal of or interest on the Global Bonds, DTC will credit DTC Accountholders' accounts with payment in amounts proportionate to their respective beneficial interests in the principal amount of the Global Bonds as shown on the records of DTC. Payments by DTC Accountholders to owners of beneficial interests in the Global Bonds held through such accountholders will be the responsibility of such accountholders, as is now the case with securities held for the accounts of customers registered in "street name." Neither the Republic nor the Fiscal Agent will have any responsibility or liability for any aspect of the records relating to, or payments made on account of, beneficial ownership interests in the Global Bonds or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

If any date for payment in respect of any Global Bond is not a business day, the holder thereof shall not be entitled to payment until the next following business day. In this paragraph "business day" means a day on which banking institutions in The City of New York and at the applicable place of payment are not authorized or obligated by law or executive order to be closed. No further interest shall be paid in respect of any such delay in payment.

Any moneys held by the Fiscal Agent in respect of the Global Bonds and remaining unclaimed for two years after such amount shall have become due and payable shall be returned to the Republic, and the holder of such Global Bond shall thereafter look only to the Republic for any payment to which such holder may be entitled. The Global Bonds will become void unless presented for payment within five years after the maturity date thereof (or such shorter period as may be prescribed by applicable law).

The Fiscal Agent will not impose any fees in respect of the Global Bonds, other than fees for the replacement of lost, stolen, mutilated or destroyed Global Bonds. However, owners of beneficial interests in the Global Bonds may incur fees payable in respect of the maintenance and operation of the book-entry accounts in which such interests are held with the clearing systems.

Until the Global Bonds are paid or payment thereof is duly provided for, the Republic will, at all times, maintain a paying agent in The City of New York (the "Paying Agent"). The Republic has appointed The Chase Manhattan Bank to serve as Paying Agent. An office of the Paying Agent in The City of New York for all purposes relating to the Global Bonds is located at the date hereof at 450 West 33rd Street, New York, New York 10001. In addition, for so long as any Global Bonds are listed on the Luxembourg Stock Exchange and the rules of such exchange shall so require, the Republic shall maintain a paying agent in Luxembourg (the "Luxembourg Paying Agent") and a transfer agent in Luxembourg (the "Luxembourg Transfer Agent"). The Republic has appointed Chase Manhattan Bank Luxembourg S.A., having offices located at 5 Rue Plaetis, L-2338, Luxembourg, to serve as Luxembourg Paying Agent and Luxembourg Transfer Agent.

### Definitive Global Bonds

If DTC notifies the Republic that it is unwilling or unable to continue as depositary for the Book-Entry Security or ceases to be a clearing agency registered under the Exchange Act at a time when it is required to be and a successor depositary is not appointed by the Republic within 90 days after receiving such notice or becoming aware that DTC is no longer so registered, or if an event of default with respect to the Global Bonds shall have occurred and be continuing as described under "Description of the Debt Securities—Default; Acceleration of Maturity" in the Prospectus, the Republic will issue or cause to be issued Global Bonds in definitive form in exchange for the Book-Entry Security. The Republic may also at any time and in its sole discretion determine not to have any of the Global Bonds represented by the Book-Entry Security, and, in such event, will issue or cause to be issued Global Bonds in definitive form in exchange for the Book-Entry Security. Global Bonds issued in definitive form will be issued only in fully registered form, without coupons, in denominations of U.S. $1,000 and integral multiples thereof. Any Global Bonds so issued will be registered in such names, and in such denominations, as DTC shall request. Such Global Bonds may be presented for registration of transfer or exchange at the office of the Fiscal Agent in The City of New York, and principal thereof and interest thereon will be payable at such office of the Fiscal Agent, provided that interest thereon may be paid by check mailed to the registered holders of the definitive Global Bonds. Such Global Bonds may also be presented for payment or registration of transfer or exchange at the office of the paying agent and transfer agent in Luxembourg set forth on the back cover of this Prospectus Supplement. With respect to any transfer or exchange of all or a portion of a Global Bond issued in definitive form, the transferor and the transferee will be entitled to receive, at the office of the Fiscal Agent, the paying agent and the transfer agent in Luxembourg, a new Global Bond in definitive form representing the principal amount retained by the transferor or the principal amount received by the transferee, as the case may be, after giving effect to such transfer.

### Notices

Notices to the holders of the Global Bonds will be deemed to be validly given upon publication at least once in a leading daily newspaper in the English language of general circulation in London and New York and, so long as the Global Bonds are listed on the Luxembourg Stock Exchange and the rules of such stock exchange so require, in a daily newspaper of general circulation in Luxembourg or, if publication in either London or Luxembourg is not practicable, in Europe. It is expected that notices in London, New York and Luxembourg will be published in the *Financial Times*, the *Wall Street Journal* and the *Luxemburger Wort*, respectively. In the case of the Book-Entry Security, notices also will be sent to DTC or its nominee, as the holder thereof, and DTC will communicate such notices to DTC Accountholders in accordance with its standard procedures.

Such notices will be deemed to have been given on the date of such publication or, if published in such newspapers on different dates, on the date of the first such publication. Neither the failure to give notice nor any defect in any notice given to any particular holder of a Global Bond shall affect the sufficiency of any notice with respect to any other Global Bonds.

### Purchase of Global Bonds by the Republic

The Republic may at any time purchase any of the Global Bonds in any manner and at any price. All Global Bonds which are purchased by or on behalf of the Republic may be held, resold or surrendered for cancellation.

### Listing

Application has been made to list the Global Bonds on the Luxembourg Stock Exchange.

## GLOBAL CLEARANCE AND SETTLEMENT

Arrangements have been made with each of DTC, Euroclear and Cedel Bank to facilitate initial issuance of the Global Bonds. See "Description of the Global Bonds—Form, Denomination and Registration" in this Prospectus Supplement. Transfers within DTC, Euroclear and Cedel Bank will be in accordance with the usual rules and operating procedures of the relevant system. Cross-market transfers between investors who hold or who will hold Global Bonds through DTC and investors who hold or will hold Global Bonds through Euroclear and/or Cedel Bank will be effected in DTC through the respective depositaries of Euroclear and Cedel Bank.

Upon the issuance of the Global Bonds, DTC or its custodian will credit, on its internal system, the respective principal amount of the individual beneficial interests represented by the Book Entry Security to the accounts of persons who have accounts with DTC. Ownership of beneficial interests in the Global Bonds will be limited to persons who have accounts with Direct Accountholders, including Euroclear and Cedel, or Indirect Accountholders. Ownership of beneficial interests in the Global Bonds will be shown on, and the transfer of that ownership will be effected only through, records maintained by DTC or its nominee (with respect to interests of Direct Accountholders) and the records of Direct Accountholders (with respect to interests of Indirect DTC Accountholders).

Euroclear and Cedel Bank will hold omnibus positions on behalf of their participants through customers' securities accounts for Euroclear and Cedel Bank on the books of their respective depositaries, which in turn will hold such positions in customers' securities accounts in such depositaries' names on the books of DTC.

Since the purchaser determines the place of delivery, it is important to establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be on the desired value date. Although DTC, Euroclear and Cedel Bank have agreed to the following procedures in order to facilitate transfers of interests in the Book-Entry Security among participants of DTC, Euroclear and Cedel Bank, they are under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time. Neither Venezuela nor the Fiscal Agent will have any responsibility for the performance by DTC, Euroclear or Cedel Bank or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

**Trading between DTC Accountholders.**   Secondary market trading of Global Bonds represented by the Book Entry Security between DTC accountholders will trade in DTC's Settlement System and will therefore settle in same-day funds.

**Trading between Cedel Bank and/or Euroclear participants.**   Secondary market trading between Cedel Bank participants and/or Euroclear participants will be settled using the procedures applicable to conventional Eurobonds in same-day funds.

**Trading between DTC seller and Cedel Bank or Euroclear purchaser.**   When interests are to be transferred from the account of a DTC Accountholders to the account of a Cedel Bank participant or a Euroclear participant, the purchaser will send instructions to Cedel Bank or Euroclear through a Cedel Bank or Euroclear participant, as the case may be, at least one business day prior to settlement. Cedel Bank or Euroclear will instruct its respective depositary to receive such interest against payment. Payment will include interest accrued on such beneficial interest in the Global Bonds from and including the last interest payment date to and excluding the settlement date. Payment will then be made by the depositary to the DTC Accountholder's account against delivery of the interest in the Global Bonds. After settlement has been completed, the interest will be credited to the respective clearing system, and by the clearing system, in accordance with its usual procedures to the Cedel Bank participant's or Euroclear participant's account. The securities credit will appear the next day (European time) and the cash debit will be back-valued to, and the interest of the Global Bonds will accrue from, the value date (which would be the preceding day when settlement occurred in New York). If settlement is not completed on the intended value date (i.e., the trade fails), the Cedel Bank or Euroclear cash debit will be valued instead as of the actual settlement date.

Cedel Bank participants and Euroclear participants will need to make available to the respective clearing system the funds necessary to process same-day funds settlement. The most direct means of doing so is to preposition funds for settlement either from cash on-hand or existing lines of credit, as such participants would for any settlement occurring within Cedel Bank or Euroclear. Under this approach, such participants may take on credit exposure to Cedel Bank or Euroclear until the interests in the Global Bonds are credited to their accounts one day later.

As an alternative, if Cedel Bank or Euroclear has extended a line of credit to a Cedel Bank or Euroclear participant, as the case may be, such participant may elect not to preposition funds and allow that credit line to be drawn upon to finance settlement. Under this procedure, Cedel Bank participants or Euroclear participants purchasing interests in the Global Bonds would incur overdraft charges for one day, assuming they cleared the overdraft when the interests in the Global Bonds would incur overdraft charges for one day, assuming they cleared the overdraft when the interests in the Global Bonds were credited to their accounts. However, interest on the Book-Entry Security would accrue from the value date. Therefore, in many cases the investment income on the interest in the Global Bonds earned during that one-day period may substantially reduce or offset the amount of such overdraft charges, although this result will depend on each participant's particular cost of funds.

Since the settlement is taking place during New York business hours, DTC Accountholders can employ their usual procedures for transferring Global Bonds to the respective depositaries of Cedel Bank or Euroclear for the benefit of Cedel Bank participants or Euroclear participants. The sale proceeds will be available to the DTC seller on the settlement date. Thus, to DTC accountholders, a cross-market sale transaction will settle no differently from a trade between two DTC Accountholders.

**Trading between Cedel Bank or Euroclear seller and DTC purchaser.**   Due to time zone differences in their favor, Cedel Bank and Euroclear participants may employ their customary procedures for transactions in which interests in the Global Bonds are to be transferred by the respective clearing system, through its respective depositary, to a DTC Accountholder, as the case may be, at least one business day prior to settlement. In these cases, Cedel Bank or Euroclear will instruct its respective depositary to deliver the interest in the Global Bonds to the DTC Accountholder's account against payment. Payment will include interest accrued on such beneficial interest in the Global Bonds from and including the last interest payment date to and excluding the settlement date. The payment will then be reflected in the account of the Cedel Bank participant or Euroclear participant the following day, and receipt of the cash proceeds in the Cedel Bank or Euroclear participant's account would be back-valued to the value date (which would be the preceding day, when settlement occurred in New York). Should the Cedel Bank or Euroclear participant have a line of credit in its respective clearing system and elect to be in debit in anticipation of receipt of the sale proceeds in its account, the back-valuation may substantially reduce or offset any overdraft charges incurred over that one-day period. If settlement is not completed on the intended value date (i.e., the trade fails), receipt of the cash proceeds in the Cedel Bank or Euroclear participant's account would instead be valued as of the actual settlement date.

Finally, day traders that use Cedel Bank or Euroclear to purchase interests in the Global Bonds from DTC Accountholders for delivery to Cedel Bank participants or Euroclear participants should note that these trades will automatically fail on the sale side unless affirmative action is taken. At least three techniques should be readily available to eliminate this potential problem:

   1. borrowing through Cedel Bank or Euroclear for one day (until the purchase side of the day trade is reflected in their Cedel Bank or Euroclear accounts) in accordance with the clearing system's customary procedures;

   2. borrowing the interests in the United States from a DTC Accountholder no later than one day prior to settlement, which would give the interests sufficient time to be reflected in their Cedel Bank or Euroclear account in order to settle the sale side of the trade; or

   3. staggering the value date for the buy and sell sides of the trade so that the value date for the purchase from the DTC Accountholder is at least one day prior to the value date for the sale to the Cedel Bank participant or Euroclear participant.

The information in this section concerning DTC, Euroclear and Cedel Bank and their book-entry system has been obtained from sources Venezuela believes to be reliable, and Venezuela makes no representation or warranty with respect thereto, other than that such information has been accurately extracted and/or summarized from such sources.

Although DTC, Euroclear and Cedel Bank have agreed to the foregoing procedures to facilitate transfers of interests in the Global Bonds among participants in DTC, Euroclear and Cedel Bank, they are under no obliga-tion to perform or to continue to perform such procedures and such procedures may be discontinued at any time. Neither Venezuela nor the Fiscal Agent will have any responsibilities for the performance by DTC, Euroclear or Cedel Bank or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

## TAXATION

The following is a summary of certain Venezuelan and United States federal income and estate tax considerations that may be relevant to an initial holder of a Global Bond. This summary deals only with Global Bonds held as capital assets by investors who purchase the Global Bonds in the offering at the offering price, and not with special classes of holders, such as dealers in securities or currencies, certain securities traders, banks, tax-exempt organizations, insurance companies, other financial institutions, persons that hold Global Bonds as a hedge (or hedged against) currency or interest rate risks or that are part of a synthetic security, straddle or conversion transaction, or persons whose functional currency is not the U.S. dollar. This summary is based on laws, regulations, rulings and decisions in effect on the date of this Prospectus Supplement, all of which are subject to change, possibly with retroactive effect. No assurances can be given that any such changes will not affect the accuracy of the discussions set forth herein.

Prospective purchasers of Global Bonds should consult their own tax advisors in determining the tax conse-quences of holding Global Bonds, including the application to their particular circumstances of (i) the tax considerations discussed below, and (ii) any relevant foreign, state, local or other tax laws.

Moreover, the legal authorities on which this summary is based are subject to various interpretations, and no rulings have been or will be sought from any tax agency with respect to the matters described herein.

### Venezuelan Taxation

Under existing laws and regulations in Venezuela, interest payments made by Venezuela may be subject to Venezuelan income tax as follows: (i) if the recipient of the interest is a bank or other financial institution not domiciled in Venezuela, at a flat rate of 4.95% payable through withholding by Venezuela, (ii) if the recipient of the interest is a corporation which is not a bank or other financial institution and which is not domiciled in Venezuela, at maximum rate of 34% for the portion of accumulated net earnings of the corporation exceeding 3,000 Tax Units at the time of the interest payment, 22% for the portion of accumulated net earnings of the corporation exceeding 2,000 Tax Units but less than or equal to 3,000 Tax Units at the time of the interest payment and 15% for earnings less than or equal to 2,000 Tax Units at the time of the interest payment, payable through withholding by Venezuela, or (iii) if the recipient of the interest is an individual non-resident in Venezuela, at a flat rate of 34% regardless of income, fully payable through withholding by Venezuela. As of April 14, 1998, the Tax Unit is equivalent to Bs. 7,400. Under current Venezuelan tax laws and regulations, so long as the Global Bonds are registered in the name of DTC or its nominee, as contemplated under "Global Clearance and Settlement" above, the applicable withholding tax rate with respect to the Global Bonds will be that described under clause (i) above.

Capital gains resulting from any trades of Global Bonds effected between or in respect of accounts maintained by or on behalf of non-residents of the Republic will not be subject to Venezuelan income or other Venezuelan taxes where such non-residents have no connection with the Republic other than as holders of an interest in the Global Bonds.

### United States Taxation

*United States Holders.* For purposes of this discussion, a "United States Holder" is a beneficial owner who or that is (i) a citizen or resident of the United States, (ii) a corporation or partnership created or organized under the laws of the United States or any political subdivision thereof, (iii) an estate the income of which is subject to regular U.S. federal income taxation regardless of its source, or (iv) any trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more United States persons have the authority to control all substantial decisions of such trust.

Gross interest paid on the Global Bonds will be subject to United States taxation. Such interest (including Additional Amounts paid in respect of taxes withheld in Venezuela) will be taxable to a United States holder as ordinary interest income at the time that it is accrued or is received (in accordance with such holder's method of tax accounting). In addition, such interest will be treated as foreign source income for United States federal income tax purposes and will generally constitute, for U.S. foreign tax credit purposes, "passive income" or "high withholding tax interest" if a Venezuelan withholding tax is imposed at a rate of at least 5% on such gross income (or, in the case of certain holders, "financial services income").

A United States Holder's tax basis in a Global Bond generally will equal the cost of such Global Bond to such holder. Upon the sale, exchange or retirement of a Global Bond, a United States Holder generally will recognize gain or loss equal to the difference between the amount realized on the sale, exchange or retirement (less amounts attributable to accrued interest, which will be taxable as ordinary income) and the United States Holder's tax basis in the Global Bond. Such gain or loss generally will be capital gain or loss, provided that the United States Holder held the Global Bond as a capital asset, and will be a long-term capital gain or loss if the Global Bond was held for longer than one year at the time of such sale, exchange or retirement.

*Non-United States Holders.* The following discussion summarizes certain United States federal income tax consequences relevant to a Non-U.S. Holder of a Global Bond. This discussion does not deal with all apsects of United States federal income taxation that may be relevant to any particular Non-U.S. Holder in light of that holder's personal circumstances with respect to such holder's purchase, ownership or disposition of a Global Bond, including such holder holding the Global Bond through a partnership. For example, persons who are partners in foreign partnerships and beneficiaries of foreign trusts or estates who are subject to United States federal income tax because of their own status, such as United States residents or foreign persons engaged in a trade or business in the United States, may be subject to United States federal income tax even though the entity is not subject to such tax.

Under United States federal income tax law as currently in effect, and subject to the discussion of "backup" withholding below and to the provisions of an applicable income tax treaty, a holder who is not a United States Holder (as defined above) (a "Non-United States Holder") will not be subject to United States federal income tax, including withholding tax, on payments of interest on the Global Bonds unless:

(i)   the holder is an insurance company carrying on a United States insurance business to which the interest is attributable, within the meaning of the United States Internal Revenue Code, or

(ii)  the holder has an office or other fixed place of business in the United States to which the interest is attributable and the interest either (a) is derived in the active conduct of a banking, financing or similar business within the United States or (b) is received by a corporation the principal business of which is in trading stocks or securities for its own account, and certain other conditions exist.

In addition, (a) subject to the discussion of backup withholding below and to the provisions of an applicable income tax treaty, a Non-United States Holder will not be subject to United States federal income tax on any gain or income realized on the sale or exchange of a Global Bond, unless (i) such gain or income is effectively connected with the conduct by the holder of a trade or business within the United States, or (ii) in the case of a Non-United States Holder who is an individual, such holder is present in the United States for a total of 183 days or more during the taxable year in which such gain or income is realized and either (A) such gain or income is attributable to an office or fixed place of business maintained in the United States by such holder or (B) such holder has a tax home in the United States and (b) the Global Bonds will be deemed to be situated

outside the United States for purposes of the United States federal estate tax and thus will not be includible in the gross estate for purposes of such tax in the case of a nonresident of the United States who was not a citizen of the United States at the time of death.

*Effect of Venezuelan Withholding Taxes*   The Venezuelan withholding tax discussed under "Venezuelan Taxation" above should qualify as an "income tax" for United States federal income tax purposes, provided, among other factors, that the amount of such tax is not considered used by the Republic to provide a subsidy by any means to a United States Holder, a related person, or any party to the transaction or to a related transaction. If any such subsidy is considered provided to any such person, a United States Holder should not be required to include the Additional Amount paid in respect of Venezuelan withholding tax in income and would not be allowed to claim a foreign tax credit or a deduction for such Venezuelan withholding tax. If the Venezuelan withholding tax qualifies as an "income tax" for United States federal income tax purposes (*i.e.*, if, among other factors, no such subsidy is considered provided), a United States Holder will be required to include the Additional Amounts paid in respect thereof in income and may be entitled to claim a U.S. foreign tax credit for and in the amount of such Venezuelan taxes against such holder's United States federal income tax liability with respect to amounts attributable to interest on the Global Bonds, subject to certain limitations. Alternatively, a United States Holder may be entitled to deduct such amounts. The calculation and availability of a tax credit or a deduction for Venezuelan taxes involve the application of complex rules that depend upon the United States Holder's particular circumstances. United States Holders should consult their own tax advisors with respect to the availability and calculation of such credit or deduction.

*Backup Withholding and Information Reporting.*   In general, information reporting requirements will apply to payments within the United States to non-corporate United States Holders of interest on a Global Bond and, under certain circumstances, of the proceeds of the sale of a Global Bond, and "backup withholding" at a rate of 31% will apply to such payments if the United States Holder fails to provide an accurate taxpayer identification number or is notified by the Internal Revenue Service that it has failed to report all interest and dividends required to be shown on its federal income tax return.

Under current U.S. Treasury Regulations, backup withholding and information reporting will not apply to payments made by the Republic or any agent thereof (acting in such capacity) to a holder of a Global Bond that is a Non-United States Holder so long as either (i) the beneficial owner of the Global Bond certifies to the Republic or its agent, under penalties of perjury, that such holder is not a United States Holder and provides the name, address and taxpayer identification number of such holder or (ii) the holder has otherwise established an exemption, and provided that neither the Republic nor its agent has actual knowledge that the holder is a United States Holder or that the conditions of any exemption are not in fact satisfied. Similar rules requiring information reporting and, in certain circumstances, backup withholding will apply with respect to gross sales proceeds if the Global Bonds are sold through certain brokers. Recently promulgated regulations which are scheduled to become effective on January 31, 1999, provide that a payment to an entity treated as a foreign partnership will be treated in certain circumstances as having been made directly to the persons treated as partners of such foreign partnership, and require in those circumstances that each partner provide a certification under penalties of perjury to establish that such person is not a United States Holder for purposes of the backup withholding rules.

## UNDERWRITING

Venezuela has entered into an Underwriting Agreement dated July 30, 1998 with J.P. Morgan Securities Inc., Credit Suisse First Boston Corporation and ABN AMRO Incorporated (the "Underwriters"). Pursuant to the terms and conditions of the Underwriting Agreement, Venezuela has agreed to issue and sell, and each of the Underwriters has severally agreed to purchase the following respective principal amounts of the Global Bonds.

| Underwriter | Principal Amount of Notes |
|---|---|
| J.P. Morgan Securities Inc. | U.S.$425,000,000 |
| Credit Suisse First Boston Corporation | 50,000,000 |
| ABN AMRO Incorporated | 25,000,000 |
| Total | U.S.$500,000,000 |

The Underwriting Agreement provides that the obligations of the Underwriters are subject to certain conditions precedent, and that the Underwriters will be obligated to purchase all of the Global Bonds if any are purchased.

The Underwriters have advised Venezuela that they propose initially to offer the Global Bonds to the public at the public offering price set forth on the cover page of this Prospectus Supplement, and to certain dealers at such price less a concession not in excess of 0.50% of the principal amount of the Global Bonds. The Underwriters may allow and such dealers may reallow a concession not in excess of 0.25% of the principal amount of the Global Bonds. After the initial public offering, the public offering price and such concessions may be changed.

Each of the Underwriters has agreed that it has complied and will comply with all applicable provisions of the Financial Services Act 1986 with respect to anything done by it in relation to the Global Bonds offered hereby in, from or otherwise involving the United Kingdom.

Each of the Underwriters has agreed that it will not offer or sell any Global Bonds directly or indirectly in Japan or to, or for the benefit of, any Japanese person or to others for re-offering or re-sale directly or indirectly in Japan or to any Japanese person except under circumstances which will result in compliance with all applicable laws, regulations and guidelines promulgated by the relevant governmental and regulatory authorities in effect at the relevant time. For purposes of this paragraph, "Japanese person" shall mean any person resident in Japan, including any corporation or other entity organized under the laws of Japan.

The Global Bonds may not be offered or sold directly or indirectly in Hong Kong by means of this Prospectus Supplement or any other offering material or document other than to persons whose ordinary business it is to buy or sell shares or debentures, whether as principal or as agent. Unless permitted to do so by the securities laws of Hong Kong, no person may issue or cause to be issued in Hong Kong this document or any amendment or supplement thereto or any other information, advertisement or document relating to the Global Bonds other than with respect to Global Bonds intended to be disposed of to persons outside Hong Kong or to persons whose business involves the acquisition, disposal or holding of securities, whether as principal or as agent.

In connection with the offering of the Global Bonds, the Underwriters may purchase and sell Global Bonds in the open market. These transactions may include over-allotment and stabilizing transactions and purchases to cover short positions created by the Underwriters (for themselves or a syndicate, if there is a syndicate) in connection with the offering. Stabilizing transactions consist of certain bids or purchases for the purpose of preventing or retarding a decline in the market price of the securities; and short positions created by the Underwriters (for themselves or a syndicate, if there is a syndicate) involve the sale by the Underwriter of a greater number of securities than they own or have a right to purchase. These activities may stabilize, maintain or otherwise affect the market price of the Global Bonds which may be higher than the price that might otherwise prevail in the open market; and these activities, if commenced, may be discontinued at any time. These transactions may be effected on the Luxembourg Stock Exchange, in the over-the-counter market or otherwise.

Venezuela has agreed to indemnify the several Underwriters against certain civil liabilities, including liabilities under the Securities Act.

Certain of the Underwriters and their affiliates have engaged in transactions with and performed various commercial banking and investment banking and other services for Venezuela in the past, and may do so from time to time in the future.

## VALIDITY OF THE GLOBAL BONDS

The validity of the Global Bonds will be passed upon for Venezuela by Arnold & Porter, 399 Park Avenue, New York, New York, 10022, United States counsel to Venezuela, and by Lares, Ramos, Ferriera y Vera, S.C., Centro Banavén, Oficina C-22, Avenida La Estancia, Chuao, Caracas 1061, Venezuela, Venezuelan counsel to Venezuela, and for the Underwriters by Sullivan & Cromwell, 125 Broad Street, New York, New York, 10004, United States counsel to the Underwriters, and by Tinoco, Travieso, Planchart, Núñez & Eiris, Avenida Francisco de Miranda, Torre Country Club, Pisos 1, 2 y 3, Chacaíto, Caracas 1050, Venezuela, Venezuelan counsel to the Underwriters. As to all matters of Venezuelan law, Arnold & Porter may rely on the opinion of Lares, Ramos y Ferreira y Vera, S.C. and Sullivan & Cromwell may relay on the opinion of Tinoco, Travieso, Planchart, Núñez & Eiris. As to all matters of United States law, Lares, Ramos, Ferreira y Vera, S.C. may rely on the opinion of Arnold & Porter and Tinoco, Travieso, Planchart Núñez & Eiris may rely on the opinion of Sullivan & Cromwell.

## AUTHORIZED REPRESENTATIVE

The Authorized Representative of the Republic of Venezuela in the United States of America is Pedro Luis Echeverría, Ambassador of the Republic of Venezuela, Embassy of the Republic of Venezuela, 1099 30th Street, N.W., Washington, D.C. 20007.

## GENERAL INFORMATION

### Due Authorization

The creation and issue of the Global Bonds have been authorized pursuant to Presidential Decree No. 2,576, dated July 1, 1998, as published in the Official Gazette of the Republic of Venezuela No. 36,496 dated July 15, 1998, enacted pursuant to Article 3 of the Law that Authorizes the National Executive to Execute and Perform Public Credit Transactions during Fiscal Year 1998, as published in the Official Gazette of the Republic of Venezuela No. 36,351, dated December 9, 1997.

### Listing and Listing Agent

Application has been made to list the Global Bonds on the Luxembourg Stock Exchange. The Luxembourg Listing Agent, from whom copies of the Global Bond Offering materials may be obtained in Luxembourg, is Banque Internationale á Luxembourg S.A., 69 route d'Esch, L-1470 Luxembourg.

### Litigation

Neither the Republic nor any governmental agency of the Republic is involved in any litigation or arbitration or administrative proceedings relating to claims or amounts which are material in the context of the Global Bond Offering or issue of the Global Bonds and which would materially and adversely affect the Republic's ability to meet its obligations under the Global Bonds and the Fiscal Agency Agreement with respect to the Global Bonds and no such litigation or arbitration or administrative proceedings are pending or, so far as the Republic is aware, threatened.

**Documents Relating to the Global Bonds**

Copies of the Fiscal Agency Agreement, the Banco Central Undertaking and the form of Global Bond may be inspected during normal business hours on any weekday (Saturdays, Sundays and public holidays excepted) at the specified offices of the Fiscal Agent and Paying Agents.

**Information on the Republic**

If any Global Bonds are listed on the Luxembourg Stock Exchange, copies of the most recent *Informe Economico Anual del Banco Central de Venezuela* and budget of the Republic for 1994, 1995 and 1996 and each subsequent year, (as or when available), or if any such materials cease to be published, comparable economic information of the Republic may be obtained at the office of the listing agent for the Global Bonds and at the office of the Fiscal Agent during usual business hours on any day (Saturdays, Sundays and public holidays excepted).

**Clearing**

The Global Bonds have been accepted for clearance through Euroclear, Cedel Bank and DTC (Common Code: 8975540; ISIN: US922646AT10; CUSIP: 922646AT1).

PROSPECTUS

# Republic of Venezuela

## *Debt Securities*

The Republic of Venezuela (the "Republic" or "Venezuela") may from time to time offer debt securities consisting of bonds, debentures and/or notes ("Debt Securities") with an aggregate principal amount of up to $2,000,000,000 or the equivalent thereof in one or more other currencies or currency units; provided, however, the Republic may increase the foregoing aggregate principal amount if in the future it determines that it may wish to sell additional Debt Securities. Debt Securities will be offered in one or more series in amounts, at prices and on terms to be determined at the time of sale and to be set forth in supplements to this Prospectus (each a "Prospectus Supplement").

The terms of the Debt Securities, including, where applicable, the specific designation, aggregate principal amount, denominations, maturity, premium, discount, interest rate (which may be fixed, floating or zero) and time of payment of any interest, currency or currencies (including any currency unit) in which the Debt Securities are denominated or in which payments in respect of the Debt Securities may be made, terms for redemption or exchange at the option of the Republic or the holder (if any), terms for sinking fund payments (if any), the initial public offering price and the other terms in connection with the offering and sale of each series of the Debt Securities in respect of which this Prospectus is being delivered, will be set forth in one or more Prospectus Supplements relating to such series of Debt Securities. The net proceeds to the Republic from each such sale will also be set forth in such Prospectus Supplements. Such Prospectus Supplements may also set forth, if appropriate, information regarding developments relating to the affairs of the Republic subsequent to the date of this Prospectus.

The Debt Securities may be sold through agents designated from time to time, through underwriters or dealers, or directly by the Republic. If any agents of the Republic or any underwriters are involved in the sale of Debt Securities, the names of such agents or underwriters and any commissions or discounts will be set forth in the applicable Prospectus Supplement.

**THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

The date of this Prospectus is July 30, 1998.



No person has been authorized to give any information or to make any representations other than those contained in this Prospectus or any accompanying Prospectus Supplement, and, if given or made, such information or representation must not be relied upon as having been authorized. This Prospectus does not constitute an offer to sell or the solicitation of an offer to buy any securities other than the securities described in a Prospectus Supplement relating hereto or any offer to sell or the solicitation of an offer to buy such securities in any circumstances in which such offer or solicitation is unlawful. The delivery of this Prospectus at any time does not, under any circumstances, imply that the information herein is correct as of any time subsequent to the date hereof. The information contained in this Prospectus is qualified in its entirety by the supplementary information contained in the Prospectus Supplement.

# TABLE OF CONTENTS

|  | Page |
|---|---|
| Available Information | 4 |
| Official Statements | 4 |
| Enforcement of Civil Liabilities | 4 |
| Incorporation of Certain Documents by Reference | 5 |
| Use of Proceeds | 5 |
| Introduction | 6 |
| Republic of Venezuela | 11 |
| The Venezuelan Economy | 15 |
| Principal Sectors of the Venezuelan Economy | 43 |
| Financial System | 56 |
| Public Finance | 64 |
| Public Debt | 68 |
| Description of the Debt Securities | 76 |
| Plan of Distribution | 87 |
| Validity of the Debt Securities | 88 |
| The Banco Central Undertaking | 89 |
| Tables and Supplementary Information | 90 |

# Available Information

A Registration Statement with respect to the Republic and the Debt Securities has been filed with the Securities and Exchange Commission, Washington, D.C., under the Securities Act of 1933. Additional information concerning the Republic and the Debt Securities is to be found in such Registration Statement and any pre- or post-effective amendment thereto, including the various exhibits thereto, which may be inspected and copied at the public reference facilities maintained by the Securities and Exchange Commission at 450 Fifth Street, N.W., Room 1024, Washington, D.C., 20549, as well as at its Regional Offices located at Seven World Trade Center, New York, New York 10048 and at 500 West Madison Street, Chicago, Illinois 60661. Copies of such information can be obtained from the Public Reference Section of the Securities and Exchange Commission at 450 Fifth Street, N.W., Room 1024, Washington, D.C. 20549 at prescribed rates. In addition, a copy of the Registration Statement and such other information can also be obtained at the office of the paying and transfer agent in Luxembourg at 5 Rue Plaetis, L-2338, Luxembourg free of charge.

---

Except as otherwise specified, all amounts in this Prospectus are expressed in United States dollars ("dollars", "$", "U.S.$", "US$" or "U.S. dollars").

Certain amounts that appear in this Prospectus may not sum because of rounding adjustments.

---

# Official Statements

Information included herein which is identified as being derived from a publication of, or supplied by, Venezuela or one of its agencies or instrumentalities is included herein on the authority of such publication as a public official document of Venezuela. All other information herein and in the Registration Statement of which this Prospectus is a part is included as a public official statement made on the authority of Dra. Maritza Izaguirre, Minister of Finance. The information included herein on the authority of Banco Central de Venezuela ("Banco Central") is considered preliminary until Banco Central has published such information in its Annual Report of National Accounts for the year following the year to which such data relates.

# Enforcement of Civil Liabilities

The Republic is a foreign sovereign state. Consequently, it may be difficult for investors to obtain or realize upon judgments in the courts of the United States and Venezuela against the Republic. The Republic will irrevocably submit to the exclusive jurisdiction of the Supreme Court of the State of New York, County of New York or the United States District Court for the Southern District of New York, in the courts of England that sit in London and the courts of Venezuela that sit in Caracas in any suit, action or proceeding against it or its properties, assets or revenues, arising out of or relating to the Debt Securities of any series (a "Related Proceeding") and the Republic will irrevocably agree that all claims in respect of any Related Proceeding may be heard and determined in such New York State or federal courts, English courts or Venezuelan courts. The Republic will irrevocably waive, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of any Related Proceeding and any objection to any Related Proceeding on the grounds of venue with respect to Related Proceedings in any such courts. To the extent that the Republic has or hereafter may acquire any immunity (sovereign or otherwise) from jurisdiction of such courts or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) in such courts, the Republic will irrevocably agree not to claim and will irrevocably waive such immunity in respect of any Related Proceeding to the fullest extent permitted by law, and, without limiting the generality of the foregoing, the Republic will agree that such waivers shall have the fullest scope permitted under the Foreign Sovereign Immunities Act of 1976 of the United States (the "U.S. Immunities Act") and are intended to be irrevocable for purposes of the U.S. Immunities Act. See "Description of the Debt Securities—Jurisdiction and Waiver of Immunity" and "—Governing Law." Under the laws of the Republic, neither the Republic nor any of its property has any immunity from jurisdiction of any court or from set-off or any legal process (whether through

4

service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise), except that the Republic and its properties located in Venezuela have immunity from set-off, attachment prior to judgment, attachment in aid of execution of judgment and execution in actions and proceedings in Venezuela.

The Republic has not consented to service or waived sovereign immunity with respect to actions brought against it under United States federal securities laws or any state securities laws. In the absence of a waiver of immunity by the Republic with respect to such actions, it would not be possible to obtain a judgment in such an action brought in a United States court against the Republic unless such court were to determine that the Republic is not entitled under the U.S. Immunities Act to sovereign immunity with respect to such action. Further, even if a United States judgment could be obtained in any such action under the U.S. Immunities Act, it may not be possible to enforce in the Republic a judgment based on such a United States judgment. Execution upon property of the Republic located in the United States to enforce a United States judgment may not be possible except under the limited circumstances specified in the U.S. Immunities Act.

## Incorporation of Certain Documents by Reference

The Republic intends to file annual reports of Form 18-K with the U.S. Securities and Exchange Commission (the "Commission") on a voluntary basis. Each Annual Report on Form 18-K (including all exhibits thereto) and any amendments to such Form 18-K on Form 18-K/A (including all exhibits thereto) (collectively, a "Form 18-K") filed with the Commission by the Republic subsequent to the date of this Prospectus and prior to the termination of the offering of the Debt Securities shall be deemed to be incorporated by reference herein and into any accompanying Prospectus Supplement and to be a part hereof and thereof from the date of the filing of such documents and shall supersede and replace any prior Form 18-K. As used herein, the term "Annual Report' shall refer to any Form 18-K incorporated herein not superseded or replaced by operation of the preceding sentence. Any statement herein or contained in a document that is incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Prospectus or any accompanying Prospectus Supplement to the extent that a statement contained in the accompanying Prospectus Supplement or in any other subsequently filed document that is deemed to be incorporated by reference herein modifies or supersedes such statement. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Prospectus or of any accompanying Prospectus Supplement.

Any person receiving a copy of this Prospectus may obtain, without charge, upon request, a copy of any of the documents incorporated by reference herein, except for the exhibits to such documents (other than exhibits expressly incorporated by reference therein). Requests for such documents shall be directed to: Embassy of Venezuela, 1099 30th Street, N.W., Washington, DC 20007, Attn: Manuel Iribarren, Director of Economic and Petroleum Affairs; telephone: (202) 342-6823. Copies of the Prospectus and each Prospectus Supplement with respect to each series of Debt Securities that is listed on the Luxembourg Stock Exchange may also be obtained at the office of the paying agent and transfer agent in Luxembourg at 5 Rue Plaetis, L-2338 Luxembourg free of charge.

## Use of Proceeds

Unless otherwise specified in the applicable Prospectus Supplement, the net proceeds from the sale of Debt Securities will be used for the general purposes of the Republic, including the refinancing of domestic and external indebtedness of the Republic.

# Introduction

## General

Venezuela is situated on the northern coast of South America. It has a coastline on the Caribbean Sea and the Atlantic Ocean and is bordered on the west by Colombia, on the south by Brazil and on the east by Guyana. The capital of Venezuela is Caracas. At June 30, 1997, Venezuela had an estimated population of 22.6 million.

Venezuela has had a democratically elected government since 1958, following the overthrow of a military dictatorship. The most recent presidential election was held in December 1993 when Mr. Rafael Caldera, running as a coalition candidate for the Convergencia Party, was elected for a five-year term of office. Presidential elections are scheduled for December 1998. National legislative power is vested in the Congress. Venezuela is divided into 22 states, a federal district, a federal territory and various dependencies.

## The Venezuelan Economy

Venezuela has been a major petroleum exporter for most of the twentieth century. According to the *BP Statistical Review of World Energy 1996*, Venezuela is the seventh largest petroleum producer in the world and the fourth largest petroleum exporting country in the world. Petroleum revenues account for over 50% of fiscal revenues, and the petroleum industry accounts for approximately one-quarter of Venezuela's gross domestic product ("GDP") notwithstanding that it employs less than one percent of the total Venezuelan workforce. In 1997, revenues related to petroleum represented over 75% of Venezuela's total export revenues and over 60% of Venezuela's fiscal revenues.

Nevertheless, the Venezuelan economy is reasonably diversified, with nonpetroleum activities generating approximately three-quarters of GDP in recent years. Major components of nonpetroleum GDP include commerce, manufacturing and finance. The Government has introduced a number of measures to reduce its dependency on petroleum revenues, but it is anticipated that petroleum will continue to be the main source of export earnings and fiscal revenues for the foreseeable future.

## Economic Performance from 1989 to 1996

Beginning in 1989, the Government has implemented stabilization and structural adjustment reforms, first through a structural adjustment program launched in 1989 (the "Adjustment Program") and subsequently as a part of Agenda Venezuela, adopted in 1996, in an effort to correct fiscal, balance of payments, monetary and other macroeconomic imbalances evident in the Venezuelan economy. Economic policy measures under these programs have been aimed at reducing the role of the Government in the direct production and distribution of goods and services and in the Venezuelan economy in general in an effort to strengthen market forces in the economy. Such measures have included the liberalization of exchange, price and interest rate controls that had previously been imposed during periods of fiscal crises to address significant increases in inflation, capital account deficits and declines in the levels of international reserves.

The implementation of the Adjustment Program between 1989 and 1993 introduced important reforms in fiscal, exchange rate and monetary policies and produced positive results in growth of nonpetroleum GDP and improvement in international reserves. However, the Adjustment Program's effectiveness was undermined by political instability and adverse economic developments. In 1992, two coup attempts were launched by dissident factions within the Venezuelan military against the Government of then President Carlos Andrés Pérez. Although each coup attempt was successfully defeated in less than one day by forces loyal to the Government, these events had adverse effects on the continuation of the economic reform programs and policies contemplated by the Adjustment Plan. Further political instability occurred in 1993 when President Pérez was suspended by Congress in connection with allegations concerning the misapplication of Bs. 250 million in Government funds, and an interim administration led by President Ramón Velásquez, an independent Senator not associated with any of the major political parties, was appointed by the Venezuelan Congress to serve until the next regularly scheduled Presidential elections in December 1993.

Immediately following President Caldera's election in December 1993, a financial sector crisis of unprecedented severity was triggered by the collapse of Banco Latino, Venezuela's second-largest commercial bank. This crisis led the Caldera administration to undertake significant corrective measures. Such measures included the imposition of exchange and price controls and the fixing of foreign exchange rates in an effort to address significant outflows of international reserves and a substantial devaluation of the Bolivar against the U.S. dollar.

The financial sector crisis continued throughout 1994 and, to a lesser degree, 1995 as additional financial institutions suffered significant losses of deposits, requiring the Government to intervene in financial institutions representing approximately 54.6% of total financial sector deposits. By the end of 1995, the financial sector crisis had been stabilized and in 1996 the Government commenced the reprivatization of a number of financial institutions in which it had intervened during the early stage of the financial sector crisis.

## Agenda Venezuela

In April 1996 the administration of President Caldera began the implementation of Agenda Venezuela. The general objectives of Agenda Venezuela included the achievement of a sustainable low level of inflation, the stabilization and strengthening of the country's fiscal accounts, balance of payments and international reserves and structural reforms, all aimed at increasing the competitiveness and efficiency of the economy.

With the support of a standby agreement with the International Monetary Fund ("IMF"), Agenda Venezuela was conceived as a two stage program. During the first stage, from April 1996 to April 1997, measures adopted led to a stabilization of the Venezuela economy. The objective of the second stage was to initiate a wide-ranging program of structural reforms. The IMF standby agreement totalled U.S.$1.4 billion, of which U.S.$509 million was disbursed in accordance with Venezuela's balance of payments requirements during the availability period under the agreement and remained outstanding at June 30, 1998. The standby agreement contained a number of targets intended to promote greater flexibility in the economy through the removal of price and exchange controls, the reduction of the fiscal deficit through the adoption of measures to increase ordinary fiscal revenues and to reduce public expenditures including the elimination of subsidiaries for energy; the introduction of structural reforms, including privatization of state-owned banks and other public enterprises; and labor reforms.

Agenda Venezuela achieved positive results in its first year of implementation. Exchange and price controls were removed, and the Government implemented a unified, free-floating exchange rate of the Bolivar against the U.S. dollar and liberalized interest rates. These actions resulted, as expected, in a significant increase in inflation and a decrease in economic activity in the nonpetroleum sector of the economy. At December 31, 1996, year-end inflation, as measured by changes in the Consumer Price Index for the Caracas Metropolitan Area (the "CPI"), increased by 103.2%, the nonpetroleum sector of the economy declined by 3.6% in real terms, and the Bolivar experienced a devaluation against the U.S. dollar from a rate of Bs. 290=U.S.$1.00 at April 22, 1996 to Bs. 476.75=$1.00. However, Agenda Venezuela's programs helped to stabilize the Venezuelan economy. Along with increased petroleum revenues resulting from higher international petroleum prices and higher sales volumes in 1996, the Venezuelan consolidated public sector recorded a fiscal surplus of 7.5% of GDP, reversing four years of fiscal deficits. Gross international reserves at Banco Central increased by U.S. $5.5 billion and ended 1996 at U.S. $15.2 billion, their highest level since before the beginning of the Latin American debt crisis in the early 1980s. Inflation slowed in the second half of 1996, with the CPI recording an accumulated increase of 25.2% as compared to the 62.3% registered in the first half of 1996.

Notwithstanding the reduction in the rate of inflation since the introduction of the initial stabilization measures pursuant to Agenda Venezuela, the Venezuelan economy has suffered from high rates of inflation since the introduction of the Adjustment Program in 1989. In the past five years, inflation, as measured by the CPI, was 45.9% in 1993, 70.8% in 1994, 56.6% in 1995, 103.2% in 1996, and 37.6% in 1997, and based on accumulated inflation through the first half of 1998, it is anticipated that inflation for 1998 will be similar to that experienced in 1997. Such inflation has resulted from the Government's fiscal deficits, which in turn have been caused by an inefficient public sector and by the dependence of the fiscal accounts on cyclical international petroleum markets. The restructuring of the public sector in Venezuela, including the privatization of many state-owned entities and other steps contemplated to reduce the role of the Government in the economy, the creation of

a Macroeconomic Stabilization Fund to conserve for future use excess petroleum revenues (the "MSF") and improvements in the collection of nonpetroleum taxes, are intended to reduce the Government's dependency on international petroleum revenues and thereby help to contribute to a lessening of inflationary pressures in the Venezuelan economy.

## Recent Economic Results

In 1997, the Venezuelan economy continued to benefit from the policy measures adopted under Agenda Venezuela with the Venezuelan economy growing in real terms at a rate of 5.1% and consolidated public sector accounts recording a fiscal surplus of 2.6% of GDP. Gross international reserves at Banco Central continued to increase and stood at U.S.$17.8 billion at year end. The foregoing results were due in part to continued strong performance of the petroleum sector, including the opening of that sector to private investment. The Government was also able to implement further adjustments in its macroeconomic policies in 1997, including reforms in Venezuelan labor and social security laws and the privatization of the state-owned steel manufacturing company.

Beginning in the last quarter of 1997 and continuing to date, the Venezuelan economy has been adversely affected by a number of factors, including a significant drop in international oil prices due to increased worldwide petroleum production and lower worldwide demand as a result of the Asian economic crisis and warm weather patterns in North America caused by "El Niño," with Venezuela and other oil producing nations realizing lower per barrel oil prices than at any time in the past ten years. The Government currently estimates that oil revenues for 1998 could decrease by approximately U.S.$4.0 billion as compared to 1997 and that a recovery, if any, in the international oil markets during the remainder of 1998 and 1999 will be gradual.

The sharp decline in oil revenues, along with uncertainties created by the likely effect of the drop in oil revenues, in Venezuela's fiscal accounts, has caused a more rapid decline in the Bolivar/U.S. dollar exchange rate during 1998 to date and a drop in international reserves at Banco Central. For the first six months of 1998 gross international reserves fell by U.S.$2.3 billion, or 13.0%, as compared to year-end 1997, although current levels of international reserves remain at historically high levels as compared to recent years. The fall in demand for Bolivars due to concerns over the anticipated 1998 fiscal deficits in the consolidated public sector accounts and market perceptions concerning the sustainability of Banco Central's foreign exchange policy have increased demand for U.S. dollars, and the expectation of a significant devaluation of the Bolivar against the U.S. dollar has led to anticipatory price markup policies that have accentuated inflationary pressures. Some abatement of these tendencies was observed in June 1998, as higher interest rates, turning positive in real terms, and a concerted slowdown in public expenditures (including those of the national petroleum company, Petróleos de Venezuela, S.A. ("PDVSA")), have given greater credibility in the financial markets to the announced policy of reducing Government expenditures.

The foregoing events have led Banco Central to intensify its restrictive monetary policies, primarily through the issuance of certificates of deposit, and more recently, *Títulos de Estabilización Monetaria* ("TEMs"). Through such policies, domestic interest rates, which had been neutral or negative in real terms, have become positive. Banco Central has also taken measures to release pressure on Venezuela's international monetary reserves by increasing the rate of the crawling band for its system of currency exchange. For 1998, the Government set the initial central parity for its currency at Bs. 508.50 = U.S. $1.00 and a crawling band of 7.5% above and below the central parity. The monthly rate of increase of the central parity was adjusted from 1.16% to 1.28%. Banco Central's restrictive monetary and exchange rate policies have promoted positive real interest rates, which have begun to attract foreign investment inflows. At July 20, 1998, the Bolivar traded at Bs. 558.50 = U.S.$1.00.

As a result of the decline in oil revenues, combined with increased expenditures for salaries and pension benefits mandated by reforms passed in 1997 to Venezuela's labor laws, Banco Central currently projects a fiscal deficit in the consolidated public sector accounts for 1998 of approximately 4.4% of GDP. To address the decline in oil revenues, the Government has implemented a series of budget cuts under its 1998 Budget Law, including reductions in the Government's expenditures. In reducing its capital expenditures, the Government has cut back on capital transfers to state and local governments and certain investments. With respect to its current expenditures, the Government has reduced its expenditures on goods and services and made miscellaneous reductions.

The Government also expects to privatize certain of its assets during 1998, simultaneously generating additional foreign exchange revenues and decreasing the level of government expenditures.

In the longer term, the Government has begun to implement structural changes to mitigate the effects of oil price volatility. Under the proposed MSF, which has been approved by the finance committee of the Venezuelan Congress, in years in which the Government receives revenues from the petroleum sector in excess of the average of such revenues for the prior five years, such excess would be retained in special foreign currency accounts for use in later years in which petroleum revenues drop below certain levels. In addition, in 1997 the Venezuelan Congress approved the Debt Rescue Fund ("DRF"), pursuant to which a portion of the proceeds received by the Government under its privatization program and other extraordinary revenues would be specifically allocated for the servicing of public sector debt obligations rather than making such revenues available for general purposes. In its first year of operation, in excess of U.S.$400 million has been allocated to the DRF. Other programs under discussion or implementation include steps to increase the level of nonpetroleum fiscal revenues, such as the modernization of customs collection procedures. The Government also has submitted a bill to Congress that would amend the current wholesale sales tax and excise tax on certain luxury terms (collectively, the "LWT") into a broader-based value-added tax by expanding the reach of the LWT to the retail level and removing numerous exemptions. In furtherance of these programs, the Government reached an agreement with the IMF in June 1998 for a staff monitoring program for the period through December 31, 1998.

The inflation rate as measured by the CPI, on an annualized basis through June 30, 1998, was approximately 34%. The persistence of this inflationary trend is due in part to continued inflationary expectations resulting from the anticipated impact on the Government's fiscal accounts of the recent reforms of Venezuela's labor laws and the decline in oil revenues, increases in the prices of certain public goods and services, an increase in the minimum wage and increases in the prices of certain agricultural products due to adverse weather conditions caused by El Niño. The Government anticipates that its plans regarding the establishment of the MSF and the other steps taken to reduce the economy's dependence on international petroleum revenues and to reduce public sector expenditures should reduce the volativity of its fiscal accounts and lessen inflationary expectations over the longer term.

## Social Development

An important goal of Agenda Venezuela is the improvement of social development and social well-being among the Venezuelan population. The Government contemplates that its social development programs will be supported by financial and technical assistance from multilateral institutions, including the International Bank for Reconstruction and Development (the "World Bank") and the Inter-American Development Bank (the "IADB"). At the end of 1997, preliminary figures indicated that Venezuela's unemployment rate was 10.6%. In addition, as much as one-half of the population may be earning income in the informal sector of the economy. The percentage of poor and extremely poor among the Venezuelan population has increased from 39.4% in 1995 to 68.7% in the second half of 1997, in part due to the failure of wages to maintain balance with the high rates of inflation experienced in 1996 and 1997. In addition to seeking to stimulate real growth in the economy and thereby increase job opportunities, the Government aims at addressing these issues through an increased emphasis on the primary education system to improve educational and technological skills among the future Venezuelan workforce; a decentralization of health and education support systems; and a reform of the social security and pension systems. In June 1997, the Government adopted a series of long-awaited labor compensation reforms which are expected to provide greater flexibility in the labor markets. The reforms caused an increase in Government obligations for required severance compensation of approximately U.S.$8.0 billion, which under the new labor law are required to be paid out over a five-year period. The Government has submitted a proposed law to the Venezuelan Congress that would permit such obligations to be documented in a manner that will permit the satisfaction of such obligations over an extended period of years.

The Government recently entered into two separate loan agreements with the IADB, in principal amounts of U.S.$350 million and U.S.$45 million, respectively, and a U.S.$200 million loan agreement with Corporación Andina de Fomento ("CAF") (a multilateral development bank, the headquarters of which are located in Caracas), the proceeds of each of which will be used to reform the social security system.

# Principal Economic Indicators

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996[1] | 1997[1] |
| | (percentage change) | | | | |
| **Economic Activity** | | | | | |
| Real GDP Growth (Decline)[2] | 0.3% | (2.3)% | 3.7% | (0.4)% | 5.1% |
| Petroleum Sector | 7.1 | 4.7 | 7.4 | 7.7 | 8.8 |
| Nonpetroleum Sector | (1.3) | (3.9) | 2.1 | (2.8) | 3.3 |
| **Consumer Prices** | | | | | |
| End of year | 45.9% | 70.8% | 56.6% | 103.2% | 37.6% |
| Average | 38.1 | 60.8 | 59.9 | 99.9 | 50.0 |
| **Wholesale Prices** | | | | | |
| End of year | 47.4% | 89.5% | 54.3% | 100.0% | 27.5% |
| Average | 35.4 | 77.5 | 57.7 | 103.2 | 29.8 |
| Unemployment (in percent) | 6.3 | 8.5 | 10.2 | 12.4 | 10.6 |
| | (in millions of U.S. dollars, except where noted) | | | | |
| **Balance of Payments** | | | | | |
| Exports (f.o.b.) | $14,586 | $15,905 | $18,842 | $23,373 | $23,711 |
| Imports (f.o.b.) | (11,390) | (8,346) | (11,937) | (9,810) | (12,311) |
| Trade Balance | 3,196 | 7,559 | 6,905 | 13,563 | 11,400 |
| Current Account Surplus (Deficit) | (1,993) | 2,541 | 2,255 | 7,374 | 5,999 |
| Overall Balance | (653) | (893) | (1,126) | 6,549 | 3,445 |
| **International Reserves** | | | | | |
| Gross Banco Central Reserves | $12,656 | $11,507 | $9,723 | $15,229 | $17,818 |
| Liquid Banco Central Operating Reserves | 8,344 | 7,217 | 5,527 | 11,066 | 13,999 |
| Net Banco Central Reserves | 8,324 | 7,262 | 6,194 | 12,038 | 15,659 |
| FIV International Monetary Assets | 881 | 984 | 906 | 1,603 | 1,141 |
| Average Petroleum Export Price (U.S.$/barrel) | 13.34 | 13.23 | 14.84 | 18.39 | 16.31 |
| Imports Coverage[3] | 13.3 | 16.5 | 10.2 | 18.6 | 17.4 |
| | (in billions of 1984 Constant Bolivars) | | | | |
| **Consolidated Public Sector** | | | | | |
| Total Revenues | 136.5 | 155.4 | 145.2 | 201.4 | 191.0 |
| Total Expenditures | 154.0 | 231.2 | 177.6 | 160.2 | 175.0 |
| Overall Surplus (Deficit) | (17.5) | (75.8) | (32.4) | 41.2 | 16.0 |
| (as percentage of GDP) | (3.0)% | (13.2)% | (6.9)% | 7.3% | 2.6% |
| | (percentage change in real terms) | | | | |
| **Monetary Aggregates** | | | | | |
| Money Supply (M2) | (13.9)% | (8.5)% | (10.1)% | (25.8)% | 18.0 |
| Monetary Base | (24.3) | (3.2) | (17.6) | (8.5) | 30.3 |

(1) Preliminary figures.

(2) Based on constant Bolivars of 1984 purchasing power ("1984 Constant Bolivars").

(3) Number of Months of Imports covered by Gross Banco Central Reserves.

Source: *Banco Central*

# Republic of Venezuela

## Area and Population

Venezuela is situated on the northern coast of South America. It has a coastline of approximately 2,813 kilometers on the Caribbean Sea and the Atlantic Ocean and is bordered on the west by Colombia, on the south by Brazil and on the east by Guyana. Venezuela's national territory of approximately 916,445 square kilometers includes 72 islands in the Caribbean.

At June 30, 1997, Venezuela had an estimated population of 22.6 million. It is estimated that by the year 2000, 34% of all Venezuelans will be under 15 years of age, 62% will be between the ages of 15 and 64, and 4% will be 65 years of age or older.

Caracas, Venezuela's capital and largest city, is the political, financial, commercial, communications and cultural center of Venezuela. The population of metropolitan Caracas is approximately 3.6 million. Maracaibo, the nation's second largest city with an estimated population of 1.8 million, is located near Venezuela's most important petroleum fields and richest agricultural areas. The Venezuelan territory varies from tropical to mountainous to Amazonian regions, and environmentally protected areas comprise approximately 20% of the land. See "—Environment." Drug traffickers and guerilla incursions from Colombia present a minor but continuing problem on the sparsely populated western border, where Venezuelan armed forces have been stationed to control such incursions and to provide protection to Venezuelan ranchers residing in this area. Part of the eastern border with Guyana is subject to a latent border dispute in which Venezuela has claimed that certain territory occupied by Guyana should be considered part of Venezuela's national territory. The area of dispute is currently under the control of Guyana. Pursuant to the Geneva Agreement of February 17, 1966, which has been superseded by the Protocol of Port Spain dated June 18, 1970, Venezuela and Guyana have agreed to seek a negotiated settlement of the territorial dispute. Since the execution of the Geneva Agreement, Venezuela and Guyana have periodically undertaken negotiations regarding the status of the territory, but the negotiations to date have not resulted in a final accord. The Protocol of Port Spain does not contain any final date by which the parties must resolve the dispute.

The estimated labor force at September 30, 1997 was approximately 9.5 million, of whom approximately 12.4% were employed in the primary sector (agriculture and petroleum and mining exploration and extraction), approximately 19% in the secondary sector (manufacturing, petroleum refining, construction and water and electricity utilities) and approximately 57% in the tertiary sector (services, finance, transportation, communications and Government employment).

Programs to improve the social welfare of poor and extremely poor Venezuelans, estimated to represent 68.7% of the Venezuelan population at June 30, 1997, are part of Agenda Venezuela. See "The Venezuelan Economy—Historical Economic Performance—Agenda Venezuela and Economic Performance in 1996" and "—Poverty and Income Distribution; Education." The following table sets forth comparative GDP figures and selected other comparative social indicators for 1994 for Venezuela and other selected Latin American countries:

| | Venezuela | Argentina | Brazil | Chile | Colombia | Mexico | Peru |
|---|---|---|---|---|---|---|---|
| GDP (billions)[1] | $58.3 | $201.9 | $554.6 | $52.0 | $67.3 | $377.1 | $50.1 |
| Life expectancy at birth (years) . . . . . . | 72.1 | 72.4 | 66.4 | 75.1 | 70.1 | 72.0 | 67.4 |
| Infant mortality rate (per 1,000 births) . . | 22 | 23 | 45 | 13 | 26 | 32 | 52 |
| Adult literacy rate (%) | 91.0 | 96.0 | 82.7 | 95.0 | 91.1 | 89.2 | 88.3 |

(1) The United Nations calculates GDP and its components at purchaser values.

Sources: *United Nations Development Program Human Development Report, 1997; World Bank 1997 World Development Indicator (statistics for the largest seven economies of Latin America).*

## Form of Government and Political Parties

Venezuela, which is divided into 22 states, a federal district, a federal territory and various dependencies, has had a democratically elected government since 1958, following the overthrow of a military dictatorship. The Constitution of 1961 sets forth the structure of the government, individual and collective rights and duties, and the division of powers among the executive, legislative and judicial branches of government.

Executive power is vested in the President, who is elected for a term of five years. The President may not succeed himself or be reelected within ten years after the expiration of his term. The Ministers, who together constitute the Council of Ministers, are appointed by the President and head various executive departments. Pursuant to the Constitution, the President is the commander-in-chief of Venezuela's armed forces. The different services within Venezuela's armed forces report to the Minister of Defense.

Traditionally, the two largest political parties in Venezuela have been Acción Democrática ("AD") and Partido Social Cristiano ("Copei"). These parties attract support from a wide spectrum of political interests, and both parties are considered to be centrist. Between 1958 and 1993, representatives of AD held the presidency five times, and representatives of Copei held the presidency twice. In the most recent presidential election held in December 1993, Mr. Rafael Caldera of the Convergencia party ("Convergencia"), a recently formed party, was elected president for a five-year term with 30.5% of the vote. Mr. Caldera, who had previously served as President between 1969 and 1974, then as the head of Copei, ran in 1993 as a coalition candidate and defeated three other candidates, each of whom received between 21.9% and 23.5% of the vote. The Convergencia party was established among many followers of Mr. Caldera from Copei and has been run as a coalition comprised of a number of smaller parties. Mr. Caldera's election reflected the Venezuelan population's disenchantment with the established political parties and concerns over allegations of public mismanagement and corruption by the traditional majority parties.

The next presidential elections are scheduled for December 1998. The major candidates in the upcoming presidential election are Luis Alfaro Ucero, who has been nominated by AD; Enrique Salas Romer, an independent candidate and former governer of the State of Carabobo, one of Venezuela's most important industrial areas; Irene Saez, an independent candidate openly supported by Copei and Causa R and former mayor of the Chacao municipality in the Caracas federal district; Hugo Chavez, a former military officer who led an unsuccessful coup attempt against the Government of then President Carlos Andrés Pérez in 1992, currently running as an independent candidate openly supported by the Movimiento al Socialismo party ("MAS") and other leftist and socialist parties; Claudio Fermín, a former mayor of AD and former mayor of Caracas, currently running as an independent candidate nominated by Partido Renovación; and Miguel Rodríguez, an independent candidate and former cabinet minister and President of Banco Central during the Pérez administration who has been nominated by Partido Apertura, the political party founded by ex-president Carlos Andrés Pérez. Convergencia has not yet announced whether it will nominate its own candidate or support an existing candidate for this presidential election.

National legislative power is vested in the Congress, which consists of a Senate and a Chamber of Deputies. Both senators and deputies are elected by universal suffrage for terms of five years. As a result of electoral reform legislation passed in 1993, approximately one-half of the members of the Chamber of Deputies are elected through direct elections of individual candidates. The remainder are elected under a proportional representation system by which party leaders name deputies to seats allocated on the basis of the number of votes received by each party in each state.

Currently, of the 52 seats in the Senate, AD holds 16, Copei holds 14, Causa R, a relatively new party with roots in the Guayana labor movement which promotes labor and socialist policies, holds five, Patria para Todos, a party which recently separated from Causa R, holds four, Convergencia holds five, MAS holds six and the two remaining seats are held for life by former presidents of Venezuela in accordance with the Venezuelan Constitution. MAS, which was formed in the 1970s out of the former Venezuelan Communist Party, has shifted its emphasis

from a socialist orientation towards the support of a market-oriented economy. In the Chamber of Deputies, AD holds 27.1% of the seats, Copei 26.1%, Causa R 19.7%, Convergencia 12.8% and MAS 11.8%. Prior to the 1993 elections, either AD or Copei had traditionally held a majority or near-majority of each of the Senate and the Chamber of Deputies. The 1993 elections resulted in giving neither President Caldera nor his opponents a working majority in the Congress, and thus coalitions are required for the passage of legislation. Nonetheless, the Government has been able to date to enact into law legislation effecting the major policy objectives of Agenda Venezuela, such as the passage of the LWT, the opening of the petroleum sector to foreign and domestic private investment, the second stage of the privatization of Compañía Anónima Nacional Teléfonos de Venezuela ("CANTV"), the former state-owned monopoly fixed-switched telephony provider, and the privatization of C.V.G. Siderurgica del Orinoco, C.A. ("SIDOR"), the former state-owned steel manufacturing company, increases in domestic gasoline prices and the reform of severance liabilities, through a process of negotiation with the opposition parties and the formation of ad hoc coalitions. The Government intends to continue its policy of creating legislative coalitions in an effort to enact into law remaining items of structural reform contemplated by Agenda Venezuela during the remainder of its term ending December 1998. The next Congressional elections are scheduled for December 1998.

The Senate and the Chamber of Deputies have similar legislative powers. For a bill to become law, it must be approved by a majority of both bodies. Differences between the two chambers are resolved by majority vote of the Congress meeting in joint session. The Constitution provides for procedures by which the President may reject bills passed by Congress, as well as provisions by which Congress may override such Presidential veto acts.

Judicial power is vested in the Supreme Court of Justice (the "Supreme Court") and various lower tribunals. The Congress in joint session elects the 15 justices of the Supreme Court for nine-year staggered terms, one-third being elected every three years. The Supreme Court is the final court of appeal and has the power to declare null and void any laws, regulations or other acts of the executive or legislative branches which conflict with the Constitution. Venezuela is currently participating in a judicial reform program sponsored by the World Bank. With the support of a U.S.$30 million loan from the World Bank, the Government has introduced a number of reforms to help modernize the judiciary. These reforms include enhanced technology, training and a general restructuring of the courts. As of May 30, 1998, U.S.$5.2 million had been disbursed under this loan. The Government has also entered into a second agreement with the World Bank under which U.S.$4.7 million will be made available to modernize the Supreme Court, strengthen its administrative and investigative capacities and increase public access to the court process.

In each state, executive power is exercised by a governor who is elected by universal suffrage. State legislative power is vested in state assemblies whose members are also elected by universal suffrage. In early 1992, the electoral procedure for gubernatorial and municipal officials was reformed to require that two-thirds of all officials be elected directly by the electorate and the remaining one-third be elected under a proportional representation system through selection by the political parties based on the percentage of the vote received by candidates nominated by the political parties.

For the first time in over two decades, two military coup attempts were staged in 1992 against the Government of then President Carlos Andrés Pérez. Both attempts were short-lived and did not significantly interfere with normal economic activity. On December 6, 1992, less than two weeks after the second coup attempt, gubernatorial, mayoral and city council elections were held throughout Venezuela as originally scheduled. In May 1993, the Supreme Court of Justice determined that sufficient grounds existed to support a full trial against then President Pérez regarding allegations of the misapplication of Bs.250 million of Government funds. In accordance with the Venezuelan Constitution, the Venezuelan Senate then determined that a trial should take place and suspended President Pérez from office. The Venezuelan Congress then elected Mr. Ramón Velásquez, an independent Senator not associated with any of the major political parties, to serve as President until the scheduled Presidential elections in December 1993. Mr. Velásquez served in that position until Mr. Caldera was elected in December 1993 and began serving his term in March 1994.

## External Affairs and International Organizations

Venezuela is a member of the United Nations and a founding member of the Organization of American States. It is also a member of the IMF, the World Bank, the IADB, the Organization of Petroleum Exporting Countries ("OPEC"), the General Agreement on Tariffs and Trade ("GATT") and the World Trade Organization ("WTO").

Venezuela has traditionally consulted with various international agencies, such as the IADB, the World Bank and the IMF, regarding its economic programs, objectives, projections and policies. In particular, Venezuela complies with Article IV of the IMF Articles of Agreement, which provides that member countries carry out annual consultations with the IMF.

Venezuela is a member of the Andean Community, an Andean regional integration alliance, the current member countries of which are Bolivia, Ecuador, Colombia, Peru and Venezuela. Venezuela, along with the other members of the Andean Community, is currently seeking to join Mercosur.

Recently, Venezuela has signed several bilateral trade agreements, including with Chile and Mexico, and has entered into a number of other multilateral trading groups, including the G-3 Group with Mexico and Colombia and the Caribbean Community and Common Market ("CARICOM"). See "The Venezuelan Economy—Historical Economic Performance—Structural Adjustment Program, 1989-1993." Venezuela is also a member of the Latin American Integration Association ("ALADI"), an association which promotes and regulates trade within Latin America; the International Fund for Agricultural Development ("IFAD"), an association which promotes agricultural development primarily through the making of loans; and CAF.

## Environment

Venezuela is a sparsely populated country with a wide range of geographically extensive habitats, many of which remain practically undisturbed. Venezuela is one of the world's most biologically diverse countries and is classified by the World Wildlife Fund for Nature as a megadiverse country. For example, Venezuela is home to more than 21,000 species of vascular plants, 1,300 species of birds (out of a world total of 9,000 and including 40% of the known species of neotropical birds) and more than 300 species of mammals (18 of which are endangered).

Over the last 50 years, the Government has instituted a system of protected areas to manage and protect Venezuela's environment and natural resources. The protected areas now constitute approximately 20% of the national territory, compared to a world average of only 5%. In addition to preserving the environment and its rich biodiversity, the system of protected areas provides tangible economic and social benefits. Ecotourism is a developing sector of the Venezuelan economy. The protection of critical watersheds results in a good supply of potable water for the population as well as the national production and export of electricity. National parks are the source of 30% of the water supply to major urban areas, as well as 30% of the water used by Venezuelan hydroelectric dams.

A body of environmental legislation and an extensive legal system of management and enforcement are in place. Venezuela has ratified 72 international treaties related to the environment. Medium- and long-term environmental goals and related rules are set forth in the Organic Law of the Environment of 1976 and the Organic Zoning Law of 1983. Venezuelan environmental law is administered and enforced by the Ministry of the Environment and Renewable Natural Resources ("MARNR"), which was founded in 1976 and has broad authority to issue regulations. MARNR also supervises, plans and administers all aspects of the enjoyment, conservation, defense and improvement of the environment. Laws regarding municipalities and decentralization allow for the sharing and delegation of federal authority.

MARNR's policies include strategies and programs intended to: (i) promote development through a rational apportionment of renewable natural resources that stimulate the growth of industry, tourism and commerce, while minimizing adverse effects upon society and the environment; (ii) improve standards of living by securing a potable water supply, a healthy environment, the treatment of toxic or dangerous waste products and the control of contamination; and (iii) develop and apply clear, precise regulations that facilitate the adequate and enforcement of environmental policies.

Both the judiciary and MARNR became empowered to enforce environmental law standards through the Environmental Penal Law of 1992. This law calls for criminal sanctions for acts that violate Venezuelan environmental laws and regulations as well as for equitable remedies including injunctions, restitution and reparation. Claims may be brought by both the Government and individuals.

# The Venezuelan Economy

## Overview

While for most of the 20th century Venezuela has been a major petroleum exporter, the Venezuelan economy is reasonably diversified, with nonpetroleum activities generating approximately three-quarters of GDP in recent years. The major components of nonpetroleum GDP in 1997 included manufacturing (16.5%), financial institutions (12.9%), and commerce (11.8%). Nonetheless, the structure of the Venezuelan fiscal system has been highly dependent on petroleum revenues, with petroleum revenues accounting in recent years for approximately three-quarters of Venezuela's foreign exchange earnings and over 50% of Venezuela's ordinary fiscal revenues.

Since 1989, the Government has implemented, as part of the Adjustment Program and subsequently as part of Agenda Venezuela, economic policy measures aimed at reducing the role of the Government in the direct production and distribution of goods and services and in the Venezuelan economy in general. See "—Historical Economic Performance—Structural Adjustment Program, 1989-1993" and "—Economic Performance in 1996 and Agenda Venezuela." To achieve these objectives, the Government has reduced and rescinded import controls and other forms of licensing and implemented a privatization program. Although some of these efforts have been adversely affected by the actions taken by the Government in addressing the financial sector crisis (see "—Historical Economic Performance—The Financial Sector Crisis and Economic Performance in 1994"), the Government anticipates a continuation of these efforts in promoting private sector development in 1998 and the following years. These efforts are intended to refocus the Government's role toward directing its resources to the provision of basic infrastructure, health, safety and education services, particularly to the poorer segments of the population.

Notwithstanding the Government's efforts, the Venezuelan economy remains a mixed economic system in which both the public and private sectors are active participants. The Government, through PDVSA and Corporación Venezolana de Guayana ("CVG"), controls significant proportions of GDP in the petroleum, mining and basic industries sectors of the economy. In addition, the Government supplies the majority of basic services such as water, electricity, health and education. Through PDVSA, the Government also accounts for the bulk of Venezuela's total exports. Most other economic activities are owned and operated by the private sector.

## Historical Economic Performance

### Structural Adjustment Program, 1989–1993

Following the inauguration of the Pérez administration in February 1989, the Government adopted a structural adjustment program (the "Adjustment Program") aimed at correcting the severe macroeconomic imbalances, including continued fiscal and capital account deficits and declines in the level of Venezuela's international reserves, that had constrained economic growth in Venezuela in the 1980s. The Adjustment Program had as its objective the transformation of the Venezuelan economy from an economy based on the general subsidization by the petroleum industry of all other sectors of the economy to a broader-based, competitive economy not tied to trends in international petroleum prices that would promote sustainable long-term growth. The Adjustment Program relied on the elimination of many general subsidies in the Venezuelan economy to balance the fiscal accounts and the introduction of a competitive exchange rate to balance external accounts. By adopting a unified floating exchange rate, the Government eliminated a *de facto* system of generalized price subsidies created by a multiple exchange rate system applied to certain consumer goods, decreased imports and promoted nonpetroleum exports. The Government also announced the implementation of a program of gradual increases in the price of many public sector goods and services, including gasoline, electricity and water. The Government liberalized domestic interest rates by removing limits on the maximum interest rates chargeable on loans and payable on

deposits so as to enable such rates to be set by market forces. The removal of such prior limits permitted interest rates to be become positive in real terms, which in turn helped to promote private sector savings and reduce incentives for capital flight. Combined with an improvement in international petroleum prices in 1990, the Adjustment Program was successful in rapidly restoring general macroeconomic equilibria: the deficit of the consolidated nonfinancial public sector was reduced from 8.6% of GDP in 1988 to 1.1% in 1989. By 1990 a surplus of 0.2% of GDP was achieved; and the current account shifted from a deficit of 10.4% of GDP in 1988 to a surplus of 5% and 4% of GDP in 1989 and 1990, respectively. The Adjustment Program also resulted, however, in an 8.6% decrease in GDP in 1989 as the economy adjusted to new prices and shifted away from the production of import substitutes toward the manufacture of products in which Venezuela possessed a competitive advantage. Following the removal of most price controls, excluding those on a basket of basic foodstuffs and transportation, consumer prices increased during March and April 1989 to more realistic levels. Inflation for 1989, as measured by the change in the CPI, reached 81.0%, although excluding the adjustment in March and April 1989 the average monthly increase during 1989 was 2.8%.

A major part of the fiscal policy and public sector restructuring policy was the privatization of public assets. As previously noted, in 1991 the Government sold 40% of CANTV to an international consortium led by GTE Corporation for U.S.$1.9 billion, a 40% interest in the state airline, VIASA, to Iberia Airlines, a cellular telephone band concession to a consortium led by BellSouth, several commercial banks and other assets.

In order to open the Venezuelan economy, the Government took a number of steps commencing in 1989 with the lowering of tariffs and the removal of non-tariff barriers. The Government acceded to GATT in September 1990 and in addition entered into a number of bilateral and multilateral trade alliances. Venezuela concluded free-trade agreements with Colombia, Chile, Ecuador, Mexico and the CARICOM countries and promoted the creation of a free trade zone among the Andean Community countries within the framework of the Cartagena Agreement. In addition, Venezuela pursued free-trade agreements with certain countries of Central America. As a result of the free trade agreement with Colombia, Colombia has become the largest market for non-oil Venezuelan exports, which reached U.S.$1.3 billion in 1996, representing a U.S.$229 million increase from the previous year. In April 1991, Venezuela entered into a framework agreement with the United States to promote increased trade and investment.

The Government also commenced a program of financial sector reform in an effort to permit greater transparency and market forces in the financial intermediation process. Banco Central freed interest rates to match demand, allowing rates for loans and deposits to float within wide bands. In addition, the Government adopted a new law for Banco Central which was designed to provide for greater independence. See "Financial System—Banco Central."

Despite certain macroeconomic disruptions associated with the implementation of the Adjustment Program, including the significant devaluation of the Bolivar against the U.S. dollar in 1989 upon the freeing of exchange rate controls and an increase in inflation as a result thereof, the Venezuelan economy substantially improved its internal and external financial positions during the period from 1990 through 1992. By 1993, however, political uncertainties caused by two unsuccessful coup attempts in 1992 and elections scheduled for the end of 1993, as well as high interest rates and contraction in the rate of GDP growth in the nonpetroleum sector of the Venezuelan economy, led to a slowdown in economic activity.

### The Financial Sector Crisis and Economic Performance in 1994

Political difficulties and changes during 1993, including the suspension of former President Pérez, the appointment of the interim Velásquez administration and upcoming congressional and presidential elections, contributed to an atmosphere of increasing commercial uncertainty and a deterioration in the economy. The economic situation deteriorated further when, in January 1994, the Government was forced to intervene in, and temporarily close, Banco Latino, Venezuela's second-largest commercial bank with deposits of over Bs.134.3 billion (approximately U.S.$1.3 billion). The temporary closure of Banco Latino caused depositors at several other large Venezuelan banks to question the solvency of those institutions. As a result, an additional eight financial institutions were forced to seek more than Bs.500 billion (approximately U.S.$4.0 billion) in financial assistance from *Fondo de*

*Garantía de Depósitos y Protección Bancaria* ("FOGADE") during the first six months of 1994. In addition, FOGADE capitalized Banco Latino, prior to its reopening, with Bs.300 billion (approximately U.S.$2.4 billion). In connection with its financial assistance, FOGADE received collateral, including real estate properties, loan portfolios and other assets, as security for the repayment of such assistance.

Although the financial sector crisis appeared to be triggered by the Government's intervention in Banco Latino, the crisis soon proved to be the result of a number of systemic factors including: (i) internal mismanagement regarding loans and investments, including certain alleged fraudulent transactions; (ii) lack of efficient supervision within both the system and the individual institutions; (iii) low capitalization levels in the banking system; (iv) general inefficiencies in the banking sector resulting from an overcapacity of institutions and high transaction costs; (v) unsupervised and unregulated investments in off-shore banks and loans to interrelated companies with poor credit; (vi) sustained high interest rates coupled with inflation, which increased the levels of arrears in loan portfolios; and (vii) general macroeconomic instability in Venezuela. The passage of amendments to the General Law of Banks and other Financial Institutions in January 1994 and subsequent developments in the Venezuelan financial sector have resulted in improvements in many of the areas of weakness in the financial sector that caused the financial sector crisis. See "Financial System—Financial Institutions."

On March 8, 1994, Congress passed special laws that retroactively raised the upper limit on insured deposits from Bs.1,000,000 to Bs.4,000,000 and raised the insurance fees that local banks were required to pay semiannually to FOGADE from 0.25% to 1.0% of a bank's total deposits (excluding deposits of public sector entities). In June 1994, the Republic issued Bs.400 billion (approximately U.S.$2.4 billion) in domestically placed government bonds, with staggered maturities, for placement in the market by FOGADE. It was anticipated that the issuance of the government bonds would permit FOGADE to repay a portion of the money that FOGADE borrowed from Banco Central (approximately U.S.$6.9 billion) to assist troubled financial institutions. However, this objective was not achieved because FOGADE was forced to use the proceeds to pay depositors for their insured deposit amounts and to provide capital to certain of the nationalized financial institutions. Banco Central and FOGADE subsequently negotiated terms for the repayment of the debt owed by FOGADE to Banco Central. The current terms set forth in the *Ley de Regulación de la Emergencia Financiera* permit FOGADE to repay the loan with bonds issued by FOGADE with maturities of no more than 30 years and interest rates not higher than 5.0%.

Government intervention in the financial sector in 1994 caused a significant increase in the monetary base in nominal terms, which in turn resulted in an acceleration in inflation and exchange rate deterioration. On June 29, 1994, pursuant to Decree No. 248, the *Junta de Emergencia Financiera* ("Financial Emergency Board" or the "Board") was created to manage and supervise the remaining financial institutions. The Board was given broad powers to prevent the failure of additional financial institutions, including the powers to hire and dismiss directors and managers; expropriate assets from troubled institutions; and direct and approve the purchase of all shares of a troubled financial institution that had been pledged to the Government in exchange for FOGADE's financial assistance as described above. The Board superseded in authority both FOGADE and the Superintendency of Banks. Members of the Board included the Minister of Finance, the President of Banco Central, and three individuals appointed by the President of the Republic. The flight of private capital due to the financial crisis during the first half of 1994 accounted for a significant portion of the U.S.$3.8 billion drop in Venezuela's foreign reserves during that period. The continuing adverse economic conditions and pressures on the rate of inflation, exchange rates and the level of international reserves led the Government in July 1994 to implement an exchange control regime and to adopt price controls in an effort to control inflation and support Venezuela's international reserves position.

During the period following the introduction of exchange and price controls, the financial sector continued to experience additional disruptions. In August and September 1994, the Board discontinued financial assistance to troubled banks and instead acquired for nominal consideration Banco de Venezuela, Banco Consolidado and Banco Andino, which together held approximately 15.0% of the financial system's total deposits. On December 13, 1994, the Board intervened and closed Banco Progreso, and distributed certain of its liabilities among all the public sector banks. On January 31, 1995, the Board intervened and closed Banco Italo Venezolano, Banco

Profesional and Banco Principal and distributed certain of their liabilities among the public sector banks. The last bank intervened and closed was Banco Empresarial in August 1995. The total cost to the Government of the financial sector crisis was approximately Bs.2,563 billion in nominal terms (approximately U.S.$16.8 billion).

By the third quarter of 1995, the financial sector's position had stabilized. Two foreign banks, ING Bank and ABN AMRO, opened operations in Venezuela in March and October 1995, respectively. By the end of 1996 the financial crisis had been overcome, and three banks and several assets owned by financial institutions acquired by the Government during the financial crisis were reprivatized in December 1996, raising more than Bs.406 billion. See "—Agenda Venezuela and Economic Performance in 1996" and "Financial System—Financial Institutions."

In 1994, after four consecutive years of growth, the Venezuelan economy, as measured by GDP, contracted in real terms by 2.9%. The lower level of economic activity contributed to an increase in the unemployment rate in 1994 to 8.5%, compared to the 1993 unemployment rate of 6.3%. The balance of payments registered a deficit of U.S.$893 million in 1994 despite a significant surplus in the current account of U.S.$2.5 billion, which surplus was principally attributable to an increase in petroleum exports and a decrease in imports of 26.7%, caused primarily by the imposition of exchange controls. The capital account registered a deficit of U.S.$3.2 billion, partially attributable to a lack of external financial resources. An acceleration in prices and exchange rates as well as an increase in the monetary base due to government intervention in the financial sector contributed to an increase in inflation in 1994 as measured by the CPI of 70.8% for 1994, compared to 45.9% in 1993.

### Economic Performance in 1995

The Venezuelan economy grew during 1995, with preliminary figures showing an increase in GDP of 3.7%. This increase was attributable principally to increased production and exports of petroleum and to higher international petroleum prices. Preliminary figures also indicate that the private sector experienced a gradual decline, principally in the areas of commerce, financial institutions and construction.

The consolidated nonfinancial public sector registered a deficit of 6.9% of GDP, an improvement over the 13.2% deficit recorded in 1994. The decrease in the public sector deficit was due to a decrease in Government spending and a readjustment of Venezuela's investment plans in order to regain access to local and international financial markets in light of Venezuela's economic situation. The current account surplus decreased from U.S.$2.5 billion at year-end 1994 to U.S.$2.3 billion for 1995, primarily as a result of a 37.2% increase in imports. In addition, Venezuela's continued lack of access to the international capital markets, combined with continuing levels of amortizations of public and private indebtedness, led to a capital account deficit of U.S.$2.8 billion as of December 31, 1995. As of December 31, 1995, the balance of payments registered a deficit of U.S.$1.1 billion, as compared to the U.S.$893 million deficit registered in 1994.

Inflation for year-end 1995, as measured by the CPI, registered approximately 56.6%, compared to 70.8% for year-end 1994. The significant decrease can be principally attributed to the effects of the exchange and price controls. During 1995, unemployment increased to 10.2% from 8.5% in 1994.

Gross international reserves at Banco Central declined during 1995 by U.S.$1.8 billion and stood at U.S.$9.7 billion at December 31, 1995. Liquid operating reserves at Banco Central were at U.S.$5.5 billion at December 31, 1995. International monetary assets of FIV totalled U.S.$906 million at December 31, 1995.

### Economic Performance in 1996 and Agenda Venezuela

In April 1996, the Government began to implement Agenda Venezuela, which superseded the Adjustment Program implemented during the Pérez administration. See "—Structural Adjustment Program, 1989-1993." Agenda Venezuela is premised upon the acknowledgment that Venezuela's public sector is inefficient and rigid in its expenditure, labor and legal structures and that Venezuela's budget deficits have diverted required financial and technological investments from the productive sectors of the economy. These matters in turn have adversely affected social conditions and development, as real wages have decreased, public services have deteriorated and unemployment and inflation have increased.

The objectives of Agenda Venezuela include promoting social development, increasing the competitiveness and efficiency of the economy and its legal structure, stabilizing and strengthening the country's fiscal accounts, balance of payments and international reserves and achieving a sustainable low level of inflation. The following paragraphs describe certain principal objectives of Agenda Venezuela and the means by which Venezuela expects to achieve such objectives:

•   *Fiscal Policy.*    Agenda Venezuela contemplated an initial period of macroeconomic stabilization through integrated fiscal, monetary, exchange rate and financial sector policies. Through a process of reduced spending, privatization and increased collection of nonpetroleum taxes, Agenda Venezuela contemplates lowering the deficit in the consolidated public sector accounts. The consolidated public sector accounts recorded a surplus equivalent to 7.3% of GDP in 1996 and a surplus of 2.6% of GDP in 1997, after four consecutive years of deficits in the accounts.

To reduce governmental spending and increase fiscal revenues, Agenda Venezuela contemplates a number of institutional and legal reforms, including a reduction in the total number of Government employees and the creation of a more efficient system of budget preparation and administration through the adoption of a new law governing the budget and appropriations process. Once fully implemented, these reforms should help to remove public administration and budget rigidities and create a process of decentralization that allows the Government to set priorities for its expenditures, as opposed to the previous system in which the Government's expenditures were automatically assigned by formula without regard for the Government's current priorities, needs and strategies. Regarding reduction of Government spending, over 17,500 public sector employees were terminated in 1996. Regarding increases in revenues, on April 16, 1996, the Government increased domestic gasoline prices by approximately 800%. Prior to the increase, domestic gasoline prices had been heavily subsidized by the Government, resulting in substantial annual fiscal losses. In order to minimize the effects of the gasoline price increase on the poorer segments of Venezuelan society, the Government announced a subsidy for users of public transportation. On July 31, 1997, the Government again raised domestic gasoline prices by an average of 25.5% to adjust domestic gasoline prices to the equivalent export FOB price received by Venezuela from its petroleum exports.

In addition to increasing domestic gasoline prices, the Government has taken a number of other actions to increase revenues, including the reform of the tax collection process through *Servicio Nacional Integrado de Administración Tributaria* ("SENIAT") and the adoption of the LWT and a business assets tax. Further steps to improve fiscal revenues include the realization of increased receipts from the privatization of state-owned industries and the authorization of private investment in the petroleum sector to make needed capital investments in that sector. The Government also has realized revenues in 1996 and 1997 from the sale of the assets received by FOGADE in connection with the financial sector crisis. See "—The Financial Sector Crisis and Economic Performance in 1994" and "Financial System—Financial Institutions." The Government in the fourth quarter of 1996 completed the reprivatization of several large Venezuelan financial institutions acquired as a result of the financial sector crisis in 1994 and 1995, as well as the sale of 40% of CANTV (in addition to the 40% sold in 1991). FOGADE has continued its reprivatization efforts throughout 1997 and the first half of 1998 in the financial institutions, service, insurance and real estate sectors of the economy.

*Financing Policy.*    In order to provide the necessary resources and increase international reserves during the restructuring process, the Government's financing policy includes a consensual restructuring of Venezuela's bilateral and domestic indebtedness and a return to the domestic and international capital markets on an opportunistic basis. Between September 1996 and June 1997, Venezuela issued debt securities in the German and Euromarkets in the approximate aggregate principal amount of U.S.$700 million. In September 1997, the Republic issued Global Bonds in the aggregate principal amount of U.S.$4.0 billion in an exchange (the "1997 Global Bond Exchange") for an aggregate principal amount of U.S.$4.4 billion in principal amount of its outstanding Collateralized Fixed Rate Bonds Due 2020 (the "Par Bonds") and its Collateralized Floating Rate Bonds Due 2020 (the "Discount Bonds," and together with the Par Bonds, the "Brady Bonds"). The 1997 Global Bond Exchange enabled the Government to release U.S.$1.3 billion in

collateral covering the Brady Bonds, which collateral was transferred to Banco Central to reduce debt owed by the Government to Banco Central that was incurred by the Government to purchase the collateral for the Brady Bonds.

- *Monetary and Exchange Policy.* Agenda Venezuela contemplated a restrictive monetary policy. In April 1996, the Government announced a dismantling of the system of official controlled exchange rates instituted in July 1994 and the establishment of a unified, free-floating exchange rate with free convertibility. Such policies were intended to help stabilize prices and, along with the financing policies described above, to help maintain an acceptable level of international reserves. On July 8, 1996, Banco Central announced the establishment of a trading band for the Bolivar. For 1997, Banco Central established an initial central parity of Bs. 472=U.S.$1.00, effective January 2, 1997 and a crawling band of 7.5% above and below the central parity. On August 4, 1997, Banco Central modified the rate of increase of the central parity to 1.16% per month. Banco Central undertook this policy action to conform the crawling band to the actual results of the foreign exchange markets. For 1998, the Government set the initial central parity at Bs.508.50=U.S.$1.00 and a crawling band of 7.5% above and below the central parity. For the year 1998 the slope of the crawling band has been adjusted upward to a rate of 1.28% per month to allow for a reduction of the rate of real appreciation. At July 20, 1998, the Bolivar traded at Bs.558.50 = U.S.$1.00.

- *Stabilization Funds.* As an adjunct to the macroeconomic and social development programs being implemented as part of Agenda Venezuela, the Government has introduced a proposed law that seeks to provide fiscal stability to the Venezuelan economy through the savings of unanticipated revenues from petroleum sales. Through the establishment of the MSF, the Government would be obligated to reserve in special foreign currency accounts petroleum revenues received in any year that exceed the average of petroleum revenues for the prior five years, which excess amounts would be available for use in later years in which petroleum revenues drop below certain levels to provide supplementary funds for general budgetary purposes. In addition, Congress enacted a law for the establishment of the DRF, pursuant to which a portion of the  proceeds received by the Government under its privatization program and other extraordinary revenues would be specially allocated for the servicing of public sector debt obligations.

- *Social Development.* Agenda Venezuela recognizes that in order to position Venezuela successfully in the global economy, it is necessary to invest in social development. The social instability resulting from the decrease in real wages, under- and unemployment and the existence of a work force that lacks the educational and technological skills necessary to develop a competitive economy have impeded the Government's efforts to correct the current macroeconomic disequilibria. Among the contemplated reforms are an increased emphasis on the primary education system; a decentralization of health and educational support systems; technical and financial support for micro-enterprises (defined as entities with five or fewer employees and with assets of Bs.10 million or less); and a reform of the social security system, including health services, retirement funds and fringe benefits. On April 15, 1996, the Government announced a number of new social measures, including an increase in the family subsidy, an increase in the amount received pursuant to social security retirement pensions, an increase in public worker salaries, subsidies for public transportation and certain prescriptions and medicines, and the expansion of staple supply centers which distribute five key staples at a 40% discount from market prices. The Government has also reformed the labor law. See "—Employment and Labor."

The Government contemplates that its social development programs will be supported by financial and technical assistance from multilateral institutions, including the World Bank and the IADB. The Government has entered into a series of loan agreements with the World Bank and the IADB covering programs in the areas of social development, health, education, judicial reform and living conditions. The Government's loans from the World Bank and the IADB total U.S.$2.6 billion and U.S.$3.5 billion, respectively, of which approximately U.S.$1.7 billion and U.S.$1.6 billion, respectively, had been disbursed as of March 31, 1998. The proceeds of such multilateral loans will be directed to worker training programs; nutritional support for the youth segment of the population; and strengthening of the health and transportation sectors used by the poorer segments of the Venezuelan society. In addition, the Government has entered into two separate loan agreements with the IADB, in

the principal amounts of U.S.$350 million and U.S.$45 million, the proceeds of which will be used to reform the social security system. Under the U.S.$350 million loan, disbursements, which are to be made in three separate tranches, are contingent upon the Government's compliance with certain conditions concerning its macroeconomic policies and existing social security system. The Government believes that it has complied with all of the conditions precedent to disbursement of the first tranche under the loan agreement. The proceeds of the U.S.$45 million loan are to be used to cover certain ancillary costs relating to social security reform, including consulting fees and legal expenses. In March 1998, the Government entered into a U.S.$200 million loan agreement with CAF, the majority of the proceeds of which will be used to capitalize the social security system's pension fund. As a result of the loan with CAF, the Government expects to raise minimum monthly pension payments to Bs. 75,000 effective April 1, 1998.

With the support of the IMF, Agenda Venezuela has been designed in two stages. During the first stage, from April 1996 to April 1997, the Government adopted measures to stabilize the Venezuelan economy. The objective of the second stage has been to consolidate stabilization efforts and continue a wide-ranging program of structural reforms. In the first stage of the implementation of Agenda Venezuela, the Government entered into a 12-month standby agreement with the IMF for a total of U.S.$1.4 billion of which U.S.$509 million was disbursed in accordance with Venezuela's balance of payments requirements during the availability period under the agreement and remained outstanding at June 30, 1998. The standby agreement contained a number of targets intended to promote greater flexibility in the economy through the removal of price and exchange controls; the reduction of the fiscal deficit through the adoption of measures to increase ordinary fiscal revenues and to reduce public expenditures; the introduction of structural reforms, including privatization of the state-owned banks and other public enterprises; and labor reforms. In June 1998, the Government reached an agreement with the IMF for a staff monitoring program for 1998, the terms of which set targets for fiscal deficits and annual inflation.

Agenda Venezuela also contemplated that many of the financial institutions taken over by the Government during the financial sector crisis will be returned to private ownership and that improved regulation of the banking sector as a result of legal and regulatory reforms commenced in the beginning of 1994 will result in a stronger, more competitive financial sector. During the second half of 1996 and the first half of 1997, the Government successfully reprivatized three of the banks which it had intervened during the financial sector crisis, sold the branch networks of Banco Latino, and sold assorted assets and entities owned by the Venezuelan banks intervened by the Government in 1994 and 1995. In December 1997, the Government reprivatized Banco Popular y de los Andes. See "—Privatization Program" and "Financial System— Financial Institutions."

Agenda Venezuela achieved a number of positive results in its first year of implementation. Even though the inflation rate for year-end 1996 was 103.2%, the inflation rate slowed in the second half of 1996 with an accumulated increase of 25.2% compared to the 62.3% registered in the first half of 1996. As previously noted, the financial sector crisis was overcome in 1996 and three banks and several assets owned by financial institutions acquired by the Government during the crisis were privatized in December 1996, raising more than Bs.406 billion. Major foreign banking institutions, including Banco Bilbao Vizcaya, Grupo Santander and a large Chilean group, Infisa, participated in such acquisitions and, as a result, have active operations in the country. At December 31, 1997, all Venezuelan commercial banks were in compliance with internationally recognized minimum capital adequacy standards (the "Basle Standards"), and their profitability indicators have exhibited gradual improvement. See "Financial System—Financial Institutions."

Although the policy action items of Agenda Venezuela, including the devaluation of the Bolivar, the removal of price and interest rate controls and the increases in the prices of public sector goods and services such as domestic gasoline, have resulted in diminished purchasing power for the Venezuelan population, the Government believes that the Venezuelan public has been generally supportive of Agenda Venezuela. Although there were certain peaceful public protests in connection with the increases in the price of domestic gasoline, the majority of the Venezuelan population have accepted the increases in prices, unlike the situation encountered when the Government raised gasoline prices in 1989, at which time widescale riots resulted in over 250 deaths and significant property damage. The Government believes that the Venezuelan public shares the Government's principal goals of improving the competitiveness and efficiency of the Venezuelan economy with a sustainable low

21

level of inflation and understands that the adjustment actions taken under Agenda Venezuela have been necessary steps in accomplishing such goals notwithstanding their initial adverse effects on the Venezuelan population and economy.

According to preliminary figures, the Venezuelan economy, as measured by GDP, contracted 0.4% during 1996 notwithstanding the 7.7% growth experienced by the petroleum sector. The nonpetroleum sector contracted by 2.8%. The expansion in the petroleum sector is attributable to an increase in international demand, investments made within this sector by both national and international companies through the program to open the petroleum sector (see "Principal Sectors of the Venezuelan Economy—Petroleum and Natural Gas–The Opening of the Venezuelan Petroleum Sector") and increases in international oil prices. The contraction in the nonpetroleum sector can be attributed to a decrease in internal demand due to price adjustments and deterioration of salaries in real terms. Preliminary figures for 1996 show an increase in unemployment to 12.4% compared to 10.2% in 1995, with the highest unemployment levels in the construction (20%), manufacturing (11.3%) and services (11.1%) sectors.

The consolidated public sector registered a surplus equivalent to 7.3% of GDP in 1996 which reversed the previous year's deficit of 6.9% of GDP. This result was achieved through an increase in fiscal revenues resulting from, among other measures, an increase in the I.W.T from 12.5% to 16.5%, an increase in the domestic price of gasoline by approximately 800%, adjustments in certain public service tariffs and improvements in Venezuela's tax collection systems. The oil royalty payment from PDVSA increased as a result of increased oil exports during the year. The central Government registered a deficit equivalent to 0.6% of GDP compared to the previous year's deficit of 4.3% of GDP.

In 1996, the balance of payments registered a surplus for the first time in five years, reaching U.S.$6.5 billion. This surplus can be attributed to a trade surplus of U.S.$12.2 billion, which allowed the current account balance to increase by U.S.$5.1 billion over its level in 1995. The positive results for 1996 were achieved as a result of substantial increases in the dollar value of oil exports and a significant increase in foreign direct investment in Venezuela. Also, an additional 40% of CANTV was sold by FIV in 1996 in an initial public offering listed on the New York and Caracas Stock Exchanges. The CANTV initial public offering included a feature intended to help to promote stock ownership among Venezuelan citizens. See "Financial System—Securities Markets." The increased investment in both the financial and petroleum sectors contributed significantly to a reduction in the capital account deficit from U.S.$2.8 billion in 1995 to U.S.$518 million in 1996.

Gross international reserves at Banco Central increased by U.S.$5.5 billion during 1996, and stood at U.S.$15.2 billion at December 31, 1996. Liquid operating reserves at Banco Central totaled U.S.$11.1 billion at year end 1996, and net international reserves at Banco Central totaled U.S.$12.0 billion at the same date. International monetary assets stood at U.S.$17.1 billion at December 31, 1996.

## Economic Performance in 1997

The Venezuelan economy recorded real positive growth in 1997 of 5.1% of GDP. The petroleum sector of the economy recorded growth of 8.8%, based in part on the Government's initiatives to open the petroleum sector to private investment. See "—Principal Sectors of the Venezuelan Economy—Petroleum and Natural Gas." The nonpetroleum sector of the economy recorded its strongest results since 1992 with real growth of 3.3% as the economy benefited from the continuation of policy measures implemented under Agenda Venezuela. In 1997, the Government took a number of additional policy actions in furtherance of Agenda Venezuela, including the adoption of reforms in Venezuelan labor and social security laws, a further increase in the price of domestic gasoline to raise such prices to the FOB export price for Venezuelan gasoline, a return to the United States capital markets and the privatization of C.V.G. Siderúrgica del Orinoco C.A. ("SIDOR"), the state-owned steel producer, which was completed in January 1998.

Inflation for 1997 totalled 37.6%, as compared with 103.2% for 1996. The relative stability of the Bolivar, which went from Bs.476.75 = U.S.$1.00 on December 31, 1996 to Bs.504.75 = U.S.$1.00 at December 31, 1997, was maintained in part due to strong inflows of foreign exchange from the petroleum industry. Such inflows related both to the increased production and sales by PDVSA (with petroleum sector exports totalling U.S.$18.3 billion in

22

1997, compared to U.S.\$17.6 billion in 1996) and to foreign direct investment through the Government's programs to open the petroleum sector to private investment (with direct investment in the petroleum sector in 1997 totalling U.S.\$3.2 billion). The balance of payments recorded its second consecutive surplus in 1997, registering a surplus of U.S.\$3.4 billion after a U.S.\$6.5 billion surplus in 1996.

The consolidated nonfinancial public sector registered a surplus of 2.6% of GDP, the second consecutive year in which the consolidated public sector accounts recorded positive results. Inflows from the petroleum sector, including extraordinary income received as a result of bidding contracts under the third round of the Government's marginal fields initiative (see "—Principal Sectors of the Venezuelan Economy—Petroleum and Natural Gas—The Opening of the Venezuelan Petroleum Sector"), more than offset increased salary and severance obligations that accrued due to changes in minimum wage legislation and amendments in the laws governing severance payments. Unemployment dropped from 12.4% at year end 1996 to 10.6% at year end 1997.

Gross international reserves at Banco Central increased during 1997 by U.S.\$2.6 billion and stood at U.S.\$17.8 billion at December 31, 1997, the highest level recorded at Banco Central in Venezuela's history. Liquid operating reserves at Banco Central totaled U.S.\$14.0 billion at year end 1997, an increase of U.S.\$2.9 billion from the prior year, and international monetary assets totaled U.S.\$19.1 billion at December 31, 1997. The foregoing results were due in part to continued strong performance of the petroleum sector, including the opening of that sector to private investment.

### Recent Economic Performance

Beginning in the last quarter of 1997 and continuing to date, the Venezuelan economy has been adversely affected by a number of factors, including a significant drop in international oil prices due to increased worldwide petroleum production and lower worldwide demand as a result of the Asian economic crisis and warm weather patterns in North America caused by "El Niño," with Venezuela and other oil producing nations realizing lower per barrel oil prices than at any time in the past ten years. The Government currently estimates that oil revenues for 1998 could decrease by approximately U.S.\$4.0 billion as compared to 1997 and that a recovery, if any, in the international oil markets during the remainder of 1998 and 1999 will be gradual.

The sharp decline in oil revenues, along with uncertainties created by the likely effect of the drop in oil revenues, in Venezuela's fiscal accounts, has caused a more rapid decline in the Bolivar/U.S. dollar exchange rate during 1998 to date and a drop in international reserves at Banco Central. For the first six months of 1998 gross international reserves fell by U.S.\$2.3 billion, or 13.0%, as compared to year-end 1997, although current levels of international reserves remain at historically high levels as compared to recent years. The fall in demand for Bolivars due to concerns over the anticipated 1998 fiscal deficits in the consolidated public sector accounts and market perceptions concerning the sustainability of Banco Central's foreign exchange policy have increased demand for U.S. dollars, and the expectation of a significant devaluation of the Bolivar against the U.S. dollar has led to anticipatory price markup policies that have accentuated inflationary pressures. Some abatement of these tendencies was observed in June 1998, as higher interest rates, turning positive in real terms, and a concerted slowdown in public expenditures (including those of PDVSA) have given greater credibility in the financial markets to the announced policy of reducing Government expenditures.

The foregoing events have led Banco Central to intensify its restrictive monetary policies, primarily through the issuance of certificates of deposit, and more recently, TEMs. Through such policies, domestic interest rates, which had been neutral or negative in real terms, have become positive. Banco Central has also taken measures to release pressure on Venezuela's international monetary reserves by increasing the rate of the crawling band for its system of currency exchange. For 1998, the Government set the initial central parity for its currency at Bs. 508.50 = U.S. \$1.00 and a crawling band of 7.5% above and below the central parity. The monthly rate of increase of the central parity was adjusted from 1.16% to 1.28%. Banco Central's restrictive monetary and exchange rate policies have promoted positive real interest rates, which have begun to attract foreign investment inflows. At July 20, 1998, the Bolivar traded at Bs. 558.50 = U.S. \$1.00.

As a result of the decline in oil revenues, combined with increased expenditures for salaries and pension benefits mandated by reforms passed in 1997 to Venezuela's labor laws, Banco Central currently projects a fiscal deficit

in the consolidated public sector accounts for 1998 of approximately 4.4% of GDP. To address the decline in oil revenues, the Government has implemented a series of budget cuts under its 1998 Budget Law, including reductions in the Government's expenditures. In reducing its capital expenditures, the Government has cut back on capital transfers to state and local governments and certain investments. With respect to its current expenditures, the Government has reduced its expenditures on goods and services and also made miscellaneous reductions. The Government also expects to privatize certain of its assets during 1998, simultaneously generating additional foreign exchange revenues and decreasing the level of government expenditures.

In the longer term, the Government has begun to implement structural changes to mitigate the effects of oil price volatility. Under the proposed MSF, which has been approved by the finance committee of the Venezuelan Congress, in years in which the Government receives revenues from the petroleum sector in excess of the average of such revenues for the prior five years, such excess would be retained in special foreign currency accounts for use in later years in which petroleum revenues drop below certain levels. In addition, in 1997 the Venezuelan Congress approved the DRF, pursuant to which a portion of the proceeds received by the Government under its privatization program and other extraordinary revenues would be specifically allocated for the servicing of public sector debt obligations rather than making such revenues available for general purposes. In its first year of operation, in excess of U.S.$400 million has been allocated to the DRF. Other programs under discussion or implementation include steps to increase the level of nonpetroleum fiscal revenues, such as the modernization of customs collection procedures. The Government also has submitted a bill to Congress that would amend the current LWT into a broader-based value-added tax by expanding the reach of the LWT to the retail level and removing numerous exemptions. In furtherance of these programs, the Government reached an agreement with the IMF in June 1998 for a staff monitoring program for the period through December 31, 1998.

The inflation rate as measured by the CPI, on an annualized basis through June 30, 1998, was approximately 34%. The persistence of this inflationary trend is due in part to continued inflationary expectations resulting from the anticipated impact on the Government's fiscal accounts of the recent reforms of Venezuela's labor laws and the decline in oil revenues, increases in the prices of certain public goods and services, an increase in the minimum wage and increases in the prices of certain agricultural products due to adverse weather conditions caused by El Niño. The Government anticipates that its plans regarding the establishment of the MSF and the other steps taken to reduce the economy's dependence on international petroleum revenues and to reduce public sector expenditures should reduce the volatility of its fiscal accounts and lessen inflationary expectations over the longer term.

## Gross Domestic Product

Venezuela experienced volatile rates of growth during the period from 1989 to 1997. In 1989 there was a significant decrease in economic activity associated with the introduction of the Adjustment Program, evidenced by a reduction in real GDP of 8.6%, with commerce, construction and manufacturing sectors registering substantial decreases. The effects of the Adjustment Program began to produce a recovery in economic activity in 1990, with GDP growing at a rate of 6.5% in real terms. This recovery continued in 1991, with the economy growing at a real rate of 9.7%, led by the petroleum sector registering real growth of 10.3%. In 1992, despite lower international oil prices and significant political turbulence, the Venezuelan economy grew by 6.1% in real terms, led by the nonpetroleum sector, which grew by 7.7% (including particularly strong contributions from construction, mining and commerce), while the petroleum sector contracted by 1.2%. In 1993, GDP grew at a real rate of 0.3%, with the petroleum sector growing at 7.1% and the nonpetroleum sector contracting 1.3%. In 1994, after four years of real growth, the economy contracted by 2.3% in real terms, principally as a result of the financial sector crisis. In 1995, the economy grew by 3.7% in real terms, led by higher output and prices in the petroleum sector. In 1996, the economy contracted by 0.4% in real terms, the net result of an increase of 7.7% in the petroleum sector and a contraction of 2.8% in the nonpetroleum sector.

Economic activity resumed a pattern of positive growth in 1997 following the adjustments that accompanied the introduction of Agenda Venezuela. In 1997, GDP grew at a real rate of 5.1%, with the petroleum sector increasing at a rate of 8.8% and the nonpetroleum sector growing at a rate of 3.3%. The Government anticipates

a decline in economic growth in real terms in 1998, principally as a result of the significant drop in activity in the petroleum sector due to the declines in the international petroleum market.

The following table sets forth Venezuela's GDP and expenditures in 1984 Constant Bolivars for each of the years indicated and GDP and expenditures in nominal Bolivars for the year ended December 31, 1997:

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | | | | | | | | | |
| | 1993 | | 1994 | | 1995 | | 1996(1) | | 1997(1) | | 1997(1) | |
| | Value | Share | Value | Share | Value | Share | Value | Share | Value | Share | Value | Share |
| | (in billions of 1984 Constant Bolivars and as percentage share of GDP) | | | | | | | | | | (in billions of nominal Bolivars) | |
| Aggregate Global Demand | 558.2 | 100.0 | 545.1 | 100.0 | 565.0 | 100.0 | 562.6 | 100.0 | 591.3 | 100.0 | 42,744.5 | 100.0 |
| Aggregate Internal Demand | 478.2 | 85.7 | 432.9 | 79.4 | 461.5 | 81.7 | 434.8 | 77.3 | 458.1 | 77.5 | 38,815.1 | 90.8 |
| Gross Capital Formation | 98.7 | 17.7 | 80.9 | 14.8 | 80.4 | 14.2 | 73.6 | 13.1 | 87.6 | 14.8 | 7,230.7 | 16.9 |
| Public | 57.7 | 10.3 | 43.5 | 8.0 | 46.5 | 8.2 | 47.0 | 8.4 | 52.2 | 8.8 | 4,075.9 | 9.5 |
| Private | 41.0 | 7.4 | 37.3 | 6.8 | 34.0 | 6.0 | 26.6 | 4.7 | 35.4 | 6.0 | 3,154.8 | 7.3 |
| Consumption | 385.0 | 69.0 | 367.0 | 67.3 | 371.4 | 65.7 | 354.8 | 63.1 | 366.1 | 61.9 | 31,250.4 | 73.1 |
| Public | 57.8 | 10.3 | 54.2 | 10.0 | 55.6 | 9.8 | 51.4 | 9.1 | 52.5 | 8.9 | 2,672.7 | 6.2 |
| Private | 327.3 | 58.6 | 312.8 | 57.4 | 315.7 | 55.9 | 303.4 | 53.9 | 313.6 | 53.0 | 28,577.7 | 66.8 |
| Variation of Stock | (5.5) | (1.0) | (15.0) | (2.7) | 9.7 | 1.7 | 6.3 | 1.1 | 4.4 | 0.7 | 334.1 | 0.8 |
| Net External Demand(2) | 80.0 | 14.3 | 112.2 | 20.6 | 103.5 | 18.3 | 127.8 | 22.7 | 133.3 | 22.5 | 3,929.3 | 9.2 |
| | | | | | | | | | | | | |
| Gross Domestic Product | 558.2 | 100.0 | 545.1 | 100.0 | 565.0 | 100.0 | 562.6 | 100.0 | 591.3 | 100.0 | 42,744.5 | 100.0 |
| Petroleum Activities | 124.4 | 22.3 | 130.2 | 23.9 | 139.4 | 24.7 | 150.2 | 26.7 | 163.4 | 27.6 | 8,973.2 | 21.0 |
| Non-petroleum Activities | 422.9 | 75.8 | 406.3 | 74.5 | 415.0 | 73.4 | 403.4 | 71.7 | 416.6 | 70.4 | 30,575.5 | 71.5 |
| Agriculture | 27.4 | 4.9 | 27.1 | 4.9 | 27.0 | 4.8 | 27.5 | 4.9 | 28.3 | 4.8 | 1,733.0 | 4.1 |
| Mining | 4.2 | 0.8 | 4.7 | 0.8 | 5.0 | 0.9 | 5.1 | 0.9 | 5.5 | 1.0 | 347.4 | 0.8 |
| Manufacturing | 91.2 | 16.4 | 88.0 | 16.1 | 94.0 | 16.6 | 89.5 | 16.0 | 91.9 | 15.5 | 5,110.4 | 12.0 |
| Water and Electricity | 9.5 | 1.7 | 9.6 | 1.7 | 9.9 | 1.8 | 10.0 | 1.8 | 10.5 | 1.1 | 694.1 | 1.6 |
| Construction | 39.3 | 7.1 | 32.5 | 5.9 | 30.9 | 5.5 | 31.5 | 5.7 | 35.4 | 6.0 | 2,255.1 | 5.3 |
| Commerce(3) | 75.3 | 13.5 | 69.3 | 12.4 | 69.3 | 12.3 | 62.8 | 11.3 | 65.4 | 11.1 | 6,508.7 | 15.2 |
| Transportation(4) | 28.1 | 5.0 | 27.1 | 4.9 | 28.0 | 5.0 | 28.4 | 5.1 | 30.2 | 5.1 | 3,640.5 | 8.5 |
| General Government | 46.4 | 8.3 | 46.6 | 8.4 | 46.9 | 8.4 | 45.1 | 8.1 | 43.6 | 7.4 | 1,991.1 | 4.7 |
| Financial Institutions(5) | 75.0 | 13.5 | 73.4 | 13.4 | 73.1 | 13.1 | 70.5 | 12.7 | 71.7 | 12.1 | 5,397.3 | 12.6 |
| Other(6) | 26.5 | 4.8 | 27.9 | 5.0 | 30.8 | 5.5 | 33.1 | 6.0 | 34.1 | 5.7 | 2,857.8 | 6.7 |
| Import Rights | 11.0 | 2.0 | 8.6 | 1.6 | 10.6 | 1.9 | 9.0 | 1.6 | 11.4 | 1.9 | 3,195.7 | 7.5 |

| | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|
| | (Percentage change from prior year in real terms) | | | |
| Aggregate Global Demand | (2.3) | 3.7 | (0.4) | 5.1 |
| Aggregate Internal Demand | (9.5) | 6.6 | (5.8) | 5.4 |
| Gross Capital Formation | (18.1) | 19.0 | (8.5) | 19.0 |
| Public | (24.5) | 6.7 | 1.2 | 11.1 |
| Private | (9.0) | (9.0) | (21.7) | 33.1 |
| Consumption | (4.7) | 1.2 | (4.5) | 3.2 |
| Public | (5.9) | 2.6 | (7.6) | 2.0 |
| Private | (4.5) | 0.9 | (3.9) | 3.4 |
| Variation of Stock | | | | |
| Net External Demand(2) | 40.3 | (7.7) | 23.4 | 4.3 |
| | | | | |
| Gross Domestic Product | (2.3) | 3.7 | (0.4) | 5.1 |
| Petroleum Activities | 4.7 | 7.1 | 7.7 | 8.8 |
| Non-petroleum Activities | (3.9) | 2.1 | (2.8) | 3.3 |
| Agriculture | (1.1) | (0.5) | 1.9 | 2.7 |
| Mining | 10.6 | 7.5 | 1.7 | 8.3 |
| Manufacturing | (3.4) | 8.8 | (4.8) | 2.8 |
| Water and Electricity | 1.4 | 2.6 | 1.2 | 4.9 |
| Construction | (17.4) | (5.0) | 1.9 | 12.6 |
| Commerce(3) | (8.0) | 0.1 | (9.4) | 4.2 |
| Transportation(4) | (3.4) | 3.3 | 1.2 | 6.5 |
| General Government | 0.4 | 0.7 | (3.8) | (3.3) |
| Financial Institutions(5) | (2.1) | (0.4) | (3.6) | 1.8 |
| Other(6) | 6.6 | 10.2 | 7.6 | 2.9 |
| Adjustments | (21.8) | 24.0 | (15.7) | 26.7 |

(1) Preliminary figures.
(2) Exports minus imports.
(3) Includes commerce, restaurants and hotels.
(4) Includes transport, storage and communications.
(5) Includes financial institutions, insurance, real estate and lending activities.
(6) Includes community, social and personal services and private non-profit services and private non-profit services minus imputed banking services.

Source: *Banco Central.*

## Inflation

Venezuela has experienced high levels of inflation during the last five years as a consequence of a variety of factors, including devaluations of the Bolivar, consolidated public sector deficits, increases in the prices for public and private sector goods and services and increases in taxes. Although the Government has effected a number of policies to reduce inflation since the initial implementation of the Adjustment Program in 1989, those actions have not been uniformly successful and in some instances the policy measures taken have led to temporary exacerbations in the rate of inflation. The freeing of interest and exchange rates in 1989 at the commencement of the Adjustment Program and again in 1996 at the outset of Agenda Venezuela in each case

resulted in significant surges of inflation upon the readjustment of real prices that had been restrained by the prior controls. In addition, the Government's actions in adjusting the prices of public goods and services to remove general subsidies, including increases in the prices of domestic gasoline and utilities, and in adjusting minimum wage levels to address the negative effect of prior increases in inflation on the purchasing power of the working population, have themselves led to increases in inflation. It is the Government's expectation that once the prices of such goods and services and salary levels have reached appropriate levels, the pattern of continual significant increases in inflation should lessen.

The rate of inflation increased in 1993 by 14.0 percentage points over 1992 to 45.9%. This increase was due in part to the increased charges for public services, a recurring fiscal deficit and continued political uncertainty.

An acceleration in prices and exchange rates as well as an increase in the monetary base due to government intervention in the financial sector in response to the financial sector crisis contributed to a 24.9 percentage point increase in inflation during 1994 to 70.8%.

Inflation for year-end 1995, as measured by the CPI, reached approximately 56.6%, down 14.2 percentage points from year-end 1994. The decrease can be principally attributed to the effects of the exchange rate and price controls implemented during the year.

Inflation for year-end 1996, as measured by the CPI, increased by 46.6 percentage points over the previous year, reaching 103.2%. This increase was due to several policy measures implemented under Agenda Venezuela including the devaluation of the Bolivar, the elimination of price controls, an increase in the level of taxation, and an increase in prices for goods and services produced by the public sector.

Inflation for year-end 1997, as measured by the CPI, was 37.6%, compared to 103.2% for the same period in 1996. The rate of inflation decreased during 1997 as the devaluation of the Bolivar against the U.S. dollar moderated in light of the Government's fiscal surpluses for 1996 and 1997. Inflation as measured by the CPI, on an annualized basis through June 30, 1998, was at a rate of approximately 34%, and the Government anticipates that inflation for the full 1998 year will be similar to that experienced in 1997. The persistence of this inflationary trend is due in part to continued inflationary expectations resulting from the anticipated impact on the Government's fiscal accounts of the recent reforms of Venezuela's labor laws and the decline in oil revenues, increases in the prices of certain public goods and services, an increase in the minimum wage and increases in the prices of certain agricultural products due to adverse weather conditions caused by El Niño. The fall in demand for Bolivars due to concerns over the the anticipated 1998 fiscal deficits in the consolidated public sector accounts and market perceptions concerning the sustainability of Banco Central's foreign exchange policy have increased demand for dollars, and the expectation of a devaluation has led to anticipatory price markup policies that have accentuated inflationary pressures. Some abatement of these tendencies was observed in June 1998, as higher interest rate levels, turning positive in real terms, and a concerted slowdown in public and PDVSA expenditures, have given greater credibility in the financial markets to the announced policy of reducing Government expenditures. The Government anticipates that its plans regarding the establishment of the MSF and other steps taken to reduce the economy's dependence on international petroleum revenues and to reduce public sector expenditures should reduce the volatility of its fiscal accounts and lessen inflationary expectations over the longer term.

The following table sets forth five price indices for the periods indicated:

| | 1993 Quarters | | | | 1993 Full Year | 1994 Quarters | | | | 1994 Full Year | 1995 Quarters | | | | 1995 Full Year | 1996 Quarters | | | | 1996 Full Year | 1997 Quarters | | | | 1997 Full Year | 1998 Full Quarter |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | I | II | III | IV | Year | I | II | III | IV | Year | I | II | III | IV | Year | I | II | III | IV | Year | I | II | III | IV | Year | I |
| | | | | | | | | | | (percentage change during period) | | | | | | | | | | | | | | | | |
| **Producer Price Index[1]:** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Manufacturing Goods[2]: | | | | | | | | | | | | | | | | | | | | | | | | | | |
|   Average | 8.8 | 6.9 | 7.8 | 15.9 | 33.6 | 11.8 | 15.2 | 24.6 | 9.2 | 69.0 | 11.1 | 10.0 | 5.6 | 9.6 | 53.1 | 34.1 | 35.1 | 16.8 | 5.4 | 110.5 | 4.0 | 5.0 | 4.6 | 5.0 | 33.0 | 4.7 |
|   End of Period[3] | n.a. | n.a. | n.a. | n.a. | 45.2 | n.a. | n.a. | n.a. | n.a. | 75.4 | n.a. | n.a. | n.a. | n.a. | 41.3 | n.a. | n.a. | n.a. | n.a. | 112.3 | n.a. | n.a. | n.a. | n.a. | 19.8 | n.a. |
| Raw Materials for Construction: | | | | | | | | | | | | | | | | | | | | | | | | | | |
|   Average | 11.5 | 7.9 | 7.2 | 13.6 | 36.8 | 14.8 | 17.3 | 30.6 | 5.9 | 78.5 | 8.4 | 8.4 | 3.4 | 7.9 | 45.9 | 46.3 | 37.1 | 15.2 | 4.5 | 124.7 | 6.5 | 4.6 | 5.2 | 3.9 | 34.6 | 5.3 |
|   End of Period[3] | n.a. | n.a. | n.a. | n.a. | 46.4 | n.a. | n.a. | n.a. | n.a. | 86.2 | n.a. | n.a. | n.a. | n.a. | 31.3 | n.a. | n.a. | n.a. | n.a. | 131.8 | n.a. | n.a. | n.a. | n.a. | 20.9 | n.a. |
| **Wholesale Price Index[4]:** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Domestic Goods[1]: | | | | | | | | | | | | | | | | | | | | | | | | | | |
|   Average | 7.5 | 7.0 | 6.7 | 19.1 | 35.8 | 12.6 | 13.6 | 29.8 | 12.4 | 76.4 | 12.8 | 9.0 | 6.8 | 8.7 | 60.3 | 33.2 | 27.1 | 17.4 | 6.3 | 99.6 | 4.1 | 5.0 | 4.7 | 4.1 | 32.7 | 6.0 |
|   End of Period | 9.8 | 4.8 | 9.1 | 18.6 | 48.8 | 11.4 | 22.2 | 22.6 | 11.5 | 86.0 | 12.4 | 8.7 | 7.0 | 10.7 | 44.8 | 32.5 | 35.0 | 9.4 | 4.8 | 105.2 | 3.5 | 5.8 | 4.3 | 4.4 | 19.3 | 6.7 |
| Imported Goods[1]: | | | | | | | | | | | | | | | | | | | | | | | | | | |
|   Average | 10.6 | 8.1 | 6.4 | 12.4 | 34.5 | 14.2 | 19.9 | 32.4 | 10.1 | 80.7 | 7.6 | 5.4 | 6.5 | 11.1 | 50.8 | 43.0 | 30.2 | 12.7 | 4.5 | 113.8 | 1.2 | 1.8 | 2.7 | 5.4 | 21.9 | 2.7 |
|   End of Period | 11.6 | 9.3 | 4.6 | 12.3 | 43.3 | 17.7 | 34.8 | 20.3 | 7.1 | 100.1 | 8.0 | 6.7 | 4.2 | 17.1 | 40.5 | 45.1 | 29.0 | 8.2 | 2.4 | 107.4 | 0.9 | 2.2 | 2.7 | 5.4 | 11.7 | 2.7 |
| **Consumer Price Index[5]** (Caracas Metro Area): | | | | | | | | | | | | | | | | | | | | | | | | | | |
|   Average | 8.1 | 8.4 | 9.6 | 12.3 | 38.1 | 10.4 | 12.8 | 20.0 | 14.1 | 60.8 | 9.9 | 11.6 | 9.7 | 14.3 | 59.9 | 23.0 | 28.5 | 18.6 | 11.4 | 99.9 | 7.8 | 7.0 | 8.6 | 10.2 | 50.0 | 7.2 |
|   End of Period | 8.1 | 9.0 | 9.9 | 12.7 | 45.9 | 9.3 | 18.4 | 16.3 | 13.5 | 70.8 | 9.0 | 12.0 | 9.5 | 12.1 | 56.6 | 23.9 | 30.9 | 13.2 | 10.6 | 103.2 | 6.8 | 7.5 | 9.7 | 9.4 | 37.6 | 7.1 |

(1) The Wholesale Price Index and the Producer Price Index include the General Wholesale Tax.
(2) The percentage changes refer to the producer price index for manufactured goods (Caracas Metropolitan Area and Central Region of Venezuela—Base 1984 = 100).
(3) This index is calculated with quarterly information collected at mid-term.
(4) The percentage changes refer to the wholesale price index for manufactured goods (Caracas Metropolitan Area and Central Region of Venezuela—Base 1984 = 100).
(5) Base 1984 = 100.
n.a.: Not available.

Source: *Banco Central.*

## Privatization Program

In recognition of the fact that the Government will be unable, due to budgetary constraints, to provide sufficient capital resources to the state-owned enterprises and in order to attract new capital and technology to such sectors of the economy, the Government identified a large set of assets at the outset of the Adjustment Program that would be better managed by the private sector. Such assets included certain public sector assets in industries such as telecommunications, banking, electricity, steel and aluminum in which the Government's role is no longer deemed to be relevant and in which the private sector will be able to provide needed new capital and technology more efficiently than the Government. The assets being privatized also include miscellaneous assets that have come under Government ownership in the past, including hotels, farms and agro-industry companies, cement plants and industrial companies. In addition, the Government's privatization program seeks to remove the budgetary burden on the consolidated public sector by inefficiently managed public sector enterprises.

The Government's privatization program is being managed by FIV, except with respect to the financial entities that were acquired by the Government during the financial crisis, which are under the control of FOGADE. FIV, which was established in 1974 to act as a mechanism for directing the Government's petroleum revenues into the nonpetroleum sectors of the Venezuelan economy, was restructured in 1990 to oversee the privatization process. Pursuant to applicable law, public sector assets scheduled for privatization have generally been transferred to FIV for restructuring and temporary financial assistance while the Government establishes necessary regulatory frameworks for the entities to be privatized and commences the privatization process. The proceeds of the privatization transactions are then used to repay FIV's interim financial assistance, with the balance being transferred to the consolidated public sector accounts.

The Government's privatization program has resulted in the transfer to private ownership and operation of a number of Venezuela's previously state-owned industrial and commercial companies. Since 1990, FIV has successfully privatized 40 companies in industries ranging from telecommunications and airlines to hotels and dairy processing facilities, raising a total of approximately U.S.$4.8 billion. Of this amount, over U.S.$3.8 billion has been received from foreign investors. Among the most significant public sector assets sold by FIV in the Government's privatization program to date are 94% of CANTV; the "B" band cellular telephone concession;

27

several commercial banks; and most recently, in January 1998, 70% of SIDOR, the country's most important steel producer. FIV views foreign participation, with access to new technology, markets and financing, as integral to a successful privatization process. In addition, the privatization process generally contemplates that a minority of the privatized enterprise's shares will be made available for purchase by the entity's employees, often on financed terms, as well as retired persons and the general public in Venezuela.

After a period of significant activity in the privatization area in 1991 and 1992, the privatization program was delayed in 1993 as a result of the political and economic uncertainty then facing Venezuela and in 1994 as the Government addressed the financial sector crisis. Since the announcement of Agenda Venezuela, the Government and FIV have reinvigorated their efforts to sell public sector assets. In 1996, the Government sold 43% of CANTV (following an earlier sale of 51% in 1991) in an initial public offering listed on the New York and Caracas Stock Exchanges, and in 1998 the Government sold 70% of SIDOR. The Government also made progress in the restructuring of certain integrated aluminium sector assets owned by CVG, although two attempts to sell such assets in 1998 have been unsuccessful as potential bidders have failed in successive auctions to present bids. See "Principal Sectors of the Venezuelan Economy—Manufacturing and Mining—Corporación Venezolana de Guayana." FIV's current expectations regarding further privatizations during the remainder of 1998 include the sale of certain electricity sector assets, including Sistema Eléctrico Nueva Esparta ("SENE"), Energía Eléctrica de Venezuela ("ENELVEN"), Energia Electrica de la Costa Oriental ("ENELCO") and C.A. Energía Eléctrica de Barquisimeto ("ENELBAR"), and certain tourism assets in 1998. See "Principal Sectors of the Venezuelan Economy—Electric Power."

In 1996, FOGADE successfully reprivatized Banco de Venezuela, Banco Consolidado, Banco Tequendama and four insurance companies and sold a number of assets owned by the financial institutions acquired by the Government during the financial sector crisis for a total of Bs.406 billion (approximately U.S.$1.1 billion at the 1996 average exchange rate of Bs.382.37=U.S.$1.00). International investors played a significant role in the reprivatization of such financial sector assets—Grupo Santander of Spain acquired Banco de Venezuela; the Infisa group of Chile acquired Banco Consolidado; and Banco Bilbao Vizcaya of Spain acquired the 9.4% of Banco Provincial that was owned by Banco Metropolitano. See "—Historical Economic Performance—The Financial Sector Crisis and Economic Performance in 1994." During 1997, FOGADE reprivatized Banco República, various assets of Banco Latino, including its branch networks, credit card affiliate and insurance affiliate, and Banco Popular y de Los Andes. See "Principal Sectors of the Venezuelan Economy—Financial Institutions."

The table below sets forth significant (over $5.0 million) privatization and reprivatization transactions since 1990 by FIV and FOGADE, respectively, and the U.S. dollar amount of the proceeds received:

| Company | Nature of Business | Date of Sale | Purchase Price[3] |
|---|---|---|---|
| | | | (in millions of U.S. dollars) |
| Banco Occidental de Descuento | Bank | October 1990 | $ 9.7 |
| Banco Italo Venezolano[1] | Bank | January 1991 | 63.6 |
| "B" Band Cellular Concession | Telecommunications | May 1991 | 97.7 |
| Banco República[1] | Bank | July 1991 | 62.0 |
| VIASA (40%) | Airline | September 1991 | 145.5 |
| CANTV (40%)[4] | Telecommunications | November 1991 | 1,885.0 |
| Astinave | Shipyard | December 1991 | 20.5 |
| Hotel Cumanagoto | Hotel | February 1992 | 5.4 |
| Central Rio Yaracuy | Sugar Cane | October 1992 | 7.0 |
| Hotel Jirahara | Hotel | October 1992 | 6.2 |
| Central Las Majaguas | Sugar Cane | February 1992 | 8.7 |
| Banco Popular[1] | Bank | September 1993 | 22.2 |
| Indulac | Milk Producers | June 1995 | 14.7 |
| Electricidad de Caracas (shares)[2] | Electric Utility | March 1996 | 43.4 |
| Seguros Nuevo Mundo | Insurance | August 1996 | 12.2 |
| Banco Provincial (shares)[2] | Bank | March 1996 | 35.6 |
| General de Seguros | Insurance | November 1996 | 9.2 |
| Aeropostal | Airline | August 1996 | 20.0 |
| CANTV (additional 40%) | Telecommunications | November 1996 | 1,026.4 |
| Hotel Bella Vista | Hotel | November 1996 | 15.6 |
| Banco de Venezuela | Bank | December 1996 | 378.0 |
| Banco Consolidado | Bank | December 1996 | 155.0 |
| Banco Tequendama | Bank | December 1996 | 48.0 |
| Seguros Royal Caribe | Insurance | December 1996 | 5.3 |
| Castravalca | Private Security | December 1996 | 68.1 |
| Latincorp | Financial Institution | March 1997 | 7.5 |
| Latino Seguros | Insurance | May 1997 | 6.7 |
| Inversiones Tacoa (shares)[2] | Real Estate Holding | May 1997 | 5.4 |
| Visa Latino | Credit Card | June 1997 | 18.6 |
| Banco Latino (branches) | Bank | June 1997 | 70.0 |
| Banco República | Bank | June 1997 | 57.7 |
| Telecomunicaciones Bantel | Telecommunications | June 1997 | 5.2 |
| Grupo Siderpro | Metal | November 1997 | 39.4 |
| Banco Popular y de Los Andes | Bank | December 1997 | 43.7 |
| Siderúrgica del Orinoco (SIDOR) | Steel | January 1998 | 1,202.0 |
| Seguros Caracas[2] | Insurance | February 1998 | 5.5 |
| Total | | | $ 5,626.6 |

(1) Subsequently reacquired by the Government as a result of the financial sector crisis. See "—Historical Economic Performance—The Financial Sector Crisis and Economic Performance in 1994." Banco República was reprivatized in 1997.

(2) Represents shares of subject entity that were owned by financial institutions intervened in and acquired by FOGADE as part of the financial sector crisis in 1994 and 1995.

(3) Converted into U.S. dollars at the prevailing average Bolívar/U.S. dollar exchange rate for the month in which the transaction occurred.

(4) An additional 11% was transferred to a trust for the benefit of employees of CANTV.

Sources: *FIV and FOGADE.*

## Foreign Trade and Balance of Payments

### Foreign Trade

Foreign trade plays a vital role in the Venezuelan economy. Venezuela traditionally has experienced a favorable balance of trade. In the five years ended December 31, 1997, exports averaged 19.8% of GDP and consisted primarily of crude oil and refined petroleum products. During the same period, imports, consisting mainly of machinery, equipment and manufactured goods, averaged 10.8% of GDP. Average annual exports for the five years ended December 31, 1997 were U.S.$19.3 billion, of which crude and refined petroleum products accounted for 87.6% of such exports. During the same period, average annual imports were U.S.$10.8 billion.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **1993** | **1994** | **1995** | **1996**[1] | **1997**[1][2] |
| | (in millions of U.S. dollars)[3] | | | | |
| **Exports (f.o.b.):** | | | | | |
| Petroleum Products . . . . . . . . . . . . . | $11,030 | $11,472 | $13,630 | $18,667 | $13,510 |
| Iron Ore and Steel Products . . . . . . . | 646 | 731 | 732 | 787 | 695 |
| Aluminum Products . . . . . . . . . . . . . | 567 | 768 | 983 | 774 | 536 |
| Other Products . . . . . . . . . . . . . . . . | 2,443 | 3,118 | 3,253 | 2,879 | 2,436 |
| Total Exports . . . . . . . . . . . . . . . . . | $14,686 | $16,089 | $18,598 | $23,107 | $17,177 |
| **Imports (f.o.b.):** | | | | | |
| Raw Materials . . . . . . . . . . . . . . . . | $3,360 | $2,831 | $4,167 | $2,977 | $2,520 |
| Machinery and Equipment . . . . . . . . | 2,547 | 1,938 | 1,998 | 1,782 | 1,917 |
| Transport Materials . . . . . . . . . . . . . | 2,396 | 1,405 | 1,684 | 1,178 | 1,677 |
| Construction Materials . . . . . . . . . . . | 385 | 371 | 481 | 457 | 500 |
| Food Products and Beverages . . . . . . | 533 | 390 | 547 | 518 | 398 |
| Other Consumer Goods . . . . . . . . . . | 2,050 | 1,342 | 2,519 | 1,990 | 2,162 |
| Total Imports . . . . . . . . . . . . . . . . . | $11,271 | $8,277 | $11,396 | $8,902 | $9,174 |
| Trade Balance . . . . . . . . . . . . . . . . | $3,415 | $7,812 | $7,202 | $14,205 | $8,003 |

---

(1) Preliminary figures.
(2) Through September 30, 1997.
(3) The figures contained in this table differ from those included in the Balance of Payments table set forth under "Balance of Payments" below. The differences with respect to exports result from the use by the Central Statistical Office and Banco Central of different sources for public sector exports. The differences with respect to imports result from the inclusion by Banco Central in the Balance of Payments table of an estimated amount for imports of contraband goods and for amounts of military imports. The Banco Central calculations contained in the Balance of Payments table are used for all purposes in this Prospectus with the exception of this table.

Sources:  *Banco Central, Central Statistical Office, Petróleos de Venezuela, S.A. and Ferrominera del Orinoco.*

### Trade Policy

Venezuelan trade policy in general terms is directed toward opening the Venezuelan economy through the reduction of tariffs and other trade barriers, as well as various measures designed to increase foreign direct investment and to maintain a favorable balance of trade. Privatization, especially in the petroleum sector, is anticipated to play an important part in the opening of the Venezuelan economy. See "—Historical Economic Performance— Agenda Venezuela and Economic Performance in 1996." In addition, Venezuela has entered into a number of bilateral, regional, and multilateral free trade agreements, and it is an active member of the GATT and the WTO. See "Republic of Venezuela—External Affairs and International Organizations."

The Ministry of Industry and Commerce ("MIC") has developed specific trade policies and measures designed to promote the opening of the trade sector of the Venezuelan economy and to promote free trade agreements. The basic goals of trade policy are to promote productive investment and to stimulate various sectors of the economy.

Venezuela is a signatory to a World Commerce Association ("WCA") accord on subsidies and compensatory measures. In accordance with the standards set by the WCA, the MIC is currently designing a more flexible import tax system with the principal objective of reducing import taxes on goods incorporated in products for export. In addition, the MIC is developing trade policy programs with a broader geographic scope and a longer-term perspective. In this connection, the MIC plans to implement and monitor programs designed to improve the quality and productivity of Venezuelan exporters through a global export incentive scheme.

### Trading Partners

The United States has historically been Venezuela's most important trading partner. In 1997, trade with the United States accounted for 33.2% and 39.1% of total nonpetroleum exports and imports, respectively. Also, Venezuela is the largest exporter of petroleum products to the United States. In addition to the United States, Venezuela's significant trading partners include Colombia, Germany, Brazil, Italy and Japan. In 1993, Colombia replaced the United States as the principal market for Venezuela's nonpetroleum exports, with 24.8% of Venezuela's nonpetroleum exports destined for Colombia.

The following tables set out the geographical distribution of Venezuela's imports and exports (including the petroleum sector) for the periods indicated:

| | Imports | | | | |
|---|---|---|---|---|---|
| | Year Ended December 31, | | | | |
| | 1993 | 1994 | 1995 | 1996[1] | 1997[1][2] |
| | (as a percentage of total) | | | | |
| Brazil | 3.5% | 3.2% | 3.8% | 3.8% | 4.7% |
| Colombia | 4.2 | 5.0 | 7.4 | 7.0 | 6.4 |
| France | 2.8 | 2.7 | 2.0 | 1.6 | 1.7 |
| Germany | 5.4 | 5.8 | 4.6 | 4.1 | 4.2 |
| Italy | 4.7 | 3.6 | 3.0 | 3.3 | 3.8 |
| Japan | 7.7 | 5.4 | 4.0 | 2.9 | 4.2 |
| United States | 46.0 | 47.1 | 42.6 | 41.6 | 45.8 |
| Others | 25.7 | 27.2 | 32.6 | 35.6 | 29.3 |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

| | Exports | | | |
|---|---|---|---|---|
| | Year Ended December 31, | | | |
| | 1993 | 1994 | 1995 | 1996[1] |
| | (as a percentage of total) | | | |
| Brazil | 2.7% | 9.3% | 4.3% | 4.1% |
| Colombia | 6.2 | 0.3 | 7.9 | 5.2 |
| France | 0.3 | 2.1 | 0.5 | 0.3 |
| Germany | 2.1 | 0.9 | 2.0 | 1.3 |
| Italy | 0.6 | 1.8 | 1.1 | 0.6 |
| Japan | 1.8 | 2.4 | 1.9 | 0.8 |
| United States | 53.7 | 49.0 | 50.0 | 49.9 |
| Others | 32.6 | 34.2 | 32.2 | 37.7 |
| Total | 100.0% | 100.0% | 100.0% | 100.0% |

(1) Preliminary figures.

(2) Through September 30, 1997.

Sources: *Banco Central, Central Statistical Office, Petróleos de Venezuela, S.A. and Ferrominera del Orinoco.*

*Development of Nonpetroleum Exports*

From the 1970s to 1983, nonpetroleum exports represented a *de minimis* percentage of total exports. Since 1983, the volume of nonpetroleum exports has increased. While nonpetroleum exports averaged approximately 18% of total exports during the period 1985 to 1990, in 1996 and 1997, nonpetroleum exports were valued at U.S.$5.2 billion and U.S.$5.4 billion, respectively, or approximately 22.8% and 22.7% of total exports in such years. Approximately 33.7% of nonpetroleum exports in 1997 were produced by state-owned enterprises and include aluminum, iron ore and steel products. Nonpetroleum exports produced by the private sector include chemical products, aluminum, fish and shellfish, cement, paper products, ceramics and tropical fruits.

*Balance of Payments*

The capital account has generally recorded manageable deficits over the past five years. After declining in 1993 due to political uncertainties, direct investment increased in each year between 1993 and 1997. Specifically, the opening of the oil sector to private investment through certain initiatives (see "Principal Sectors of the Venezuelan Economy—Petroleum and Natural Gas—The Opening of the Venezuelan Petrolem Sector") resulted in significant direct investment in 1997. Because direct investment in 1997 benefited from special programs related to the opening of the Venezuelan petroleum sector (see "Principal Sectors of the Venezuelan Economy—Petroleum and Natural Gas—The Opening of the Venezuelan Petroleum Sector"), the Government does not anticipate that such level of direct investment is likely to be repeated in the coming years.

In 1993, the capital account surplus declined to U.S.$1.9 billion, a decrease of 39.5% from the 1992 level of U.S.$3.1 billion, with reduced levels of all major components of inflows and outflows. Direct investments declined from the level achieved in 1992 due to political uncertainty and a reduction of the level of investments by PDVSA. During that period, the amortization of both short- and medium-term loans increased substantially.

The capital account recorded a significant deficit in 1994 of U.S.$3.2 billion. The deficit resulted from a lack of new borrowings in the international markets, with total inflows declining approximately 40% from those recorded in 1993, and a sustained high level of amortizations and other outflows.

In 1995, the capital account deficit decreased to U.S.$2.8 billion, which represented a 11.0% reduction from the 1994 deficit. Inflows amounted to U.S.$7.5 billion, a 1.7% reduction over the previous year. Outflows decreased to U.S.$10.3 billion, a 4.4% reduction from 1994.

Due to the implementation of significant reforms in accordance with Agenda Venezuela, the capital account deficit was further reduced to U.S.$518 million in 1996. While inflows increased to U.S.$7.9 billion outflows decreased to U.S.$8.5 billion, an 18.1% reduction from the 1995 outflows.

The capital account deficit increased slightly in 1997 to U.S.$1.2 billion. Inflows due to direct foreign investment and other transfers increased significantly from the amounts recorded in 1996, but outflows due to public debt amortizations and others more than offset the increase in direct foreign investment.

Due to its position as a major oil producer and exporter, Venezuela has traditionally recorded trade and current account surpluses. After suffering a deficit of U.S.$2.0 billion in the balance of trade in 1988, Venezuela has had a positive balance of trade in every year since 1989. In 1989, a recovery in oil prices, growth in non-traditional exports and the containment of imports led to a surplus of U.S.$5.6 billion. In 1990, Venezuela recorded a trade surplus of U.S.$10.7 billion, mainly as a result of increased revenues from petroleum sales due in part to the Persian Gulf crisis. Venezuela recorded a trade surplus of U.S.$3.2 billion in 1993, U.S.$7.6 billion in 1994, U.S.$7.2 billion in 1995, U.S.$12.2 billion in 1996 and U.S.$11.4 billion in 1997.

Combined trade and current account surpluses have enabled Venezuela to increase its level of international reserves while covering its capital account deficits in recent years. However, due to the sharp decline in oil revenues in 1998, Venezuela expects that the current account in 1998 will suffer a deficit of approximately U.S.$0.5 billion.

The following table sets out Venezuela's balance of payments for the five years ended December 31, 1997:

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996[1] | 1997[1] |
| | (in millions of U.S. dollars) | | | | |
| Current Account . . . . . . . . . . . . . . . | $(1,993) | $2,541 | $2,014 | $8,824 | $5,999 |
| Trade Balance . . . . . . . . . . . . . . . . | 3,196 | 7,559 | 6,905 | 13,590 | 11,400 |
| Oil Exports (f.o.b.) . . . . . . . . . . . . | 10,855 | 11,288 | 13,630 | 18,385 | 18,331 |
| Non-oil Exports (f.o.b.) . . . . . . . . . | 3,731 | 4,617 | 5,212 | 5,015 | 5,380 |
| Imports (f.o.b.) . . . . . . . . . . . . . . | (11,390) | (8,346) | (11,937) | (9,810) | (12,311) |
| Freight and Insurance . . . . . . . . . . . | (1,054) | (637) | (949) | (878) | (940) |
| Travel . . . . . . . . . . . . . . . . . . . . . | (1,521) | (1,163) | (865) | (1,392) | (1,273) |
| Investment Income . . . . . . . . . . . . . | (1,714) | (1,895) | (1,915) | (1,725) | (1,865) |
| Inflows . . . . . . . . . . . . . . . . . . | 1,597 | 1,624 | 1,862 | 1,554 | 2,014 |
| Public Sector Interest . . . . . . . . | 598 | 545 | 761 | 619 | 899 |
| Private Sector Interest . . . . . . . . | 652 | 793 | 839 | 784 | 870 |
| Other . . . . . . . . . . . . . . . . . . . | 347 | 288 | 262 | 151 | 245 |
| Outflows . . . . . . . . . . . . . . . . . | (3,311) | (3,519) | (3,777) | (3,279) | (3,879) |
| Public Debt Interest . . . . . . . . . | (1,626) | (1,685) | (1,916) | (1,734) | (1,659) |
| Private Debt Interest . . . . . . . . . | (224) | (300) | (301) | (253) | (219) |
| Other . . . . . . . . . . . . . . . . . . . | (1,461) | (1,534) | (1,560) | (1,292) | (2,001) |
| Other Services . . . . . . . . . . . . . . . . | (577) | (1,306) | (1,356) | (996) | (1,272) |
| Unilateral Transfers . . . . . . . . . . . . . | (323) | (17) | 194 | 225 | (51) |
| Capital Account . . . . . . . . . . . . . . . | $1,878 | $(3,153) | $(2,647) | $(2,224) | $(1,176) |
| Inflows . . . . . . . . . . . . . . . . . . | 12,879 | 7,664 | 8,006 | 9,204 | 18,619 |
| Public Debt (Disbursement) . . . . | 4,329 | 1,025 | 1,489 | 901 | 5,290 |
| Private Debt . . . . . . . . . . . . . . | 1,038 | 195 | 87 | 177 | 293 |
| Direct Investment . . . . . . . . . . . | 378 | 813 | 996 | 1,872 | 4,893 |
| Other . . . . . . . . . . . . . . . . . . . | 2,969 | 2,021 | 2,132 | 3,586 | 4,373 |
| Imports Financing . . . . . . . . . . . | 4,165 | 3,610 | 3,302 | 2,668 | 3,770 |
| Outflows . . . . . . . . . . . . . . . . . | (11,001) | (10,817) | (10,653) | (11,428) | (19,795) |
| Public Debt (Amortization) . . . . . | (1,262) | (1,928) | (2,280) | (2,188) | (5,554) |
| Private Debt . . . . . . . . . . . . . . | (720) | (802) | (834) | (842) | (732) |
| Other . . . . . . . . . . . . . . . . . . . | (9,019) | (8,087) | (7,539) | (8,398) | (13,509) |
| Net Errors and Omissions . . . . . . . . . | $(538) | $(281) | $(493) | $(67) | $(1,378) |
| Overall Balance . . . . . . . . . . . . . . . | $(653) | $(893) | $(1,126) | $6,533 | $3,445 |
| Valuation Change . . . . . . . . . . . . . . | (50) | (66) | (20) | (8) | (274) |
| Change in Reserves (Increase) . . . . . . | 703 | 959 | 1,146 | (6,525) | (3,171) |
| Banco Central de Venezuela . . . . . . | 345 | 1,149 | 1,784 | (5,506) | (2,588) |
| FIV . . . . . . . . . . . . . . . . . . . . . | (153) | (103) | 78 | (681) | 446 |
| Reserves Obligations . . . . . . . . . . | 511 | (87) | (716) | (338) | (1,029) |

(1)  Preliminary figures.

Source: *Banco Central.*

*International Reserves*

At December 31, 1992, Banco Central's gross international reserves totaled U.S.$13.0 billion. Despite a net balance of payments deficit of U.S.$653 million in 1993, gross international reserves at Banco Central declined by only U.S.$345 million to a level of U.S.$12.7 billion at December 31, 1993. The decline in international reserves, resulting from a decrease in the supply of foreign exchange from external operations net of the petroleum industry, was offset in part by Banco Central's increase in reserve obligations from official sources. Banco Central's net international reserves declined in 1993 by approximately U.S.$856 million to U.S.$8.3 billion at December 31, 1993. At the end of 1993, FIV's international monetary assets increased to U.S.$881 million.

At December 31, 1994, gross international reserves at Banco Central had declined to U.S.$11.5 billion, a decrease of U.S.$1.1 billion from the end of 1993. The decline in international reserves during 1994 resulted from significant net outflows of foreign exchange due to a decrease in monetary demand as a result of the financial sector crisis and expectations in the Venezuelan economy of a devaluation of the Bolivar. Banco Central's net international reserves totalled U.S.$7.3 billion at the close of 1994, a decrease of U.S.$1.1 billion. FIV's international monetary assets increased to U.S.$984 million at December 31, 1994.

Gross international reserves at Banco Central declined during 1995 by U.S.$1.8 billion and stood at U.S.$9.7 billion at December 31, 1995. Liquid operating reserves at Banco Central stood at U.S.$5.5 billion at December 31, 1995 and net international reserves were U.S.$6.2 billion at year-end 1995. International monetary assets of FIV were U.S.$906 million as of December 31, 1995.

By December 31, 1996, gross international reserves at Banco Central had increased by U.S.$5.5 billion and stood at U.S.$15.2 billion. International monetary assets were at U.S.$17.1 billion at December 31, 1996. Liquid operating reserves at Banco Central totaled U.S.$11.1 billion at year-end 1996, with net international reserves at Banco Central totalling U.S.$12.0 billion at the same date.

At December 31, 1997, gross international reserves at Banco Central had increased by U.S.$2.6 billion and stood at U.S.$17.8 billion, the highest level recorded at Banco Central in Venezuela's history. International monetary assets stood at U.S.$13.9 billion as of the same date. Liquid operating reserves at December 31, 1997 totaled U.S.$14.0 billion, with net international reserves at U.S.$15.7 billion.

During the first half of 1998, international reserves at Banco Central have declined from the high levels recorded as of December 31, 1997. At June 30, 1998, gross international reserves at Banco Central were U.S.$15.5 billion, liquid operating reserves were U.S.$12.3 billion and net international reserves were U.S.$14.1 billion. The decline in international reserves during 1998 have resulted from lower U.S. dollar receipts due to lower international oil prices and greater instability in the foreign exchange markets as compared to 1996 and 1997. Nonetheless, the level of international reserves remains high as compared to prior years.

34

The following table sets out a breakdown of the international monetary assets of Venezuela for the years ended December 31, 1993 through 1997 and for the six-month period ended June 30, 1998:

| | Year Ended December 31, | | | | | June 30, 1998[1] |
|---|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996[1] | 1997[1] | |
| | (in millions of U.S. dollars) | | | | | |
| International Reserves at Banco Central[2] . . | $12,656 | $11,507 | $9,723 | $15,229 | $17,818 | $15,499 |
| Gold[3] . . . . . . . . . . | 3,440 | 3,440 | 3,440 | 3,440 | 3,440 | 2,942 |
| IMF Position[4] . . . . . . | 486 | 463 | 215 | 208 | 196 | 193 |
| Special Drawing Rights | 199 | 212 | 380 | 456 | 183 | 42 |
| Total Liquid Operating Reserves . . . . . . . . | 8,531 | 7,392 | 5,688 | 11,125 | 13,999 | 12,321 |
| Liquid Operating Reserves of Banco Central[5] . . . . . . | 8,344 | 7,217 | 5,527 | 11,066 | 13,999 | 12,321 |
| Liquid Operating Reserves of FIV[6] . | 187 | 175 | 161 | 59 | 0 | 0 |
| Liabilities of Banco Central[7] . . . . . . . . | (4,332) | (4,245) | (3,529) | (3,191) | (2,159) | (1,399) |
| Net Liquid Operating Reserves . . . . . . . . | 4,199 | 3,147 | 2,159 | 7,934 | 11,840 | 10,922 |
| International Monetary Assets[8] . . . . . . . . . | 13,787 | 12,731 | 10,884 | 17,130 | 19,523 | 18,471 |
| International Monetary Assets of FIV . . . . . | 881 | 984 | 906 | 1,603 | 1,212 | 2,496 |

(1) Preliminary figures.

(2) Includes letter of credit liabilities.

(3) Valued at U.S.$300 per ounce.

(4) Includes net IMF Position and IMF Supplementary Credit Fund.

(5) Includes international financing cooperation and ALADI Agreement.

(6) Includes FIV cash flow and FIV balance with Banco Central.

(7) Includes Banco Central reserve liabilities and liabilities.

(8) Includes all monetary or similar assets denominated in units of exchange other than Bolivars owned or controlled by the Republic, Banco Central and other public sector entities.

Sources: *Banco Central, FIV and Petróleos de Venezuela, S.A.*

## Foreign Exchange Rates and Exchange Controls

Since April 22, 1996, Venezuela has had a unified, free-floating exchange rate with free convertibility. The exchange rate, however, is subject to a system established by the Central Bank which is designed to allow the Bolivar to fluctuate within a crawling band. For 1997, the band was set at 7.5% above and below an initial central parity of Bs.472=U.S.$1.00, effective January 2, 1997. On August 4, 1997, Banco Central modified the rate of increase of the central parity to 1.16% per month. At December 31, 1997, the Bolivar traded at Bs.504.75=U.S.$1.00.

As noted above under "The Venezuelan Economy—Recent Economic Performance," during 1998 Banco Central has continued and intensified its restrictive monetary policies primarily through the issuance of certificates of deposit, and more recently, TEMs. Banco Central has also taken measures to release pressure on its international monetary reserves by increasing the rate of the crawling band of its system of currency exchange. For 1998, the Government set the initial central parity at Bs. 508.50=U.S. $1.00 and a crawling band of 7.5% above and below the central parity. The monthly rate of the increase of the central parity was adjusted from 1.16% to 1.28%. Banco Central's restrictive monetary and exchange rate policies have promoted positive real interest rates which have begun to attract foreign investment inflows. In spite of these policies, however, beginning in March 1998, the Bolivar has depreciated against the U.S. dollar more rapidly than has been the case since April 1996. At July 20, 1998 the Bolivar traded at Bs.558.50=U.S.$1.00.

Prior to February 1983, the exchange rate was fixed at Bs.4.30=U.S.$1.00. In February 1983, a system of differential exchange rates was implemented to reduce imports and to stimulate domestic production and production of nontraditional exports. Under this system, while the Bolivar was permitted to float for certain transactions, a series of controlled foreign exchange rates was established to moderate the inflationary impact of the cost of living and mitigate the financial costs of the devaluation of the Bolivar among those sectors of the economy with a high level of external debt. These controlled rates of exchange were utilized for payments of registered external public and private debt and for most commercial transactions. During the same period, a much higher free market exchange rate was in effect for obtaining foreign exchange for tourism, imports of certain nonessential goods, personal transfers and certain other items. Although the system of differential exchange rates assisted in moderating inflation, it also resulted in imbalances in both the external and internal accounts by effecting quantitative restrictions on imports, creating an anti-export bias in the Venezuelan economy, and increasing speculative pressures on the Bolivar. On March 13, 1989, pursuant to the Adjustment Program, the Pérez administration ended the system of official, controlled exchange rates and established a unified, floating exchange rate with free convertibility.

The financial sector crisis in 1994 resulted in a solvency and/or liquidity crisis in the Venezuelan financial sector. See "—Historical Ecomomic Performance—The Financial Sector Crisis and Economic Performance in 1994." This crisis, occurring in the context of a general climate of economic and political insecurity and uncertainty, caused a run in the foreign exchange markets in favor of U.S. dollars. As of the end of June 1994, the exchange rate had declined to Bs.199.69=U.S.$1.00. The adverse effect of such pressure in the foreign exchange markets, and the resulting intensification of devaluation expectations and the loss of international reserves, led the Government temporarily to close the foreign exchange markets on June 27, 1994 and to adopt an exchange control regime on July 9, 1994. Between July 1994 and December 11, 1995, the official exchange rate was set at Bs.170=U.S.$1.00. On December 11, 1995, the Government announced Decree No. 972 which devalued the Bolivar and changed the official exchange rate from Bs.170=U.S.$1.00 to Bs.290=U.S.$1.00 effective as of December 12, 1995. In April 1996, the exchange control system was eliminated and the Bolivar was permitted to float.

The following table sets out the average Bolivar/U.S. dollar exchange rates for the periods indicated:

| Year and Month | Exchange Rates (Bolivars/ U.S. dollar) |
|---|---|
| **1993** | |
| March | Bs.84.14 |
| June | 88.93 |
| September | 96.34 |
| December | 104.51 |
| **1994** | |
| March | Bs.113.13 |
| June | 171.80 |
| September | 170.00 |
| December | 170.00 |
| **1995** | |
| March | Bs.170.00 |
| June | 170.00 |
| September | 170.00 |
| December | 251.29 |
| **1996** | |
| March | Bs.290.00 |
| June | 471.25 |
| September | 476.08 |
| December | 474.73 |
| **1997** | |
| January | Bs.476.84 |
| February | 474.40 |
| March | 478.40 |
| April | 479.25 |
| May | 483.38 |
| June | 485.63 |
| July | 491.14 |
| August | 495.90 |
| September | 496.79 |
| October | 498.62 |
| November | 499.93 |
| December | 502.80 |
| **1998** | |
| January | Bs.507.29 |
| February | 514.64 |
| March | 520.90 |
| April | 530.08 |
| May | 537.05 |
| June | 542.00 |

Source: *Banco Central.*

37

## Foreign Investment and the Private Sector

In order to augment domestic savings and increase Venezuela's export capacity, the Government has introduced a number of measures intended to promote foreign and domestic private sector investment. In January 1990, the Government adopted Decree No. 727 which was designed to increase foreign investment and encourage private sector participation in the Venezuelan economy. The regulations included the elimination of required prior authorizations for investment and expanded the areas in which foreign investment was permitted. The only areas in which foreign investment is still restricted are iron ore and petroleum exploitation (subject to the recent measures described under "Principal Sectors of the Venezuelan Economy—Petroleum and Natural Gas—The Opening of the Venezuelan Petroleum Sector") and insurance companies, personal security services, and media industries (radio, television and Spanish language newspapers). In January 1994, a new banking law was passed pursuant to which foreign investors now are permitted to participate in the financial sector. See "Financial System—Financial Institutions." In addition, Decree No. 727 permits foreign investors to establish subsidiaries in Venezuela and the unrestricted contracting within the technology sector (requiring only subsequent notification) and allows foreigners to invest in securities on domestic stock exchanges and to obtain financing in Venezuela, either from banks or by way of the issue of shares or notes in the capital markets. Decree No. 727 was replaced by Decree No. 2,095 in February 1992. The purpose of this new decree was to incorporate into the newly liberalized foreign investment regime certain changes in the Andean Community norms concerning foreign investment. See also "—Agenda Venezuela and Economic Performance in 1996" and "—Foreign Trade and Balance of Payments."

In order to promote foreign investment, Venezuela has entered into agreements with the U.S. Overseas Private Investment Corporation, the Export-Import Bank of the United States, the Multilateral Investment Guaranty Agency (an affiliate of the World Bank), and certain other bilateral agencies of the OECD countries, to enable such entities to offer noncommercial risk insurance to foreign investors.

## Employment and Labor

The estimated labor force of Venezuela at December 31, 1997 was approximately 9.5 million (9 million at December 31, 1996), which represented approximately 41.7% of the total population. The composition of the labor force has undergone substantial changes during the last 25 years, the most significant of which has been a shift in employment from the primary sector, principally consisting of agricultural activities and petroleum and mining exploration and extraction, to the tertiary sector, principally consisting of services, finance, transportation, communications and Government employment. In 1997, approximately 12% of the labor force was employed in the primary sector, approximately 19% in the secondary sector and approximately 57% in the tertiary sector.

The labor force grew at an average annual rate of 4.0% during the period 1990 to 1997. However, the economy has been unable to absorb fully large numbers of unskilled workers, particularly persons migrating from rural to urban areas. The ability of the economy to absorb additional workers has been weakest in the secondary sector of the economy. In addition, the Government recognizes that there is underemployment, particularly in urban areas, but is unable to estimate the precise amount of such underemployment. The unemployment rate was estimated at approximately 10.2% of the labor force at the end of 1995 and at 12.4% at the end of 1996. Preliminary figures for 1997 indicate a decrease in the unemployment level to 10.6%. It is estimated that during the first half of 1997 as much as 49% of the economically active labor force earned income in the informal sector of the economy.

A significant shortage of management personnel, technicians and skilled workers of all kinds and a relatively limited supply of agricultural workers currently exist. Because approximately 35.8% of the total population is estimated to be under 15 years of age, the working age population is expected to grow substantially in coming years. In connection with expected growth in the Venezuelan economy in coming years, improvements in training and education will be needed to remedy a significant shortage of management personnel, technicians and skilled workers of all ages.

The Organic Labor Law sets forth minimum standards for employee benefits and working conditions such as a minimum wage, maximum working hours, specified holidays, vacations, retirement and severance compensation, and health and safety regulations. The law applies to private sector workers and to most public sector employees.

On May 1, 1997, the Government enacted a bonus to the minimum wage for workers earning less than Bs.75,000 per month, so that they would receive at least Bs.75,000 per month in total remuneration. As of May 1, 1998, the Government increased the minimum monthly salary for workers to Bs.100,000. The benefits of other public employees, technicians and professionals are also regulated by the Law of Administrative Careers. Public sector wages are set by decree, in accordance with the labor laws and the Law of Collective Contracting of the Public Sector. Skilled and professional private sector wages are competitive, or set through collective bargaining contracts.

In early 1997, after extensive debate, the Government announced an increase in salaries for public employees, with smaller salary increases for senior government officials. Effective April 1997, public employees now earn between Bs.97,000 and Bs.435,858 per month, including wages and bonuses.

On June 19, 1997, President Caldera signed a sweeping labor reform law. The new law implemented a tripartite agreement reached by the Government, employees represented by unions and employers. The most significant reform is the elimination of retroactive calculation of mandatory severance compensation for years of service. Previously, employers were required to pay severance compensation for years of service calculated retroactively, based on salary at the time of termination of the labor relationship, regardless of any changes in the salary over the course of the employment. The new law requires that severance pay accumulated by December 1996, termed "Labor Liabilities," must be paid out within five years to both public and private employees. After December 1996, employers must calculate this severance compensation monthly based on wages earned at that time and they must deposit the amount in an account designated by, and in the name of, the employee. The amounts deposited will earn interest tax-free, which interest may be withdrawn on a yearly basis. The account will accumulate during the entire period of employment, and at the end of employment the entire amount can be withdrawn by the employee. Under defined circumstances, portions of the principal in the account may be withdrawn by the employee prior to the end of the employee's retirement. The Government's obligations under the new labor law are estimated to total approximately U.S.$8.0 billion. The Government has submitted a proposed law to the Venezuelan Congress that would permit such obligations to be documented in a manner that will permit the satisfaction of such obligations over an extended period of years.

Social security reforms are currently being discussed in the Venezuelan Congress. Proposed legislation contemplates reforms including a mixed public/private pension system. Private pension funds would utilize an individual capitalization scheme and private/public funds would rely on a pay-as-you-go scheme. Also, the reengineering of the *Instituto Venezolano de los Seguros Sociales* ("IVSS"), in order to provide a more efficient health services system, is being debated.

Venezuela has numerous labor unions, most of which are affiliated with the *Confederación de Trabajadores de Venezuela*, an umbrella union organization ("CTV"). Unions engage in collective bargaining primarily involving the negotiation of contracts on an industry-wide basis. Strikes and lockouts are permitted, but there are conciliation procedures which must be observed prior to calling a strike or lockout. Although the CTV and affiliated unions from time to time have held demonstrations to promote support for labor-related issues, including proposed increases in minimum wages, such demonstrations have not caused a change in the Government's policy of avoiding the inflationary spirals that would result from large wage increases. The CTV has staged several single-day work stoppages to protest the failure of the Government or the private sector to increase wages, but such stoppages have not had any significant effect on the Venezuelan economy as a whole.

The following table sets forth employment activity by sector for the periods indicated:

| | Year Ended December 31, | | |
| | 1995 | 1996 | 1997 |
|---|---|---|---|
| **Labor Force:** | | | |
| Employed | 7,729,174 | 7,902,508 | 8,494,724 |
| Unemployed | 879,479 | 1,122,119 | 1,012,401 |
| Total | 8,608,653 | 9,024,627 | 9,507,125 |
| **By Sector:** | | | |
| Petroleum and Mining | 67,324 | 89,101 | 93,846 |
| Agriculture, Fishing and Hunting | 1,032,289 | 1,030,700 | 792,482 |
| Manufacturing | 1,034,564 | 1,005,216 | 1,211,413 |
| Water, Electricity and Gas | 68,652 | 64,360 | 71,399 |
| Construction | 622,584 | 602,617 | 745,094 |
| Commerce, Restaurant and Hotels | 1,766,939 | 1,816,269 | 2,061,940 |
| Transportation, Storage and Communications | 474,282 | 547,046 | 551,947 |
| Financial Institutions, Insurance and Real Estate | 438,730 | 498,604 | 460,837 |
| Community, Social and Personal Services | 2,207,369 | 2,236,337 | 2,482,055 |
| Others | 16,441 | 12,258 | 23,711 |

Source: *Central Statistical Office.*

## Poverty and Income Distribution; Education

### Poverty and Income Distribution

Agenda Venezuela contemplates that the benefits of economic development reach the poor so as to enable further, long-term development. See "The Venezuelan Economy—Agenda Venezuela and Economic Performance in 1996." The Government differentiates between extemely poor, poor and non-poor households based on census survey examinations with respect to qualitative factors such as access to electricity, potable water, number of persons per dwelling units and related factors. The following is a table of Government statistics comparing the number and percentage of extremely poor, poor and nonpoor households in Venezuela for the last three years:

| | 1995 | | 1996 | | 1997[1] | |
| | Total | % | Total | % | Total | % |
|---|---|---|---|---|---|---|
| **Households:** | | | | | | |
| Non-Poor | 2,856,011 | 64.9% | 2,092,129 | 46.0% | 1,643,200 | 35.9% |
| Poor | 933,610 | 21.2 | 1,210,824 | 26.6 | 1,272,374 | 27.8 |
| Extremely Poor | 609,583 | 13.9 | 1,246,410 | 27.4 | 1,665,844 | 36.4 |
| Total | 4,399,204 | 100.0% | 4,549,363 | 100.0% | 4,581,418 | 100.0% |
| **Population:** | | | | | | |
| Non-Poor | 13,244,006 | 60.6% | 9,147,704 | 41.0% | 7,075,322 | 31.3% |
| Poor | 5,177,728 | 23.7 | 6,241,528 | 28.0 | 6,411,149 | 28.4 |
| Extremely Poor | 3,429,186 | 15.7% | 6,926,365 | 31.0 | 9,124,164 | 40.4 |
| Total | 21,850,920 | 100.0% | 22,315,597 | 100.0% | 22,610,635 | 100.0% |

(1) Through June 30, 1997.

Source: *Central Statistical Office.*

40

The percentage of poor and extremely poor among the Venezuelan population has increased from 39.4% in 1995 to 68.7% in 1997, in part due to the failure of wages to maintain balance with the high rate of inflation experienced in 1996 and the decline in nonpetroleum GDP during 1996. In addition to seeking to stimulate real growth in the economy and thereby increase job opportunities, Agenda Venezuela aims at addressing these issues through an increased emphasis on the primary education system to improve educational and technological skills among the future Venezuelan workforce; a decentralization of health and education support systems; and a reform of the social security and pension systems. To that end, the Government has recently entered into two loan agreements with the IADB, in the principal amounts of U.S. $350 million and U.S. $45 million, and a U.S. $200 million loan agreement with CAF, the proceeds of each of which will be used to reform the social security system.

The following table compares statistics for the distribution of income or consumption in Venezuela and other Latin American countries:

| | Venezuela[1] | Brazil[1] | Chile[1] | Colombia[1] | Mexico[2] | Peru[2] |
|---|---|---|---|---|---|---|
| Survey Year . . . . . . . . | 1995 | 1995 | 1994 | 1995 | 1992 | 1994 |
| General Index . . . . . . | 46.8 | 60.1 | 56.5 | 57.2 | 50.3 | 44.9 |
| Lowest 10%[3] . . . . . . | 1.5 | 0.8 | 1.4 | 1.0 | 1.6 | 1.9 |
| Lowest 20% . . . . . . . . | 4.3 | 2.5 | 3.5 | 3.1 | 4.1 | 4.9 |
| Second 20% . . . . . . . . | 8.8 | 5.7 | 6.6 | 6.8 | 7.8 | 9.2 |
| Third 20% . . . . . . . . | 13.8 | 9.9 | 10.9 | 10.9 | 12.5 | 14.1 |
| Fourth 20% . . . . . . . . | 21.3 | 17.7 | 18.1 | 17.6 | 20.2 | 21.4 |
| Highest 20% . . . . . . . | 51.8 | 64.2 | 61.0 | 61.5 | 55.3 | 50.4 |
| Highest 10% . . . . . . . | 35.6 | 47.9 | 46.1 | 46.9 | 39.2 | 34.3 |

(1) Rankings are based on per capita income. Data refers to income shares by percentile of the population.

(2) Rankings are based on per capita expenditures. Data refers to expenditure shares by percentile of the population.

(3) The percentage share of income or consumption is the share that accrues to subgroups of population indicated by the deciles or quintiles. Percentage shares by quintiles may not add to 100 because of rounding.

Source: *World Bank 1997 World Development Indicators.*

*Education and Other Sustainable Development Factors*

According to the Human Development Index ("HDI") measure used by the United Nations Development Program ("UNDP"), Venezuelan social conditions rank 47th among the 171 countries in the world surveyed. The following table summarizes the statistics for social factors related to the HDI in Venezuela and the other six largest economies in Latin America:

| | Survival | | | Education | | Income | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | People Not Expected to Survive to Age 40 (%) 1990 | Population without access to health services (%) 1990-95 | Population without access to safe water (%) 1990-96 | Adult Illiteracy Rate (%) 1995 | Children not reaching grade 5 (%) 1990-95 | Real GDP per capita (PPP$) | | | Population in Poverty (%) | |
| HDI Rank | | | | | | Poorest 20% 1980-94 | Richest 20% 1989-94 | $1 a day (PPP$)[1] 1989-94 | National poverty line 1989-94 |
| 30 Chile . . . . . . | 4.6 | 3 | n.a. | 4.8 | 5 | 1,558 | 27,145 | 15 | n.a. |
| 36 Argentina . . . | 6.3 | 29 | 29 | 3.8 | n.a. | n.a. | n.a. | n.a. | 26 |
| 47 Venezuela . . . | 6.1 | n.a. | 21 | 8.9 | 22 | 1,505 | 24,411 | 12 | 31 |
| 50 Mexico . . . . . | 8.3 | 7 | 17 | 10.4 | 16 | 1,437 | 19,383 | 15 | 34 |
| 51 Colombia . . . | 6.3 | 19 | 15 | 8.7 | 41 | 1,042 | 16,154 | 7 | 19 |
| 68 Brazil . . . . . | 14.0 | n.a. | 27 | 16.7 | 30 | 578 | 18,563 | 29 | 17 |
| 89 Peru . . . . . . | 13.1 | 56 | 28 | 11.3 | n.a. | 813 | 8,366 | 49 | 32 |

n.a.: Statistics not available.

(1)   Personal Purchasing Power used to measure the poverty line.

Source: *United Nations Development Program, Human Development Report, 1997* (statistics for the largest seven economies of Latin America).

While the extremely poor in Venezuela are severely challenged by a lack of access to basic necessities, some positive signs of sustainable development are present. The adult literacy rate was 92% in 1995. In 1992, the average number of years in school was 10 years for men and 11 years for women. The quality of Venezuelan higher education and the level of development in terms of communications and technology are relatively high on the UNDP's HDI. Venezuela is ranked in the category of high human development in terms of measures of overall profile and HDI trends, South-North gaps, child survival, health, food security, education imbalances, communications, social investment, and natural resource uses.

# Principal Sectors of the Venezuelan Economy

### Petroleum and Natural Gas

*General*

The petroleum industry has been the cornerstone of the Venezuelan economy for the past 50 years, providing both the principal source of Government revenues and foreign exchange earnings and the stimulus for extensive economic, industrial and social change. According to the *BP Statistical Review of World Energy 1996*, Venezuela is the seventh largest petroleum producer in the world and the fourth largest petroleum exporting country in the world. In 1996, the petroleum industry accounted for 26.5% of GDP and 80% of the total value of exports. International sales of crude oil, refined products, petrochemical products and coal accounted for approximately 97% of total sales in 1996.

*Petróleos de Venezuela, S.A.*

Petróleos de Venezuela, S.A. ("PDVSA"), a company wholly owned by the Republic, is the holding company for the national petroleum, petrochemical, bitumen and coal industries. PDVSA was created in 1975 to manage the assets acquired as a result of the nationalization of the domestic oil industry in that year. Since January 1, 1976, PDVSA has been responsible for coordinating most aspects of the petroleum industry, including administration, planning, operations, domestic and foreign marketing and capital investment. Since 1978, PDVSA has also been responsible for the petrochemical sector, and since 1985 also has been responsible for the development of coal resources located in western Venezuela and for the development of the country's bitumen resources. The Ministry of Energy and Mines determines overall Government policies with respect to the rate of production, new investments and resource conservation. In addition, the Minister of Energy and Mines is the chairman of PDVSA's General Shareholder's Assembly, which sets PDVSA's general policy. PDVSA obtains income from its subsidiaries in the form of a mandatory 10% payment of their net export revenues from oil and oil derivatives calculated after deductions for related royalties and expenses but before income taxes. In accordance with the law relating to the nationalization of the petroleum industry, such revenues must be used for the industry's capital investment programs. PDVSA also receives the net profits of each subsidiary after those companies pay taxes to the Government.

PDVSA is the largest corporation in Venezuela. As of December 31, 1997, PDVSA's total assets were approximately US$47.2 billion. In 1997, PDVSA reported revenues of approximately US$40.8 billion, pre-tax income of US$10.4 billion and net cash provided by operating activities of US$7.2 billion. In both 1993 and 1995, PDVSA was voted "Best Run/Financially Managed National Oil Company" in the bi-annual *Petroleum Economist* surveys.

According to a 1997 comparative study published by *Petroleum Intelligence Weekly*, PDVSA ranks as the world's second largest vertically integrated oil and gas company, based on a composite of 1996 operating criteria, including reserves, production, refining capacity and refined product sales. According to *Petroleum Intelligence Weekly*, PDVSA is ranked fourth in the world in production of crude oil, fifth in crude oil proven reserves, third in refining capacity and fifth in product sales. Venezuela has exported crude oil without interruption since 1914. According to *Petroleum Supply Monthly* (a publication of the United States Department of Energy), in 1997 PDVSA was the largest supplier of crude oil and refined petroleum products, in the aggregate, to the United States. Through its United States affiliates, PDVSA is the third largest gasoline retailer in the United States by sales volume.

Upon the nationalization of the petroleum industry in 1975, PDVSA established a number of operating subsidiaries, including Lagoven, S.A. ("Lagoven"), Maraven, S.A. ("Maraven") and Corpoven, S.A. ("Corpoven"), to continue the businesses of the concessionaires that had been operating in Venezuela prior to the nationalization of the oil industry, in each case with existing infrastructure and personnel. Over time, PDVSA has incorporated additional subsidiaries to take advantage of new developments within the petroleum industry and new businesses, such as coal and petrochemicals. The main structure of the three main operting subsidiaries, each operating a

vertically integrated business from exploration and refining to international distribution and domestic retail sales, has been maintained for the past twenty years to retain perceived competitive advantages in that structure.

In 1997, PDVSA established a new operating structure based on business units, and continued a process of extensive transformation of its operations with the aim of improving productivity by reducing operating costs and overheads, modernizing administrative processes and optimizing returns on investments. The transformation has involved:

(1) a new definition of the role of PDVSA, which now will focus on the development of a corporate strategy and be responsible for certain other corporate functions necessary to ensure the continuation of PDVSA's activities. Four corporate vice-presidencies (Planning, Public Affairs, Finance and Human Resources) and nine functional corporate units (Legal Counsel, Industrial Safety and Environment, Loss Prevention and Control, Process Analysis, Internal Control, Office of the Presidency, Office of the Chief Economist, Information Technology and Administration and Services) are in charge of defining guidelines for PDVSA's broad scope of activities, which will fold into the long-term corporate strategy; and

(2) the formation of PDVSA-Petróleo y Gas, S.A. ("PDVSA-P&G") as PDVSA's principal operating subsidiary through the merger of Lagoven and Maraven into Corpoven and the renaming of the combined entity, which became effective January 1, 1998. PDVSA-P&G's operations are now organized under three divisions, namely PDVSA Exploración y Producción ("PDVSA-E&P"), PDVSA Manufactura y Mercadeo ("PDVSA-M&M"), and PDVSA Servicios ("PDVSA-Services").

Although the reorganization did not affect the legal structure of PDVSA's other Venezuelan and international subsidiaries, most of these subsidiaries now report functionally to one of PDVSA-P&G's three divisions.

Through PDVSA-E&P, PDVSA manages the Exploration, Production, Orinoco Belt and Bitor/Carbozulia business units and the subsidiary Corporación Venezolana del Petróleo, S.A. ("CVP"). The Exploration and Production business units are responsible for exploration and production activities, respectively.

Through PDVSA-M&M, PDVSA manages the Refining and Trading business unit and subsidiaries that market gasoline and other refined petroleum products in Venezuela, conduct PDVSA's shipping activities, operate refineries and market gasoline.

Through PDVSA Services, PDVSA manages the Administration and Services and Engineering and Projects business units and a subsidiary (Bariven) responsible for services and materials procurement. The Administration and Services business unit is responsible for planning, finances, human resources and other services. The Engineering and Projects business unit is responsible for engineering and the development of corporate projects.

PDVSA conducts its petrochemical activities through Petroquímica de Venezuela, S.A. ("Pequiven"), which reports directly to Petróleos de Venezuela. Pequiven has three major petrochemical complexes in Venezuela and is currently involved in 17 joint ventures with private sector partners.

PDVSA Finance is PDVSA's principal vehicle for corporate financing through the issuance of unsecured debt.

Other important subsidiaries that report directly to PDVSA include Intevep, S.A. ("Intevep"), which undertakes research and development, the *Sociedad de Fomento de Inversiones Petroleras* (the Petroleum Investment Development Corporation or "SOFIP"), which develops vehicles enabling domestic and international investors to invest in the Venezuelan oil industry, and *Centro Internacional de Educación y Desarrollo* ("CIED"), which is responsible for the training and development of PDVSA and private sector personnel.

### Hydrocarbon Reserves and Exploration

Proven crude oil reserves of Venezuela at December 31, 1997 amounted to approximately 75 billion barrels. The average API gravity of proven crude oil reserves was $16°$ as compared to an average API gravity of $24°$ for crude oil produced in 1997. Based on 1997 production levels, proven reserves of crude oil (which include heavy and extra heavy crude oil reserves) had a remaining reserve life of 63 years.

44

Cumulative production of crude oil in Venezuela from 1914 to the present totals approximately 48 billion barrels. One in fifteen barrels consumed in the world to date has come from Venezuela. Despite the quantities of oil produced, new discoveries continue to be made and proven reserves increased. Between 1991 and 1996, Venezuela replaced more than 200% of crude oil production. From December 31, 1993 to December 31, 1997, PDVSA's estimated proven reserves of crude oil increased by 10.5 billion barrels. These increases resulted from the application of secondary recovery technology to existing crude oil deposits and to the discovery of new crude oil. At December 31, 1996, crude oil represented 74% of Venezuela's total estimated proven oil reserves on the basis of barrels of oil equivalent ("boe").

Domestic natural gas production is predominantly a by-product of petroleum extraction. Gross natural gas production during 1997 was 6.44 billion cubic feet ("bcf") per day. PDVSA has substantial proven developed reserves of natural gas amounting to 101,872 bcf (or 17,564 million boe) at December 31, 1997. Proven natural gas reserves include the portion of liquifiable hydrocarbons recoverable in the processing plants. In 1997, 1996 and 1995, natural gas liquids recovered amounted to approximately 64 million, 61 million and 55 million barrels, respectively.

Production of natural gas is shown on the basis of actual volumes before the extraction of liquifiable hydrocarbons. During 1997, 1996 and 1995, natural gas utilized in reinjection operations amounted to 644 billion, 540 billion and 481 billion cubic feet, respectively.

The following table shows estimated proven crude oil and natural gas reserves and proven developed crude oil and natural gas reserves, all located in Venezuela. Proven reserve quantities exclude natural gas liquids.

| | Year Ended December 31 | | | | |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | 1997 |
| | (million barrels) | | | | |
| **Proven Reserves**[1] | | | | | |
| Light and medium crude oil (API gravity of 21° or more) . . . . . . . . . | 18,712 | 19,335 | 19,907 | 21,426 | 22,544 |
| Heavy and extra heavy crude oil (API gravity of less than 21°)[2] . . . . . . | 45,735 | 45,543 | 46,421 | 51,149 | 52,387 |
| Total crude oil . . . . . . . . . . . . . . . | 64,447 | 64,878 | 66,328 | 72,575 | 74,931 |
| Natural gas (bcf) . . . . . . . . . . . . . . | 138,050 | 140,009 | 143,542 | 142,976 | 145,531 |
| Proven reserves of crude oil and natural gas (boe)[3] . . . . . . . . . . . | 88,249 | 89,017 | 91,077 | 97,226 | 100,023 |
| Remaining reserve life of crude oil (years)[4] . . . . . . . . . . . . . . . . . | 72 | 69 | 65 | 72 | 63 |
| **Proven Developed Reserves** | | | | | |
| Light and Medium crude oil (API Gravity of 21° or more) . . . . . . . . | 8,484 | 8,463 | 8,712 | 9,884 | 10,464 |
| Heavy and extra heavy crude oil (API gravity of less than 21°) . . . . . . . | 5,363 | 5,691 | 5,758 | 5,949 | 6,552 |
| Total crude oil . . . . . . . . . . . . . . . | 13,847 | 14,154 | 14,470 | 15,883 | 17,016 |
| Percentage of proven crude oil reserves . . . . . . . . . . . . . . . . . | 21% | 22% | 22% | 22% | 23% |
| Natural gas (bcf) . . . . . . . . . . . . . . | 96,635 | 98,006 | 100,702 | 100,278 | 101,292 |
| Proven developed reserves of crude oil and natural gas (boe) . . . . . . . . . | 30,508 | 31,052 | 31,832 | 33,122 | 34,579 |

(1) Proven reserves include both proven developed reserves and proven undeveloped reserves.

(2) Includes reserves in the Orinoco Oil Belt.

(3) Natural gas is converted to barrels of oil equivalent (boe) at a ratio of 5.8 thousand cubic feet of natural gas per one barrel of crude oil.

(4) Based on 1997 crude oil production.

Source: *Petróleos de Venezuela, S.A.*

45

*Proven crude oil and natural gas reserves are estimated by using geological and engineering data to demonstrate with reasonable certainty whether they are recoverable in future years from known reservoirs under existing economic and operating conditions, and include proven developed and proven undeveloped reserves. Proven developed crude oil and natural gas reserves can be expected to be recovered through existing wells with available equipment and operating methods; and proven undeveloped crude oil and natural gas reserves are expected to be recovered from new wells on undrilled acreages. Reserve estimates are based on subjective judgments and, consequently, are not precise and are subject to revision. Crude oil and natural gas reserves are reviewed annually to take into account factors such as production levels, reservoir performance reviews, the addition of new reserves from discoveries and changes in economic parameters.*

In July 1995, CVP was authorized by the Government to begin hydrocarbon exploration, development and production offshore and in the states of Cojedes, Delta Amacuro, Guárico, Mérida, Portuguesa, Sucre, Trujillo and Zulia (collectively, the "Areas"). The Areas comprise approximately 4.5 million acres. To accelerate the development of the Areas, CVP selected a number of foreign investors in January 1996 to undertake exploration of the Areas. The selected investors will bear all of the risks and expenses during the exploration stage which, depending upon the Area assigned, is expected to last between three and five years (and may be extended by two to four years). With respect to certain parts of the Areas (each a "Block") in which hydrocarbons are discovered, it is anticipated that CVP will enter into a joint venture agreement with the investor assigned to such Blocks. CVP may own between 1% and 35% of the joint venture.

Using its own resources, PDVSA plans investments of approximately U.S.$2.7 billion in exploration activities in the period 1997 through 2006 to increase its light and medium crude oil reserves. It is expected that these activities could increase such reserves by as much as 8,500 million barrels. Total expected investment in exploration from the winning bidders is expected to reach approximately U.S.$2 billion.

PDVSA has also conducted exploration activities in the Orinoco Belt where it has large proven reserves of heavy and extra heavy crude oil. The Orinoco Belt is generally considered the world's largest area of heavy and extra heavy oil accumulation. In the period 1979 through 1983 PDVSA, through its affiliates undertook an evaluation of the area. An intensive exploration campaign was carried out during which approximately 660 wells were drilled. After this activity original-oil-in-place of 1,200 billion barrels were estimated to be contained in the Orinoco Belt. By the end of 1996, only 36.3 billion barrels of this immense resource had been incorporated in the Venezuelan oil reserves because only those oil reserves in areas ready for production projects in the Orinoco Belt are taken into account for purposes of calculating reserves.

*Petroleum Production and Exports*

The following table sets out production, export and revenue statistics for the industry since 1992, excluding all products refined outside of Venezuela:

| Years | Production[1] | | Exports | | | Domestic Consumption | Realized Price | | |
|---|---|---|---|---|---|---|---|---|---|
| | Crude | Refined | Crude | Refined | Total | | Crude | Products | Total |
| | (Thousands of bpd) | | (Thousands of bpd) | | | (Thousands of bpd) | (U.S. dollars per barrel) | | |
| 1993 | 2,410 | 2,038 | 1,540 | 630 | 2,170 | 376 | 12.11 | 16.35 | 13.34 |
| 1994 | 2,512 | 1,999 | 1,693 | 649 | 2,342 | 361 | 12.11 | 15.36 | 13.23 |
| 1995 | 2,752 | 2,121 | 1,818 | 718 | 2,536 | 378 | 13.93 | 17.14 | 14.84 |
| 1996 | 2,937 | 2,153 | 1,976 | 775 | 2,751 | 334 | 17.44 | 20.82 | 18.39 |
| 1997 | 3,206 | 2,482 | 2,211 | 841 | 3,052 | 364 | 15.10 | 19.76 | 16.31 |

(1) Does not include condensates.

Source: *Petróleos de Venezuela, S.A.*

Production during 1997 averaged 3,206,000 barrels per day ("bpd") of crude oil. Total petroleum exports from Venezuela averaged 3,052,000 bpd in 1997, of which 2,211,000 bpd consisted of crude oil and 841,000 bpd consisted of refined products. The average price of these sales was U.S.$16.31 per barrel.

One of the most significant undertakings of PDVSA has been the adaptation of its national refining operations to satisfy PDVSA's domestic and export requirements. Prior to nationalization in 1976, concessionaires were required by law to refine in Venezuela a certain portion of the oil produced in Venezuela. In order to meet this legal obligation while pursuing their commercial objectives, the concessionaires installed plants which could only process light crudes. The typical yield of those refineries was 35% gasoline and distillates, supplying local market demand, and 60% residuals, which were mainly exported to the United States. Upon nationalization, PDVSA determined that because its oil reserves were composed of 65% heavy crudes and 35% light and medium crudes a change in refining capabilities was required. Plans were implemented to adapt the Amuay, Punta Cardón and El Palito refineries to process heavier crudes and improve product yields. During the next seven years, the results were a substantial improvement in the composition of exports, reducing progressively PDVSA's participation in the residuals markets; the assurance of supply capacity for the local market; an increase in domestic refinery capacity; and an improvement of yields, increasing gasoline and distillates from 35% to 71% and reducing residuals from 60% to 22%.

Between 1983 and 1994, PDVSA implemented a complementary refining and marketing strategy through the acquisition of additional refinery capacity geographically closer to the final consumer. During this period, PDVSA acquired total or partial ownership in 15 refineries in Belgium, Germany, England, Sweden and the United States, and leased a refinery in the Caribbean. See "—Diversification Programs and Foreign Investment." PDVSA is involved in refining activities in Venezuela and the Caribbean, the United States and Europe. PDVSA has six refineries in Venezuela, in which it holds a 100% interest, with a total rated crude oil refining capacity of 1,278 MBPD, and leases and operates a refinery in Curaçao, with a refining capacity of 335 MBPD. PDVSA has equity or ownership interests in seven refineries in the United States, three of which it wholly owns and two in which it has equity interests, with an aggregate net interest in crude oil refining capacity of 945 MBPD. PDVSA has equity interests in nine refineries in Western Europe with a total rated crude oil refining capacity at December 31, 1997 of 968 MBPD, of which PDVSA's net interest in crude oil refining capacity is 263 MBPD.

### Diversification Programs and Foreign Investment

The Venezuelan oil industry, which prior to the 1980s was largely an exporter of crude oil, is now predominantly a seller of oil products via downstream investments in important centers of consumption. Downstream diversification programs, planned since 1978 and initiated in 1983 with the establishment of a 50% joint venture with the German company Veba Oel for refining and distribution, form part of PDVSA's global marketing strategy. In 1986, PDVSA entered into another joint venture in Western Europe when it purchased a 50% interest in Nynas Petroleum, a subsidiary of Sweden's Axel Johnson group, which participates in five refineries in Western Europe. Also in 1986, PDVSA purchased CITGO, which in turn has purchased various petrochemical assets in the United States. In 1995, the overall operations of CITGO provided PDVSA with an outlet for a total of 378,000 bpd of Venezuelan crude oil and petroleum products pursuant to long-term supply agreements. In 1989 PDVSA entered into a 50% joint venture with Unocal covering most of Unocal's refining, distribution and marketing assets in the midwestern United States and in 1997 PDVSA acquired Unocal's 50% of the venture. The objective of these programs is to secure a stable outlet for a significant proportion of Venezuela's petroleum production, while assuring a long-term, secure and reliable supply to the world's major consumption centers. Since the implementation of such programs commenced in 1983, PDVSA has invested approximately U.S.$3.0 billion in refining and marketing subsidiaries and joint ventures outside of Venezuela. At December 31, 1996, approximately 20% of PDVSA's consolidated net assets were represented by foreign assets.

In addition to the investments described above, PDVSA has increased its storage capacity abroad to enhance its operational and commercial flexibility. PDVSA's total storage capacity at December 31, 1996 included 92,000,000 barrels in Venezuela, 15,000,000 barrels in Curacao, 10,000,000 barrels in Bonaire and 20,000,000 barrels in the Bahamas.

*Other Projects*

A principal business strategy of PDVSA involves the outsourcing of activities that are not considered to be part of its core businesses. Among the activities that are, or are currently expected to be, the subject of such outsourcing, whether by contract with third parties, joint ventures or otherwise, are electric generation, gas compression, data processing, pipelines and terminal facilities. Outsourced projects currently being implemented include the El Furrial and PIGAP II gas injection project, the operation of a terminal facility at Jose, and the Accro III and IV projects involving natural gas extraction, fractioning, refrigeration and storage facilities.

As part of the development of the Jose industrial complex, PDVSA is sponsoring the development of a number of services to be shared by each of the projects. Services include water supply of 4,000 liters per second, 600 MW of electricity, 700 million cubic feet per day ("cfd") of natural gas, and terminal facilities for 2,500 bpd of crude oil. Each of these activities is expected to be outsourced to third parties.

PDVSA is also developing a number of projects with the private sector to process intermediate refinery streams into higher margin products that will substitute for imports and increase non-traditional exports. Such products include solvents, propylene, waxes and oil tars. PDVSA's subsidiary affiliate Proesca, S.A. is responsible for such ventures.

In December 1996, PDVSA, together with Science Applications International Corporation ("SAIC"), established a new joint venture company, Intesa, S.A. that will render information systems services and provide support and maintenance services for the information technology systems of PDVSA and its Venezuelan subsidiaries.

*Strategic Plan—Investments*

As noted above, since 1990 PDVSA and the Government have jointly pursued an ambitious long-term expansion initiative aimed at developing the country's enormous hydrocarbon resources. PDVSA has set aggresive goals and objectives for the Venezuelan petroleum industry, summarized as follows:

- To increase substantially production and refining capacity and capabilities through PDVSA's own investments and through joint ventures;

- To expand and upgrade PDVSA's crude oil refining capacity, both within and outside Venezuela, to accommodate higher crude oil production and an anticipated increase in the production of heavy and extra heavy crude oil, which otherwise would have limited markets, and to adapt its product slate to the quality constraints of its international markets, including the United States, and

- To expand its refining and marketing operations internationally, to ensure stable demand for its crude oil production and reduce vulnerability to crude oil volume and price fluctuations.

PDVSA's five-year strategic plan calls for an increase in production capacity from 3.4 million bpd during 1996 to 5.0 million bpd during the period between 1997 and 2001. The five-year plan is part of a larger plan to produce 6.2 million bpd by the year 2006. Most of the growth in production is expected from the associations with foreign partners initiated in 1991. See "—The Opening of the Venezuelan Petroleum Sector."

PDVSA's five-year strategic plan calls for average annual capital expenditures of U.S.$4.4 billion, the same amount as the actual average annual capital expenditures from 1991 through 1996. PDVSA's strategy is to finance future capital expenditures from its annual operating cash flow (net income plus depreciation), which was U.S.$5.8 billion, U.S.$7.3 billion and U.S.$7.4 billion for 1995, 1996 and 1997, respectively. PDVSA is currently receiving on average approximately U.S.$40 million in export revenues each business day. Such revenues are available on a priority basis by law to meet PDVSA's commitments in foreign currency. Should lower oil prices or other factors cause reductions in expected cash flows, as is the case in 1998, PDVSA expects to maintain the flexibility to reduce spending (particularly for exploration and production) to meet any commitments related to projects whose construction cannot be delayed. PDVSA's strategic plan also contemplates approximately U.S.$11.3 billion in capital contributions from its foreign partners. See "—The Opening of the Venezuelan Petroleum Sector."

PDVSA's ability to make investments depends on its income. The income of PDVSA's operating subsidiaries, Lagoven, Maraven, and Corpoven, is taxed at a rate of 67.7%. In determining taxable income for the operating subsidiaries, export revenues are adjusted upward by a percentage (the "Export Reference Value") that cannot legally exceed 20%. The average Export Reference Values were 15.9%, 8% and 4% in 1993, 1994 and 1995, respectively. In order to permit PDVSA to increase its capital expenditures, the Ministry of Energy and Mines and the Ministry of Finance reduced the Export Reference Value to 0% in 1996. In addition to income tax liability, the operating subsidiaries are obligated by law to make a mandatory payment to PDVSA equal to 10% of their net income from exports. Although these mandatory payments are deductible from the operating companies' taxable income, they are non-taxable income for PDVSA. As a result of anticipated lower income in 1998 due to the sharp decline in international oil prices and volume reductions announced by PDVSA, PDVSA anticipates a decline in expenditures under its investment program during 1998.

PDVSA and all of its subsidiaries are entitled to a tax credit for new investments up to 14% of the amounts invested. Such credits, however, may not exceed 2% of the subsidiary's annual net taxable income.

### The Opening of the Venezuelan Petroleum Sector

Since 1990, PDVSA and the Government have jointly developed initiatives aimed at expanding the country's hydrocarbon production through greater private participation. The purpose of the initiatives is to strengthen the private sector's role in developing Venezuela's hydrocarbon reserves, and to integrate the international oil community's participation in Venezuela's upstream development. By working with the private sector, PDVSA also expects to leverage existing resources to develop areas of strategic importance, the development of which would otherwise be postponed until resources became available. These initiatives reflect PDVSA's philosophy of involving the latest technology, outside management, partner relationship, and private ownership in its expansion program and non-core activities.

Since 1992, Venezuela has held three successful bidding rounds with 48 oil companies to reactivate 33 marginal fields. These oil companies will use secondary and tertiary recovery techniques to produce oil for PDVSA, pursuant to service agreements, from fields that no longer meet PDVSA's required rate of return on investment. Approximately 284,000 barrels per calendar day ("bcd") of crude oil were being produced from these fields at year-end 1997, and PDVSA projects that production will increase to 750,000 to 900,000 bcd when the fields are in substantially full operation by the year 2007. These fields are expected to contain proven reserves in excess of 5.6 billion barrels of crude oil and condensates. Under the initiative, companies have already invested in excess of U.S.$4.2 billion and are committed to spending an additional U.S.$10.5 billion over the next ten years.

In addition to the marginal field initiatives the Venezuelan Congress has approved since 1993 several strategic associations with foreign investors requiring investments of almost U.S.$15 billion. The Venezuelan Government has approved four joint ventures for the exploitation of the hydrocarbon resources of the Orinoco Belt; the first is between Maraven and Conoco Inc.; the second is a joint venture between Maraven, Total, Statoil, and Norsk Hydro; the third is a joint venture between Corpoven and Atlantic Richfield Corporation, Phillips Petroleum Company and Texaco, Inc.; and the fourth is a joint venture between Lagoven, Mobil Oil Corporation and Veba Oel. If completed as planned, these four alliances will produce approximately 500,000 bcd of upgraded crude oil by early in the next decade. In addition, two letters of intent have been signed with Exxon and Coastal for the possible development of additional heavy crude oil projects.

### Petrochemicals, Orimulsion® and Coal

Government activities in the field of petrochemicals are carried out through Pequiven. Pequiven promotes initiatives in the field of petrochemicals and related chemicals, participates in the development of investment opportunities in these fields and, when necessary, invests directly in projects of a strategic nature.

The raw materials currently used in the Venezuelan petrochemical industry are natural gas and natural gas liquids ("NGLs"), reformed naphtha, sulphur phosphate rock and salt. The main feedstocks, natural gas and NGLs, have been supplied by Corpoven and Maraven. Phosphate rock is mined in the State of Falcón by a

Pequiven subsidiary, Fosfaven. Marine salt comes from eastern Venezuela, and sulphur is provided by the refineries of Amuay, Cardón and El Palito, belonging respectively to Lagoven, Maraven and Corpoven. Reformed naphtha is supplied by Corpoven at the El Palito refinery. In addition to natural gas, intermediate refinery streams from PDVSA refineries will become a major feedstock for future petrochemical developments.

Pequiven operates three petrochemical complexes, with a total combined production capacity of over three million metric tons per annum. In addition to Pequiven's own production facilities, the three sites include plants belonging to joint ventures between Pequiven and local and foreign private partners.

The Morón complex, in the State of Carabobo, deals primarily with fertilizer production for the local market. The El Tablazo complex, on the eastern shore of Lake Maracaibo in the State of Zulia, produces olefins and derivatives thereof, mainly thermoplastic resins, nitrogen-based fertilizers and industrial chemicals. In 1987, construction began on the third petrochemical complex, the Eastern ("Jose") complex, located on the eastern coastline of the country in the State of Anzoátegui. Next to this site, a cryogenic complex built and operated by Corpoven supplies most of the raw materials required for the manufacture of petrochemicals. The first plant within this complex, a methyl-tertiary-butyl-ether (MTBE) unit, started production in March 1991. This complex also includes two large methanol plants, which started commercial operations in April 1994 and January 1995, respectively. Plants for producing petrochemicals out of intermediate refinery streams will be located close to the Cardón and Amuay refineries.

At present, Pequiven is a partner in 17 joint ventures operating mostly in the three existing petrochemical complexes. Eight new joint ventures are at various stages of development. Gross production from joint ventures was approximately 3.3 million metric tons in 1997, which remained constant for 1996. The main products to be produced by the joint ventures include methanol, ethylene, propylene, ethylene oxide, glycols, polyethylenes, caustic soda, chlorine, ethylene dichloride, thermoplastic resins, aromatics and derivatives, and other special products.

With a view to contributing to the funding of the continued expansion of Pequiven's petrochemical activities in accordance with the investment plan, PDVSA is encouraging further private participation in these activities.

Gross production of Pequiven's wholly-owned plants and its joint ventures is estimated to increase from eight million metric tons per annum in 1997 to 16.8 million metric tons per annum in 2007. As of December 31, 1997, Pequiven's total gross assets amounted to approximately U.S.$950 billion. Its revenues for 1997 were approximately U.S.$916 million. Pequiven's gross production for its wholly-owned plants and joint ventures combined in 1997 totalled 7.7 million metric tons, as compared to 8.0 million metric tons in 1996.

The Orinoco Belt has substantial reserves of natural bitumen, an extra-heavy hydrocarbon product. PDVSA, through its wholly-owned subsidiary, Bitúmenes Orinoco, S.A. ("Bitor"), has developed a process of combining natural bitumen with water and a surfactant to create Orimulsion®, a liquid coal substitute. Bitor plans, develops and markets the bituminous resources of the Orinoco Belt. Field development and production of the resources needed to manufacture Orimulsion® in 1997 was approximately 4.3 million metric tons, an increase of 300,000 metric tons from 1996. Orimulsion® is marketed world-wide by Bitor itself, and through Bitor's two wholly-owned subsidiaries, Bitor Europe Limited and Bitor America Corporation, and through a 50% joint venture with Mitsubishi Corporation of Japan, MC Bitor Ltd. Bitor has also signed a marketing alliance with Citizens Corporation for the North American market and has begun developing commercial relations with local channels in various countries in the Far East.

With respect to coal, a project has been commenced to tap a rich thermal coal bed located in the Guasare River basin in the northwestern region of the State of Zulia. The project is led by Carbones del Zulia, S.A. ("Carbozulia"), a wholly-owned subsidiary of PDVSA. Detailed exploration of the Guasare region has shown proven coal reserves of 983 million metric tons. The coal deposit is about 50 kilometers long by three kilometers wide and comprises four major areas that can be exploited. The Guasare region, from north to south, has the following coal reservoirs: the Norte mine with proven reserves exploitable by open-pit operations of 59 million metric tons; the Paso Diablo mine with open-pit proven reserves of 180 million metric tons; the Socuy mine with 226 million

metric tons; and the Cachirí field with 14 million metric tons. Guasare offers a premium quality bituminous coal with a sulphur content of only 0.6%, a low ash content of 6.7% and a high calorific value of 12,650 BTU/lb. Of the total proven coal reserves, 18% has been exploited, and 50% of the total can be exploited using current operating methods. New methods of extraction must be applied in the near future to recover the remaining Guasare coal reserves.

International sales of coal are conducted by Guasare Coal International, a wholly-owned subsidiary of Carbozulia. Carbozulia expects to increase coal production from 4.0 million metric tons in 1997 to 21.0 million metric tons per year by the year 2007 by means of additional international joint ventures. Carbozulia does not sell coal to the Venezuelan domestic market.

### *OPEC*

Venezuela is a founding member of OPEC, whose members collectively produced approximately 41% of total world production of crude oil and accounted for about 62% of worldwide crude oil exports in 1996. In addition, OPEC countries hold 77% of world crude oil reserves. OPEC was founded in 1960 for the purposes of improving oil prices, attaining greater state participation by member countries in the petroleum industry and influencing production levels. Pursuant to agreement among OPEC members, general quotas for production by each country have been established. Such quotas have not been the subject of any formal actions by OPEC, and the quotas do not distinguish clearly between crude oil, refined products and derivatives and between exports and domestic utilization. To date, the quotas assigned to Venezuela within OPEC have not had any adverse effects on Venezuela's petroleum exports or production. Venezuela's strategic plan to increase its petroleum production and exports assumes that the growth in international demand for petroleum products can only be met by a small number of countries, including Venezuela, that have adequate reserves. Venezuela believes that the reality of this situation, and the need for oil consuming countries and oil producing countries to continue to act in a mutually beneficial manner, will result in the future in a reorientation in the structure and stated goals of OPEC.

Crude oil prices declined in 1997 as compared to 1996, as growing supply, particularly from the re-entry of Iraq in world oil markets, more than offset strong demand. As a result, the price for crude oil of the OPEC basket declined by $1.50 per barrel, to an average of $18.80 per barrel in 1997. Beginning in the first quarter of 1998, international oil prices declined significantly due to several factors, including reduced energy demand caused by the Asian crisis, a mild winter in the Northern Hemisphere, and growing supply from Iraq, and high inventory levels globally.

On March 22, 1998, in response to the continued sharp decline in the levels of prices for crude oil, several major oil exporting countries, including Venezuela, agreed on a temporary basis to adopt measures expected to reduce the current levels of crude oil production. On June 4, 1998, Venezuela, Saudi Arabia and Mexico met in Amsterdam to discuss the state of the international oil market and agreed to reduce their aggregate crude oil production by 450,000 barrels per day. On June 24, 1998, Venezuela and a number of OPEC and non-OPEC oil exporting countries met in Vienna and agreed to further reductions in their aggregate oil production in an effort to mitigate the effects of decreased demand for oil experienced during 1998. As a result of these meetings, Venezuela has agreed to reduce its oil production on a temporary basis by an aggregate amount of 525,000 barrels per day. Notwithstanding the agreements between oil-producing nations to curtail production, international oil prices remain at a ten-year low and a recovery, if any, in the international oil markets during the remainder of 1998 and 1999 will be gradual.

### **Manufacturing and Mining**

After the petroleum and natural gas sector, the second most important sector of the Venezuelan economy is manufacturing. The manufacturing sector can be divided into two sub-sectors, one which produces goods for the domestic market in connection with the Government's plans to encourage domestic industry and import substitution and the other which produces goods for export.

The industries producing intermediate goods (inputs for other factories) have been developed predominantly by public enterprises.

### *Corporación Venezolana de Guayana*

After PDVSA, the second largest industrial complex in the country is made up of branches and subsidiary companies of CVG. CVG was created in 1960 to institutionalize the industrial development strategies of one of the richest areas in Venezuela. The creation of CVG enabled Venezuela to develop an extensive industrial complex in sectors in which Venezuela had a comparative advantage due to low-cost inputs of energy, electricity and high-quality minerals. Despite such comparative advantages, many of the CVG companies have incurred significant losses due to low commodity prices for CVG's products and inefficient management and labor operations. As part of the Adjustment Program and Agenda Venezuela, the Government has undertaken a number of internal reorganizations intended to improve the operating performance of CVG and reduce the costs imposed on the consolidated public sector accounts occasioned by CVG's losses. In 1994, the Government decided to privatize CVG's aluminum and steel industries, among others, and a commission, comprised of CVG, FIV and each institution involved in the aluminum and steel sectors, was established to oversee the restructuring and privatization processes.

Pursuant to that program, FIV and CVG successfully completed the sale of 70% of CVG's steel production assets held by C.V.G. Siderúrgica del Orinoco, C.A. (SIDOR) in January 1998 to Consorcio Siderurgica Amazonia Ltd. ("Amazonia"), a consortium of industry participants comprised of Sivensa, S.A.C.A. (Venezuela), Hylsamex S.A. de C.V. (Mexico), Siderar S.A. (Argentina) and Usiminas (Brazil), generating cash proceeds in the amount of U.S.$1.2 billion. The amount paid for SIDOR is equivalent to 70% of the winning bid amount (approximately U.S.$2.3 billion) net of liabilities assumed by Amazonia in the amount of approximately U.S.$584 million. Of the remaining 30% of the outstanding capital stock of SIDOR which was retained by the Government, it is expected that up to 20% will be offered for sale to employees of SIDOR, in accordance with Article 13 of the Privatization Law, and that 10% will be offered to the general public in Venezuela. In view of Venezuela's position as the third largest steel producer in Latin America, behind Brazil and Mexico, the Government anticipates that private ownership of SIDOR will enable it to gain access to the technological and financial resources necessary to compete successfully in the global marketplace. FIV and CVG have commenced the process of privatizing the ferroalloy and integrated aluminum sectors of CVG. The integrated aluminum sector, which includes the bauxite transport and storage and alumina processing operations of C.V.G. Bauxilum, C.A. (with an installed capacity of 230,000 metric tons per year of alumina), the aluminum processing facilities of C.V.G. Industria Venezolana de Aluminio, C.A. (VENALUM) (with an installed capacity of 430,000 metric tons per year) and C.V.G. Aluminio del Caroní S.A. (ALCASA) (with an installed capacity of 210,000 metric tons per year), and the coal anode processing facilities of C.V.G. Carbones del Orinoco, C.A. (CARBONORCA) (with an installed capacity of 193,800 metric tons per year of baking capacity), is intended to be sold to strategic industry participants in the first stage of the privatization process, with a potential public offering of the Government's remaining shares at a later date. To that end, the Government initiated in 1997 a bidding process for its aluminum sector companies. The proposed sale of the aluminum sector did not, however, result in a bid, and a second proposed sale in July 1998 also failed to receive a bid. In light of the failures of the two auctions, the Government is evaluating the situation regarding the aluminum sector.

The following tables set out the production and exports of CVG's aluminum, iron, steel and gold companies for the five years ended December 31, 1997:

| Production | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 1993 | 1994 | 1995 | 1996 | 1997 |
| | (in thousands of metric tons, except as noted) | | | | |
| Iron | 17,300 | 18,300 | 19,432 | 19,720 | 17,554 |
| Bauxite | 2,500 | 4,892 | 5,360 | 5,360 | 4,966 |
| Alumina | 1,500 | 1,551 | 1,669 | 1,778 | 1,730 |
| Aluminum | 576 | 418 | 427 | 426 | 639 |
| Steel | 2,655 | 2,682 | 2,791 | 3,194 | 3,097 |
| Gold (in kilograms) | 2,548 | 2,916 | 3,274 | 3,486 | 3,325 |
| Ferroalloys | 47 | 41 | 47 | 67 | 54 |

Source: *CVG Companies.*

| Exports | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 1993 | 1994 | 1995 | 1996 | 1997 |
| | (in millions of U.S. dollars) | | | | |
| Iron Ore | $145 | $137 | $202 | $161 | $239 |
| Aluminum | 472 | 571 | 915 | 660 | 634 |
| Steel | 252 | 350 | 276 | 294 | 443 |
| Alumina | 46 | 48 | 91 | 48 | 85 |
| Ferroalloys | 16 | 18 | 27 | 48 | 23 |

Source: *CVG Companies.*

## Agriculture and Livestock

Venezuela's principal agricultural and livestock products are coffee, cacao, plantains, sugar cane, rice, corn, pork, eggs and milk. The following tables set out the production, exports and imports of the agricultural sector for the five years ended December 31, 1997:

| Production | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 1993 | 1994 | 1995 | 1996 | 1997 |
| | (in thousands of metric tons) | | | | |
| Coffee | 66.5 | 68.4 | 65.1 | 73.0 | 63.0 |
| Cacao | 16.1 | 17.0 | 16.5 | 17.1 | 18.5 |
| Sugar cane | 7,200.7 | 6,521.8 | 6,146.9 | 6,423.8 | 6,429.0 |
| Rice | 723.4 | 728.1 | 756.9 | 779.9 | 792.2 |
| Corn | 987.8 | 1,094.5 | 1,166.7 | 1,033.3 | 1,199.2 |

Source: *Banco Central.*

| Year ended December 31, | Exports (f.o.b.) | Imports (f.o.b.) |
| --- | --- | --- |
| | (in millions of U.S. dollars) | |
| 1993 | $239 | $709 |
| 1994 | 250 | 641 |
| 1995 | 224 | 877 |
| 1996[1] | 259 | 878 |
| 1997[1][2] | 250 | 601 |

(1) Preliminary figures.

(2) Through September 30, 1997.

Source: *Banco Central.*

53

The Adjustment Program in 1989 and 1990 had an adverse effect on the agricultural sector through significant increases in the costs of agricultural inputs. The impact of the exchange rate unification and corresponding depreciation of the Bolivar against the U.S. dollar had a greater effect on this sector than other sectors due to the fact that many inputs for the agricultural sector had been imported at the preferential controlled rate of Bs.7.50 = U.S.$1.00 until March 1989. In addition, the agricultural sector had benefited from preferential interest rate policies. In July 1990, the Government issued new guidelines and adopted measures for the commercial reform of the agricultural sector. The measures were intended to promote efficiency in, and diversification of, the agricultural sector, mitigate the adverse effects of the Adjustment Program on consumer prices for foodstuffs, and orient the agricultural sector toward specialization in those agricultural products in which Venezuela has a comparative advantage. The most significant of these measures have been a simplification of the tariff classification system for agricultural products; a progressive reduction of tariffs for agricultural products, which at present have a maximum rate of 20%; and the progressive elimination of import quotas. Another important step taken has been the creation of the Interministerial Commission for the Design and Follow-up of the Commercial Agricultural Reform, which coordinates actions and policies among the ministries involved in the agricultural sector. In order to stimulate growth in the agricultural sector, the Government is providing financing to small, medium and large producers. Financing for small producers is available through the Instituto de Crédito Agrícola (ICA), while financing for medium and large producers is made available with Government funds through Conindustria, a private organization. The Government also expects that increased trade within the Andean Community countries will also help to develop the agricultural sector.

## Electric Power

### The Participants

The electric power sector in Venezuela is made up of various state-owned and private companies serving approximately 3.8 million customers. Practically all of the assets of Venezuela's electric power sector are held by six companies: C.V.G. Electrificación del Caroní, C.A. ("EDELCA"), Compañía de Administración y Fomento Eléctrico ("CADAFE"), ENELVEN, ENELBAR, ENELCO and C.A. La Electricidad de Caracas, S.A.C.A. ("EDC"). EDELCA is owned by CVG and CADAFE, ENELVEN, ENELBAR and ENELCO are held by FIV. EDC is a privately held company.

EDELCA currently generates approximately 70% of the total electricity production in Venezuela from its two hydroelectric plants in the Caroní river basin in the Guayana Region. EDELCA's Guri and Macagua I plants have installed capacities of 9,025 megawatts ("MW") and 360 MW, respectively. CADAFE is the largest electricity distribution company in Venezuela covering approximately 90% of the country. ENELVEN, ENELBAR and ENELCO are each smaller vertically integrated electric companies serving Zulia State on the western coast of Lake Maracaibo, the Barquisimeto area of Lara State and the eastern coast of Lake Maracaibo, respectively. EDC is the largest privately held electric company, serving approximately 1.1 million customers throughout Venezuela, of which approximately 629,000 reside in Caracas and its suburbs.

### The Regulatory Framework and Tariff Rates

There is no unified body of law which regulates the electric power sector in Venezuela. The regulatory framework is based on two Presidential Decrees, Decree No. 368, dated July 27, 1989, and Decree No. 2383, dated July 21, 1992, which set forth the methodology for determining tariff rates and established the principal regulatory bodies. The Government has also issued Decree No. 1558, dated October 30, 1996, setting forth the *Norms for Regulation of the Electricity Sector* which provide for, among other things, less governmental involvement in the electric power sector in order to stimulate competition with the objective of achieving lower rates and better service quality. Decree No. 1558 contemplates the division of the electric power sector into three functions, generation, transmission and distribution, and separate accounting of costs among the three functions for private sector electric companies. Other sources of electric power sector regulation are derived from resolutions passed by the Ministry of Energy and Mines ("MEM") and the Ministry of Industry and Commerce ("MIC"), laws of general application and the National Concessions Law and the Municipalities Law. On March 10, 1998, a bill

was introduced and is currently under discussion in Congress which, if enacted, would provide for a unified regulatory framework to govern Venezuela's electric power sector at the national level.

MEM and MIC, in conjunction with *Comisión de Energía Eléctrica* ("CREE") and *Fundación para el Desarollo del Servicio Eléctrico* ("FUNDELEC"), are responsible for formulating policy for the electric power sector and setting tariff rates. The function of FUNDELEC includes conducting studies and drafting proposals for legislation concerning the organization of the electric power sector with a view to increasing competition and efficiency, establishing the methodology for calculating tariff rates and defining service quality norms and penalties for theft of electricity. CREE is responsible for approving tariff applications submitted by electricity companies, subject to final approval by MEM and MIC.

Tariff rates which may be charged by electric companies in Venezuela are established on a company-by-company basis. Currently, tariff rates are calculated using a cost-plus methodology. Under the cost-plus methodology, the tariff rate is set such that an electric company's revenues are sufficient to cover operating costs and expenses incurred in providing electricity to customers plus a profit margin which is a rate of return (the "Base Tariff") on the company's assets and working capital. The Base Tariff, which is established by CREE and applies to all electric companies, is currently set at 9.0%. Tariff rates may be adjusted periodically to account for inflation and changes in energy and oil prices. The Government announced on April 1, 1998 that tariff rates in effect on December 31, 1997 would remain in effect without adjustment for the remainder of 1998.

### Privatization Efforts

EDC and three other smaller electric companies are the only privately held electric companies in Venezuela. EDELCA, CADAFE, ENELVEN and ENELBAR on a combined basis generated approximately 88% and distributed approximately 78% of the total electricity used in Venezuela during the year ended December 31, 1997.

In 1992 the Venezuelan Congress enacted the privatization law which established guidelines for the restructuring and privatization of the electric power sector, which law was modified by new legislation passed on December 30, 1997 (collectively, the "Electricity Privatization Law"). Under the Electricity Privatization Law, FIV will be responsible for developing the Government's privatization policy and agenda with respect to its electric power sector holdings. To that end, FIV has already commenced the privatization process with respect to SENE, the electric utility company which serves the islands of Margarita, Coche and Cubagua. SENE's potential acquirors have been selected by FIV and CADAFE to begin their due diligence efforts in connection with the privatization. In accordance with Article 13 of the Electricity Privatization Law, 70% of the capital stock of SENE will be sold to the highest bidder at the time of auction, with up to 20% of the capital stock being sold to employees of SENE and the remainder being offered to the public in Venezuela. The sale of SENE is expected to be completed during the third quarter of 1998. FIV also expects to proceed with the privatization of CADAFE's Planta Centro thermo-electric generating facility, as well as ENELVEN, ENELBAR and ENELCO. The Government has announced plans to transfer all of the electricity transmission assets of CADAFE, EDELCA, ENELBAR and ENELVEN to a newly-formed entity, Empresa Nacional de Transmisión. The creation of Empresa Nacional de Transmisión is an integral part of the Government's plan to restructure the electric power sector in Venezuela for the purpose of facilitating the privatization of its electric power sector holdings. It is expected that the privatization of these companies will increase competition, productivity and efficiency in the country's electric power sector.

### Expansion Plans

Economic growth in Venezuela will require expansion of the electric power sector. In order to meet such anticipated demand, EDELCA is currently constructing a third hydroelectric plant, Macagua II, which will have an installed capacity of 2,564 MW and is expected to be completed by the end of 1998. EDELCA is also evaluating plans to build two other hydroelectric plants in the Caroní river basin, Carauchi and Tocoma, each having a projected installed capacity of 2,160 MW.

# Financial System

## Banco Central

Banco Central, which is wholly-owned by the Republic, is Venezuela's central bank and its currency-issuing bank. The law currently governing the operation of Banco Central was most recently amended on December 4, 1992 (the "Central Bank Law"). Under this law, Banco Central's statutory functions include: acting as depositary and financial agent for the Government; discounting and re-discounting prime commercial paper; conducting open market operations in Government, and other, securities; fixing rates of exchange for foreign currencies; trading in gold and foreign exchange; holding the gold and foreign exchange reserves of the country; setting the minimum reserve requirements for banks and other financial institutions, regulating interest rates charged for loans and paid for deposits and other liabilities by banks and other financial institutions; and acting as a clearinghouse for the banking system and other financial institutions.

### Monetary Policy

Banco Central has conducted an active monetary policy which has supported both the Adjustment Program and, subsequently, Agenda Venezuela. In this regard, Banco Central has utilized open market operations with respect to its own instruments issued initially through the Caracas Stock Exchange and later by means of an auction mechanism. The placement of zero coupon bonds has progressively replaced Banco Central's money desk as a primary mechanism of monetary regulation and has become an efficient means of moderating the increase of monetary aggregates. The use of the rediscount and loan mechanism has been reduced, consistent with Banco Central's role as a lender of last resort and with the greater resources available to the banking system.

In May 1991, Banco Central established a cash reserve requirement of 80% on the deposits and obligations of the public sector held in the banking system. In August 1991, the reserve requirements established for the deposits held by the private sector were raised progressively from 15% to 25%. On September 14, 1992, a revised set of cash reserve requirements was put into place by Banco Central. The revisions, which were phased in over a three-month period, entailed incremental reductions in the base reserve requirement on the deposits of both public and private sector institutions held in the banking system. In response to the financial crisis, Banco Central lowered the cash reserve requirements of the private sector deposits from 15% to 12% and temporarily exempted certain troubled financial institutions from the reserve requirements. Interbank loans increased substantially as those institutions with surpluses made overnight loans to those suffering liquidity shortages. The current cash reserve requirements are 25% for public sector deposits and 17% for private sector deposits.

The amendments to the Central Bank Law promulgated in December 1992 reaffirmed the importance of the monetary policy carried out by Banco Central, made Banco Central more independent and established the level of control by Banco Central of legal reserves within the financial system. The Central Bank Law, as so amended, prohibits Banco Central from making direct loans to the Republic and purchasing notes issued by the Republic, and eliminates Banco Central's fiduciary operations, while maintaining Banco Central's role as financial agent of the Republic.

On March 15, 1993, Banco Central adjusted the maximum level fixed for interest rates from 60% to a variable level that was tied to the average return on Banco Central's zero coupon bonds. In the area of monetary control, Banco Central reserve requirements for bank loans were reviewed and streamlined. Instead of requiring different reserve amounts depending on the type of loan transaction, a single reserve requirement was established.

At the end of 1993, instability in the financial markets became apparent and it was evident that a more restrictive monetary policy was necessary. During the first six months of 1994, however, a dichotomy existed in monetary policy. On the one hand, Banco Central recognized the need for a restrictive monetary policy and Banco Central increased the frequency of zero coupon bond auctions on the open market. On the other hand, Banco Central, as the "lender of last resort" during the financial sector crisis, granted financing to those financial

institutions confronting liquidity or solvency problems, both directly and indirectly through FOGADE. This prevented Banco Central from fulfilling its restrictive autonomous role in the economy and jeopardized its restrictive monetary policy.

By the second half of 1994, Banco Central was able to reestablish the restrictive character of its execution of its monetary policy in an attempt to drain excess liquidity from the market and, as a result of the stabilization of the financial sector, once again became a true "lender of last resort." In addition, the Government, in response to the continuing adverse economic conditions, implemented exchange controls and adopted various price and interest rate controls. See "The Venezuelan Economy—Historical Economic Performance—The Financial Sector Crisis and Economic Performance in 1994."

In 1995, Banco Central temporarily suspended the placement of zero coupon bonds and facilitated the placement of the remaining treasury bonds so that the Republic could refinance in an orderly fashion its external public debt obligations. At the end of January 1995, Banco Central issued TEMs, in substitution for zero coupon bonds, in order to establish the maximum (46%) and minimum (24%) interest rates in the monetary market.

The monetary base contracted in real terms by 3.8% in 1996 despite an increase in international reserves during that year (56.6% in U.S. dollars). See "The Venezuelan Economy—Foreign Trade and Balance of Payments—International Reserves." There was also an increase in fiscal income in 1996 from oil exports and from the devaluation of the exchange rate in April 1996. Moreover, foreign direct investment increased to U.S.$1.7 billion in 1996 from U.S.$909 million for 1995 as a result of the opening of the petroleum sector and the increased pace of the privatization program.

In real terms, the monetary base increased by 30.3% in 1997 as a result of the remonetization that was associated with the economic recovery, the reduction in inflation and increased investor confidence in Bolivar-denominated financial instruments that was experienced during 1997.

The table below sets forth the changes in monetary aggregates for the five-year period ended December 31, 1997 and for the three-month period ended March 31, 1998:

| Year | (M2) | | Monetary Base | |
|---|---|---|---|---|
| | In billions of nominal Bolivars | In billions of 1984 Constant Bolivars | In billions of nominal Bolivars | In billions of 1984 Constant Bolivars |
| 1993 | 1,660.7 | 106.2 | 422.7 | 27.0 |
| 1994 | 2,595.7 | 97.2 | 698.8 | 26.2 |
| 1995 | 3,535.9 | 87.3 | 872.5 | 21.5 |
| 1996 | 5,510.5 | 64.8 | 1,675.8 | 19.7 |
| 1997 | 8,945.7 | 76.4 | 3,004.7 | 25.7 |
| 1998[1] | 8,712.1 | 69.5 | 2,747.5 | 21.9 |

(1)  Through March 31, 1998.

Source: *Banco Central.*

Banco Central has intensified its restrictive monetary policy through the issuance of certificates of deposit, and more recently, TEMs. However, the results obtained through these issuances have not had a material impact on the expansionary tendencies in the monetary base referred to above.

In addition, pursuant to a special Refinancing Law passed by the Venezuelan Congress, the Government refinanced its obligations to Banco Central in the amount of U.S.$3.7 billion through a program involving the issuance of bonds of the Republic to Banco Central. This program is intended to strengthen the asset base of Banco Central and enable Banco Central to use these newly issued bonds as a tool for restrictive monetary policy which was not previously legally available to Banco Central. This in turn should have an impact on interest rates, which were decontrolled in 1996. The bonds will set a benchmark for rates and will assist Banco Central in its goal of promoting positive real interest rates. As of March 31, 1998, the Government had issued bonds totaling U.S.$906.8 million in repayment of its obligations to Banco Central pursuant to this program.

The following table sets out Venezuela's interest rates by quarter for the periods indicated:

| | Short-Term (Commercial Banks) | Long-Term (Mortgage Banks) | 90 Day CDs Deposit Rate | Central Bank Discount Rate | Basic Inflation Rate[1] |
|---|---|---|---|---|---|
| **Year and Quarter** | | | (in percent per annum)[2] | | |
| **1993** | | | | | |
| First Quarter | 54.32% | 39.18% | 48.17% | 62.40% | 36.51% |
| Second Quarter | 64.07 | 36.94 | 57.59 | 66.16 | 41.27 |
| Third Quarter | 56.70 | 47.81 | 49.53 | 63.40 | 45.70 |
| Fourth Quarter | 66.47 | 49.50 | 63.09 | 71.25 | 61.45 |
| **1994** | | | | | |
| First Quarter | 63.87% | 39.88% | 52.98% | 67.00% | 42.47% |
| Second Quarter | 61.48 | 33.24 | 44.97 | 67.00 | 96.80 |
| Third Quarter | 51.18 | 26.10 | 27.86 | 45.00 | 83.17 |
| Fourth Quarter | 42.07 | 28.60 | 24.26 | 48.00 | 65.85 |
| **1995** | | | | | |
| First Quarter | 39.46% | 26.98% | 21.51% | 43.50% | 41.07% |
| Second Quarter | 36.56 | 25.83 | 21.57 | 49.00 | 57.60 |
| Third Quarter | 40.63 | 23.49 | 26.94 | 49.00 | 43.86 |
| Fourth Quarter | 42.66 | 25.44 | 27.27 | 49.00 | 88.11 |
| **1996**[3] | | | | | |
| First Quarter | 42.47% | 27.41% | 29.78% | 51.00% | 135.96% |
| Second Quarter | 53.58 | 27.17 | 40.07 | 85.00 | 193.87 |
| Third Quarter | 34.03 | 23.94 | 23.47 | 85.00 | 64.36 |
| Fourth Quarter | 28.02 | 22.05 | 20.30 | 45.00 | 49.72 |
| **1997**[3] | | | | | |
| First Quarter | 19.61% | 25.41% | 13.15% | 45.00% | 29.14% |
| Second Quarter | 22.79 | 24.99 | 13.92 | 45.00 | 33.59 |
| Third Quarter | 26.84 | 28.33 | 13.59 | 45.00 | 44.94 |
| Fourth Quarter | 26.09 | 28.07 | 16.34 | 45.00 | 43.40 |
| **1998**[3] | | | | | |
| First Quarter | 33.10% | 26.49% | 23.96% | 60.00% | 31.58% |

(1)   Based on the CPI (Base 1984=100), calculated by annualizing forward cumulative quarterly inflation rates.

(2)   Interest rates are calculated using averages during the relevant period.

(3)   Preliminary figures.

Source: *Banco Central.*

The following table sets out total outstanding loans and long-term investments (by quarter) by public and private financial institutions for the five years ended December 31, 1997 and for the three-month period ended March 31, 1998:

| Year and Quarter | Commercial Bank Credit[1] | | Mortgage Bank Credit[1] | | Other[2] | Total Credit of the Financial System[3] | Percentage Change[4] |
|---|---|---|---|---|---|---|---|
| | | | | | (in millions of Bolivars) | | |
| **1993** | | | | | | | |
| First Quarter . . . . . . . . . . . . . . | Bs. | 781.332 | Bs. | 69.985 | Bs. 177.877 | Bs. 1,029.194 | 31.96% |
| Second Quarter . . . . . . . . . . . | | 755.011 | | 73.802 | 192.663 | 1,021.476 | 19.69 |
| Third Quarter . . . . . . . . . . . . | | 793.371 | | 78.820 | 205.217 | 1,077.408 | 17.84 |
| Fourth Quarter . . . . . . . . . . . . | | 836.583 | | 84.718 | 217.046 | 1,138.347 | 13.92 |
| **1994** | | | | | | | |
| First Quarter . . . . . . . . . . . . . | Bs. | 943.598 | Bs. | 81.011 | Bs. 185.018 | Bs. 1,209.627 | 17.53% |
| Second Quarter . . . . . . . . . . . | | 1,070.310 | | 78.565 | 211.247 | 1,360.122 | 33.15 |
| Third Quarter . . . . . . . . . . . . | | 1,068.440 | | 84.902 | 196.583 | 1,349.925 | 25.29 |
| Fourth Quarter . . . . . . . . . . . . | | 765.216 | | 56.779 | 203.498 | 1,025.493 | (9.91) |
| **1995** | | | | | | | |
| First Quarter . . . . . . . . . . . . . | Bs. | 741.369 | Bs. | 55.360 | Bs. 216.933 | Bs. 1,013.662 | (16.20)% |
| Second Quarter . . . . . . . . . . . | | 852.827 | | 58.067 | 227.459 | 1,138.353 | (16.32) |
| Third Quarter . . . . . . . . . . . . | | 984.692 | | 57.760 | 275.534 | 1,317.986 | 2.37 |
| Fourth Quarter . . . . . . . . . . . . | | 1,153.143 | | 62.990 | 283.516 | 1,499.649 | 46.24 |
| **1996** | | | | | | | |
| First Quarter . . . . . . . . . . . . . | | Bs.1,278.175 | Bs. | 65.569 | Bs. 318.085 | Bs. 1,661.829 | 63.96% |
| Second Quarter . . . . . . . . . . . | | 1,305.822 | | 66.046 | 283.991 | 1,655.859 | 45.40 |
| Third Quarter . . . . . . . . . . . . | | 1,081.362 | | 84.576 | 333.313 | 1,499.251 | 13.81 |
| Fourth Quarter . . . . . . . . . . . . | | 2,324.303 | | 48.998 | 255.168 | 2,628.469 | 75.31 |
| **1997** | | | | | | | |
| First Quarter . . . . . . . . . . . . . | | Bs.2,768.584 | Bs. | 40,173 | Bs. 319,771 | Bs. 3,128,528 | 88.26% |
| Second Quarter . . . . . . . . . . . | | 3,428,214 | | 54,904 | 375,128 | 3,858,246 | 133.01 |
| Third Quarter . . . . . . . . . . . . | | 4,124,729 | | 66,354 | 525,874 | 4,716,957 | 215.08 |
| Fourth Quarter . . . . . . . . . . . . | | 5,283,646 | | 56,284 | 685,261 | 6,025,192 | 125.71 |
| **1998** | | | | | | | |
| First Quarter . . . . . . . . . . . . . | | Bs. 5,403,666 | Bs. | 58,936 | Bs. 828,177 | Bs. 6,290,779 | 101.08% |

(1) Excludes, for the periods subsequent to December 1994, intervened and other state-owned banks.

(2) Includes finance companies, savings and loan institutions, Banco de los Trabajadores de Venezuela and Banco de Desarrollo Agropecuario. Excludes Banco Central.

(3) Excludes Banco Central.

(4) From the corresponding quarter of the previous year.

Source: *Banco Central.*

### Financial Institutions

The Superintendency of Banks is responsible for inspection, supervision and control of banks and credit institutions as well as any individuals, companies or institutions that conduct or purport to conduct any of the operations which are subject to the prior authorization of the Government under the General Law of Banks and Other Financial Institutions (the "Banking Law"). FOGADE, which was established in 1985, insures deposits up to Bs.4 million per depositor and assists in the recovery and stabilization of financial institutions through lending assistance.

On January 1, 1994, amendments to the Banking Law came into effect. The new Banking Law, the enactment of which was a part of the planned structural reforms of the Adjustment Program, contained five sets of major

amendments to the prior law. Whereas the prior regulatory scheme called for supervision only of the domestic operations of Venezuelan commercial banks, the amended Banking Law permits Government supervision of *Venezuelan banks' overseas lending activities. Also, the new Banking Law deregulated financial activity by* allowing banks to undertake any transactions unless explicitly prohibited in the Banking Law. Additionally, banks were authorized to include under one entity both commercial banking and other investment activities under the concept of a "universal bank." All entities, including all offshore operations, are required to prepare consolidated financial accounts and are subject to comprehensive regulation by the Superintendency of Banks. The regulatory scheme and standards have been strengthened, and Venezuelan commercial banks were required to meet the Basle Standards of capital adequacy as of December 31, 1995. As of that date 35 out of 39 operating Venezuelan commercial banks met the 8.00% minimum capital adequacy requirements of the Basle Standards. At December 31, 1996, 36 of 37 operating Venezuelan commercial banks were in compliance with the Basle Standards. At December 31, 1997, all operating Venezuelan commercial banks were in compliance with the Basle Standards. The amended Banking Law also permitted foreign investors to acquire shares in existing financial institutions and *to establish new banks and open new branches or representative offices. Finally, the amended Banking Law* increased the powers of the Superintendency of Banks and added additional administrative and criminal sanctions for violations of the banking law.

Immediately after the effectiveness of the Banking Law on January 14, 1994, the Government, through FOGADE, officially intervened in and temporarily closed the operations of Banco Latino, the second-largest commercial bank in Venezuela. The temporary closure of Banco Latino caused depositors at several other Venezuelan commercial banks to question the solvency of those institutions. As a result, many Venezuelan banks experienced significant withdrawals of deposits, and an additional eight financial institutions were forced to seek financial assistance from FOGADE during the first six months of 1994. On March 8, 1994, Congress passed special laws that retroactively raised the upper limit on insured deposits from Bs.1 million to Bs.4 million and raised the insurance fees that local banks are required to pay to FOGADE semiannually from 0.25% to 1.0% of a bank's total deposits (excluding deposits of public sector entities). On April 4, 1994, Banco Latino was reopened as a *state-owned bank. Under the procedures established for the reopening of Banco Latino, depositors with accounts* under Bs.10 million (approximately U.S.$86,000) had immediate availability of their funds while amounts in excess of that level are being repaid over time at below-market interest rates.

In an effort to prevent the failure of the remaining Venezuelan financial institutions, the Financial Emergency Board was created in June 1994 to coordinate Government actions in the banking sector. The Board was given broad powers to prevent the failure of additional financial institutions, including the powers to hire and dismiss directors and managers; expropriate assets from troubled institutions; and direct and approve the purchase of all shares of a troubled financial institution. See "The Venezuelan Economy—Historical Economic Performance—The Financial Sector Crisis and Economic Performance in 1994." In June 1994, the Government officially intervened the eight financial institutions to which it had been providing liquidity support. Subsequently, the Government acquired Banco de Venezuela and Banco Consolidado, which at that time were Venezuela's second and third largest commercial banks, respectively, and Banco Andino, a small regional bank. On December 13, 1994, Banco Progreso was intervened and closed and its assets were transferred among all the public sector banks. On January 31, 1995, the Financial Emergency Board intervened and closed Banco Italo Venezolano, Banco Profesional and Banco Principal, and distributed certain of their liabilities among the public sector banks. The last bank in which the Financial Emergency Board intervened and closed was Banco Empresarial in August 1995. As a result of the foregoing actions, FOGADE intervened in financial institutions representing approximately 54.6% of the total financial sector deposits. The financial cost of such assistance, which totalled approximately Bs.2,563 billion in nominal terms (approximately U.S.$16.8 billion), was provided by the Government.

By the third quarter of 1995, the financial sector's position had stabilized. Two foreign banks, ING Bank and ABN AMRO, opened operations in Venezuela in March and October 1995, respectively.

As a result of the intervention by the Government in Banco Latino, a number of Venezuelan financial institutions *faced significant outflows of funds as described above and the number of privately owned commercial banks* decreased significantly. As of March 31, 1998, the financial system consisted of 109 banking institutions, which

include 11 universal banks, 28 commercial banks (2 of which were publicly owned), 15 investment banks, 5 mortgage banks, 12 leasing companies 21 savings and loan associations and 12 money market funds, established in accordance with the Banking Law and the Law of Savings and Loans Associations.

In December 1996, FOGADE reprivatized Banco de Venezuela, Banco Consolidado and Banco Tequendama, raising a total of Bs.274.1 billion (approximately U.S. $577.6 million at the prevailing average exchange rate for December 1996 of Bs. 474.73=U.S. $1.00). International investors played a significant role in the reprivatization of such financial sector assets: Grupo Santander of Spain acquired Banco de Venezuela; the Infisa Group of Chile acquired Banco Consolidado; and Banco Bilbao Vizcaya of Spain acquired a 9.4% interest in Banco Provincial previously owned by Banco Metropolitano. FOGADE has also reprivatized eight insurance companies and a number of assets owned by the financial institutions acquired by the Government. During June 1997, FOGADE sold various assets of Banco Latino, including its branch networks, credit card affiliate and insurance affiliate, for a total of Bs. 53.4 billion (approximately U.S. $110 million at the prevailing average exchange rate for June 1997 of Bs. 485.63 = U.S. $1.00) and Banco República was reprivatized raising Bs. 28.0 billion (approximately U.S. $57.7 million at the prevailing average exchange rate for June 1997 of Bs. 485.63=U.S. $1.00). In December 1997, FOGADE reprivatized Banco Popular y de Los Andes for Bs. 21.9 billion (approximately U.S. $43.7 million at the prevailing average exchange rate for December 1997 of Bs. 502.80 = U.S. $1.00). It is expected that assets of other financial institutions will be sold during 1998.

## Securities Markets

### Stock Exchanges

There are three securities markets in Venezuela which are, in order of size, the Caracas Stock Exchange, the Electronic Stock Exchange and the Maracaibo Stock Exchange. The total volume of trading in these three exchanges is composed of trades in stocks and bonds. The Caracas Stock Exchange is the largest of the three, both in terms of stock and in bond trading, accounting for the majority of the stock trading and the overall trading volume. Since its inception in June 1995, the Electronic Stock Exchange has increased its market share in the stock trading volume from 12.5% in 1995 to 18% in 1996, with an overall participation of 13.5% in both stock and bond trading volumes in 1996. The Electronic Stock Exchange offers the possibility of trading and concluding transactions in real time through a high-technology network connected to brokers' offices, transfer agents and clearing agents.

The market capitalization as of December 31, 1997 was approximately U.S.$14.4 billion, representing 24.2% of GDP. The market capitalization relative to GDP has shown a significant improvement, from 8% in 1995 to 15.4% in 1996 and 24.2% in 1997, after a declining trend during the period from 1992 to 1995. The Government believes that significant potential for additional growth exists in the Venezuelan securities markets as their size relative to GDP has not yet regained the level achieved in 1991. The market size of Venezuela's securities markets relative to other Latin American countries is still quite small. However, the Government believes that recently enacted and proposed capital markets reforms should increase confidence in the Venezuelan securities markets and enable the securities markets to grow. In connection with the initial public offering of CANTV in the fourth quarter of 1996, the Government instituted a program to permit a portion of the CANTV shares being offered to be purchased by Venezuelan citizens through the provision of low-cost loans. The Government anticipates that similar programs aimed at increasing Venezuelan citizens' ownership of newly-privatized Venezuelan companies will be implemented in connection with future privatizations.

The following table provides a comparison of the Venezuelan stock markets with other Latin American stock markets as of December 31, 1996:

| Country | Market Capitalization | | | Volume Traded | |
| --- | --- | --- | --- | --- | --- |
| | millions of U.S.$ | % Total | % GDP | millions of U.S.$ | % Total |
| Argentina | $44,679 | 9.4% | 15.6% | $4,382 | 2.5% |
| Brazil | 216,990 | 45.6 | 28.9 | 111,450 | 64.0 |
| Chile | 65,940 | 13.9 | 87.9 | 8,443 | 4.8 |
| Colombia | 17,137 | 3.6 | 20.1 | 1,518 | 0.8 |
| Mexico | 106,539 | 22.4 | 35.6 | 43,040 | 24.7 |
| Peru | 13,837 | 2.9 | 23.4 | 3,814 | 2.2 |
| Venezuela | 10,055 | 2.1 | 15.4 | 1,309 | 0.7 |
| Total | $475,177 | 100.0% | | $173,956 | 100.0% |

Source: *International Finance Corporation.*

The stocks listed on the stock exchanges are the same in all three exchanges. Although the regulations of the Caracas Stock Exchange require that settlement of trades occur within 48 hours, a large number of the trades are not settled within the prescribed period and some trades are not settled at all. On the Electronic Stock Exchange, the settlement of trades is contemplated to occur immediately. Presently, some operations can be settled the same day in any of the stock exchanges, but given operating procedures the standard settlement is within 5 days of trading. On August 1, 1996, the Government approved the formation of *Cajas de Valores* ("Clearing Houses") for the settlement of trades on the Venezuelan stock exchanges. It is expected that the Clearing Houses will improve settlement procedures on the Venezuelan stock exchanges to three-day international standards once the registration at the Clearing Houses of all the issues outstanding in the Venezuelan stock exchanges is concluded.

The Venezuelan stock exchanges post trading information with respect to price, volume and transaction activity for listed securities during trading hours, including the high, low and average sales prices. The Caracas Stock Exchange also publishes three indices for equity securities, with the principal stock index being the *Indice General de Precios de las Acciones Negociadas en la Bolsa de Valores de Caracas* (the "Index"). The Index is based on the share prices of 17 major companies. The Electronic Stock Exchange, given its new presence in the market and the level of trading, has not published an index but is expected to do so by the end of 1997.

The stock exchanges have in the past experienced substantial fluctuations in the market price of listed securities. Factors contributing to such fluctuations include changes in the overall state of the Venezuelan economy and adverse political developments, but such fluctuations are believed to be primarily due to the relatively small size of the Venezuelan stock market. The Caracas and Maracaibo Stock Exchanges have the power to suspend dealing in any listed security if the prices of the security vary by 20% or more from the opening price of the security for that session, and the Electronic Stock Exchange has authority to do so if the prices vary by 10% or more. The duration of any such suspension period is determined by the Exchanges; however, suspension periods in effect at the close of trading generally are not carried over to the next trading day.

### Market Regulation

All Venezuelan companies must be authorized by the *Comisión Nacional de Valores* ("CNV") before they can legally offer equity or debt securities to the public in Venezuela. In order to offer securities to the public in Venezuela, an issuer must meet certain CNV requirements regarding assets, operating history, management and other matters. All outstanding securities of such companies must also be registered with the CNV and approved by the relevant stock exchange. Only securities for which an application of listing has been approved by the CNV may be listed on a stock exchange. Issuers of listed securities are required to file unaudited quarterly financial statements and audited annual financial statements with the applicable stock exchange and the CNV. In addition,

since September 1, 1994, any company issuing debt in Venezuela is required to obtain a rating from two independent rating agencies registered with the CNV.

The Capital Markets Law and the rules issued thereunder by the CNV provide a regulatory structure for the Venezuelan securities industry. In addition to setting standards for brokers, it empowers the CNV to regulate the public offering and trading of securities. A proposal to amend and revise the Capital Markets Law to allow for future modernization of the securities markets and to strengthen the regulatory powers of the CNV is currently being considered by the Congress.

# Public Finance

### General Description of Accounts and Entities

Responsibility for the preparation of the budget and the administration of Government finances rests with the Ministry of Finance, which is required to submit a proposed budget each year to Congress. Congress may change items in the proposed budget so long as authorized expenditures do not exceed projected revenues, although actual expenditures may exceed revenues in a given year as a result of differences in the timing of receipts and expenditures at year end. The budget must include appropriations in each year for distribution to the states and the federal district in accordance with a prescribed formula. No taxes may be levied, money borrowed or expenditures made unless authorized by law. In addition to budgeted expenditures contained in Congressionally approved budgets, expenditures, including allocations for debt service obligations, may be increased during the course of the year by the Government with Congressional approval, provided that total authorized expenditures at no time exceed actual revenues.

All revenues and expenditures are budgeted and recorded on a cash basis. The collection of public revenues is the responsibility of the Ministry of Finance. Responsibility for the execution of the budget is assigned to the various ministries. Expenditures are made by the respective ministries authorized to do so in the budget. The Comptroller General is charged with the control, supervision and auditing of the national revenues, expenditures and assets and related operations. The Comptroller General is appointed by, and responsible to, the Congress.

The consolidated public sector is divided, in general terms, into two parts: the Central Government and the decentralized state institutions, some of which are established to carry out public functions which lend themselves to decentralized financial and operating management. The decentralized state institutions are corporations which are majority- or wholly-owned by the public sector.

### Taxation

The Central Government is the sole entity in Venezuela with authority to tax income. In 1984 Constant Bolivars income tax revenues in 1997 accounted for 73.4% of Central Government revenues (70.3% in 1996) with the petroleum industry providing 43.1% of such income tax revenues (42.9% in 1996). Non-tax revenues accounted for 26.6% of Central Government revenues in 1997 in 1984 Constant Bolivars (29.7% in 1996), with petroleum royalties providing 60.1% of such non-tax revenues (74.5% in 1996).

Among the greater difficulties in the establishment of a positive balance in the consolidated public sector accounts and in the general stability of the Venezuelan economy as a whole has been the inability of the Government to rely on sources of financing other than petroleum revenues. Because the development of a more diversified economy, with greater capacity for and volumes of nontraditional exports, can only be accomplished in the medium term, the Government has attempted to increase the base of nonpetroleum tax revenues since the commencement of the Adjustment Program.

A new tax code (Código Orgánico Tributario) was approved in 1991 pursuant to which penalties for overdue tax payments were substantially increased and tax avoidance was made a criminal offense. The Ministry of Finance, with World Bank and IADB assistance, developed a tax collection program aimed at decreasing income tax evasion. The number of tax collectors increased from 220 in 1991 to 700 in 1992, with an additional 500 tax collectors added in 1993. As a result of these measures, income tax receipts increased in 1992 and 1993 by 50.0% and 40.0%, respectively, over projected receipts for each respective period.

In September 1993, a value added tax ("VAT"), which had been debated in the Congress since 1989, was adopted. A 10% VAT was implemented at the wholesale level in October 1993, exempting certain exports and certain basic goods. Although it was originally contemplated that the VAT would be applied also at the retail level, this step was never implemented. The introduction of the VAT had a positive effect on the Government's fiscal accounts during the period that it was in effect. The VAT was replaced on August 1, 1994 by the LWT.

On January 1, 1994, the Government implemented a business assets tax that was intended to act as an alternative minimum tax on all Venezuelan personal and corporate taxpayers that owned tangible assets in Venezuela. The tax, which is assessed on the average yearly balance of tangible assets, is currently set at 1% and is deductible from a taxpayer's income tax obligations. Exemptions from the business assets tax exist for certain

taxpayers, including charitable and nonprofit organizations, certain agricultural activities and investments in securities.

The LWT is currently set at 16.5%. Certain goods and services, including residential telephone service, gas, water and electricity, are exempted from the LWT. The Government has proposed amendments to the LWT to Congress to reduce the number of exemptions and broaden the tax base in an effort to increase non-oil revenues in light of the significant decline in petroleum revenues experienced in 1998 as a result of the drop in international oil prices. In May 1994, the Government instituted a temporary tax on bank debits equal to 0.75% of the transaction value. The bank debit tax, which was in place only during 1994, applied to all bank debits (e.g., withdrawals from savings and checking accounts) and resulted in extraordinary revenues to the Government of Bs.111.8 billion (or 6.7% of all Treasury revenues).

Pursuant to new income tax legislation, the income of corporations not engaged in the petroleum industry is subject to a progressive tax ranging from 15.0% on taxable income of up to Bs.14.8 million to 34.0% on income in excess of Bs.22.2 million. Individuals are subject to a progressive income tax ranging from 6% on taxable income of up to Bs.7.4 million to 34% on income in excess of Bs.44.4 million. Such ranges are to be indexed to inflation. The income of private sector corporations engaged in joint ventures and other associations in the petroleum industry will be taxed at the rates for corporations not engaged in the petroleum industry. Income from the petroleum industry is taxed at special rates. See "Principal Sectors of the Venezuela Economy—Petroleum and Natural Gas—Strategic Plan—Investments."

To support the Government's tax collection efforts, the Government reformed the tax code by providing for the establishment in August 1994 of the SENIAT as an independent agency within the Ministry of Finance for the administration of tax and customs collections. The objectives of the SENIAT include: (i) increasing the level of non-oil tax revenues to reach 10% of GDP; (ii) reducing tax evasion by 0.5% of GDP; (iii) improving customs collection; (iv) promoting the modernization of the Venezuelan tax code system and the development of a "tax culture"; and (v) consolidating the organization of the SENIAT to promote efficiency and collections. SENIAT also is in the process of overseeing modernization of six principal Custom Offices by the end of 1997 and six more in 1998.

The combination of the LWT, business assets tax and the creation of the SENIAT have had positive effects on the Government's revenues. In 1995, nonpetroleum tax revenues exceeded petroleum tax revenues for the first time in recent history, with such taxes representing 51.6% of total Government revenues. In that year, in nominal Bolivar terms, revenues from the LWT totalled approximately Bs.579 billion (approximately 26.9% of total Central Government revenues) and revenues from income tax increased to Bs.303 billion. In 1996, gross revenues administered by SENIAT represented 9.0% of GDP and 46.6% of ordinary Government revenues. In that year, in nominal Bolivar terms, gross revenues from the LWT totalled Bs.1,327 billion (52.2% of total revenues), income tax revenues increased to Bs.597.5 billion (23.5% of total revenues) and customs duty collections reached Bs.412.0 billion (16.2% of total revenues).

In July 1996, a tax amnesty law was approved. This law allowed taxpayers who in the past had not paid the appropriate taxes to pay such taxes without incurring penalties and interest. All such taxes were to be paid prior to October 31, 1996. A total of Bs.30.3 billion in nominal Bolivars was received in back tax obligations.

Tax incentives for investors and corporations include a five-year exemption from the LWT for capital goods purchased during the start-up phase of major industrial projects, which was approved in 1996. In the petroleum sector, private sector oil companies engaged in exploration and production agreements with PDVSA have been granted an exemption from municipal taxes.

## Revenues and Expenditures

Between 1993 and 1997, consolidated public sector revenues increased from Bs.136.5 billion to Bs. 190.5 billion in 1984 Constant Bolivar terms. Taxes and royalties from the petroleum industry accounted for the major part of this growth.

The consolidated public sector recorded a surplus of Bs. 15.5 billion in 1997, in comparison to a surplus of Bs.40.9 billion in 1996, in 1984 Constant Bolivar terms. The decrease in the consolidated public sector surplus

for 1997 can be primarily attributed to lower petroleum revenues and increased public sector salaries and pension liabilities. See "The Venezuelan Economy—Historical Economic Performance—Economic Performance in 1997."

During the past several years, including 1997, Venezuela's fiscal accounts and results have been positively affected by the receipt of extraordinary noncurrent revenues from privatizations and new initiatives in the petroleum sector. See "The Venezuelan Economy—Privatization Program" and "Principal Sectors of the Venezuelan Economy—Petroleum and Natural Gas—The Opening of the Venezuelan Petroleum Sector."

The following tables set forth the revenues, by source, and expenditures, by sector, of the Central Government and the consolidated public sector for the five years ended December 31, 1997:

## Venezuela Central Government Revenues and Expenditures

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996[1] | 1997[1] |
| | (in billions of 1984 Constant Bolivars) | | | | |
| **Central Government** | | | | | |
| Total Revenues . . . . . . . . . . . . . . . . | 91.839 | 93.089 | 88.677 | 108.575 | 138.145 |
| Current Revenues . . . . . . . . . . . . . . | 91.839 | 93.089 | 88.677 | 108.575 | 138.145 |
| Tax Revenues . . . . . . . . . . . . . . . | 72.652 | 74.154 | 69.741 | 76.288 | 101.409 |
| Petroleum Sector . . . . . . . . . . . | 37.389 | 28.616 | 23.976 | 32.736 | 43.746 |
| Other . . . . . . . . . . . . . . . . . . . | 35.263 | 45.538 | 45.766 | 43.548 | 57.644 |
| Non-tax Revenues . . . . . . . . . . . . | 19.187 | 18.935 | 18.935 | 32.294 | 36.736 |
| Petroleum Royalties . . . . . . . . . | 17.845 | 18.030 | 18.062 | 24.029 | 22.065 |
| Dividends . . . . . . . . . . . . . . . . . . | 0 | 0 | 0 | 7.530 | 13.835 |
| Other . . . . . . . . . . . . . . . . . . . | 1.342 | .905 | .874 | .735 | .836 |
| Capital Revenues . . . . . . . . . . . . . . | 0 | 0 | 0 | 0 | 0 |
| Total Expenditures . . . . . . . . . . . . . | 108.146 | 132.945 | 112.825 | 105.068 | 126.818 |
| Current Expenditures . . . . . . . . . . . . | 79.380 | 79.664 | 82.589 | 80.374 | 99.618 |
| Operating Expenditures . . . . . . . . . | 44.745 | 50.255 | 49.802 | 38.404 | 40.437 |
| Salaries, etc. . . . . . . . . . . . . . . | 23.273 | 22.955 | 19.915 | 14.216 | 22.387 |
| Interest Payments . . . . . . . . . . . | 18.435 | 22.346 | 24.969 | 21.076 | 14.293 |
| Purchase of Goods and Services . | 3.038 | 4.954 | 4.918 | 3.113 | 3.794 |
| Current Transfers . . . . . . . . . . . . . | 34.566 | 29.609 | 32.787 | 41.970 | 59.144 |
| To Rest of Public Sector . . . . . . | 26.393 | 23.701 | 28.492 | 33.832 | 50.116 |
| To Private Sector . . . . . . . . . . . | 8.173 | 5.908 | 4.294 | 8.138 | 9.028 |
| Quasi-fiscal Operations of Banco | | | | | |
| Central . . . . . . . . . . . . . . . . | .855 | 11.053 | 5.810 | 3.934 | 1.465 |
| Extra-budgetary . . . . . . . . . . . . . . | 1.738 | 4.188 | 548 | 1.091 | 2.235 |
| Current Account Surplus . . . . . . . . . | 11.672 | 2.173 | 278 | 24.268 | 37.062 |
| Capital Expenditures . . . . . . . . . . . . | 26.241 | 37.840 | 23.879 | 19.670 | 23.500 |
| Capital Formation . . . . . . . . . . . . | 5.393 | 3.766 | 3.367 | 2.199 | 2.711 |
| Capital Transfers . . . . . . . . . . . . . | 10.045 | 9.151 | 12.380 | 9.733 | 15.378 |
| To Public Sector . . . . . . . . . . . . | 10.029 | 9.141 | 12.354 | 9.733 | 15.305 |
| To Private Sector . . . . . . . . . | .015 | .009 | .026 | 0 | .073 |
| Financial Investment . . . . . . . . . . . . | 10.803 | 24.924 | 8.132 | 7.738 | 5.412 |
| Overall Surplus (Deficit) . . . . . . . . . | (16.307) | (39.856) | (24.148) | (3.507) | 11.327 |
| As percentage of GDP . . . . . . . . . | (2.92)% | (7.31)% | (4.27)% | 0.62% | 1.92% |

(1) Preliminary figures.

Sources: *Central Budget Office ("OCEPRE") and Banco Central.*

**Venezuela Public Sector Revenues and Expenditures**

| | 1993 | 1994 | 1995 | 1996[1] | 1997[1] |
|---|---|---|---|---|---|
| | (in billions of 1984 Constant Bolivars) | | | | |
| **Consolidated Public Sector** | | | | | |
| Total Revenues . . . . . . . . . . . . . . . . | 136.886 | 157.065 | 146.163 | 116.657 | 190.499 |
| Tax Revenues . . . . . . . . . . . . . . . . . | 40.969 | 52.071 | 50.575 | 45.599 | 60.160 |
| Non-tax Revenues . . . . . . . . . . . . . . | 95.917 | 104.984 | 95.560 | 151.058 | 130.339 |
| Central Government | | | | | |
| PDVSA Operating Surplus . . . . . . . | 82.799 | 87.798 | 76.917 | 130.300 | 93.964 |
| FIV Interest and Dividend Income . | 4.641 | 3.738 | 3.048 | 4.378 | 3.833 |
| Non-financial Public Enterprises . . | 4.209 | 7.465 | 11.645 | 10.480 | 4.993 |
| Capital Revenues . . . . . . . . . . . . . | 71 | 99 | 78 | 3.142 | 22.520 |
| Other . . . . . . . . . . . . . . . . . . . . | 4.197 | 5.884 | 3.873 | 2.757 | 5.029 |
| Total Expenditures . . . . . . . . . . . . . . | 163.542 | 229.036 | 185.240 | 155.796 | 175.005 |
| Current Expenditures . . . . . . . . . . . . | 93.183 | 101.100 | 101.767 | 81.567 | 104.869 |
| Salaries, etc. . . . . . . . . . . . . . . . . | 25.168 | 25.013 | 21.859 | 15.679 | 24.497 |
| Purchases of Goods and Services . . | 5.475 | 6.665 | 6.170 | 4.007 | 5.152 |
| Interest Payments . . . . . . . . . . . . . | 25.945 | 27.835 | 34.568 | 27.388 | 17.142 |
| Transfers to Private Sector . . . . . . . | 11.689 | 8.587 | 6.511 | 9.627 | 12.074 |
| Central Government (Extra-Budgetary) | 1.738 | 4.188 | 548 | 1.091 | 2.235 |
| Central Government Transfers to | | | | | |
| Unconsolidated Entities . . . . . . . | 24.050 | 21.947 | 28.850 | 30.932 | 44.538 |
| Other[2] . . . . . . . . . . . . . . . . . . . | 855 | 11.053 | 5.810 | 3.934 | 2.465 |
| Capital Expenditures . . . . . . . . . . . . | 58.620 | 123.747 | 82.926 | 63.137 | 67.901 |
| Capital Formation . . . . . . . . . . . . | 44.298 | 44.126 | 48.483 | 50.938 | 48.732 |
| Oher (Including Transfers to | | | | | |
| Unconsolidated Entities) . . . . . . | 14.323 | 79.622 | 34.442 | 12.199 | 19.169 |
| Overall Surplus (Deficit) . . . . . . . . . . | (16.656) | (71.981) | (39.105) | 40.861 | 15.493 |
| **(As percentage of GDP)** | | | | | |
| Total Revenues . . . . . . . . . . . . . . . . | 24.5% | 28.8% | 25.9% | 36.6% | 32.2% |
| Total Expenditures . . . . . . . . . . . . . . | 27.5 | 42.0 | 32.8 | 27.69 | 29.6 |
| Overall Surplus (Deficit) . . . . . . . . . . | (2.98) | (13.21) | (6.9) | 7.3 | 2.6 |

(1)  Preliminary figures.

(2)  Includes other expenditures, exchange losses and quasi-fiscal losses of Banco Central.

Sources: *OCEPRE and Banco Central.*

## The 1998 Budget

The decline in international oil prices that commenced at the end of 1997 and has continued through the first half of 1998 has resulted in revenue shortfalls for the Venezuelan fiscal accounts and has required the Government to readjust its budget. In line with the falling prices throughout the first half of 1998, the Government reduced the oil price assumptions in its budget twice, first from U.S.$15.50 per barrel to U.S.$14.00 per barrel and later to U.S.$13.00 per barrel. In order to offset the expected decline in revenues, the Government adopted reductions in both capital and current expenditures totalling approximately U.S.$1.5 billion. In addition, with respect to the consolidated public sector budget, PDVSA announced reductions in its investment program of approximately U.S.$1.4 billion. Notwithstanding the budget reductions, Banco Central currently projects a Central Government deficit of approximately 3.3% of GDP and a consolidated public sector deficit of approximately 4.4% of GDP.

# Public Debt

The Public Credit Law, first enacted in 1976, provides for the creation and issue of public debt through prior authorization and registration. Public debt for the purposes of the Public Credit Law is defined to include: (i) public issues of bonds and treasury notes in Venezuela and abroad; (ii) domestic and foreign direct indebtedness; (iii) contracts providing for payments extending beyond the then current fiscal year; (iv) guarantees; and (v) modifications of existing indebtedness. The types of entities subject to regulation include: (i) the national, state and municipal governments; (ii) decentralized state institutions; (iii) autonomous government institutions and other public entities; (iv) corporate entities controlled directly or indirectly by the public sector; and (v) nonprofit organizations under Government control. The Ministry of Finance is required to maintain a current registry of all external public debt, including transactions which are exempt from the authorization requirements of the law.

In 1992, Congress enacted a set of reforms to the Public Credit Law which, among other things, established a process for setting annual limits on public sector indebtedness, both on a commitment and disbursement basis. Pursuant to these amendments, the Government is authorized to incur new indebtedness in any calendar year only to the extent that such new indebtedness, less scheduled amortizations of existing indebtedness during such year, does not exceed at the end of the year, an aggregate amount agreed by the Congress. In addition, the reforms prohibited the issuance by the Central Government of new guarantees on debt of state-owned entities and decentralized institutions and eliminated future use of off-budget debt instruments.

## Summary of External Debt

As of December 31, 1997, total external public debt was estimated at approximately U.S.$23.8 billion. Since December 31, 1995, Venezuela's net external public debt has decreased by approximately U.S.$3.1 billion. The following tables set out the composition of external public debt outstanding as of December 31, 1993 through

1997 at the nominal principal amount of such debt and the scheduled amortizations for external public debt for each of the years indicated:

|  | Outstanding as of December 31, | | | | |
|---|---|---|---|---|---|
|  | **1993** | **1994** | **1995** | **1996**[1] | **1997**[1] |
|  | (in millions of U.S. dollars) | | | | |
| Commercial Bank External |  |  |  |  |  |
| Public Sector Debt . . . . . . . . . . . . . . . . | $462.3 | $272.9 | $240.6 | $130.4 | $112.8 |
| Other External Public Sector Debt . . . . . . . . . | 26,345.0 | 26,708.5 | 26,661.3 | 25,312.7 | 23,727.4 |
| Bonds . . . . . . . . . . . . . . . . . . . . . . . | 20,372.1 | 20,250.8 | 20,289.9 | 19,992.9 | 18,849.8 |
| Nonrestructured[2] . . . . . . . . . . . . . . . . | 2,898.3 | 2,692.2 | 2,613.0 | 2,384.8 | 6,413.4 |
| 1990 Financing Plan Bonds . . . . . . . . . . | 17,473.8 | 17,558.6 | 17,676.9 | 17,608.1 | 12,436.4 |
| Suppliers and Contractors . . . . . . . . . . . . | 804.5 | 716.7 | 516.7 | 220.8 | 294.3 |
| Multilateral Agencies . . . . . . . . . . . . . . . . | 2,817.1 | 2,954.6 | 3,052.8 | 2,816.0 | 2,717.6 |
| Bilateral Agencies . . . . . . . . . . . . . . . . . . | 2,351.3 | 2,786.4 | 2,801.9 | 2,283.0 | 1,865.7 |
| Total External Public Sector Debt . . . . . . . . . | $26,807.3 | $26,981.4 | $26,901.9 | $25,443.2 | $23,840.2 |

(1)  Preliminary figures.

(2)  Of these amounts, U.S.$854 million was held as of December 31, 1997 by other public sector agencies of the Republic, including Banco Industrial de Venezuela, Banco Nacional de Ahorro y Préstamo, Banco Central and FIV. Pursuant to an agreement among the Republic and these agencies, these bonds are scheduled to be amortized between 1998 and 2003 as follows: June 1998-2003—U.S.$115 million. These amounts are not included in the Republic's balance of payments calculations. In addition, the amounts reflected under this heading represent the then outstanding amount of Venezuela's bonds and notes issued in external capital markets other than the 1990 Financing Plan Bonds. See "—Capital Market Issues of Public External Debt" for a summary of outstanding issues of such bonds and notes as of March 31, 1998.

Source: *Ministry of Finance.*

| | | | Scheduled Amortizations[1] | | | |
|---|---|---|---|---|---|---|
| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 and thereafter |
| | | | (in millions of U.S. dollars) | | | |
| Commercial Bank External | | | | | | |
| Public Sector Debt . . . . . . . . . . . . . | $   49.8 | $   47.0 | $   70.7 | $   65.7 | $   28.3 | $   87.5 |
| Other External Public Sector Debt . . . . . . . | 2,140.2 | 1,642.8 | 1,845.6 | 1,734.1 | 1,597.3 | 18,327.7 |
| Bonds . . . . . . . . . . . . . . . . . . . . . . | 1,583.4 | 995.0 | 1,167.7 | 993.8 | 878.7 | 9,246.2 |
| Nonrestructured[2] . . . . . . . . . . . . . | 703.8 | 115.0 | 288.9 | 115.0 | 0.0 | 858.8 |
| 1990 Financing Plan Bonds . . . . . . . | 879.6 | 880.0 | 878.8 | 878.8 | 878.7 | 8,387.4 |
| Suppliers & Contractors . . . . . . . . . . . . . | 83.2 | 103.6 | 44.8 | 37.2 | 27.4 | 29.5 |
| Multilateral Agencies. . . . . . . . . . . . . . . | 318.9 | 354.6 | 430.9 | 502.4 | 499.3 | 3,029.9 |
| Bilateral Agencies. . . . . . . . . . . . . . . . . | 154.7 | 189.6 | 202.2 | 200.7 | 191.9 | 6,022.1 |
| Total External Public Sector Debt . . . . . . . . | $2,190.0 | $1,689.8 | $1,916.3 | $1,799.8 | $1,625.6 | $18,415.2 |

(1) Assumes subsequent disbursements from credit facilities entered into as of December 31, 1997.

(2) Of these amounts, U.S.$854 million was held as of December 31, 1997 by other public sector agencies of Venezuela, including Banco Industrial de Venezuela, Banco Nacional de Ahorro y Préstamo, Banco Central and FIV. Pursuant to an agreement among the Republic and these agencies, these bonds are scheduled to be amortized between 1998 and 2003 as follows: June 1998-2003—U.S.$115 million. These amounts are not included in the Republic's balance of payments calculations.

Source: *Ministry of Finance.*

## Internal Public Debt

In addition to Venezuela's external public debt, the internal public debt of the Republic as of March 31, 1998 totalled approximately Bs. 1,684 billion in nominal terms (U.S.$3.2 billion). See "Supplementary Information." The table below sets forth a summary of Venezuela's internal public debt as of March 31, 1998:

| Type of Debt | Amount Outstanding |
|---|---|
| | (in millions of U.S.$) |
| Treasury Bonds (Bonos del Tesoro) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $      2 |
| DPN FOGADE Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 478 |
| Commercial Bank Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 |
| Social Security Institute Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40 |
| Debt with Banco Central . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,864 |
| National Public Debt Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 742 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 |
| Total Internal Debt of the Republic of Venezuela . . . . . . . . . . . . . . . . . . . . . . . . | 3,138 |
| Internal Debt Issued by Public Entities and Guaranteed by the Republic . . . . . . . . . . . | 79 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,217 |

Source: *Ministry of Finance.*

## Multilateral Borrowings and Subscriptions

In 1989, in connection with this Adjustment Program the Government entered into an Extended Fund Facility (the "EFF") with the IMF covering the years 1989 to 1992 for Special Drawing Rights ("SDR") 3.7 billion (U.S.$4.8 billion) and used its first credit tranche of SDR 343 million (U.S.$443 million). Through the date of expiration in

March 1993, Venezuela's total purchases under the EFF amounted to SDR 2.0 billion (U.S.$2.7 billion). In July 1996, as part of Agenda Venezuela the Government entered into a standby agreement with the IMF for SDR 976 million (U.S.$1.4 billion) covering the years 1996 to 1997, of which SDR 350 million (U.S.$509 million) was disbursed during the availability period therefor and was outstanding on June 30, 1998.

Beginning in the early 1980s, the Government initiated discussions with the IADB to increase the use of the IADB as a source of financing. Between 1983 and 1997, the IADB entered into loan agreements with the Republic and certain public sector enterprises for a total of U.S.$3.5 billion, of which U.S.$903 million was outstanding as of December 31, 1997. These agreements cover current projects in agriculture, small- and medium-sized industry, communications, tourism, environmental protection, electrical power transmission, water supply and bauxite. The Government anticipates that it will continue to seek financing from the IADB for public sector investment projects.

The Republic has also received financing from the World Bank. Between 1989 and 1997, the Government and the World Bank have entered into several loan agreements totalling U.S.$2.6 billion, of which approximately U.S.$1.2 billion was outstanding as of March 31, 1998. These agreements cover a wide spectrum of initiatives, including structural adjustment, public sector reform, education, health, infrastructure enhancements and the environment. Among the most significant loans are a U.S.$402 million structural adjustment loan and a U.S.$353 million trade policy loan.

The Republic has entered into several loan agreements with CAF totaling U.S. $647 million, of which U.S. $20.9 million was outstanding as of March 31, 1998.

Venezuela is one of the founding members of the IMF and its current subscription to the IMF (which corresponds to its quota) is SDR 2.0 billion (U.S.$2.7 billion). Venezuela's subscription to the capital of the World Bank is U.S.$2.4 billion. Of this amount, U.S.$167.2 million has been disbursed as of December 31, 1997. The balance of Venezuela's subscription is callable only if required by the World Bank to meet its obligations for funds borrowed or loans guaranteed by it and is payable at the option of Venezuela in either gold, U.S. dollars or the currency required to discharge the obligations for which the call is made. In addition, Venezuela is a member of the other World Bank Group affiliates, International Finance Corporation and the Multilateral Investment Guaranty Agency ("MIGA"), with subscriptions of U.S.$15.6 million and U.S.$15.4 million, respectively. Venezuela's subscription to the capital of the IADB is U.S.$5.7 billion, one of the largest subscriptions of the bank's Latin American members. Of this amount, U.S.$196.0 million had been paid in cash as of December 31, 1997, and the balance is callable if required to meet the bank's obligations. Venezuela's contribution to the IADB's Fund for Special Operations is U.S.$433.1 million. Venezuela is also a member of CAF with subscriptions of capital totaling U.S. $505.4 million, of which U.S. $188.8 million has been paid in cash as of December 31, 1997.

## The Debt Crisis 1983-1988

### The Debt Crisis

At the beginning of 1983, Venezuela was faced with a number of macroeconomic imbalances, including deficits in the consolidated public sector fiscal accounts and the capital account and a decline in the level of international reserves, which were exacerbated by a decline in international oil prices. The consolidated public sector deficit reached 5% of GDP and the capital account deficit grew to U.S.$3.4 billion. These pressures led to large scale capital flight, promoted by ceilings on domestic interest rates, which in an environment of free convertibility provided significant differentials with U.S. dollar time deposits. In addition, the profile of maturities on Venezuelan public sector debt was such that over 50% of the total outstanding debt of U.S.$29.2 billion was due by December 31, 1983. Following Mexico's declaration of a moratorium on external debt payments in 1982, Venezuela was no longer able to achieve regular periodic rollovers of those short-term maturities.

In early 1983, the Government initiated a number of policy measures, including a devaluation of the Bolivar against the U.S. dollar within the context of a new multiple exchange rate system. The Government proposed three-month deferrals of amortization payments and commenced negotiations with commercial banks for the

71

restructuring of the external public debt. In early 1984, additional policy measures were adopted to reestablish macroeconomic equilibrium, including reducing public sector spending, doubling domestic prices for petroleum products and a second devaluation through the multiple exchange rate system. These measures were largely successful in reestablishing macroeconomic equilibrium and led to significant surpluses in the balance of payments and the fiscal accounts in 1984 and 1985.

At the end of 1985, the Government instituted an expansionary fiscal policy and relaxed its restrictive domestic credit policy. However, this policy decision coincided with a drop in international oil prices of 52% which drop caused a strong external shock. Thus, although the nonpetroleum sectors of the economy reacted to the fiscal policy with a recovery in growth rates, the balance of payments registered a deficit of 7.8% of GDP in 1986, 2.1% in 1987, and 8.5% in 1988. In 1986, the Government signed multi-year rescheduling agreements with respect to medium- and long-term public sector commercial bank debt owing by the Republic and certain of its public sector enterprises.

Between 1986 and 1988, the Government reacted to the deterioration in fiscal and external accounts through increased economic controls, including generalized price controls, maintenance of interest rate ceilings and increases in exchange rate and export subsidies. After a brief recovery in 1987, international oil prices declined 15% in 1988 causing a marked deterioration in macroeconomic indicators, including a consolidated public sector deficit of 8.6% of GDP and a current account deficit of 10.4% of GDP.

### External Commercial Bank Debt Restructuring

The Republic began discussions in 1983 with a bank advisory committee of creditor banks to seek an orderly restructuring of the public sector external debt. As noted above, on February 26, 1986, 13 restructuring agreements covering the restructurable debt of the public sector of Venezuela (approximately U.S.$21.1 billion) were executed.

Shortly thereafter, the Republic experienced a sharp and unexpected drop in petroleum prices which prompted Venezuela and its creditor banks to execute an amendment to the restructuring agreements. On September 18, 1987, the parties agreed that the amortization schedule would be modified in accordance with the then existing expectations as to the external income of Venezuela. The restructured debt bore interest at a margin of ⅞ of 1% over selected funding rates. The amendment became effective on November 13, 1987.

On December 30, 1988, at the request of the Government, representatives of the Government met with Venezuela's bank advisory committee. The Republic presented its major lines of economic and financial plans and its intentions regarding its external financing over the next several years. Successive interim proposals were delivered by the Republic beginning on December 30, 1988. Pursuant to such proposals, in 1989 the Republic implemented a re-timing program for interest payments, whereby certain interest payments on "Eligible Debt," defined to include all debt outstanding under the restructuring agreements and certain other medium-term commercial bank debt disbursed prior to March 22, 1983, was paid on a semiannual, rather than a quarterly, basis through the third quarter of 1990.

## 1990 Financing Plan

In June 1990, after a period of constructive negotiations, the Government and its bank advisory committee announced the principal terms of a financing plan that would provide for the exchange of medium-term commercial bank debt for a variety of options featuring debt and debt service reduction or new money, including collateralized short-term notes, collateralized bonds and new money bonds. The 1990 Financing Plan, structured along the bases of the Brady initiative, contemplated that all Eligible Debt would be exchanged for one or more of the options. Funds for the acquisition of collateral for the options came from the IMF and the World Bank, other external sources and Venezuela's own resources.

The 1990 Financing Plan was consummated on December 18, 1990. Pursuant to the 1990 Financing Plan, holders of Eligible Debt exchanged such debt for one or more of the options offered under the 1990 Financing

Plan. The options under the 1990 Financing Plan included: (i) a New Money Option; (ii) a Collateralized Short-Term Notes Option; (iii) Collateralized Principal Options; and (iv) a Front-Loaded Interest Reduction Option.

The bonds were issued in different currencies as follows: New Money Bonds and Debt Conversion Bonds: U.S. dollars, Deutsche marks and Pounds sterling; Short-Term Notes: U.S. dollars; Par Bonds: U.S. dollars, Deutsche marks, French francs, Italian lire and Swiss francs; Discount Bonds: U.S. dollars and Deutsche marks; and Front-Loaded Interest Reduction Bonds: U.S. dollars, Deutsche marks, Swiss francs and Pounds sterling. All of the bonds other than those denominated in Deutsche marks are listed on the Luxembourg Stock Exchange, and bonds denominated in Deutsche marks are listed on the Frankfurt Stock Exchange. All of the bonds other than the Short-term Notes and the New Money Bonds, Series B were issued by Venezuela, and the Short-term Notes and New Money Bonds, Series B were issued by Banco Central.

The following table sets out a summary of the main features of the obligations issued by Venezuela and Banco Central pursuant to the 1990 Financing Plan:

| Option | Interest Rate | | Tenor | Collateral | Discount | Debt Allocated[1] | |
|---|---|---|---|---|---|---|---|
| Short-Term Notes[2] . . . . . . . . . . . . | 13-Week U.S. Treasury Bill Rate | | 91 days [3] | 100% face value of notes collateralized with U.S. Treasury Bonds | 55% | U.S.$1,411 | 7.2% |
| Discount Bonds [4] . . . . . . . . . . | LIBOR + 13/16% | | 30 yrs | Principal-zero coupon bond; interest-14 months in escrow | 30% | U.S.$1,810 | 9.2% |
| Par Bonds [3] . . . . . . . . . . | 6.75% | | 30 yrs | Principal-zero coupon bond; interest-14 months in escrow | None | U.S.$7,457 | 37.8% |
| | **Years** | **%** | | | | | |
| Front-Loaded | 1 & 2 | 5% | 17 yrs | 12 months interest | None | U.S.$3,028 | 15.3% |
| Interest | 3 & 4 | 6% | 7 yrs grace | in escrow until 1995 | | | |
| Reduction | 5 | 7% | | | | | |
| Bonds[4] | 6-17 LIBOR + 7/8% | | | | | | |
| New Money Bonds | | | | | | | |
| Series A: . . . . . . . . . . . | LIBOR + 1% | | 15 yrs 7 yrs grace | | None | U.S.$480 | n.a. |
| Series B[2]: . . . . . . . . . . | LIBOR + 7/8% | | 15 yrs 7 yrs grace | | None | U.S.$720 | n.a. |
| Debt Conversion Bonds . . . | LIBOR + 7/8% | | 17 yrs 7 yrs grace | | None | U.S.$6,033 | 30.5% |

(1) Expressed in millions of U.S. dollars and as a percentage of Eligible Debt as of the effective date of the 1990 Financing Plan in 1990.

(2) Issued by Banco Central.

(3) Matured on January 17, 1991.

(4) Interest rates and interest collateral for the Par and Discount Bonds are with respect to U.S. dollar denominated bonds. Interest rates for Front-Loaded Interest Reduction Bonds are with respect to U.S. dollar denominated bonds.

n.a.: Not applicable.

Sources: *Ministry of Finance and Banco Central.*

**Capital Market Issues of Public External Debt**

Over the past 35 years, despite the debt crisis that prompted the restructuring of its commercial bank debt, Venezuela has paid on a current basis in accordance with the terms of the relevant agreements the full amount of principal and interest due on all publicly issued bonds and notes in the international capital markets. Prior to the consummation of the 1990 Financing Plan (see "—1990 Financing Plan"), the percentage of Venezuela's external debt represented by obligations issued in the international capital markets was very small (approximately 5.6% at December 31, 1989). The change in Venezuela's debt structure as a result of the 1990 Financing Plan has shifted such that international capital market obligations now constitute the major portion (79.1%) at December 31, 1997) of Venezuela's total external debt.

In September 1997, the Government completed the issuance of U.S.$4.0 billion in principal amount of its 9.25% Global Bonds due 2027 in exchange for $4.4 billion in principal amounts of its U.S. dollar denominated Par and Discount Bonds due 2020 issued under the 1990 Financing Plan. As a result of the exchange, collateral totalling U.S.$1.317 billion pledged in favor of the Par and Discount Bonds was released to the Government and was applied by the Government to reduce the Government's outstanding indebtedness to Banco Central that was incurred by the Government to purchase the collateral for the Brady Bonds. As a result, the Republic was able to reduce its total indebtedness to Banco Central by 47.4%.

The following table sets out a summary of the principal features of the Republic's currently outstanding bonds and notes publicly issued in external capital markets other than the bonds issued pursuant to the 1990 Financing Plan, the main features of which are set forth under "—1990 Financing Plan" above.

| Security | Currency | Original Issue Size | Principal Outstanding | Interest Rate[1] | Issue Date | Maturity Date | Target Market |
|----------|----------|---------------------|------------------------|------------------|------------|---------------|---------------|
| | | (Millions) | | | | | |
| ROV—FRN'98 . . . . | U.S.$ | 167 | 167 | LIBOR + 1⅛% | Dec. 88 | Dec. 98 | Euromarket |
| ROV—FRN'03 . . . | U.S.$ | 167 | 167 | LIBOR + 1⅛% | Dec. 88 | Dec. 03 | Euromarket |
| ROV—DM-8.75% . | DM | 300 | 300 | 8.75% | Oct. 93 | Oct. 00 | Germany |
| ROV—DM-10% . . . | DM | 500 | 500 | 10.00% | Dec. 95 | Dec. 98 | Germany |
| ROV—DM-10.25% | DM | 650 | 650 | 10.25% | Sept. 96 | Sept. 03 | Germany |
| ROV—9.125% . . . | U.S.$ | 315 | 315 | 9.125% | June 97 | June 07 | Euromarket |
| ROV—9.25% . . . . | U.S.$ | 4,000 | 4,000 | 9.25% | Sept. 97 | Sept. 27 | United States |

(1) Interest is paid on a semi-annual basis except on the DM denominated issues on which interest is paid annually.

Source: *Ministry of Finance.*

**External Private Sector Debt**

In addition to the restructuring of the external public sector debt in 1986, the Government implemented a plan for the repayment of external private sector debt. After discussions with its creditor banks, the Government adopted Exchange Agreement No. 2 in 1986 establishing the Government's policies with respect to access by private sector companies to foreign exchange purchases for external debt servicing obligations.

Exchange Agreement No. 2 permitted private sector companies to purchase foreign exchange over an eight-year period in increasing amounts for principal amortizations. Under Exchange Agreement No. 2, private sector companies were eligible to purchase foreign exchange for the payment of principal at the rate of Bs.14.50=U.S.$1.00. In addition to the general program of access, private sector companies were given the

option of obtaining access to foreign exchange for the payment of principal at a guaranteed rate of Bs.7.50=U.S.$1.00 upon the payment of a premium. Finally, upon the payment of an additional premium, private sector companies were entitled to obtain foreign exchange at the rate of Bs.7.50=U.S.$1.00 for the payment of certain amounts of interest.

Exchange Agreement No. 2 was conceived in order to alleviate the excessive burden incurred by the private sector represented by the financial cost of servicing external debt contracted prior to February 1983. The implied losses under the unified foreign exchange regime adopted in 1989 made it impossible to maintain Exchange Agreement No. 2, and consequently its effects were suspended. See "The Venezuelan Economy—Historical Economic Performance—Structural Adjustment Program, 1989-1993."

On November 28, 1990, the Government adopted Decree No. 1,307 to provide for the delivery of foreign exchange for the payment of external private sector debt covered by exchange rate guarantees under Exchange Agreement No. 2. Pursuant to Decree No. 1,307, Banco Central was authorized to deliver foreign exchange in an amount equal to 35% of the net unpaid balance of such debt in cases where the total outstanding debt did not exceed U.S.$10 million or equivalent or where a private sector company renounced any rights to obtain foreign exchange with respect to amounts exceeding U.S.$10 million. With respect to private sector companies whose unpaid debt exceeded U.S.$10 million or equivalent, Decree No. 1,307 provided that Banco Central would deliver negotiable, foreign currency denominated registered bonds for up to 70% of the unpaid balance. Such bonds are repayable in twenty equal, consecutive annual installments and bear interest at a rate of 4% per annum. In addition to the delivery of foreign exchange or foreign exchange denominated bonds for the repayment of principal, Banco Central was authorized, with respect to the delivery of foreign exchange for the repayment of unpaid overdue interest or private sector debt covered by exchange rate guarantees, to deliver negotiable, foreign currency denominated registered bonds for 70% of such overdue unpaid interest. Such bonds are repayable in eight equal, consecutive annual installments and do not bear interest.

Delivery of any amounts of foreign exchange and/or foreign currency denominated bonds contemplated by Decree No. 1,307 was effected upon the delivery by the private sector companies of the Bolivar countervalue of the outstanding principal amount of the net registered debt or total unpaid overdue interest of such companies at the rates contemplated by Exchange Agreement No. 2. Pursuant to Decree 1,307, principal bonds in the amount of U.S.$706 million and interest bonds in amount of U.S.$333 billion were issued, and foreign currency in the amount of U.S.$479 million was delivered, to participating debtors.

From March 1989 to July 1994, private sector entities were not required to register their foreign currency denominated indebtedness and the Government had no official records of any inflows or outflows of private sector indebtedness. Upon the implementation of foreign exchange controls in July 1994, the Government established a procedure for private sector entities to register their foreign currency indebtedness and apply for access to foreign exchange. Commencing in the third quarter of 1994, private sector entities were permitted to register their outstanding foreign currency debt with the *Unidad de Registro de la Deuda Externa Privada* ("UDE") and thereafter the *Oficina Técnica de Administración Cambiaria* ("OTAC"). As of November 1995, UDE estimated that total private external debt was U.S.$5.0 billion. On April 15, 1996 the Government announced the elimination of exchange controls, and private sector entities no longer need to obtain governmental authorization to obtain foreign currency.

# Description of the Debt Securities

The Debt Securities will be issued under a fiscal agency agreement, dated as of August 6, 1998, (the "Fiscal Agency Agreement") entered into between the Republic, Banco Central, as financial agent of the Republic ("Banco Central") and The Chase Manhattan Bank ("Chase"), as fiscal agent. The Fiscal Agency Agreement has been, and the forms of Debt Securities will be, filed as an exhibit to the Registration Statement. The following description summarizes certain terms of the Debt Securities and the Fiscal Agency Agreement. Such summary does not purport to be complete and is qualified in its entirety by reference to such exhibits. Wherever particular defined terms of the Fiscal Agency Agreement are used and not otherwise defined herein, such defined terms have been defined in the Fiscal Agency Agreement and are incorporated herein by reference.

The Republic may replace the Fiscal Agent at any time, subject to the appointment of a replacement fiscal agent. The Fiscal Agent is not a trustee for the holders of the Debt Securities and does not have the same responsibilities or duties to act for such holder as would a trustee. The Republic and its affiliates may maintain deposit accounts and conduct other banking transactions in the ordinary course of business with the Fiscal Agent.

## General

Reference is made to the Prospectus Supplement relating to the particular series of the Debt Securities offered thereby for the following terms of such Debt Securities: (a) the specific designation of such Debt Securities; (b) any limit on the aggregate principal amount of such Debt Securities; (c) the price or prices (expressed as a percentage of the aggregate principal amount thereof) at which such Debt Securities will be issued; (d) the dates or dates on which such Debt Securities will mature; (e) the rate or rates (which may be fixed or floating) per annum at which interest, if any, on such Debt Securities will accrue, the dates on which such interest, if any, will be payable, the date or dates from which such interest, if any, will accrue and the record dates for the interest payable on any interest payment date; (f) the dates, if any, on which, and the price or prices at which, such Debt Securities will, pursuant to any mandatory sinking fund provisions, or may pursuant to any optional sinking fund provisions or to any purchase fund provisions, be redeemed by the Republic, and the other detailed terms and provisions of such sinking and/or purchase funds; (g) the date, if any, after which, and the price or prices at which, such Debt Securities may pursuant to any optional redemption or repayment provisions, be redeemed at the option of the Republic or repaid at the option of the holder thereof and the other detailed terms and provisions of such optional redemption or repayment; (h) the currency or currencies in which such Debt Securities are denominated, which may be U.S. dollars, another foreign currency or units of two or more currencies; (i) the currency or currencies for which such Debt Securities may be purchased and in which principal, premium, if any, and interest may be payable; (j) the manner in which the amount of payments of principal (and premium, if any) or interest on such Debt Securities is to be determined if such determination is to be made with reference to any index; and (k) any other terms of such Debt Securities not inconsistent with the provisions of the Fiscal Agency Agreement.

One or more series of Debt Securities may be sold at a substantial discount below their stated principal amount, bearing no interest or interest at a rate which at the time of issuance is below market rates. One or more series of Debt Securities may be floating rate debt securities, exchangeable for fixed rate debt securities. United States Federal income tax consequences and special considerations applicable to any such series will be described in the Prospectus Supplement relating thereto.

Principal and interest (if any) on the Debt Securities of a series will be payable at such place or places and in such currency or currencies as designated by the Republic and set forth in the applicable Prospectus Supplement. Unless otherwise specified in the applicable Prospectus Supplement, and subject to further provisions set forth in the applicable Debt Securities, principal of and interest on the Debt Securities will be payable in lawful money of the United States of America at the New York office of the Fiscal Agent to the registered holders of the Debt Securities as of the due date for payment; *provided, however*, that unless otherwise specified in the Prospectus Supplement, interest will be paid by check mailed to the registered holders of the Debt Securities at their registered addresses.

Unless otherwise specified in the applicable Prospectus Supplement, and subject to further provisions set forth in the applicable Debt Securities, the Debt Securities denominated in U.S. dollars will be issued in fully registered form only without coupons in denominations of $1,000 and integral multiples thereof. The authorized denominations of Debt Securities denominated in a currency unit other than U.S. dollars will be set forth in the applicable Prospectus Supplement. The register of holders of Debt Securities will be kept at the New York office of the Fiscal Agent.

The Debt Securities may be issued under the Fiscal Agency Agreement upon exchange or conversion of other Debt Securities. The specific terms of exchange or conversion of any such Debt Securities and the specific terms of the Debt Securities issuable upon any such exchange or conversion will be described in the Prospectus Supplement relating to any such exchange or conversion of Debt Securities.

Any moneys held by the Fiscal Agent in respect of Debt Securities and remaining unclaimed for two years after such amount shall have become due and payable shall be returned to the Republic, and the holder of a Debt Security shall thereafter look only to the Republic for any payment to which such holder may be entitled.

### Redemption and Repurchase

Unless otherwise set forth in the applicable Prospectus Supplement, the Debt Securities will not be redeemable prior to maturity at the option of the Republic or the registered holders thereof. The Republic may at any time purchase Debt Securities at any price in the open market or otherwise. Debt Securities so purchased by the Republic may, at the Republic's discretion, be held, resold or surrendered to the Fiscal Agent for cancellation.

### Global Securities

The Debt Securities of a series may be issued in whole or in part in the form of one or more global securities ("Global Securities") that will be deposited with, or on behalf of, a depository (the "Depository") identified in the Prospectus Supplement relating to such series. Global Securities may be issued only in fully registered form, unless otherwise set forth in the applicable Prospectus Supplement, and in either temporary or definitive form. Unless and until it is exchanged in whole or in part for Debt Securities in definitive form, a Global Security may not be transferred except as a whole by the Depository for such Global Security to a nominee of such Depository or by a nominee of such Depository to such Depository or another nominee of such Depository or by such Depository or any nominee of such Depository to a successor Depository or any nominee of such successor.

The specific terms of the depository arrangement with respect to a series of Debt Securities will be described in the Prospectus Supplement relating to such series. Unless otherwise specified in the Prospectus Supplement, the Republic anticipates that the following provisions will apply to depository arrangements.

Upon the issuance of a Global Security, the Depository for such Global Security will credit on its book-entry registration and transfer system the respective principal amounts of the Debt Securities represented by such Global Security to the accounts of persons that have accounts with such Depository ("Accountholders"). Such accounts shall be designated by the agents or underwriters with respect to such Debt Securities or by the Republic if such Debt Securities are offered and sold directly by the Republic. Ownership of beneficial interests in a Global Security will be limited to Accountholders or persons that may hold interests through Accountholders. Ownership of beneficial interests in such Global Security will be shown on, and the transfer of that ownership will be effected only through records maintained by the applicable Depository (with respect to interests of Accountholders). Owners of beneficial interests in a Global Security (other than Accountholders) will not receive written confirmation from the applicable Depository of their purchase. Each beneficial owner is expected to receive written confirmation providing details of the transaction, as well as periodic statements of its holdings, from the Depository (if such beneficial owner is an Accountholder) or from the Accountholder through which such beneficial owner entered into the transaction (if such beneficial owner is not an Accountholder). The laws of some states require that certain purchasers of securities take physical delivery of such securities in definitive form. Such limits and such laws may impair the ability to own, pledge or transfer beneficial interests in a Global Security.

So long as the Depository for a Global Security, or its nominee, is the registered owner of such Global Security, such *Depository or such nominee, as the case may be, will be considered the sole owner or holder of the Debt Securities* represented by such Global Security for all purposes under the Fiscal Agency Agreement. Except as specified below or in the applicable Prospectus Supplement, owners of beneficial interests in a Global Security will not be entitled to have any of the individual Debt Securities of the series represented by such Global Security registered in their names, will not receive or be entitled to receive physical delivery of any such Debt Securities in definitive form and will not be considered the owners or holders thereof under the Debt Securities or the Fiscal Agency Agreement. Accordingly, each person owning a beneficial interest in a Global Security must rely on the procedures of the Depository for such Global Security and, if such person is not an Accountholder, on the procedures of the Accountholder through which such person owns its interest, to exercise any rights of a holder under the Debt Securities or the Fiscal Agency Agreement. The Republic understands that under existing industry practices, if the Republic requests any action of holders, or an owner of a beneficial interest in such Global Security desires to take any action which a holder is entitled to take under the Fiscal Agency Agreement, the Depository for such Global Security would authorize the Accountholders holding the relevant beneficial interests to take such action, and such Accountholders would authorize beneficial owners owning through such Accountholders to take such action or would otherwise act upon the instructions of beneficial owners holding through them.

Payments of principal of and any premium and any interest on Debt Securities registered in the name of a Depository or its nominee will be made to the Depository or its nominee, as the case may be, as the registered *owner of the Global Security representing such Debt Securities. None of the Republic, any Paying Agent or the Fiscal Agent,* in its capacity as registrar for such Debt Securities, will have any responsibility or liability with respect to any aspect of the records relating to or payments made on account of beneficial ownership interests in a Global Security or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

The Republic expects that the Depository for a series of Debt Securities or its nominee, upon receipt of any payment of principal, premium or interest will credit Accountholders' accounts with payments in amounts proportionate to their respective beneficial interests in the principal amount of such Global Security as shown on the records of such Depository. The Republic also expects that payments by Accountholders to owners of beneficial interests in such Global Security held through such Accountholders will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers in bearer form or registered in "street name." Such payments will be the responsibility of such Accountholders.

If a Depository for a series of Debt Securities is at any time unwilling or unable to continue as Depository and a successor *Depository is not appointed by the Republic within ninety days, the Republic will issue Debt Securities* for such series in definitive form in exchange for the Global Security or Securities representing such series of Debt Securities. In addition, the Republic may at any time and in its sole discretion determine not to have the Debt Securities of a series represented by a Global Security or Securities and, in such event, will issue Debt Securities of such series represented by a Global Security or Securities in definitive form in exchange for the Global Security or Securities representing such series of Debt Securities. In either instance, an owner of a beneficial interest in a Global Security will be entitled to have Debt Securities of the series represented by such Global Security equal in principal amount to such beneficial interest registered in its name and will be entitled to physical delivery of such Debt Securities in definitive form. Debt Securities of such series so issued in definitive form will be issued in denominations of $1,000 and integral multiples thereof and will be issued in registered form only, without coupons.

## Status of the Debt Securities

The Debt Securities will be direct, unsecured, general and unconditional obligations of Venezuela. The Debt Securities will rank *pari passu*, without any preference among themselves. The payment obligations of Venezuela under the Debt Securities will at all times rank at least equally with all other payment obligations of Venezuela relating to unsecured and unsubordinated External Public Debt of the Republic.

78

## Negative Pledge

Venezuela will undertake, for so long as any Debt Securities remain outstanding, that if any Lien on Oil or Accounts Receivable (other than a Permitted Lien) is created after the date hereof by Venezuela, Banco Central or any Governmental Agency to secure External Public Debt, Venezuela will cause such Lien to equally and ratably secure the obligations of Venezuela under the Debt Securities. For the purposes of the foregoing, the following terms have the following meanings:

"*Accounts Receivable*" means accounts payable to Venezuela, Banco Central or any Governmental Agency in respect of the sale, lease or other provision of Oil, whether or not yet earned by performance or scheduled to be documented in the future pursuant to a contract in existence on the relevant date.

"*Bond Currencies*" means U.S. dollars, Deutsche marks, Pounds sterling, French francs, Italian lire and Swiss francs.

"*Debt*" means, with respect to any Person, the following (whether outstanding on the date hereof or at any time thereafter): (a) all indebtedness of such Person for borrowed money, or for the deferred purchase price of property or services if and to the extent that the obligation to pay such purchase price is evidenced by an instrument; (b) all reimbursement obligations of such Person under or in respect of letters of credit or banker's acceptances; (c) all obligations of such Person to repay deposits with or advances to such Person; (d) all obligations of such Person (other than those specified in clauses (a) and (b) above) evidenced by bonds, debentures, notes or other similar instruments; and (e) all direct or indirect guarantees, endorsements and similar obligations of such Person in respect of, and all obligations (contingent or otherwise) of such Person to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of any other Person specified in clause (a), (b), (c) or (d) above.

"*Export*" means any sale of Oil by any Person, including any sales to Persons owned or controlled, directly or indirectly, by any such seller, (i) in connection with which such Oil is transported from Venezuela or from storage facilities for Oil held for Export by any such Person outside of Venezuela, and (ii) which has not been preceded by any sale of such Oil which constitutes an Export hereunder.

"*External Debt*" means any Debt which is denominated or payable, or which at the option of the holder thereof may be payable, in a currency other than Bolivars.

"*External Public Debt*" means, at any time, the External Debt of the public sector entities referred to in Article 2 of the Organic Law of Public Credit of the Republic of Venezuela, as in effect on the date hereof, including principal, interest and other amounts payable in connection therewith.

"*Governmental Agency*" means each agency, department, ministry, authority, statutory corporation or other statutory body or juridical entity of Venezuela or any political subdivision thereof or therein, now existing or hereafter created, and any bank, corporation or other legal entity 51% or more of the capital or voting stock or other ownership interest of which is now or hereafter owned or controlled, directly or indirectly by Venezuela, but excluding Banco Central.

"*Lien*" means any lien, pledge, mortgage, security interest, deed of trust, charge or other encumbrance on or with respect to, or any preferential arrangement which has the practical effect of constituting a security interest with respect to the payment of any obligation with or from the proceeds of, any asset or revenues of any kind.

"*1990 Financing Plan*" means The Republic of Venezuela 1990 Financing Plan dated June 25, 1990, distributed to the international banking community.

"*Oil*" means hydrocarbons, their products and derivatives, in each case produced in Venezuela, provided, however, that "Oil" shall not include Orimulsion®, products from Orimulsion® natural gas, coal and petrochemicals.

"*Operating Reserves*" means, at any time, the value (determined in accordance with the second sentence of this definition) of all of the following assets owned by Banco Central at such time to the extent denominated in units of exchange other than the lawful currency of Venezuela (excluding from such assets any assets which are subject

to a Lien): (a) currencies other than the lawful currency of Venezuela (excluding Special Drawing Rights in the IMF and all funds received from the IMF); (b) deposits and credit balances with commercial financial lending institutions, central banks of non-Venezuelan governments or multilateral lending institutions which are payable in any of the Bond Currencies or currencies that are readily convertible into any of the Bond Currencies; and (c) marketable bonds, notes, certificates of deposit and other obligations issued by commercial financial institutions, non-Venezuelan governments or multilateral lending institutions which are payable in any of the Bond Currencies or currencies that are readily convertible into any of the Bond Currencies. For the purposes of this definition: (i) the value of an amount of any currency other than the lawful currency of Venezuela at any time is the equivalent in U.S. dollars of such amount at such time determined in accordance with the consistently applied accounting practices of Banco Central; (ii) the value of a deposit or credit balance referred to in clause (b) above at any time is the equivalent in U.S. dollars of such deposit or credit balance at such time determined in accordance with the consistently applied accounting practices of Banco Central; and (iii) the value of a bond, note, certificate of deposit or other obligation referred to in clause (c) above at any time is the equivalent in U.S. dollars of the fair market value of such obligation at such time determined in accordance with the consistently applied accounting practices of Banco Central.

"*Orimulsion®*" means a liquid fuel consisting of (i) a natural bitumen of 7-10° API, (ii) water and (iii) a surfactant which is added to stabilize the bitumen in the water emulsion.

"Permitted Lien" means a Lien on Oil or Accounts Receivable, if at the time of the creation of such Lien (the "*New Lien*"):

(i) Operating Reserves are greater than the sum of (a) two months of imports into Venezuela of goods and services (including interest payments with respect to External Public Debt) and (b) two months of principal payments with respect to all of the bonds issued to implement the 1990 Financing Plan and any other External Public Debt held by commercial lending institutions (measured in each case on the basis of imports and interest and principal payments during the preceding six months) (the availability of sufficient Operating Reserves to be certified by Banco Central);

(ii) The aggregate principal amount of all External Public Debt secured by Liens on Oil or Accounts Receivable (including the External Public Debt to be secured by the New Lien and other External Public Debt to be simultaneously secured by Liens on Oil or Accounts Receivable) paid, due or scheduled to fall due in the current calendar year, and the aggregate outstanding principal amount of all such External Public Debt scheduled to fall due in each subsequent calendar year, is in each such year less than an amount equivalent to 17.5% of the aggregate revenues from the Export of Oil during the 12-month period preceding the creation of the New Lien (the amount of such External Public Debt to be certified by Banco Central and *the amount of such revenues to be certified by Venezuela); and*

(iii) The aggregate outstanding principal amount of all External Public Debt secured by Liens on Oil or Accounts Receivable (including the External Public Debt to be secured by the New Lien and other External Debt to be secured by Liens on Oil or Accounts Receivable) is less than an amount equivalent to 55% of the aggregate revenues from the Export of Oil during the 12-month period preceding the creation of the New Lien (the amount of such External Public Debt to be certified by Banco Central and the amount of such revenues to be certified by Venezuela);

*provided*, that no New Lien will constitute a Permitted Lien if such New Lien is created while there is a default in the payment of principal of or interest on any Debt Security or any bonds issued to implement the 1990 Financing Plan unless the proceeds of the financing secured by such New Lien are used to make or secure on a ratable basis interest and principal payments due with respect to any Debt Security; provided further that, notwithstanding the foregoing, a New Lien will constitute a Permitted Lien if (a) such New Lien arises pursuant to an order of attachment, distraint or similar legal process arising in connection with court proceedings so long as the execution or enforcement thereof is effectively stayed and the claims secured thereby are being contested in good faith by appropriate proceedings, provided that such New Lien is released or discharged within one year of its imposition, or (b) such New Lien arises by operation of law (and not pursuant to any agreement) and has

not been foreclosed or otherwise enforced against the Oil or Accounts Receivable to which such New Lien applies.

"*Person*" means any individual, corporation, partnership, association, joint stock company, joint venture, trust, unincorporated organization or other entity, or a sovereign state or government or any agency or political subdivision thereof.

### Default; Acceleration of Maturity

If any of the following events (each an "Event of Default") shall occur and be continuing with respect to the Debt Securities of each series:

(a) the Republic shall fail to pay the principal amount of any Debt Security when due and such failure continues for a period of 30 days; or

(b) the Republic shall fail to pay interest or other amounts due on any Debt Security when due and such failure continues for a period of 30 days; or

(c) the Republic shall fail to duly perform or observe any term or obligation contained in the Debt Securities of such series or the Fiscal Agency Agreement (other than those specified in paragraphs (a) or (b) above) and such failure shall continue unremedied for 90 days after written notice thereof shall have been given to the Republic at the specified office of the Fiscal Agent by any holder; or

(d) Banco Central shall fail to duly perform or observe any of its obligations contained in the Banco Central Undertaking to remit (as and to the extent provided therein) U.S. dollars in the amount of each payment of principal of, and interest on, the Debt Securities upon payment by the Republic to Banco Central of the necessary Bolivar amount to make such payments, as provided in the Banco Central Undertaking, or on the occurrence and continuation of such a failure, Banco Central shall make any withdrawal of any amounts held on deposit with any holder or the Fiscal Agent that has notified Banco Central of its intention to set-off from such amounts any amounts owed to such holder or the Fiscal Agent, and any such failure shall continue unremedied for 30 days after written notice thereof shall have been given to Banco Central and the Republic by the Fiscal Agent or any holder at the office of the Fiscal Agent; or

(e) Banco Central shall fail duly to perform or observe any term or obligation contained in the Banco Central Undertaking or the Fiscal Agency Agreement on its part to be performed or observed (other than those specified in (d) above) and such failure shall continue unremedied for 90 days after written notice thereof shall have been given to the Republic and Banco Central at the specified office of the Fiscal Agent by any holder; or

(f) as a result of any default or event of default contained in any agreement or instrument related to any Public Issue of External Debt (other than the Debt Securities) of the Republic, Banco Central or any Governmental Agency guaranteed by the Republic, any party to such agreement or instrument accelerates or declares to be due and payable any such Public Issue of External Debt prior to the stated maturity thereof; or

(g) the Republic or Banco Central fails generally to pay or perform its obligations under Public Issues of External Debt as they become due, or a moratorium on the payment or performance of such obligations shall be declared by the Republic or Banco Central; or

(h) there shall have been entered against the Republic or Banco Central a final judgment, decree or order by a court of competent jurisdiction from which no appeal may be or is taken, for the payment of money in excess of U.S. $100,000,000 and 30 days shall have passed since the entry of any such order without it having been satisfied or stayed; or

(i)     the Republic shall cease to be a member of the IMF or ceases to be eligible to use the general resources of the IMF; or

(j)     the validity of the Debt Securities of such series or the Fiscal Agency Agreement shall be contested by the Republic, Banco Central or any legislative, executive or judicial body or official of the Republic *authorized in each case by law to do so, or the Republic or Banco Central shall deny any of its* obligations thereunder to any of the holders of such Debt Securities (whether by a general suspension of payments or a moratorium on the payment of debt or otherwise), or any constitutional provision, treaty, convention, law, regulation, official communique, decree, ordinance or policy of the Republic, or any final decision by any court in Venezuela having jurisdiction, shall purport to render any provision of the Debt Securities of such series or the Fiscal Agency Agreement invalid or unenforceable or shall purport to prevent or delay the performance or observance by the Republic or Banco Central of any of their respective obligations thereunder to any of the holders; or

(k)     any constitutional provision, treaty, convention, law, regulation, ordinance, decree, consent, approval, license or other authority necessary to enable the Republic or Banco Central to make or perform its obligations under the Debt Securities of such series or the Fiscal Agency Agreement (as the case may be), or for the validity or enforceability thereof, shall expire, be withheld, revoked, terminated or otherwise cease to remain in full force and effect, or shall be modified in a manner which adversely affects, or may reasonably be expected to affect adversely, any rights or claims of any of the holders;

then holders of 25% or more in aggregate outstanding principal amount of the Debt Securities of such series may, by written demand to the Republic at the office of the Fiscal Agent, declare the Debt Securities of such series immediately due and payable whereupon the entire unpaid principal amount of the Debt Securities of such series, all interest accrued and unpaid thereon and all other amounts payable in respect of the Debt Securities of such series shall become and be forthwith due and payable, without the holder's presentation, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Republic. Upon such declaration, the Fiscal Agent shall give notice thereof in the manner provided in the Fiscal Agency Agreement to the Republic (by facsimile, with transmission confirmed) and to the holders of the Debt Securities of such series in the manner provided in such Debt Securities. After any such declaration, if all amounts then due with respect to the Debt Securities of such series are paid (other than amounts due solely because of such declaration) and all other defaults with respect to the Debt Securities of such series are cured, such declaration may be annulled and rescinded by holders of more than 50% in aggregate outstanding principal amount of the Debt Securities of such series (or such other percentage required at a meeting of holders in accordance with the provisions described under "Meetings and Amendments" below) by written notice thereof to the Republic at the specified office of the Fiscal Agent.

For purposes hereof, the term "Public Issue of External Debt" shall mean any External Debt issued in a public offering or private placement of securities or other instruments of a type offered in the capital markets, including, without limitation, any bonds, floating rate notes, commercial paper, certificates of deposit, debentures or other evidence of indebtedness.

**Meetings and Amendments**

A meeting of holders of Debt Securities of any series may be called, as set forth below, at any time and from time to time to make, give or take any request, demand, authorization, direction, notice, consent, waiver or other action provided by the Fiscal Agency Agreement or the Debt Securities of such series to be made, given or taken by holders of Debt Securities of such series or to modify, amend or supplement the terms of the Debt Securities of such series or the Fiscal Agency Agreements as hereinafter provided. The Republic may at any time call a meeting of holders of Debt Securities of any series for any such purpose to be held at such time and at such place as the Republic shall determine. Notice of every such meeting, setting forth the time and the place of such meeting and in general terms the action proposed to be taken at such meeting, shall be given as provided in the terms of the Debt Securities, not less than 30 nor more than 60 days prior to the date fixed for the meeting (provided that, in the case of any meeting to be reconvened after adjournment for lack of a quorum, such notice shall be given not less than 10 days nor more than 60 days prior to the date fixed for such meeting). In case at any time the Republic or the holders of at least 10% in aggregate principal amount of the Outstanding (as defined in the Fiscal Agency Agreement) Debt Securities of any series shall, after the occurrence and during the continuance of any Event of Default under the Debt Securities of such series, have requested the Fiscal Agent to call a meeting of the holders of Debt Securities of such series for any such purpose, by written request setting forth in reasonable detail the action proposed to be taken at the meeting, the Fiscal Agent shall call such meeting for such purposes by giving notice thereof.

To be entitled to vote at any meeting of holders of Debt Securities of any series, a person shall be a holder of Outstanding Debt Securities of such series or a person duly appointed by an instrument in writing as proxy for such holder. The persons entitled to vote a majority in principal amount of the Outstanding Debt Securities of such series shall constitute a quorum. In the absence of a quorum within 30 minutes of the time appointed for any such meeting, the meeting shall, if convened at the request of the holders, be dissolved. In any other case, the meeting may be adjourned for a period of not less than 10 days as determined by the chairman of the meeting prior to the adjournment of such meeting. In the absence of a quorum at any such adjourned meeting, such adjourned meeting may be further adjourned for a period of not less than 10 days as determined by the chairman of the meeting prior to the adjournment of such adjourned meeting. Notice of the reconvening of any adjourned meeting shall be given as provided in the preceding paragraph, except that such notice need be given only once. Notice of the reconvening of an adjourned meeting shall state expressly the percentage of the principal amount of the Outstanding Debt Securities of such series which shall constitute a quorum. Subject to the foregoing, at the reconvening of any meeting adjourned for a lack of a quorum, the persons entitled to vote 25% in principal amount of the Outstanding Debt Securities of such series shall constitute a quorum for the taking of any action set forth in the notice of the original meeting. Any meeting of holders of Debt Securities of such series at which a quorum is present may be adjourned from time to time by a vote of a majority in principal amount of the Outstanding Debt Securities of such series represented at the meeting, and the meeting may be held as so adjourned without further notice.

The Fiscal Agent may make such reasonable and customary regulations consistent with the Fiscal Agency Agreement as it shall deem advisable for any meeting of holders of Debt Securities of any series with respect to the proof of the holding of Debt Securities of such series, the adjournment and chairmanship of such meeting, the appointment and duties of inspectors of votes, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall deem appropriate. The Fiscal Agent shall, by an instrument in writing, appoint a temporary chairman of the meeting, unless the meeting shall have been called by the Republic or the holders of Debt Securities of any series as provided above, in which the case the Republic or the holders of Debt Securities of such series calling the meeting, as the case may be, shall in like manner appoint a temporary chairman. A permanent chairman and a permanent secretary of the meeting shall be elected by vote of the persons entitled to vote a majority in principal amount of the Outstanding Debt Securities of such series represented and voting at the meeting. The chairman of the meeting shall have no right to vote, except as holder of Debt Securities of such series or proxy. A record, at least in duplicate, of the proceedings of each

meeting of holders shall be prepared, and one such copy shall be delivered to the Republic and another to the Fiscal Agent to be preserved by the Fiscal Agent.

With (a) the affirmative vote, in person or by proxy thereunto duly authorized in writing, of holders entitled to vote the lesser of (i) a majority in principal amount of the Outstanding Debt Securities of any series and (ii) 66 2/3% in aggregate principal amount of the Outstanding Debt Securities of any series represented and voting at a meeting duly called and held as specified above, or (b) the written consent of the holders of a majority in aggregate principal amount of the Outstanding Debt Securities of any series, Venezuela and the Fiscal Agent (and, in the case of the Banco Central Undertaking, with the agreement of Banco Central) may modify, amend or supplement the terms of the Fiscal Agency Agreement or the Debt Securities of such series and such holders may make, take or give any request, demand, authorization, direction, notice, consent, waiver or other action provided by the Fiscal Agency Agreement or the Debt Securities to be made, given or taken by holders of the Debt Securities of such series; provided, however, that no such action may, without the consent or affirmative vote of the holder of each Debt Security of such series affected thereby, (A) change the due date for the payment of the principal of, or the portion of such principal amount which is payable upon acceleration of the maturity of such Debt Security or the interest rate thereon, (B) reduce the principal amount of any Debt Security of such series, the portion of such principal amount which is payable upon acceleration of the maturity of such Debt Security, the interest rate thereon or the premium payable upon redemption thereof, (C) change the coin or currency in which payment with respect to interest, any premium or principal in respect of any Debt Security of such series is payable, (D) reduce the proportion of the principal amount of the Debt Securities of such series the vote or consent of the holders of which is necessary to modify, amend or supplement the Fiscal Agency Agreement or the terms and conditions of the Debt Securities of such series or to make, take or give any request, demand, authorization, direction, notice, consent, waiver or other action provided hereby or thereby to be made, taken or given, or (E) change the obligation of Venezuela to pay Additional Amounts (as defined in "Taxation; Additional Amounts" below). Any such modification, amendment or supplement shall be binding on all holders of the Debt Securities of such series.

Venezuela and the Fiscal Agent (and, in the case of the Banco Central Undertaking, with the agreement of Banco Central) may, upon agreement among themselves, without the vote or consent of any holder of Debt Securities of any series, modify, amend or supplement the Fiscal Agency Agreement or the Debt Securities of any series for the purpose of (i) adding to the covenants of Venezuela for the benefit of the holders of Debt Securities of such series, (ii) surrendering any right or power conferred upon Venezuela, (iii) securing the Debt Securities of such series pursuant to the requirements of the Debt Securities of such series or otherwise; (iv) curing any ambiguity, or curing, correcting, or supplementing any defective provision contained in the Fiscal Agency Agreement, the Banco Central Undertaking or in the Debt Securities of such series; or (v) amending the Fiscal Agency Agreement or the Debt Securities of such series in any manner which the Republic, Banco Central and the Fiscal Agent, as the case may be, may determine, provided, that such amendment shall not adversely affect the interest of any holder of Debt Securities of such series in any material respect.

## Jurisdiction and Waiver of Immunity

Venezuela has agreed that any suit, action or proceeding against it or its properties, assets or revenues with respect to the Debt Securities of any series (a "Related Proceeding") shall be brought exclusively in the Supreme Court of the State of New York, County of New York; in the courts of England that sit in London; in the United States District Court for the Southern District of New York; or in the courts of Venezuela that sit in Caracas, as the person bringing such Related Proceeding may elect in its sole discretion, provided that if none of the courts specified above located in the country in which such person has elected to bring such Related Proceeding is a court that has jurisdiction of the subject matter or is otherwise competent under applicable law to hear and determine such proceeding, such Related Proceeding may be brought in such other court located in such country as shall have jurisdiction of the subject matter or be otherwise competent under applicable law to hear and determine such Related Proceeding, or if such Related Proceeding seeks relief or a judgment that is enforceable only against any of its properties, assets or revenues that are subject to the jurisdiction of any other court located

in the countries listed above and is limited to the value of such properties, assets or revenues, such Related Proceeding may be brought in any such court (all such courts described in this sentence being called herein "Specified Courts"). Venezuela also has agreed that any judgment obtained in any of the Specified Courts arising out of any Related Proceeding may be enforced or executed in any Specified Court or any other court of competent jurisdiction whatsoever and any judgment obtained in any such other court as a result of such enforcement or execution may be enforced or executed in any such other court of competent jurisdiction (all courts other than Specified Courts being herein called "Other Courts"), by means of a suit on the judgment or in any other manner provided by law. Venezuela has irrevocably submitted to the exclusive jurisdiction of each of the Specified Courts for the purpose of any Related Proceeding and, solely for the purpose of enforcing or executing any judgment referred to in the preceding sentence (a "Related Judgment"), of each Specified Court and each Other Court. The agreement made by Venezuela with respect to jurisdiction is made solely with respect to Related Proceedings and the enforcement or execution of Related Judgments and under no circumstances shall it be interpreted as a general agreement by Venezuela with respect to proceedings unrelated to the Debt Securities.

Venezuela has agreed that service of all writs, process and summonses in any Related Proceeding or any suit, action or proceeding to enforce or execute any Related Judgment brought against it in the State of New York may be made upon the Consul General of the Republic of Venezuela or, in his or her absence or incapacity, any official of the Consulate of Venezuela, presently located at 7 East 51st Street, New York, New York 10022, U.S.A. (the "New York Process Agent"), and service of all writs, process and summonses in any Related Proceeding or any suit, action or proceeding to enforce or execute any Related Judgment brought against it in England may be made upon the person in charge of consular affairs at the Embassy of the Republic of Venezuela, presently located at One Cromwell Road, London SW7 2HW, England (the "London Process Agent" and, together with the New York Process Agent, the "Process Agents"), and Venezuela has irrevocably appointed the Process Agents as its agents to receive such service of any and all such writs, process and summonses, and has agreed that the failure of any of the Process Agents to give any notice to it of any such service of process shall not impair or affect the validity of such service or of any judgment based thereon. Venezuela has agreed to maintain at all times an agent with offices in New York to act as its New York Process Agent, and an agent with offices in London to act as its London Process Agent as aforesaid (each such agent to be appointed by an irrevocable power of attorney granted before a Venezuelan notary public). Nothing herein shall in any way be deemed to limit the ability to serve any such writs, process or summonses in any other manner permitted by applicable law.

Venezuela has irrevocably consented to and waived any objection which it may now or hereafter have to the laying of venue of any Related Proceeding brought in any of the Specified Courts or to the laying of venue of any suit, action or proceeding brought solely for the purpose of enforcing or executing any Related Judgment in any of the Specified Courts or Other Courts, and further has irrevocably waived, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of any Related Proceeding or any such suit, action or proceeding in any such court.

To the extent that Venezuela or any of its revenues, assets or properties shall be entitled, with respect to any Related Proceeding at any time brought against Venezuela or any of its revenues, assets or properties in any jurisdiction in which any Specified Court is located, or with respect to any suit, action or proceeding at any time brought solely for the purpose of enforcing or executing any Related Judgment in any jurisdiction in which any Specified Court or Other Court is located, to any immunity from suit, from the jurisdiction of any such court, from attachment prior to judgment, from attachment in aid of execution of judgment, from execution of a judgment or from any other legal or judicial process or remedy, and to the extent that in any such jurisdiction there shall be attributed such an immunity, Venezuela has irrevocably agreed not to claim and irrevocably waived such immunity to the fullest extent permitted by the laws of such jurisdiction (including, without limitation, the Foreign Sovereign Immunities Act of 1976 of the United States) and consented generally for the purposes of the State Immunity Act of 1978 of the United Kingdom to the giving of any relief or the issue of any process in connection with any Related Proceeding or Related Judgment, provided that such agreement and waiver, insofar as it relates to any jurisdiction other than a jurisdiction in which a Specified Court is located, was given solely for the

purpose of enabling the Fiscal Agent, any Paying Agent or any holder of the Debt Securities to enforce or execute a Related Judgment. In addition, to the extent that Venezuela or any of its revenues, assets or properties shall be entitled, in any jurisdiction, to any immunity from set-off, banker's lien or any similar right or remedy, and to the extent that there shall be attributed, in any jurisdiction, such an immunity, Venezuela has irrevocably agreed not to claim and irrevocably waived such immunity to the fullest extent permitted by the laws of such jurisdiction with respect to any claim, suit, action, proceeding, right or remedy arising out of or in connection with the Debt Securities.

If for the purpose of obtaining judgment in any court it is necessary to convert a sum due under the Debt Securities to the holder of Debt Securities in one currency into another currency, Venezuela has agreed, to the fullest extent that it may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures such holder could purchase the first currency with such other currency in the city which is the principal financial center of the country of issue of the first currency two business days which shall be business days in New York and in such principal financial center, preceding the day on which final judgment is given.

## Taxation; Additional Amounts

Any and all payments by Venezuela under the Debt Securities or in respect thereof shall be made free and clear of and without deduction for any present or future taxes, levies, imposts, deductions, charges or withholdings, and all interest, penalties or other liabilities with respect thereto, imposed or levied at any time, excluding (i) in the *case of each holder, taxes imposed on or measured by its income or capital by the jurisdiction (or any political* subdivision or taxing authority of such jurisdiction or any organization or federation of which such jurisdiction is at any time a member) under the laws of which such holder is organized, (ii) in the case of each holder, taxes imposed on or measured by its income or capital by the jurisdiction (or any political subdivision or taxing authority of such jurisdiction or any organization or federation of which such jurisdiction is at any time a member) in which the principal place of business or residence (as the case may be) of such holder is located, including, without limitation, any jurisdiction in which such holder is, through an office or fixed place of business, deemed to be doing business or maintaining a permanent establishment under any income tax treaty and (iii) all other taxes imposed by any jurisdiction (or any political subdivision or taxing authority of such jurisdiction or any organization or federation of which such jurisdiction is at any time a member) outside of Venezuela except such taxes which arise as a result of action taken by Venezuela (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being herein called "Taxes"). If Venezuela shall be required by law to deduct any Taxes from or in respect of any sum payable under the Debt Securities or in respect thereof to any holder, (a) Venezuela shall pay such additional amounts ("Additional Amounts") as may be necessary so that after making all required deductions for Taxes (including deductions applicable to Additional Amounts payable hereunder) such holder receives an amount equal to the sum it would have received had no such deductions been made, (b) Venezuela will make such deductions and (c) Venezuela will pay the full amount deducted to the relevant taxing authority or other authority in accordance with applicable law.

Except as otherwise provided in the Debt Securities, Venezuela will pay (i) all stamp or other documentary taxes or duties, if any, which may be imposed by Venezuela or the United States of America or any state or political subdivision thereof or taxing authority therein with respect to the original issue of the Debt Securities of any series or the exchange of interests in Global registered Debt Securities in definitive form as provided under "Description of the Debt Securities-Global Securities" above and (ii) all other excise or property taxes, charges or similar levies which arise in any jurisdiction from any payment made hereunder or from the execution or delivery of, or otherwise with respect to, the Debt Securities, the Fiscal Agency Agreement or any other document or instrument referred to herein or in the Fiscal Agency Agreement, excluding (in the case of the preceding clause (ii)) any such taxes imposed by any jurisdiction (or any political subdivision or taxing authority of such jurisdiction or any organization or federation of which such jurisdiction is at any time a member) outside of Venezuela *except those resulting from, or required to be paid in connection with, the enforcement of the Debt Securities, the* Fiscal Agency Agreement or any such other document or instrument following the occurrence of an Event of

Default (all such non-excluded taxes, charges or levies described in clauses (i) and (ii) above being herein called "Other Taxes").

Venezuela will reimburse each holder for the full amount of Taxes or Other Taxes (including without limitation, any Taxes or Other Taxes imposed on amounts payable under the Debt Securities) paid by such holder or any liabilities (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted. Each holder which wishes to claim reimbursement hereunder for any such Taxes, Other Taxes or liabilities arising therefrom or with respect thereto will notify Venezuela (through the Fiscal Agent) of its intention to pay the same as promptly as practicable and, if possible, prior to the date of such payment (such notice to describe such Taxes, Other Taxes or liabilities in reasonable detail). Such reimbursement shall be made within 30 days from the date such holder makes demand therefor.

Within 30 days after the date of any payment of Taxes (but in no event later than the date 45 days after the date such Taxes become due), Venezuela will furnish to the Fiscal Agent the original (or a certified copy) of a receipt evidencing payment thereof.

Without prejudice to the survival of any other obligation of Venezuela hereunder, the obligations of Venezuela with respect to Additional Amounts shall survive the payment of the Debt Securities.

Whenever in the Debt Securities there is mentioned, in any context, the payment of the principal of or interest on, or in respect of, Debt Securities, such mention shall be deemed to include mention of the payment of Additional Amounts to the extent that, in such context, Additional Amounts are, were or would be payable in respect thereof pursuant to these provisions, and express mention of the payment of Additional Amounts (if applicable) in any provisions hereof shall not be construed as excluding Additional Amounts in those provisions hereof where such express mention is not made.

### Judgment Currency

Venezuela has agreed that, if a judgment or order given or made by any Specified Court or Other Court for the payment of any amount in respect of any Debt Security is expressed in a currency (the "judgment currency") other than the currency in which such Debt Security is denominated (the "denomination currency"), Venezuela will pay any deficiency arising or resulting from any variation in rates of exchange between the date as of which the amount in the denomination currency is notionally converted into the amount in the judgment currency for the purposes of such judgment or order and the date of actual payment thereof. This obligation will constitute a separate and independent obligation from the other obligations under the Debt Securities, will give rise to a separate and independent cause of action, will apply irrespective of any waiver or extension granted from time to time and will continue in full force and effect notwithstanding any judgment or order for a liquidated sum or sums in respect of amounts due in respect of the relevant Debt Security or under any such judgment or order.

### Governing Law

The Fiscal Agency Agreement and the Debt Securities will be governed by and interpreted in accordance with the laws of the State of New York without regard to any conflicts of laws principles thereof that would require the application of the laws of a jurisdiction other than the State of New York, and except that all matters governing the authorization and execution of such documents by Venezuela or Banco Central, as the case may be, will be governed by the laws of Venezuela.

## Plan of Distribution

The Republic may sell the Debt Securities of any series in any of three ways: (a) through underwriters or dealers; (b) directly to one or more purchasers; or (c) through agents. The Prospectus Supplement relating to a particular series of Debt Securities offered thereby will set forth the terms of the offering, including the name or names of any underwriters, the purchase price of such Debt Securities and the proceeds to the Republic from such sale, any underwriting discounts and other items constituting underwriters' compensation, any initial public

offering price and any discounts or concessions allowed or reallowed or paid to dealers and any securities exchanges on which such Debt Securities may be listed.

The distribution of the Debt Securities may be effected from time to time in one or more transactions at a fixed price or prices, which may be changed, or at market prices prevailing at the time of the sale, at prices related to such prevailing market prices or at negotiated prices.

If underwriters are used in the sale of Debt Securities of any series, such Debt Securities will be acquired by the underwriters for their own account and may be resold by them from time to time in one or more transactions, including negotiated transactions, at a fixed public offering price or at varying prices to be determined at the time of sale. The Debt Securities may be offered to the public either through underwriting syndicates represented by managing underwriters or directly by underwriters. Unless otherwise set forth in the applicable Prospectus Supplement, the obligations of the underwriters to purchase the Debt Securities offered thereby will be subject to certain conditions precedent and the underwriters will be obligated to purchase all such Debt Securities if any are purchased. Any initial public offering price and any discounts or concessions allowed or reallowed or paid to dealers may be changed from time to time.

The Debt Securities of any series may be sold directly by the Republic or through agents designated by the Republic from time to time. Any agent involved in the offer or sale of Debt Securities in respect of which this Prospectus is delivered will be named, and any commissions payable by the Republic to such agent will be set forth, in the applicable Prospectus Supplement. Unless otherwise specified in the applicable Prospectus Supplement, any such agent will be acting on a reasonable best efforts basis for the period of its appointment.

If so indicated in the applicable Prospectus Supplement, the Republic will authorize agents, underwriters or dealers to solicit offers by certain specified entities to purchase the Debt Securities offered thereby from the Republic at the public offering price set forth in such Prospectus Supplement pursuant to delayed delivery contracts providing for payment and delivery on a specified date in the future. Such contracts will be subject only to those conditions set forth in such Prospectus Supplement and such Prospectus Supplement will set forth the commission payable for solicitation of such contracts.

If so indicated in the applicable Prospectus Supplement, the Republic may offer the Debt Securities of any series to present holders of other securities of the Republic as full, partial or alternative consideration for the purchase or exchange by the Republic of such other securities either in connection with a publicly announced tender, exchange or other offer for such securities or in privately negotiated transactions. Such offering may be in addition to or in lieu of sales of Debt Securities directly or through underwriters or agents as set forth in the Prospectus Supplement.

Agents and underwriters may be entitled under agreements entered into with the Republic to indemnification by the Republic against certain liabilities, including liabilities under the United States Securities Act of 1933, as amended, or to contribution with respect to payments which the agents or underwriters may be required to make in respect thereof. Agents and underwriters may engage in transactions with or perform services for the Republic in the ordinary course of business.

## Validity of the Debt Securities

The validity of the Debt Securities will be passed upon for the Republic by Lares, Ramos, Ferreira y Vera, S.C., Venezuelan counsel to the Republic, and by Arnold & Porter, United States counsel to the Republic, and for the underwriters, if any, by United States counsel and Venezuelan counsel to the underwriters named in the applicable Prospectus Supplement. As to all matters of Venezuelan law, Arnold & Porter may rely on the opinion of the Lares, Ramos, Ferreira y Vera, S.C.

# The Banco Central Undertaking

The Republic has irrevocably and unconditionally agreed that each payment to be made by the Republic under the Debt Securities shall be effected through Banco Central, and for that purpose, has instructed Banco Central to execute and deliver an undertaking in favor of the holders of the Debt Securities of each series from time to time, the Fiscal Agent and each paying agent (each, a "Banco Central Undertaking") and to remit (as and to the extent provided in the Banco Central Undertaking) U.S. dollars in the amount of each payment of principal of, and interest on, such series of Debt Securities at the time and place and in the manner provided in such series of Debt Securities. In this regard, the Republic has irrevocably and unconditionally agreed to deposit, from time to time, at Banco Central, in the accounts specially established for this purpose, the Bolivars required for each payment prior to the date such payment is required to be made and to deliver in a timely fashion to Banco Central the authorizations necessary for it to effect the required conversions of Bolivars into U.S. dollars. The Republic has agreed that no such deposit of funds with Banco Central shall be deemed to constitute payment to any holder of such series of Debt Securities of any amount payable to such holder. Each Banco Central Undertaking will be governed by the law of the State of New York.

Pursuant to each Banco Central Undertaking, upon the deposit by the Republic at Banco Central of the Bolivars required for a payment due under the Debt Securities and receipt by Banco Central of the authorizations necessary for it to effect the required conversions of the Bolivars into U.S. dollars, Banco Central shall have a separate and independent obligation to remit U.S. dollars to the Fiscal Agent provided that Banco Central shall not be obliged to make any remittance of U.S. dollars if such remittance would constitute a breach of Banco Central's obligation under Article 89 of the Central Bank Law to provide, on a priority basis, the foreign currency demanded from time to time by PDVSA to meet its needs for U.S. dollars in accordance with the foreign exchange budget prepared by PDVSA.

Banco Central has irrevocably agreed that any suit, action or proceeding against it or its properties, assets or revenues with respect to a Banco Central Undertaking (a "Banco Central Proceeding") shall be brought exclusively in the Supreme Court of the State of New York, County of New York, in the United States District Court for the Southern District of New York; in the High Court of Justice, England; or in the courts of Venezuela that sit in Caracas, as the person bringing such Banco Central Proceeding may elect in its sole discretion (or in such other court as shall have jurisdiction or be otherwise competent to hear and determine such Banco Central Proceeding, but only in the circumstances specified in the Banco Central Undertaking), all as more fully set out in each Banco Central Undertaking.

Banco Central has irrevocably waived any objection which it may have to the laying of venue of any Banco Central Proceeding brought in any of the courts referred to above or to the laying of venue of any suit, action or proceeding brought solely for the purpose of enforcing or executing any judgment obtained in a Banco Central Proceeding and has further irrevocably waived, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of any Banco Central Proceeding or any such suit, action or proceeding.

To the extent that Banco Central or any of its revenues, assets or properties shall be entitled, with respect to any Banco Central Proceeding at any time brought against it or any of its revenues, assets or properties in any jurisdiction in which any court specified above is located, or with respect to any suit, action or proceeding at any time brought solely for the purpose of enforcing or executing any judgment obtained in a Banco Central Proceeding in any jurisdiction in which any of the courts referred to above is located, to any immunity from suit, from the jurisdiction of any such court, from attachment in aid of execution of judgment from execution of a judgment or from any other legal or judicial process or remedy (except for certain processes and remedies more fully described in the Banco Central Undertaking), and to the extent that in any such jurisdiction there shall be attributed to itself or any of its revenues, assets or properties such an immunity, Banco Central has irrevocably agreed not to claim and has irrevocably waived such immunity to the fullest extent permitted by the laws of such jurisdiction, all as more fully set out in each Banco Central Undertaking.

The foregoing description of the Banco Central Undertakings is a summary of, and does not purport to be complete and is qualified in its entirety to the detailed provisions of, each Banco Central Undertaking. A copy of the Banco Central Undertaking has been filed as an exhibit to the Registration Statement relating to the Global Bonds of which this Prospectus is a part.

# Tables and Supplementary Information

## External Direct Debt of the Republic
### (as of March 31, 1998)

| | Interest Rate | Issue Date | Final Maturity | Currency | **Principal Amount** Issued Amount (Millions of Original Currency)[1] | Outstanding Amount (Millions of U.S.$)[2] |
|---|---|---|---|---|---|---|
| **Multilateral Organizations:** | | | | | | |
| World Bank . . . . . . . . . . . . . . . . | 6.50% | 1992 | 2006 | U.S.$ | 160.0 | $ 35.4 |
| | 7.27% | 1993-1994 | 2007-2008 | U.S.$ | 271.4 | 111.1 |
| | 7.50% | 1995 | 2010 | U.S.$ | 93.0 | 11.5 |
| | 7.73% | 1993 | 2007 | U.S.$ | 40.0 | 21.3 |
| | 7.75% | 1989-1991 | 2004-2008 | U.S.$ | 1,569.2 | 995.7 |
| | 8.25% | 1991 | 2007-2008 | U.S.$ | 250.0 | 27.0 |
| | | | | | | $ 1,202.3 |
| Inter-American Development Bank . . . . . | 3.0% | 1974-1975 | 1998 | U.S.$ | 32.5 | $ 2.6 |
| | 3.50% | 1992 | 2012 | U.S.$ | 61.5 | 7.1 |
| | 7.69% | 1990-1991 | 2010-2011 | U.S.$ | 609.1 | 191.0 |
| | 8.38% | 1985-1994 | 2000-2018 | U.S.$ | 1,007.1 | 362.0 |
| | 8.88% | 1992-1995 | 2000-2003 | U.S.$ | 362.5 | 37.1 |
| | | | | | | $ 902.8 |
| Corporación Andina de Fomento . . . . . . | Variable | 1992-1995 | 2000-2003 | U.S.$ | 47.0 | $ 20.9 |
| FIDA . . . . . . . . . . . . . . . . . . . | 3% | 1982-1992 | 2003-2005 | U.S.$ | 21.0 | $ 4.3 |
| **Bilateral Agencies:** | | | | | | |
| Various Creditors . . . . . . . . . . . . . | Variable | 1992-1994 | 1997-2004 | U.S.$ | 535.7 | $ 322.7 |
| Various Creditors . . . . . . . . . . . . . | 6.81% | 1992 | 2004 | U.S.$ | 40.8 | 23.7 |
| Various Creditors . . . . . . . . . . . . . | 6.87% | 1992 | 2005 | U.S.$ | 22.7 | 12.0 |
| Various Creditors . . . . . . . . . . . . . | 7.90% | 1991 | 1999-2005 | Yen | 13,614.7 | 210.5 |
| Various Creditors . . . . . . . . . . . . . | 9.63% | 1988-1989 | 1999-2002 | U.S.$ | 64.8 | 25.6 |
| | | | | | | $ 624.5 |
| **Commercial Banks:** | | | | | | |
| Various Creditors . . . . . . . . . . . . . | Variable | 1992-1994 | 1997-2004 | U.S.$ | 113.2 | $ 64.8 |
| Various Creditors . . . . . . . . . . . . . | Variable | 1995 | 2006 | U.S.$ | 10 | 8.8 |
| | | | | | Austrian | |
| Various Creditors . . . . . . . . . . . . . | 8.25% | 1995 | 2002 | Schilling | 129.2 | 5.9 |
| Various Creditors . . . . . . . . . . . . . | Variable | 1997 | 2002 | U.S.$ | 30.0 | 30.0 |
| | | | | | | $ 106.5 |
| **Suppliers and Contractors:** | | | | | | |
| Various Creditors . . . . . . . . . . . . . | Variable | 1992-1997 | 1999-2004 | U.S.$ | 64.9 | $ 13.7 |
| **Bonds:** | | | | | | |
| Resident Bonds . . . . . . . . . . . . . . | 11% | 1985 | 2005 | U.S.$ | 950.0 | $ 793.2 |
| FRN'98 . . . . . . . . . . . . . . . . . | LIBOR + 1% | 1993 | 1998 | U.S.$ | 167.0 | 167.0 |
| FRN'03 . . . . . . . . . . . . . . . . . | LIBOR + 1% | 1993 | 2003 | U.S.$ | 167.0 | 167.0 |
| DM—8.75% . . . . . . . . . . . . . . . | 8.75% | 1993 | 2000 | DM | 300.0 | 164.3 |
| DM 10% . . . . . . . . . . . . . . . . . | 10.0% | 1995 | 1998 | DM | 500.0 | 273.9 |
| DM—9.125% . . . . . . . . . . . . . . . | 9.125% | 1996 | 2006 | DM | 650.0 | 356.1 |
| | LIBOR + | | | | | |
| Discount—DM . . . . . . . . . . . . . . | 13/16% | 1990 | 2020 | DM | 130.8 | 71.7 |
| | LIBOR + | | | | | |
| Discount—U.S.$ (Series A) . . . . . . . . | 13/16% | 1990 | 2020 | U.S.$ | 968.6 | 733.6 |
| | LIBOR + | | | | | |
| Discount—U.S.$ (Series B) . . . . . . . . | 13/16% | 1990 | 2020 | U.S.$ | 211.4 | 133.1 |
| Par—DM . . . . . . . . . . . . . . . . . | 6.66% | 1990 | 2020 | DM | 507.7 | 278.3 |
| Par—French Franc . . . . . . . . . . . . | 7.71% | 1990 | 2020 | FF | 321.4 | 52.5 |
| Par—Lira . . . . . . . . . . . . . . . . | 11.30% | 1990 | 2020 | IL | 348,889.0 | 177.4 |
| Par—Swiss Franc . . . . . . . . . . . . | 4.70% | 1990 | 2020 | SSF | 100,000.0 | 39.6 |
| Par—U.S.$ (Series A) . . . . . . . . . . . | 6.5% | 1990 | 2020 | U.S.$ | 5,072.0 | 1,638.1 |
| Par—U.S.$ (Series B) . . . . . . . . . . . | 6.75% | 1990 | 2020 | U.S.$ | 1,621.5 | 719.5 |
| FLIRB—DM . . . . . . . . . . . . . . . | LIBOR + 3/8% | 1990 | 1997-2007 | DM | 340.9 | 160.4 |
| FLIRB—Swiss Franc . . . . . . . . . . . | LIBOR + 7/8% | 1990 | 1997-2007 | SSF | 153.3 | 47.8 |
| FLIRB—Pounds Sterling . . . . . . . . . | LIBOR + 7/8% | 1990 | 1997-2007 | STG | 37,443.5 | 52.7 |
| FLIRB—U.S.$ (Series A) . . . . . . . . . | LIBOR + 3/8% | 1990 | 1997-2007 | U.S.$ | 1,670.4 | 1,434.7 |
| FLIRB—U.S.$ (Series B) . . . . . . . . . | LIBOR + 7/8% | 1990 | 1997-2007 | U.S.$ | 938.2 | 782.5 |
| Debt Conversion—DM . . . . . . . . . . | LIBOR + 7/8% | 1990 | 1997-2007 | DM | 208.5 | 108.8 |
| Debt Conversion—Pounds Sterling . . . . . | LIBOR + 7/8% | 1990 | 1997-2007 | STG | 119.1 | 187.9 |
| Debt Conversion—U.S.$ (Series DL) . . . . | LIBOR + 7/8% | 1990 | 1997-2007 | U.S.$ | 5,352.8 | 4,907.8 |
| Debt Conversion—U.S.$ (Series IL) . . . . | LIBOR + 7/8% | 1990 | 1997-2008 | U.S.$ | 298.7 | 285.7 |
| New Money—DM (Series A) . . . . . . . . | LIBOR + 1% | 1990 | 1992-2005 | DM | 28.8 | 44.9 |
| New Money—Pounds Sterling (Series A) . . | LIBOR + 1% | 1990 | 1992-2005 | STG | 28.2 | 43.9 |
| New Money—U.S.$ (Series A) . . . . . . . | LIBOR + 1% | 1990 | 1992-2005 | U.S.$ | 409.6 | 363.7 |
| Global Bonds—9.125% . . . . . . . . . . | 9.125% | 1997 | 2007 | U.S.$ | 315.0 | 315.0 |
| Global Bonds—9.25% . . . . . . . . . . . | 9.25% | 1997 | 2027 | U.S.$ | 1,000.0 | 1,000.0 |
| | | | | | | $18,507.6 |
| Total . . . . . . . . . . . . . . . . . . . | | | | | | $21,112.7 |

(1) Expressed in units of original currencies.
(2) Debt incurred in currencies other than U.S. dollars are translated into U.S. dollars at the respective exchange rates as of March 31, 1998.

## External Guaranteed Debt of the Republic
### (as of March 31, 1998)

| Name of Public Sector Entity | By Type of Creditor and Amount Outstanding | | | |
| --- | --- | --- | --- | --- |
| | Commercial Banks | Bilateral Agencies | Multinational Organizations | Suppliers and Contractors |
| | (in millions of U.S.$) | | | |
| ALCASA | $ 0.0 | $ 42.8 | $ 0.0 | $ 0.0 |
| BAUXIVEN | 0.0 | 34.7 | 42.5 | 0.0 |
| CADAFE | 0.0 | 81.4 | 0.0 | 0.0 |
| CANTV[1] | 0.0 | 95.5 | 0.0 | 0.0 |
| CAMETRO | 0.0 | 269.5 | 0.0 | 0.0 |
| EDELCA | 11.7 | 300.8 | 517.3 | 55.0 |
| FERROMINERA | 0.0 | 209.7 | 10.7 | 0.0 |
| FESILVEN | 0.0 | 18.8 | 0.0 | 0.0 |
| INAVI | 0.0 | 1.0 | 0.0 | 0.0 |
| INTERALUMINA | 0.0 | 87.6 | 0.0 | 0.0 |
| SIDOR[2] | 0.0 | 1.6 | 0.0 | 0.0 |
| VENALUM | 23.8 | 0.0 | 0.0 | 0.0 |
| Total | $35.5 | $1,143.4 | $570.5 | $55.0 |

(1)  CANTV was privatized in 1991 but the Republic's guarantee of existing debt to official creditors was not released. Debt is being serviced on a current basis by CANTV.

(2)  SIDOR was privatized in January, 1998 but the Republic's guarantee of existing debt to official creditors was not released. Debt is being serviced on a current basis by SIDOR.

## Internal Debt of the Republic
### (as of March 31, 1998)

| Internal Direct Debt of the Republic | Interest Rate | Issuance Date | Final Maturity | Issued Amount (Millions of U.S.$) | Outstanding Amount (Millions of U.S.$) |
|---|---|---|---|---|---|
| **Treasury Bonds (Bonos del Tesoro)** | | | | | |
| Decree 824, Emisión 2° . . . . . . . . . . . . . . . . | (2) | Sept. 1995 | Up to 3 years | $   286 | $    2 |
| **DPN FOGADE Bonds** | | | | | |
| Decree 347, Emisión 128° . . . . . . . . . . . . . | (2) | June 1994 | June 1999 | $   287 | $   72 |
| Decree 348, Emisión 130° . . . . . . . . . . . . . | (2) | Sept. 1994 | September 1999 | 287 | 57 |
| Decree 436, Emisión 136° . . . . . . . . . . . . . | (2) | Nov. 1994 | November 1999 | 191 | 62 |
| Decree 1391, Emisión 190° . . . . . . . . . . . . | (2) | July 1996 | July 1999 | 382 | 287 |
| | | | | $1,147 | $   478 |
| **Commercial Bank Bonds** . . . . . . . . . . . . . . | Various | Nov. 91-Dec. 96 | Nov. 97-Dec. 01 | $    14 | $   10 |
| **Social Security Institute Bonds** | | | | | |
| Decree 2674, Emisión 105° . . . . . . . . . . . . | (3) | Dec. 1992 | December 1999 | $    76 | $   40 |
| **Debt with Banco Central** | | | | | |
| Debt to Equity Conversion Bonds . . . . . . . . . | | | | | |
| Decree 1051, Emisión 2°, 1990 . . . . . . . . | (2) | Sept. 1988 | August 2003 | $    22 | $   22 |
| Decree 1398, Emisión 3°, 1990 . . . . . . . . | (2) | Dec. 1991 | December 2001 | 1 | 1 |
| Decree 2057, Emisión 4°, 1991 . . . . . . . . | (2) | June 1990 | June 2000 | 27 | 27 |
| Decree 2190, Emisión 1°, 1988 . . . . . . . . | (2) | Dec. 2000 | December 2000 | 1 | 1 |
| Decree 3120, Emisión 6°, 1993 . . . . . . . . | (2) | August 1993 | August 2003 | 20 | 20 |
| BCV Debt Refinancing Bonds . . . . . . . . . . . . | (2) | July 1997 | July 2015 | 3,688 | 1,148 |
| BCV Debt Refinancing Bonds | | | | | |
|    (1° Exchange Offering) . . . . . . . . . . . . . . . . | (2) | July 1997 | July 1999 | 907 | 615 |
| | | | | $4,666 | $1,804 |
| **National Public Debt Bonds (Deuda Pública Nacional-DPN)** | | | | | |
| Deuda Pública Nacional (DPN) . . . . . . . . . . . | (2) | 1986 | 7-9 years | $    11 | $   10 |
| Deuda Pública Nacional (DPN) . . . . . . . . . . . | (2) | 1987 | 10-15 years | 4 | 1 |
| Deuda Pública Nacional (DPN) . . . . . . . . . . . | (2) | 1988 | 10-12 years | 7 | 2 |
| Deuda Pública Nacional (DPN) . . . . . . . . . . . | (2) | 1990 | 8-12 years | 24 | 5 |
| Deuda Pública Nacional (DPN) . . . . . . . . . . . | (2) | 1991 | 8 years | 4 | 1 |
| Deuda Pública Nacional (DPN) . . . . . . . . . . . | (2) | 1992 | 5-10 years | 41 | 8 |
| Deuda Pública Nacional (DPN) . . . . . . . . . . . | (2) | 1993 | 5-7 years | 162 | 144 |
| Deuda Pública Nacional (DPN) . . . . . . . . . . . | (2) | 1994 | 5-7 years | 21 | 19 |
| Deuda Pública Nacional (DPN) . . . . . . . . . . . | (2) | 1995 | 4-6 years | 197 | 186 |
| Deuda Pública Nacional (DPN) . . . . . . . . . . . | (2) | 1996 | 4-5 years | 148 | 148 |
| Deuda Pública Nacional (DPN) . . . . . . . . . . . | (2) | 1997 | 2-5 years | 551 | 216 |
| | | | | $1,170 | $   742 |
| **Other** | | | | | $    2 |
| **Total Internal Direct Debt of the Republic** . . . | | | | $7,359 | $3,138 |
| **Internal Debt of Public Sector Entities Guaranteed by the Republic** . . . . . . . . . . . | | | | | $   79 |
| **Total Internal Debt** . . . . . . . . . . . . . . . . . . . | | | | $7,359 | $3,217 |

(1)  Rate set by Banco Central in accordance with formula established by Decree 1434.
(2)  Rate set by Banco Central in accordance with formula established by the decrees pursuant to which the bonds were issued.
(3)  Rate set by Banco Central in accordance with Decree 2674.

**THE ISSUER**

**Republic of Venezuela**
Ministry of Finance
Avenida Urdaneta
Esquina de Carmelitas
Edificio Ministerio de Hacienda
Piso 9
Caracas, Venezuela

**FISCAL AGENT**

**The Chase Manhattan Bank**
450 West 33rd Street,
15th Floor
New York, New York 10001
United States

**PAYING AGENT AND TRANSFER AGENT**

**Chase Manhattan Bank Luxembourg S.A.**
5, Rue Plaetis
L-2338 Luxembourg
Luxembourg

**LEGAL ADVISORS**

*To the Republic, as to U.S. law:*
**Arnold & Porter**
399 Park Avenue
New York, New York 10022
United States

*To the Underwriters, as to U.S. law:*
**Sullivan & Cromwell**
125 Broad Street
New York, New York 10004
United States

*To the Republic, as to Venezuelan law:*
**Lares, Ramos, Ferreira y Vera, S.C.**
Centro Banavén
Torre C, Piso 2, Oficina C-22
Avenida La Estancia, Chuao
Caracas 1061, Venezuela

*To the Underwriters, as to Venezuelan law:*
**Tinoco, Travieso, Planchart, Núñez & Eiris**
Avenida Francisco de Miranda
Torre Country Club, Pisos 1, 2 y 3, Chacaíto
Caracas 1050, Venezuela

**LISTING AGENT**

**Banque Internationale à Luxembourg**
69 route d'Esch
L-1470 Luxembourg
Luxembourg