**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CONTRARIAN CAPITAL MANAGEMENT, L.L.C., CONTRARIAN CAPITAL FUND I, L.P., CONTRARIAN DOME DU GOUTER MASTER FUND, LP, CONTRARIAN CAPITAL SENIOR SECURED, L.P., CONTRARIAN EM II, LP, CONTRARIAN EMERGING MARKETS, L.P., POLONIUS HOLDINGS, LLC, and CONTRARIAN FUNDS, L.L.C., | Case No. 19 Civ. 11018 [rel. Nos. 19 Civ. 3123 & 18 Civ. 11940] |
| Plaintiffs, | Hon. Analisa Torres |
| v. | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | |
| Defendant. | |

**MEMORANDUM OF THE BOLIVARIAN REPUBLIC OF VENEZUELA IN SUPPORT OF THE REPUBLIC'S MOTION FOR A STAY AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 3

     A.    The Constitutional and Humanitarian Crisis in Venezuela ...................... 3

     B.    The Venezuelan Sanctions Regime ........................................................... 6

     C.    Procedural History .................................................................................... 7

LEGAL STANDARDS .......................................................................................... 7

ARGUMENT .......................................................................................................... 7

   I.    The Court Should Exercise Its Inherent Power To Stay This Proceeding. ............. 8

     A.    A Stay Would Not Prejudice Plaintiffs. .................................................... 9

     B.    Allowing This Case to Proceed Would Cause Tremendous Harm to the Republic. .......................................................................................... 10

     C.    A Stay Would Preserve Valuable Judicial Resources. ............................. 11

     D.    A Stay Promotes Non-Party Humanitarian Interests. .............................. 12

     E.    A Stay Is in the Public Interest Because It Furthers U.S. Foreign Policy Goals. ......................................................................................... 12

  II.    A Stay Is Warranted Under Principles of International Comity and Necessity. ....................................................................................................... 13

     A.    *Canada Southern Railway* Comity-Based Abstention Is Appropriate. ......................................................................................... 13

     B.    A Stay Is Justified Under the International Law Doctrine of Necessity. ............................................................................................. 15

     C.    A Stay Is Justified Because the Republic Currently Is Unable to Access Resources Necessary to Perform or Settle Its Financial Obligations. ........................................................................................... 17

 III.    OFAC Sanctions Further Support a Stay and Prevent Entry of Judgment. ........... 18

     A.    OFAC Regulations Prohibit Alteration of Any Interest in Blocked Property of the Republic. ...................................................................... 18

     B.    The Republic Has a Property Interest in the Bonds. ................................. 20

     C.    Plaintiffs Seek a Judgment That Would "Alter" the Republic's Property Interests in the Contractual Terms of the Bonds. ....................... 22

     D.    OFAC's Regulations Do Not Violate Separation of Powers Principles. ........................................................................................... 24

IV.     The Court Should Exercise Its Discretion to Decline to Award Plaintiffs'
        Prejudgment Interest. ....................................................................................... 26

        A.      The Federal Standard for Determining Prejudgment Interest
                Applies. .................................................................................................. 26

        B.      The Court Should Not Award Prejudgment Interest on Interest
                Payments. ............................................................................................... 28

V.      If the Court Moves Forward with Judgment, the Judgment Should Include
        Fraud Prevention Mechanisms to Protect the Republic from the Risk of
        Future Fraudulent Claims. ............................................................................... 29

CONCLUSION ................................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Bank Int'l* v. *Banco Credito Agricola*,
757 F.2d 516 (2d Cir. 1985)......................................................................15

*Am. Airways Charters, Inc.* v. *Regan*,
746 F.2d 865 (D.C. Cir. 1984)...................................................................25

*Arch Trading Corp.* v. *Republic of Ecuador*,
839 F.3d 193 (2d Cir. 2016).......................................................................26

*Argentine Republic* v. *Amerada Hess Shipping Corp.*,
488 U.S. 428 (1989)....................................................................................27

*Bryant* v. *Maffucci*,
923 F.2d 979 (2d Cir. 1991).........................................................................7

*Canada Southern Railway Co.* v. *Gebhard*,
109 U.S. 527 (1883)............................................................................13, 14

*Catskill Mountains Chapter of Trout Unlimited, Inc.* v. *EPA*,
630 F. Supp. 2d 295 (S.D.N.Y. 2009)..........................................................8

*Clearfield Tr. Co.* v. *United States*,
318 U.S. 363 (1943)....................................................................................28

*In re Colonial Realty Co.*,
980 F.2d 125 (2d Cir. 1992).......................................................................10

*Comet Enters. Ltd.* v. *Air-A-Plane Corp*,
128 F.3d 855 (4th Cir. 1997) .....................................................................25

*Commercial Union Assurance Co.* v. *Milken*,
17 F.3d 608 (2d Cir. 1994)............................................................26, 28, 29

*Cont. Cas. Co.* v. *Argentine Republic*, ICSID Case No. ARB/03/9, Award (Sept.
5, 2008) .......................................................................................................17

*Crystallex Int'l Corp.* v. *PDV Holding, Inc.*,
2019 WL 6785504 (D. Del. Dec. 12, 2019).................................................12

*Dames & Moore* v. *Regan*,
453 U.S. 654 (1981)............................................................................24, 25

*Dresser-Rand Co.* v. *Petroleos de Venezuela, S.A.*,
No. 19-cv-2689 (S.D.N.Y. Feb. 11, 2020)............................................................23

*Endico Potatoes, Inc.* v. *CIT Grp./Factoring, Inc.*,
67 F.3d 1063 (2d Cir. 1995)..............................................................................26

*FCS Advisors, Inc.* v. *Fair Fin. Co.*,
605 F.3d 144 (2d Cir. 2010)..............................................................................27

*Guides, Ltd.* v. *Yarmouth Grp. Prop. Mgmt., Inc.*,
295 F.3d 1065 (10th Cir. 2002) .........................................................................27

*Kadic* v. *Karadzic*,
70 F.3d 232 (2d Cir. 1995)................................................................................16

*Leopard Marine & Trading, Ltd.* v. *Easy St. Ltd.*,
896 F.3d 174 (2d Cir. 2018)..............................................................................14

*LG&E Energy Corp.* v. *Argentine Republic*, ICSID Case No. ARB/02/1, Decision
on Liability (Oct. 3, 2006) ................................................................................16

*Louis Vuitton Malletier S.A.* v. *LY USA, Inc.*,
676 F.3d 83 (2d Cir. 2012).............................................................................7, 8

*Metro. Life Ins. Co.* v. *Noble Lowndes Int'l*,
84 N.Y.2d 430 (1994) ......................................................................................22

*Nat'l Airmotive Corp.* v. *Gov't & State of Iran*,
499 F. Supp. 401 (D.D.C. 1980) ........................................................................25

*Nat'l Oil Corp.* v. *Libyan Sun Oil Co.*,
733 F. Supp. 812 (D. Del. 1990)........................................................................25

*NML Capital, Ltd.* v. *Republic of Argentina*,
727 F.3d 230 (2d Cir. 2013)..............................................................................21

*NML Capital, Ltd.* v. *Republic of Argentina*,
No. 1:09-cv-01707, ECF No. 190 (Sept. 28, 2011) ................................................30

*Pravin Banker Assocs., Ltd.* v. *Banco Popular del Peru*,
165 B.R. 379 (S.D.N.Y. 1994)......................................................................14, 15

*Range* v. *480-486 Broadway, LLC*,
810 F.3d 108 (2d Cir. 2015)...............................................................................9

*Societe Nationale Industrielle Aerospatiale* v. *U.S. Dist. Court*,
482 U.S. 522 (1987).........................................................................................14

*United Feature Syndicate, Inc.* v. *Miller Features Syndicate, Inc.*,
216 F. Supp. 2d 198 (S.D.N.Y. 2002) ...................................................................14

*United States* v. *Trinidad*,
839 F.3d 112 (1st Cir. 2016) ...............................................................................15

*Wickham Contracting Co.* v. *Local Union No. 3, Int'l Bhd. of Elec. Workers,
AFL-CIO*, 955 F.2d 831 (2d Cir. 1992) ...............................................................28

**Statutes & Rules**

28 U.S.C. § 1605 ...................................................................................................27

Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d),
1602–1611 ............................................................................................................27

International Emergency Economic Powers Act, Pub. L. 95-223, 91 Stat. 1625
(1977), codified as amended at 50 U.S.C. § 1701 *et seq.* .......................................24

Exec. Order No. 13808, 82 Fed. Reg. 41,155 (Aug. 29, 2017) ...............................6

Exec. Order No. 13884, 84 Fed. Reg. 38,843 (Aug. 7, 2019) ..........................6, 9, 19

31 C.F.R. § 591.202 ...............................................................................................23

31 C.F.R. § 591.310 ...........................................................................................19, 20

31 C.F.R. § 591.407 ...............................................................................................20

31 C.F.R. § 591.506 ...............................................................................................12

**Other Authorities**

Brief of the United States, *Aurelius Capital Master, Ltd., et al.* v. *Republic of
Argentina*, 2016 WL 1267524 (2d Cir. Mar. 23, 2016) ...........................................28

Brief for the United States, *NML Capital Ltd.* v. *Republic of Argentina*, 2012 WL
1150791 (2d Cir. Apr. 4, 2012) .......................................................................12, 27

Statement of Interest of the United States, *EM Ltd.* v. *Republic of Argentina*,
No. 1:03-cv-02507 (S.D.N.Y. 2004) ....................................................................27

Anna Gelpern & Mitu Gulati, *Public Symbol in Private Contract: A Case Study*,
84 WASH. UNIV. L. REV. 1627 (2006) ...................................................................22

Int'l Monetary Fund Paper, *A Survey of Experiences with Emerging Market
Sovereign Debt Restructurings* (June 5, 2012) .....................................................22

Restatement (Third) of Foreign Relations Law § 111(1) (1987) ..............................16

Mark Sobel, *Strengthening Collective Action Clauses: Catalysing Change—The Back Story*, 11 Cᴀᴘ. Mᴀʀᴋᴇᴛꜱ L. J., 3 (2016) .......................................................................21

*State Responsibility*, Y.B. Int'l L. Comm'n (1980) 14, U.N. Doc. A/CN.4/Ser.A/1980/Add.1 (Part 1) ........................................................................16

*State Responsibility*, Y.B. Int'l L. Comm'n (2001) 80, U.N. Doc. A/CN.4/.Ser.A/2001/Add.1 (Part 2) ........................................................................16

Mark C. Weidemaier & Mitu Gulati, *A People's History of Collective Action Clauses*, 54 Vᴀ. J. Iɴᴛ'ʟ L. 51 (2013) .....................................................................21

Defendant Bolivarian Republic of Venezuela (the "Republic" or "Venezuela") respectfully submits this memorandum of law in support of its motion for a stay and in opposition to Plaintiffs' motion for summary judgment.

## INTRODUCTION

This case is no run of the mill contract dispute.  It arises amidst an unprecedented political and humanitarian crisis in Venezuela, and the Court's decision here will have far-reaching implications: for the Republic and its nascent democracy led by Interim President Juan Guaidó; for U.S. foreign policy, which strongly supports Mr. Guaidó and has long supported the orderly restructuring of sovereign debt; and for the people of Venezuela, whose future health and economic welfare hangs in the balance.

In Venezuela, the economic and political crisis that culminated with Nicolás Maduro declaring victory in a rigged election has continued to worsen.  The humanitarian situation is dire:  many Venezuelans lack access to clean water and more than 9 million Venezuelans are experiencing some form of food insecurity.[1]  Eighty percent of the population can no longer afford basic healthcare.[2]  The coronavirus pandemic has only exacerbated this crisis—the public health system is on the brink of collapse, and millions have fled Venezuela seeking refuge in neighboring countries.[3]  The future of the Venezuelan people depends on the restoration of democracy and the

---

[1] Venezuela Regional Crisis, Fact Sheet #2 at 1, U.S. Agency for Int'l Dev. (May 22, 2020), https://www.usaid.gov/sites/default/files/documents/1866/05.22.20_-_USG_Venezuela_Regional _Crisis_Fact_Sheet_2.pdf ("USAID Fact Sheet #2").

[2] Venezuela Regional Crisis, Fact Sheet #1 at 5, U.S. Agency for Int'l Dev. (Mar. 1, 2019), https://www.usaid.gov/sites/default/files/documents/1866/venezuela_regional_crisis_fs01_03-01-2019.pdf.

[3] USAID Fact Sheet #2, at 1-3 (estimating 5.1 million Venezuelan migrants and refugees and finding that "70 percent of surveyed health care facilities lacked consistent supply of soap, 40 percent lacked gloves, and 55 percent lacked protective masks, reflecting a consistently acute

success of a comprehensive, consensual debt restructuring that equitably compensates its creditors while preserving crucial assets for the Venezuelan people.

In light of these extraordinary circumstances, this Court should exercise its broad discretion to stay this litigation to afford the Republic the time it needs to restore democratic rule and pursue an orderly and consensual debt restructuring.  The Republic is committed to resolving bona fide debts in an equitable and efficient manner.   But entry of judgment now would significantly complicate the Republic's restructuring efforts by inviting an onslaught of additional litigation by creditors seeking to secure their place in line. At the same time, it would offer little benefit to Plaintiffs, who concede that the sanctions regulations promulgated by the Office of Foreign Assets Control ("OFAC") prevent them from enforcing any judgment.[4]  A stay is amply justified here, where the great harm to the Republic and the Venezuelan people must be weighed against the reasonable expectations of Plaintiffs—sophisticated investors who purchased the bonds with full knowledge of the risks of their investment.

A stay is also appropriate in light of OFAC sanctions, which prohibit any transfer of the property of the Republic, including any alteration of the Republic's interest in its property. And even if the Court is not inclined to stay this litigation, OFAC sanctions bar summary judgment in Plaintiffs' favor, because Plaintiffs seek, by this judgment, to alter the Republic's interest in the bonds and their contractual terms.

If, however, the Court proceeds to judgment, it should deny Plaintiffs' request for prejudgment "interest on interest" using New York's statutory 9% rate.  Further, the Republic

---

supply shortage since the near-daily survey began in late March; additionally, 95 percent of surveyed hospitals lacked running water.")

[4] *See* Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment ("Pls.' Br.") at 20.

respectfully requests that the Court include in any judgment a provision barring Plaintiffs and their successors and assigns from transferring the bonds without prior written approval of the Court.

## STATEMENT OF FACTS

### A.  The Constitutional and Humanitarian Crisis in Venezuela

As has been explained in the Republic's briefing in *Pharo Gaia Fund Ltd. et al.* v. *Bolivarian Republic of Venezuela*, No. 1:19-cv-03123, (S.D.N.Y.) and *Casa Express Corp.* v. *Bolivarian Republic of Venezuela*, No. 1:18-cv-11940 (S.D.N.Y.) (the "Related Cases"),[5] Venezuela has been mired in a political and humanitarian crisis for the last several years.  On May 20, 2018, Nicolás Maduro declared a re-election victory in a rigged and widely discredited election in Venezuela.[6]   In response, on January 23, 2019, the leader of the democratically elected Venezuelan National Assembly, Juan Guaidó, assumed the office of the presidency on an interim basis pursuant to Article 233 of the Venezuelan Constitution.[7]   That same day, the President of the United States recognized Mr. Guaidó as the Interim President of Venezuela and declared the

---

[5] *See* Memorandum of the Bolivarian Republic of Venezuela in Response to Motion for Summary Judgment and in Support of Cross-Motion for a Stay ("Repub. Related Cases Stay Mem.") at 2-6, *Pharo Gaia Fund Ltd. et al.* v. *Bolivarian Republic of Venezuela*, No. 1:19-cv-03123, (S.D.N.Y. Jan. 16, 2020) (ECF No. 44); *Casa Express Corp.* v. *Bolivarian Republic of Venezuela*, No. 1:18-cv-11940 (S.D.N.Y. Jan. 16, 2020) (ECF No. 66).

[6] *See* Tom Phillips, *Venezuela Elections: Maduro Wins Second Term* (May 21, 2018), https://www.theguardian.com/world/2018/may/21/venezuela-elections-nicolas-maduro-wins-second-term (reporting that the 14-nation Lima group of Latin American countries, Canada, opposition leaders, and the U.S. Mission to the United Nations all condemned the election as fraudulent due to "widespread vote buying and electoral irregularities").

[7] *See* Library of Congress Global Legal Monitor, Venezuela: President of the National Assembly Cites Constitutional Basis for Assuming Office the Presidency on an Interim Basis (Jan. 31, 2019), https://www.loc.gov/law/foreign-news/article/venezuela-president-of-the-national-assembly-cites-constitutional-basis-for-assuming-office-the-presidency-on-an-interim-basis/.

Maduro regime illegitimate.[8]  Nearly sixty countries have since followed suit in recognizing Mr.

Guaidó and the Interim Government he leads (the "Interim Government") as the only legitimate

government of Venezuela.[9]

In the midst of this political turmoil, Venezuela has fallen into an unprecedented

economic and humanitarian crisis.  Over the past six years, Venezuela's gross domestic product

has plummeted nearly 62.2%,[10] and an estimated 5.1 million people have fled Venezuela as a result

of this far-reaching human rights disaster.[11]  This crisis has been referred to by one expert as "the

biggest economic collapse in history outside of war or state collapse."[12]  The drop in Venezuelan

GDP is double the size of the U.S. Great Depression, double the size of the Greek crisis, and double

the size of the economic collapse during the Spanish Civil War.[13]  According to the U.N. Food and

Agriculture Organization, the undernourishment rate in Venezuela has quadrupled since 2012.[14]

---

[8] The White House, Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaidó as the Interim President of Venezuela (Jan. 23, 2019), https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-recognizing-venezuelan-national-assembly-president-juan-guaido-interim-president-venezuela/.

[9] U.S. Dep't of State, *Secretary Michael R. Pompeo at a Press Briefing on Current U.S. Foreign Policy* (July 9, 2020), https://www.state.gov/secretary-michael-r-pompeo-at-a-press-briefing-on-current-u-s-foreign-policy-2/.

[10] Statement by United Nations High Commissioner for Human Rights Michelle Bachelet, Oral Update on the Situation of Human Rights in the Bolivarian Republic of Venezuela (Dec. 18, 2019), https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=25438&LangID=E.

[11] USAID Fact Sheet #2, at 1.

[12] Ricardo Hausmann, *Understanding Venezuela's Collapse*, The Harvard Gazette (Feb. 12, 2019), https://news.harvard.edu/gazette/story/2019/02/harvard-expert-tries-to-make-sense-of-venezuelas-collapse/.

[13] *Id.*

[14] Dany Bahar & Meagan Dooley, *Venezuela Refugee Crisis to Become the Largest and Most Underfunded in Modern History*, Brookings (Dec. 9, 2019), https://www.brookings.edu/blog/up-

This human rights disaster has been further exacerbated by the global COVID-19 pandemic. Access to food and other life-saving resources is scarce, and the public health system is on the brink of collapse, with hospitals lacking even the most basic resources, such as running water.[15]

And despite mounting international pressure against the illegitimate Maduro government, and widespread recognition of its corruption[16]—including the criminal indictments issued against him and 14 current and former officials by the U.S. Department of Justice in March 2020[17]—Mr. Maduro has refused to relinquish control over government agencies and instrumentalities within Venezuela.  In the face of  these challenges, the Interim Government continues to take concrete steps toward achieving an orderly restructuring, including issuing a call for a Reconciliation Agent, who will, among other things, assist the Republic in compiling a comprehensive inventory of all the private claims against it and beginning the process of factual

---

front/2019/12/09/venezuela-refugee-crisis-to-become-the-largest-and-most-underfunded-in-modern-history.

[15] Philip Reeves, *Many Venezuelan Hospitals Lack Access to Function, Let Alone Handle COVID-19*, NPR (Apr. 10, 2020), https://www.npr.org/2020/04/10/831569313/many-venezuelan-hospitals-lack-basics-to-functionlet-alone-handle-covid-19; *see also* USAID Fact Sheet #2, at 3.

[16] *See, e.g.*, U.S. Dep't of State, *Nicolás Maduro: Corruption and Chaos in Venezuela* (Aug. 6, 2019), https://www.state.gov/nicolas-maduro-corruption-and-chaos-in-venezuela-2/ (explaining that the Maduro regime "has consistently violated and abused the human rights and dignity of the country's citizens, plundered its natural resources, and driven a once-prosperous nation into economic ruin" and has "been responsible for the theft and embezzlement of billions of dollars from the Venezuelan people over many years.")

[17] U.S. Dep't of Justice, *Nicolás Maduro and 14 Current and Former Venezuelan Officials Charged with Narco-Terrorism, Corruption, Drug Trafficking and Other Criminal Charges* (March 26, 2020), https://www.justice.gov/opa/pr/nicol-s-maduro-moros-and-14-current-and-former-venezuelan-officials-charged-narco-terrorism.

investigation in certain cases.[18]

### B. The Venezuelan Sanctions Regime

As part of its support for the Interim Government and condemnation of the Maduro regime, the United States has developed a robust sanctions regime against Venezuela, including blocking the bonds at issue here.  These sanctions are meant to "prevent further diverting of Venezuela's assets by Maduro and preserve these assets for the people of Venezuela."[19]  On August 24, 2017, the President issued Executive Order 13808, which prohibits "all transactions related to … and other dealings in" "bonds issued by the Government of Venezuela prior to the effective date of [that] order."  Exec. Order No. 13808, § 1(a)(iii), 82 Fed. Reg. 41,155 (Aug. 29, 2017).[20]  Subsequently, on August 5, 2019, the President issued Executive Order 13884, which designates "all property and interests in property of the Government of Venezuela that are in the United States" as blocked property that may not be "transferred, paid, exported, withdrawn, or

---

[18] *See* Debtwire, *Venezuela Interim Government Distributes Preliminary RFP for Debt Reconciliation Agent*, (Mar. 4, 2020), https://www.debtwire.com/intelligence/view/ prime-2996157?searchTerm=venezuela.

[19] Press Release, U.S. Dep't of Treasury, Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A. (Jan. 28, 2019), https://home.treasury.gov/news/press-releases/sm594 ("Treasury Sanctions Venezuela's State-Owned Oil Company").

[20] OFAC has issued a series of general licenses permitting certain transactions in bonds of the Republic.  Specifically, paragraph (a) of General License 3 and its successor, General License 3A, permitted transactions related to these bonds otherwise prohibited by Executive Order 13808 until February 1, 2019, when General License 3B narrowed the authorization by adding a proviso that "any divestment or transfer of, or facilitation of divestment or transfer of, any holdings in such bonds must be to a non-U.S. person."  Office of Foreign Assets Control, General License 3B (Feb. 1, 2019), https://www.treasury.gov/resource-center/sanctions/Programs/Documents/venezuela_gl3b.pdf.  This authorization, including the proviso introduced in General License 3B, remains in effect under General License 3H, which OFAC issued on May 12, 2020.

otherwise dealt in." Exec. Order No. 13884, § 1(a), 84 Fed. Reg. 38,843 (Aug. 7, 2019).

### C. Procedural History

Plaintiffs first filed their complaint on November 29, 2019, seeking to collect overdue payments on $101,813,000 in face value of bonds issued by the Republic.  (ECF No. 1 at ¶ 1.)  On January 7, 2020 Plaintiffs filed a corrected first amended complaint bringing principal and interest claims on approximately $575,000,000 in face value of bonds.  (ECF No. 21 at ¶ 1.) The Republic appeared and filed its answer on March 31, 2020.  (ECF No. 32-34.)  The Republic conducted expedited fact discovery, which concluded on April 23, 2020.  That discovery and related negotiations between the parties led to the voluntary dismissal of a substantial portion of Plaintiffs' claims.  (*See* ECF Nos. 49 & 53 (stipulations of dismissal).)  On May 15, 2020, Plaintiffs filed the operative Second Amended Complaint bringing principal and interest claims on $432,862,156 in face value of bonds issued by the Republic. (ECF No. 54 at ¶ 1.)

## LEGAL STANDARDS

A district court's power "to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Louis Vuitton Malletier S.A.* v. *LY USA, Inc*., 676 F.3d 83, 96 (2d Cir. 2012) (quoting *Landis* v. *N. Am. Co.*, 299 U.S. 248, 254 (1936)).  Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Bryant* v. *Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).  On summary judgment, "all ambiguities and reasonable inferences are viewed in a light most favorable to the nonmoving party."  *Id.* (quoting *United States* v. *Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## ARGUMENT

This Court should exercise its inherent power to stay this proceeding until

democracy is restored in Venezuela and the Republic has had a reasonable opportunity to pursue

a consensual restructuring, or OFAC sanctions are lifted.  All of the balancing factors weigh in

favor of a stay:  Plaintiffs will suffer no prejudice, as they cannot collect on any debt unless and

until they obtain a specific license from OFAC, while the Republic and the Venezuelan people

will be exposed to tremendous harm if the case is allowed to continue, because entry of judgment

here inevitably would spark a run on the court that would significantly complicate the prospects

for a consensual debt restructuring.  The interests of the Court, human rights concerns, the policy

interests of the U.S. government, and the OFAC sanctions regime all militate in favor of a stay

here.  And even if the Court is not inclined to enter a stay, it should deny Plaintiffs' summary

judgment motion because OFAC sanctions prohibit the judgment Plaintiffs seek.  Further, if the

Court enters judgment, it should exercise its discretion to deny Plaintiffs' request for prejudgment

interest on interest.

## I.    The Court Should Exercise Its Inherent Power To Stay This Proceeding.

The district court has the inherent authority to stay the cases on its docket, and

should exercise that authority here.  *See Louis Vuitton*, 676 F.3d at 96.  In deciding whether a stay

is appropriate, this Court typically considers:

> (1) the private interests of the plaintiffs in proceeding expeditiously
> with the civil litigation as balanced against the prejudice to the
> plaintiffs if delayed; (2) the private interests of and burden on the
> defendants; (3) the interests of the courts; (4) the interests of persons
> not parties to the civil litigation; and (5) the public interest.

*Catskill Mountains Chapter of Trout Unlimited, Inc.* v. *EPA*, 630 F. Supp. 2d 295, 304 (S.D.N.Y.

2009).  This test need not be strictly applied; rather, it serves "as a rough guide for the district court

as it exercises its discretion."  *Louis Vuitton*, 676 F.3d at 99.  Ultimately, "[t]he decision whether

to stay an action calls on a district court's studied judgment, requiring the court to examine the

particular facts before it and determine the extent to which . . . a stay would work a hardship,

inequity, or injustice to a party, the public or the court." *Range* v. *480-486 Broadway, LLC*, 810 F.3d 108, 113 (2d Cir. 2015) (internal quotation marks and citation omitted).   Here, each of the factors weighs in favor of a stay.

### A.  A Stay Would Not Prejudice Plaintiffs.

A stay of this action until the restoration of democracy in Venezuela or lifting of OFAC sanctions would not prejudice Plaintiffs or harm their private interests.   Plaintiffs are sophisticated investors who market themselves as "experts in distressed securities" with a "flagship strategy" of "seek[ing] to capitalize on all manners of distressed investing with particular emphasis on privately traded and complex distressed claims."[21]   Plaintiffs' interests must be viewed in light of this reality:   the investors here are sophisticated market participants who understood when they purchased the bonds that, in the midst of Venezuela's ongoing humanitarian and economic crisis, the chances of prompt repayment were slim.

Moreover, Plaintiffs acknowledge that OFAC sanctions prevent them from enforcing any judgment they may receive,[22] and therefore from recovering on any debt of the Republic, without specific permission from the Executive Branch in the form of an OFAC license.[23]  *See* Exec. Order No. 13884, § 1(a), 84 Fed. Reg. 38,843 (Aug. 7, 2019).  Plaintiffs have

---

[21] *See* CONTRARIAN CAPITAL MANAGEMENT, L.L.C., http://www.contrariancapital.com/  (last visited July 10, 2020); *Id.* at http://www.contrariancapital.com/our-strategies/flagship/ (last visited July 10, 2020).

[22] *See* Pls.' Br. at 20.

[23] OFAC issues two types of licenses: a "general license authorizes a particular type of transaction for a class of persons without the need to apply for a license," and a "specific license is a written document issued by OFAC to a particular person or entity, authorizing a particular transaction in response to a written license application."  U.S. Dep't of Treasury, OFAC FAQs: General Questions, FAQ No. 74 (Feb. 6, 2019), https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx#basic.

produced no evidence that they have such a license, or have even applied for one from OFAC.  A stay of this proceeding therefore would not harm Plaintiffs' private interests, as they will be unable to collect on any judgment.

### B.  Allowing This Case to Proceed Would Cause Tremendous Harm To the Republic.

By contrast, allowing this case to proceed now would threaten to wreak havoc on Venezuela and its citizens.  The Republic has announced its intention to undertake an orderly and comprehensive restructuring of its debts on consensual terms, and is taking concrete steps to move that process forward, including, most recently, seeking proposals for a Reconciliation Agent.[24] Entry of judgment here would cause tremendous harm to the Republic by triggering an onslaught of further proceedings as bondholders seek to gain a leg up in the eventual restructuring.  That result would waste the Republic's scarce resources and significantly complicate the Republic's restructuring efforts and its ability to preserve critical assets for the Venezuelan people.  As the Second Circuit has observed in the corporate bankruptcy context, where stays are automatic upon the commencement of bankruptcy proceedings, a stay contributes to the restructuring process by "prevent[ing] a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts" and "ensur[ing] that the debtor's affairs will be centralized, initially, in a single forum in order to prevent conflicting judgments from different courts and to harmonize all of the creditors' interests with one another."  *See In re Colonial Realty Co.*, 980 F.2d 125, 133 (2d Cir. 1992) (citations and quotation marks omitted).

---

[24] *See* Debtwire, *Venezuela Interim Government Distributes Preliminary RFP for Debt Reconciliation Agent*, (Mar. 4, 2020), https://www.debtwire.com/intelligence/view/prime-2996157?searchTerm=venezuela.

As the Republic explained in the Related Cases,[25] the prospects for a "chaotic and uncontrolled scramble" for Venezuelan assets in the United States are particularly acute here, because Venezuela and its state-owned enterprises ("SOEs") have significant assets in the United States as a result of their extensive commercial contacts here.   These contacts are far more extensive than any emerging-market country that has restructured its external debt in the last 30 years.[26]   Further, the claims against Venezuela and its SOEs are also highly diverse because— unlike the majority of the sovereign debt restructurings in the previous decades—a significant portion of these claims did not arise from financial debt instruments. They include, for example, claims of unpaid suppliers and damages resulting from expropriations and nationalizations by the Chávez and Maduro regimes.  The claims' diversity increases the risk that, absent a stay, creditors will resort to legal action in the United States that threatens to disrupt the voluntary, orderly restructuring that ultimately best serves all interested parties.

### C.  A Stay Would Preserve Valuable Judicial Resources.

The run on the court that would be triggered by entry of judgment here would also waste valuable judicial time and resources.  As demonstrated by the discovery in this case, which resulted in voluntary dismissal of a substantial amount of the face value of Plaintiffs' claims, each additional case will require devotion of resources to discovery and evaluation.  And yet at this point, entry of judgment would not result in compensation to Plaintiffs, or any other creditors,

---

[25] Repub. Related Cases Stay Mem. at 10-11.

[26] *See* Lee C. Buchheit & G. Mitu Gulati, *How to Restructure Venezuelan Debt*, (Cleary Gottlieb Steen & Hamilton (New York) and Duke University Law School) (July 21, 2017), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3006680 ("Venezuela, principally through its state-owned oil company, Petróleos de Venezuela, S.A. ('PDVSA'), has extensive commercial contacts with the United States. Not since Mexico in the 1980s has an emerging market country with this level of commercial contacts attempted to restructure its New York law-governed sovereign debt.").

because applicable sanctions forbid any person subject to U.S. law from enforcing any such judgment absent a specific license.  31 C.F.R. §§ 591.407, 591.506(c).  Thus, it would be far more efficient for the Court to stay litigation until the Republic is in a position to propose an orderly, consensual, debt-restructuring plan.

### D.  A Stay Promotes Non-Party Humanitarian Interests.

Human rights concerns also weigh heavily in favor of a stay.  At this critical time, Venezuela's assets should be directed towards addressing the human rights disaster—for example, providing running water, food, and other desperately-needed resources for its citizens—and achieving economic recovery.  Perhaps recognizing this, the vast majority of the Republic's creditors have determined not to proceed with litigation.  Those few creditors who have chosen to move forward in their claims against the Republic should not be rewarded at the expense of the millions of people in Venezuela who are in desperate need of resources.

### E.  A Stay Is in the Public Interest Because It Furthers U.S. Foreign Policy Goals.

Finally, U.S. foreign policy strongly supports a consensual restructuring of the Republic's debt.  *See* Brief for the United States, *NML Capital Ltd.* v. *Republic of Argentina*, 2012 WL 1150791, at *7 (2d Cir. Apr. 4, 2012) ("In those rare cases where a sovereign cannot meet its external obligations . . . the policy of the United States is that the orderly and consensual restructuring of sovereign debt . . . is the most appropriate response."); *see also Crystallex Int'l Corp.* v. *PDV Holding, Inc.*, 2019 WL 6785504, at *3 (D. Del. Dec. 12, 2019) (staying cases pending against the Republic based, in part, on "concern not to create a 'run on the bank,' that is, an influx of creditors to the Court, with negative consequences for the Republic, for U.S. policy (which favors an orderly transition of power in the Republic and a coordinated restructuring of its debts), and, potentially, th[e] Court").

As Treasury Secretary Mnuchin has explained, Executive Branch sanctions

concerning the crisis in Venezuela serve a triple purpose: (1) "to support Interim President Juan Guaidó, the National Assembly, and the Venezuelan people's efforts to restore their democracy," (2) to "prevent further diverting of Venezuela's assets by Maduro," and (3) to "preserve these assets for the people of Venezuela."[27]   The White House has repeatedly reaffirmed its support for the Interim Government, stating, "[w]e will continue to work with our partners in the region to confront the illegitimate dictatorship in Venezuela, and we will stand alongside the Venezuelan people to ensure a future that is democratic and prosperous."[28]   A stay furthers these important Executive Branch objectives by allowing the Interim Government time to accomplish the transition to democracy in Venezuela and direct much-needed assets to economic recovery.

## II.   A Stay Is Warranted Under Principles of International Comity and Necessity.

In addition, as explained below, and for the reasons set forth in the Republic's briefing in the Related Cases (Repub. Related Cases Stay Mem. at 14-23), a stay is also appropriate here based on principles of international comity in light of (i) the abstention doctrine first outlined in *Canada Southern Railway Co.* v. *Gebhard*, 109 U.S. 527, 539 (1883), which applies specifically to foreign debt restructuring; (ii) the customary international law doctrine of necessity, which is particularly significant in light of the COVID-19 pandemic; and (iii) the Republic's current inability to access the resources necessary to satisfy its financial obligations at this time.

### A.  *Canada Southern Railway* Comity-Based Abstention Is Appropriate.

International comity is "the spirit of cooperation in which a domestic tribunal

---

[27] *See supra* n.19.

[28] The White House, Statement from the Press Secretary on the Visit of Interim President Juan Guaido of Bolivarian Republic of Venezuela (Feb. 5, 2020), https://www.whitehouse.gov/briefings-statements/statement-press-secretary-visit-interim-president-juan-guaido-bolivarian-republic-venezuela/.

approaches the resolution of cases touching the laws and interests of other sovereign states." *Societe Nationale Industrielle Aerospatiale* v. *U.S. Dist. Court*, 482 U.S. 522, 543 n.27 (1987). It aims to "maintain[] amicable working relationships between nations, a shorthand for good neighbourliness, common courtesy and mutual respect." *Leopard Marine & Trading, Ltd.* v. *Easy St. Ltd.*, 896 F.3d 174, 189 (2d Cir. 2018) (quotation marks and citation omitted). "[U]nder the federal common law principles governing comity-based abstention," a court should stay litigation proceedings when justified by considerations of international comity. *United Feature Syndicate, Inc.* v. *Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 211-12 (S.D.N.Y. 2002).

As the Supreme Court has recognized in the context of a restructuring of a foreign sovereign's national railroad system, international comity requires deference to a foreign nation's restructuring efforts. *See Canada Southern Railway*, 109 U.S. 527 (1883). In *Canada Southern Railway*, the Supreme Court required bondholders, who had sued in U.S. federal courts, to be bound by Canada's scheme of arrangement for certain debts of its national railroad that was assented to by stakeholders and adopted by the Canadian parliament. The Supreme Court concluded that "the true spirit of international comity require[d]" Canada's scheme of arrangement to be "recognized in other countries." *Id.* at 539.

The Second Circuit Court of Appeals likewise has recognized that a stay may be warranted under principles of international comity in order to allow a foreign state to negotiate with its creditors as part of a sovereign restructuring effort. For example, in *Pravin Banker Assocs., Ltd.* v. *Banco Popular del Peru*, the court observed that the circumstances of sovereign restructurings may justify "a stay of the proceedings or, in the alternative, a stay of the execution of . . . judgment[s] because either stay might allow the completion of . . . negotiations with its creditors without unduly threatening the ultimate enforceability of the debt." 109 F.3d 850, 855–

56 (2d Cir. 1997).

A stay is particularly appropriate in the sovereign debt restructuring context when, as here, the restructuring is supported by U.S. foreign policy goals. *See Pravin Banker Assocs., Ltd.* v. *Banco Popular del Peru*, 165 B.R. 379, 387 (S.D.N.Y. 1994) (staying litigation against Banco Popular, a state-owned Peruvian bank because Peru was "in compliance with the mandates of U.S. policy"); *see also Allied Bank Int'l* v. *Banco Credito Agricola*, 757 F.2d 516, 519 (2d Cir. 1985) (U.S. policy supports "debt resolution procedure that operates through the auspices of the International Monetary Fund (IMF)," which "encourages the cooperative adjustment of international debt problems" in a "system of international cooperation and negotiation" under which "the underlying obligations to pay nevertheless remain valid and enforceable").

The Interim Government has demonstrated its strong commitment to developing a comprehensive restructuring plan that engages with each of its creditors by publishing guidelines laying out the core principles for such a plan,[29] and by seeking proposals for a Reconciliation Agent. Nevertheless, crafting a successful debt resolution and economic recovery plan in the midst of the ongoing humanitarian crisis will take time. A stay is therefore justified in order to give the Republic the time it needs to pursue an orderly restructuring.

## B. A Stay Is Justified Under the International Law Doctrine of Necessity.

The international law doctrine of necessity allows a state to temporarily defer its financial obligations while it is "threatened by a serious danger to its existence, to its political or economic survival, [or] to the possibility of maintaining its essential services in operation."[30]

_____

[29] *See* Office of the Special Attorney General of the Bolivarian Republic of Venezuela, *Guidelines for the Renegotiation of the Chávez/Maduro Era Legacy Public External Debt* (July 1, 2019) ("Guidelines") (submitted as Exhibit 1 to Repub. Related Cases Stay Mem.).

[30] It is well settled that international law, from which the doctrine of necessity derives, is part of federal law. *See United States* v. *Trinidad*, 839 F.3d 112, 122 n.16 (1st Cir. 2016) ("Customary

*LG&E Energy Corp.* v. *Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, ¶ 246 (Oct. 3, 2006).  A state may invoke the necessity doctrine in a case of "extreme peril," "a grave danger to the existence of the State itself, its political or economic survival, the continued functioning of its essential services, the maintenance of internal peace, [or] the survival of a sector of its population." *See State Responsibility*, Y.B. Int'l L. Comm'n (1980) 14, U.N. Doc. A/CN.4/Ser.A/1980/Add.1 (Part 1); *State Responsibility*, Y.B. Int'l L. Comm'n (2001) 80, U.N. Doc. A/CN.4/.Ser.A/2001/Add.1 (Part 2) ("The term 'necessity' (*état de nécessité*) is used to denote those exceptional cases where the only way a State can safeguard an essential interest threatened by a grave and imminent peril is, for the time being, not to perform some other international obligation of lesser weight or urgency."); *id.* at 80–81 ("There is substantial authority in support of the existence of necessity as a circumstance precluding wrongfulness.").

The doctrine clearly applies in the case of Venezuela, which is facing an unprecedented economic collapse, a refugee crisis of massive proportions, a lack of access to even the most basic necessities, all of which have been dramatically worsened by the global COVID-19 pandemic.  As stated by the Permanent Council of the Organization of the American States, "the Venezuelan crisis has a destabilizing impact and represents a clear threat to peace and security in the Hemisphere."[31]

This is especially true now, as the pandemic has emerged as an existential threat to the health and safety of the Venezuelan people.  The public health system is on the brink of

---

international law is part of the federal common law."); *Kadic* v. *Karadzic*, 70 F.3d 232, 246 (2d Cir. 1995) (accepting "the settled proposition that federal common law incorporates international law"); Restatement (Third) of Foreign Relations Law § 111(1) (1987) ("International law . . . [is] law of the United States and supreme over the law of the several States . . . .").

[31] Resolution No. 1137 (2245/19) (September 12, 2019), available at https://www.oas.org/es/centro_noticias/comunicado_prensa.asp?sCodigo=C-065/19.

collapse—six of the sixteen hospitals tracked by health-care unions in Caracas do not have face masks, five have no running water, and thirteen do not have soap.[32]  Power outages have also become commonplace.[33]  In light of this crisis, debt obligations should give way temporarily to the pressing need to invest resources in health care.  For similar reasons, commentators have recently argued for application of the necessity defense to defer Argentina's debt obligations on the basis that the coronavirus represents a grave, uncertain threat to Argentina's existence.[34]  Those considerations are even greater for Venezuela, where the economic and public health catastrophes are of much larger proportion.

Under these exceptional circumstances, where Venezuela faces grave threats to its political and economic survival, the doctrine of necessity provides the state with "flexibility in the application of international obligations" and "recogniz[es] that necessity to protect national interests of a paramount importance may justify setting aside or suspending an obligation, or preventing liability from its breach."  *Cont. Cas. Co.* v. *Argentine Republic*, ICSID Case No. ARB/03/9, Award, ¶ 168 (Sept. 5, 2008).  A stay is thus appropriate to allow Venezuela to address its humanitarian crisis.

### C.  A Stay Is Justified Because the Republic Currently Is Unable to Access Resources Necessary To Perform or Settle Its Financial Obligations.

A stay is also warranted here because the Republic lacks access to the key resources

---

[32] Stephania Taladrid, *Hunger, Infection, and Repression: Venezuela's Coronavirus Calamity*, THE NEW YORKER (May 29, 2020), https://www.newyorker.com/news/news-desk/hunger-infection-and-repression-venezuelas-coronavirus-calamity.

[33] *Id.*

[34] *See* Mike Chen, Charlie Fendrych, and Andres Paciuc, *Necessity in the Time of Corona* (Apr. 13, 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3575182.

within Venezuela that are necessary to perform or settle its financial obligations.  The corrupt Maduro regime has refused to relinquish control over Venezuelan state organs and financial institutions, and has blocked the Guaidó administration and the democratic National Assembly from accessing critical resources.  It is therefore impossible at this time for the Interim Government to access the billions of dollars that would be needed to settle its financial obligations.  Once the transition to democracy is complete, the Republic will be able to utilize Venezuela's resources to achieve economic recovery and a consensual resolution with all of its external creditors.[35]

**III.    OFAC Sanctions Further Support a Stay and Prevent Entry of Judgment.**

OFAC regulations specifically prohibit the alteration of any interest in blocked property of the Republic.  The bonds at issue are unquestionably "property" under OFAC's sanctions regulations, and the Republic has an interest in that property insofar as it has rights under the bonds—including, specifically, in the collective action clauses ("CACs")—that would be altered by a judgment here.  OFAC sanctions thus prevent entry of the judgment Plaintiffs seek. Finally, contrary to plaintiffs' assertions, OFAC regulations do not violate separation of powers principles.

**A.    OFAC Regulations Prohibit Alteration of Any Interest in Blocked Property of the Republic.**

The express terms of the President's Executive Orders with respect to Venezuela and the regulations issued thereunder bar Plaintiffs from receiving a judgment that would alter, or that is intended to alter, any interest that Venezuela has in blocked property. As set forth above (pp. 6-7), under the Venezuela Sanctions Regulations, all "property and interest in property" of the

---

[35] In order to monitor the stay, the Court may wish to provide that the parties report to it periodically—perhaps every four months—with respect to whether the conditions supporting the stay have remained in place.

Republic in the United States "are blocked *and may not be transferred . . . or otherwise dealt in.*"
Exec. Order No. 13884, § 1(a), 84 Fed. Reg. 38,843 (Aug. 7, 2019).  Applicable OFAC regulations
define the term "transfer" broadly to encompass "any actual or purported act or transaction," "the
purpose, intent, or effect of which is to create, surrender, release, convey, transfer, or *alter, directly
or indirectly,* any right, remedy, power, privilege, or *interest with respect to any property*."  31
C.F.R. § 591.310 (emphasis added).  The definition further states that a "transfer" includes "*the
issuance, docketing, or filing of . . . any judgment*" "the purpose, intent, or effect of which is to . .
. alter, directly or indirectly, any right . . . or interest with respect to property."  *Id.* (emphasis
added).

Likewise, OFAC interpretive guidance further confirms that a specific license is
required in order to create or perfect "any legal or equitable interests" in blocked Venezuelan
property through "judicial process."[36]  While FAQ 808 states that "[a] specific license from OFAC
is not *ordinarily* required to initiate or continue U.S. legal proceedings against a person designated
or blocked pursuant to OFAC's Venezuela sanctions program, or for a U.S. court, or its personnel,
to hear such a case," it goes on to explain that a specific license is required for the "purported
creation or perfection of any legal or equitable interests (including contingent or inchoate interests)
in blocked property."  *Id.* (emphasis added).  As explained below, Plaintiffs seek a judgment that
they maintain would replace significant parts of their contractual claim under the bonds with a new
claim under a court judgment; thus, a judgment in favor of Plaintiffs would constitute a "judicial
process purporting to . . . alter or affect property or interests in blocked property" and the purported
"creation or perfection" of "legal or equitable interests," which requires a specific license from

---

[36] *See* U.S. Dep't of Treasury, OFAC FAQ No. 808 (Feb. 18, 2020),
https://www.treasury.gov/resourcecenter/faqs/sanctions/pages/faq_other.aspx#venezuela.

OFAC.  31 C.F.R. § 591.407; FAQ 808.[37]

### B.  The Republic Has a Property Interest in the Bonds.

The bonds at issue are unquestionably "property" within the meaning of the OFAC

regulations, which specifically define the term to include bonds and other indebtedness:

> The terms property and property interest include, but are not limited
> to, money, checks, drafts, bullion, bank deposits, savings accounts,
> *debts, indebtedness, obligations, notes*, guarantees, debentures,
> stocks, **bonds, coupons, any other financial instruments**, . . .
> *contracts of any nature whatsoever*, and any other property, real,
> personal, or mixed, tangible or intangible, or interest or interests
> therein, present, future, or contingent.

§ 591.309 (emphasis added).  The Republic has an interest in such property insofar as it has

rights under the bonds.  Among the rights that it has are the right to modify the terms of the bond

with the consent of a specified supermajority of bondholders (measured by principal amount of

bonds held), including specifically reducing the principal amount and interest rate and changing

the due date of any principal or interest payments.  These so-called "collective action clauses"

(CACs) are critical components of modern sovereign debt restructurings.[38]

---

[37] Plaintiffs point to language elsewhere in OFAC's Venezuela sanctions regulations that
prohibits "*the enforcement of any* lien, *judgment*, arbitral award, decree, or other order through
execution, garnishment, or other judicial process purporting to transfer or otherwise alter or
affect [blocked] property or interests in [blocked] property."  § 591.407.  Plaintiffs contend that
this passage demonstrates that OFAC's regulations prohibit only *enforcement*—not *entry*—of
judgment.  (Pls.' Br. at 20).  But § 591.310, quoted in the text above, makes clear that, in certain
cases, "the issuance, docketing, or filing of . . . any judgment" is a prohibited transfer.  And,
because the judgment Plaintiffs seek here would purportedly replace significant provisions of
their claims under the bonds with claims under a court judgment, entry of judgment on the terms
Plaintiffs seek would constitute "judicial process purporting to transfer or otherwise alter or
affect property or interests in property."  § 591.407.

[38] *See, e.g.*, Ex. F to Declaration of Justin M. Ellis in Support of Plaintiff's Motion for Summary
Judgment ("Ellis Decl.") at 20 (ECF. No. 65).  Unlike private sector bankruptcy regimes, which
allow a debtor to make orderly and equitable payments to creditors based on its ability to pay
under court supervision, a sovereign debtor must rely on a consensual restructuring of its debt
with its creditors.  CACs are "critical" because they prevent a small minority of bondholders
from blocking a restructuring that the majority of bondholders feel is in their best interest.

Notwithstanding the broad definition of "property interest," Plaintiffs contend that the Republic does not hold a property interest in the CACs because (i) it has not yet invoked those rights by demonstrating agreement by a supermajority of bondholders, and (ii) it supposedly cannot enforce its rights under the CACs with respect to already-defaulted payments.  (Pls.' Br. at 24 n.11).  These arguments are clearly wrong.   First, the definition of "property interest" includes "present, future or contingent" interests.  § 591.309.  The Republic's right to attempt to assemble the specified supermajority of bondholders to support an eventual restructuring is at least a contingent interest in property.

Second, the CACs contain no limitation on the scope of any modification of the clauses that the Republic and its bondholders could agree on, and in particular there is no suggestion in the clauses that the bondholders could not agree to modify obligations to pay principal or interest that have already been missed.  Indeed, such an interpretation of the clauses would be entirely contrary to their purpose, which is precisely to facilitate sovereign debt restructuring.[39]  Of course, "[i]n most cases," debt restructuring occurs "*after* a default."  Int'l

Report of the G-10 Working Group on Contractual Clauses 3-4 (Sept. 26, 2002), https://www.bis.org/publ/gten08.pdf.; John B. Taylor, Under Secretary of Treasury for Int'l Affairs, *Sovereign Debt Restructuring: A U.S. Perspective*,  Peterson Institute for Int'l Economics (April 2, 2002), https://www.piie.com/commentary/speeches-papers/sovereign-debt-restructuring-us-perspective (noting that absent CACs, "a small minority [could] prevent a restructuring that the majority of bondholders feel is in their best interests"); *see also* Mark C. Weidemaier & Mitu Gulati, *A People's History of Collective Action Clauses*, 54 VA. J. INT'L L. 51, 57 (2013).

[39] *See, e.g.*, *NML Capital, Ltd.* v. *Republic of Argentina*, 727 F.3d 230, 247 (2d Cir. 2013) ("[N]ewer bonds almost universally include collective action clauses ("CACs") which permit a super-majority of bondholders to impose a restructuring on potential holdouts."); Taylor, *supra* n.38; Mark Sobel, *Strengthening Collective Action Clauses: Catalysing Change—The Back Story*, 11 CAP. MARKETS L. J., 3, 5 (2016) ("the advent of CACs offered the promise that the contractual framework could be used to better mimic domestic bankruptcy proceedings and bind creditors").

Monetary Fund Paper, *A Survey of Experiences with Emerging Market Sovereign Debt Restructurings*, at 4 (June 5, 2012) (emphasis added).  CACs, therefore, are designed to apply pre- and post-default.  *Id.* at 14 n.21 (CACs "allow a qualified majority of bondholders of an issuance to change the bonds' financial terms and to bind in all other holders of that issuance, *either before or after default*") (emphasis added); *see also* Anna Gelpern & Mitu Gulati, *Public Symbol in Private Contract: A Case Study*, 84 WASH. UNIV. L. REV. 1627, 1639 (2006) ("Collective Action Clauses in sovereign debt contracts are provisions that address collective action problems that might arise among creditors, such as the incentives to rush for the exits (sell the debt), to rush to the courthouse, or to hold out and free-ride on a restructuring agreement.").   In short, the Republic—like any party to a contract—has interests in the clauses of the bonds designed for its protection.[40]

## C.  Plaintiffs Seek a Judgment That Would "Alter" the Republic's Property Interests in the Contractual Terms of the Bonds.

In opposing the Republic's motion for a stay in the Related Cases, plaintiffs in the Related Cases explained that one of their primary goals in seeking a judgment from this Court is to alter their rights by relieving them of certain material obligations under the bonds, namely, the CACs.[41]  Indeed, the supposed ability to avoid the CACs by obtaining a judgment from this Court

---

[40] Plaintiffs' argument that a party in breach of a contract cannot sue to enforce it (Pls.' Br. at 24 n.11) is both overstated and beside the point.  A breaching party certainly can enforce certain of its contract rights, in particular, the right to particular remedies even after breach.  Where, for example, a contract specifies certain consequences and remedies such as a limitation of liability in the case of breach, and the non-breaching party fails to comply, the breaching party can enforce its rights.  *See, e.g.*, *Metro. Life Ins. Co.* v. *Noble Lowndes Int'l*, 84 N.Y.2d 430, 436 (1994) (enforcing a limitation of liability provision). Here, a modification of the bonds would be a *defense* to a suit on the unmodified bond terms, and the Republic clearly has a right to assert any such defense—giving it an interest in the bond terms under OFAC regulations.

[41] *See* Reply Memorandum of Law in Support of Plaintiffs' Consolidated Motion for Summary Judgment and in Opposition to Venezuela's Cross-Motion to Stay at 6, *Pharo Gaia Fund Ltd. et al.* v. *Bolivarian Republic of Venezuela*, No. 1:19-cv-03123, (S.D.N.Y. Feb. 6, 2020), ECF No.

was the principal interest that the plaintiffs claimed would be prejudiced if the Court grants the Republic's stay motion.  *Id.*  That candid acknowledgment erases any doubt that the plaintiffs in the Related Cases seek a judgment that they contend will substantially alter their rights in blocked property of the Republic.  Indeed, under the Related Cases plaintiffs' theory, entry of judgment would effectively rewrite the contract.  The sanctions prevent this; indeed, the sanctions declare such an act "null and void."  31 C.F.R. § 591.202(a) (providing that any transfer in violation of the sanctions is "null and void").  No court to date has issued a judgment in comparable circumstances under these new sanctions.[42]

Perhaps it is not surprising, then, that Plaintiffs here go to great lengths to avoid any such admission.  Indeed, Plaintiffs affirmatively argue that "Entering Judgment Will Not Affect the Republic's Rights and Obligations Under the Contracts." (Pls.' Br. at 24.)  But Plaintiffs walk this concession back in their position, discussed above, that the Republic in fact has no contractual rights under the CACs (or presumably other contract clauses, such as those allowing the Republic to repurchase the Notes[43]) as to payments that are in default.  As set forth above, this

---

47 ("A judgment would protect the Pharo Plaintiffs" from "a compulsory restructuring of their debts.").

[42] Plaintiffs point to *Dresser-Rand Co.* v. *Petroleos de Venezuela, S.A.*, as an example of a monetary judgment entered against a sanctioned entity.  Pls.' Br. at 21.  But in *Dresser-Rand*, Judge Stanton *denied* summary judgment as to Petróleos de Venezuela, S.A. ("PDVSA"), finding that the existence of OFAC sanctions rendered PDVSA's compliance with the contract impossible.  *See* Opinion & Order at 7, *Dresser-Rand Co.* v. *Petroleos de Venezuela, S.A.*, No. 19-cv-2689 (S.D.N.Y. Feb. 11, 2020) (ECF No. 59).  While Judge Stanton did grant summary judgment, and ultimately entered judgment, against the guarantor Petroleó S.A. ("Petroleó"), that judgment was entered on extraordinarily narrow grounds not implicated here, namely, that Petroleó had waived all defenses except payment, a conclusion that in effect Petroleó had no remaining property interest in the guarantee.  Order for Judgment at 1-2, *Dresser-Rand Co.* v. *Petroleos de Venezuela*, No. 19-cv-2689 (S.D.N.Y. May 29, 2020) (ECF No. 78).

[43] *See, e.g.,* Ellis Decl. Ex. F at 15 (ECF. No 65).

is wrong:  nothing in the clauses limits the modifications that a supermajority of the bondholders may choose to make in the bonds.  Thus, Plaintiffs here are in the same position as the plaintiffs in the Related Cases, seeking a judgment that they maintain will extinguish the Republic's contract rights.  This they cannot do without obtaining a license from OFAC.  At the least, the existence of OFAC sanctions should bar entry of summary judgment at this time.

Plaintiffs' argument that other courts have issued "judgments that merely fixed rights and obligations and did not by themselves transfer property" (Pls.' Br. at 21-22) is precisely the point.  None of the cases cited entered a judgment that purportedly would extinguish the blocked party's interest in an underlying contract.  To the contrary, in a case Plaintiffs candidly cite as a "cf.," *Itek Corp.* v. *First Nat'l Bank of Boston*, the First Circuit *vacated* a declaratory judgment nullifying letters of credit in favor of an Iranian bank because it found that the judgment would effect a transfer of property, in violation of OFAC blocking regulations.  704 F.2d 1, 10 (1st Cir. 1983).  The *Itek* court explained that the judgment would extinguish the Iranian interest in the blocked letters of credit and "would, therefore, transfer an interest in blocked property."  *Id.* at 8. Similarly here, Plaintiffs seek a judgment that would purport to extinguish Venezuela's interest in the bonds at issue, which they cannot do absent a license.

### D.  OFAC's Regulations Do Not Violate Separation of Powers Principles.

It is well settled that the President has broad statutory authority to bar certain judicial processes that involve or affect blocked foreign assets.  *See Dames & Moore* v. *Regan*, 453 U.S. 654, 673-74 (1981) (holding that the President was statutorily authorized to nullify judicially granted attachments and order the transfer of assets).  That authority arises under the International Emergency Economic Powers Act ("IEEPA"), which vests the President with expansive powers that include, in specified circumstances, the power to "prevent or prohibit *any* . . . use, transfer . . . or dealing in, or exercising any right, power, or privilege with respect to, or

transactions involving, any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B) (emphasis added).  In *Dames & Moore*, the Supreme Court found that IEEPA provided "specific congressional authorization to the President" to "nullify" attachments of Iranian property and to "order the transfer of Iranian assets."  453 U.S. at 675.  In doing so, the Court "recognized that the congressional purpose in authorizing blocking orders is 'to put control of foreign assets in the hands of the President.'"  *Id.* at 673.  Consistent with that interpretation, courts have regularly recognized that the President and, by extension, OFAC, have the power to prohibit judicial processes that affect or transfer an interest in blocked property– including the cases on which Plaintiffs rely (Pls.' Br. at 22, 28).  *See Nat'l Oil Corp.* v. *Libyan Sun Oil Co.*, 733 F. Supp. 812 (D. Del. 1990) (recognizing "the President's statutory authority" "to regulat[e] those judicial processes that would effect a transfer of foreign property *or property interests*") (emphasis added); *Nat'l Airmotive Corp.* v. *Gov't & State of Iran*, 499 F. Supp. 401, 404 (D.D.C. 1980) (observing that "courts have proceeded with litigation pertaining to blocked assets . . . even to the point of judgment, *where the judicial processes <u>did not</u> involve the transfer of blocked funds*") (emphasis added).[44]

Moreover, courts, including the Supreme Court, have rejected arguments like that posited by Plaintiffs here (*see* Pls.' Br. at 25-26) that seek to portray Presidential Executive Orders or OFAC regulations restricting transfers or alterations of blocked property as somehow stripping federal courts of jurisdiction.  For example, in *Dames & Moore*, the Court considered the constitutionality of the President's order suspending all claims pending against Iran in American

---

[44] Plaintiffs also cite (Pls.' Br. at 28) *Comet Enters. Ltd.* v. *Air-A-Plane Corp*, 128 F.3d 855 (4th Cir. 1997), and *Am. Airways Charters, Inc.* v. *Regan*, 746 F.2d 865 (D.C. Cir. 1984), but both cases are inapposite.  Both cases construed OFAC regulations not to interfere with a federal court's power to hear counsel representing a party.  There was no question in either case regarding OFAC's undoubted power to regulate dealing in blocked property.

courts.  453 U.S. at 675.  The Court concluded that the President's suspension of claims did "not divest the federal court of 'jurisdiction,'" but rather "effected a change in the substantive law governing the lawsuit."  *Id.* at 684-85.  If the suspension of a pending claim does not implicate federal court jurisdiction, then there can be no serious question that OFAC can, without affecting federal court jurisdiction, issue regulations barring Plaintiffs from receiving a certain type of relief that would, under OFAC's Venezuelan sanctions program, affect or alter an interest in blocked property.

## IV. The Court Should Exercise Its Discretion To Decline To Award Plaintiffs' Prejudgment Interest.

Even if Plaintiffs might otherwise be entitled to summary judgment (they are not), Plaintiffs' request for prejudgment interest at the New York statutory rate should be denied.  As the Republic has explained in the Related Cases, "[t]he decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion."  *Endico Potatoes, Inc.* v. *CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1071 (2d Cir. 1995) (quotation marks and citation omitted).  "In deciding whether an award of prejudgment interest is warranted, it must be remembered that this is an equitable remedy and courts must be careful that an award does not overcompensate a plaintiff."  *Commercial Union Assurance Co.* v. *Milken*, 17 F.3d 608, 614 (2d Cir. 1994).  An award of prejudgment interest on interest here, particularly at the New York 9% rate, would significantly overcompensate Plaintiffs.

### A. The Federal Standard for Determining Prejudgment Interest Applies.

The Foreign Sovereign Immunities Act ("FSIA")[45] provides "the sole basis for obtaining jurisdiction over a foreign state in our courts."  *Arch Trading Corp.* v. *Republic of*

---

[45] 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602–1611.

*Ecuador*, 839 F.3d 193, 200 (2d Cir. 2016) (quoting *Argentine Republic* v. *Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989)).  "Absent [a specific statutorily defined] exception, the immunity conferred by the FSIA strips courts of both subject matter and personal jurisdiction over the foreign state."  *Id.*  This court's subject-matter jurisdiction accordingly rests on the Republic's waiver of its sovereign immunity under the FSIA, 28 U.S.C. § 1605(a)(1).  Where, as here, the Court's jurisdiction arises under federal law, the federal standard for prejudgment interest should apply.  *Cf. Guides, Ltd.* v. *Yarmouth Grp. Prop. Mgmt., Inc.*, 295 F.3d 1065, 1077 (10th Cir. 2002) ("[A] federal rate of interest rather than the state rate applies where jurisdiction is based on a federal question.").

Despite the federal nature of their suit, Plaintiffs nevertheless seek interest on unpaid interest at the statutory rate applicable in New York state courts.[46]  Citing *Barkanic* v. *Gen. Administration of Civil Aviation of China*, Plaintiffs contend that "state substantive law is controlling in FSIA cases" where state-law claims are raised.  (Pls.' Br. at 17 (quoting *Barkanic*, 923 F.2d 957, 959 (2d Cir. 1991)).  But, as the *Barkanic* court recognized, in certain circumstances, "a uniform body of federal law should control."  *Id.* at 959 n.2.

These considerations are relevant here, where longstanding federal policy supports voluntary participation in "consensual, orderly sovereign debt restructuring efforts."[47]  Applying

---

[46] In seeking to apply New York's statutory rate, plaintiffs rely on contractual choice-of-law clauses, which provide that the securities are governed by, and shall be construed in accordance with, New York law.  But the Second Circuit has expressly held, in the context of post-judgment interest, that "the existence of a choice-of-law provision, standing alone," does not "demonstrate[] a 'clear, unambiguous and unequivocal' intent to deviate from the federal rate." *FCS Advisors, Inc.* v. *Fair Fin. Co.*, 605 F.3d 144, 147-48 (2d Cir. 2010) (quoting *Westinghouse Credit Corp.* v. *D'Urso*, 371 F.3d 96, 102 (2d Cir. 2004)).

[47] Statement of Interest of the United States, *EM Ltd.* v. *Republic of Argentina*, No. 1:03-cv-02507 (S.D.N.Y. 2004);  *see, e.g.*, Brief for the United States, *NML Capital Ltd.* v. *Republic of Argentina*, 2012 WL 1150791, at *7 (2d Cir. Apr. 4, 2012) (stating that "in those rare cases where a sovereign cannot meet its external obligations . . . the policy of the United States is that

the interest rate of the forum state would encourage creditors to forum shop for courts with high interest rates and race to obtain judgments that would make it more difficult to persuade all creditors to participate in an orderly and equitable restructuring in which like claims are treated alike, on a voluntary basis. *Cf. Clearfield Tr. Co.* v. *United States*, 318 U.S. 363, 367 (1943) (requiring a "uniform rule" in the context of federal commercial paper because "application of state law, even without the conflict of laws rules of the forum, would subject the rights and duties of the United States to exceptional uncertainty" and "lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states"). The federal policy favoring voluntary restructuring of sovereign debts demands a uniform national rule rather than a variable rule depending on the plaintiff's choice of forum.

**B. The Court Should Not Award Prejudgment Interest on Interest Payments.**

In exercising its discretion whether to award prejudgment interest on interest, the decision "should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co.* v. *Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 833–34 (2d Cir. 1992). "[T]his is an equitable remedy, [thus] courts must be careful that an award does not overcompensate a plaintiff," *Commercial Union Assurance*, 17 F.3d at 614, and courts should deny requests for prejudgment interest where the plaintiff has been fully compensated by the judgment.

Plaintiffs contend that the Court "should take into account the rate at which the

---

the orderly and consensual restructuring of sovereign debt . . . is the most appropriate response"); *accord* Brief of the United States, *Aurelius Capital Master, Ltd., et al.* v. *Republic of Argentina*, 2016 WL 1267524, at *4 (2d Cir. Mar. 23, 2016).

Republic would have paid to borrow money" which they claim would "have been closer to the 7% to 13.625% rates" provided for by the Bonds. (Pls.' Br. at 19 n.9). But that argument ignores that the bonds at issue in this litigation already accrue interest at those premium rates, thereby compensating investors for the relatively higher chance of nonpayment or delayed payment compared to other sovereign debt (such as U.S. Treasury bonds). *Cf. Commercial Union Assurance*, 17 F.3d at 614 (prejudgment interest inappropriate where plaintiffs seek compensation for "extremely risky" investments, where the plaintiffs "were fully aware of the risk and chose to invest in spite of it."). Here, granting Plaintiffs' an additional interest rate on top of the high interest rates they already enjoy would be fundamentally unfair in light of the parties' reasonable, bargained-for expectations at the time they made their investments. *Id.* (affirming denial of prejudgment interest, where "[w]hat has been repaid to the [plaintiffs] more than adequately satisfies any equitable demand for interest on the capital recovery").

## V.     If the Court Moves Forward with Judgment, the Judgment Should Include Fraud Prevention Mechanisms to Protect the Republic from the Risk of Future Fraudulent Claims.

As explained in Section I *supra*, the most efficient path forward for all interested parties would be for the Court to stay this proceeding. If, however, the Court decides to move forward at this time, it should establish fraud and error prevention mechanisms prior to entering judgment. Plaintiffs do not hold physical certificates; rather they hold their beneficial ownership of the securities at issue in "street name" by maintaining accounts at financial institutions or brokerage houses. This type of ownership allows the securities to be transferred easily. This ease of transfer, however, gives rise to a potential concern. An unscrupulous plaintiff with a judgment could attempt to "double dip" by obtaining a judgment and then selling securities to an unsuspecting third party without disclosing the judgment to the buyer or the sale to the Defendant. Because of this risk, the Republic respectfully requests that the Court include in its judgment a

29

provision barring Plaintiffs and their successors and assigns from transferring their bonds without prior written approval of this Court on notice to the Republic.[48] *See NML Capital, Ltd.* v. *Republic of Argentina*, No. 1:09-cv-01707, ECF No. 190 (Sept. 28, 2011) (directing parties to include provision in proposed judgments ordering plaintiffs to "refrain from selling or otherwise transferring their beneficial interests in the bond(s) involved in this action without advising the Court in advance and obtaining permission of the Court").

## CONCLUSION

For the foregoing reasons, the Court should grant the Republic's motion for a stay and deny the Plaintiffs' motion for summary judgment.

---

[48] Specifically, the judgment should state:

Plaintiffs and any of their successors or assigns; and anyone acting on their behalf, including their officers, agents, servants, employees, trustees, beneficial owners, and attorneys; and all persons and organizations acting in concert with any of them are hereby **PERMANENTLY ENJOINED** from transferring in any manner the securities or security entitlements on which Plaintiffs have brought suit in this case, identified as **ISIN US922646AT10, ISIN USP9395PAA95, ISIN USP97475AD26, ISIN USP17625AC16, ISIN USP17625AA59, ISIN USP97475AP55, ISIN USP17625AE71 , ISIN USP17625AB33, ISIN USP17625AD98,** without prior written approval of this Court on notice to the Republic.

Dated:  July 13, 2020

SULLIVAN & CROMWELL LLP

/s/ Joseph E. Neuhaus
Joseph E. Neuhaus
Sergio J. Galvis
James L. Bromley
125 Broad Street
New York, New York 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
neuhausj@sullcrom.com
galviss@sullcrom.com
bromleyj@sullcrom.com

Angela N. Ellis
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W. Suite 700
Washington, D.C.  20006-5215
Telephone:  202-956-7500
Facsimile:  202-293-6330
ellisan@sullcrom.com

*Attorneys for Defendant Bolivarian Republic of Venezuela*