## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONTRARIAN CAPITAL MANAGEMENT, L.L.C., CONTRARIAN CAPITAL FUND I, L.P., CONTRARIAN DOME DU GOUTER MASTER FUND, LP, CONTRARIAN CAPITAL SENIOR SECURED, L.P., CONTRARIAN EM II, LP, CONTRARIAN EMERGING MARKETS, L.P., POLONIUS HOLDINGS, LLC, and CONTRARIAN FUNDS, L.L.C., | Case No. 19 Civ. 11018 [rel. Nos. 19 Civ. 3123 & 18 Civ. 11940] |
| Plaintiffs, | Hon. Analisa Torres |
| v. | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | |
| Defendant. | |

## REPLY MEMORANDUM OF THE BOLIVARIAN REPUBLIC OF VENEZUELA IN SUPPORT OF MOTION FOR A STAY

## TABLE OF CONTENTS

<u>Page</u>

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 1

I.    The Court Should Exercise Its Inherent Power To Stay This Proceeding. ............. 1

      A.    The Court Has Broad Discretion to Fashion an Appropriate Stay.............. 2

      B.    Equity Favors a Stay. ................................................................................. 5

II.    A Stay Is Warranted Under Principles of International Comity and Necessity. ................................................................................................... 9

      A.    Comity-Based Abstention Is Appropriate.................................................. 9

      B.    A Stay Is Justified Under the International Law Doctrine of Necessity. ................................................................................................. 10

      C.    A Stay Is Justified Because the Republic Currently Is Unable to Access Resources Necessary To Perform or Settle Its Financial Obligations. ............................................................................................. 14

III.    A Stay Is Warranted in Light of OFAC Sanctions. ............................................. 14

CONCLUSION................................................................................................... 15

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aquamar S.A.* v. *Del Monte Fresh Produce N.A.*,
  179 F.3d 1279 (11th Cir. 1999) .....................................................................12

*Bank of New York* v. *Yugoimport SDPR JP*,
  780 F. Supp. 2d 344 (S.D.N.Y. 2011)...............................................................2

*Catskill Mountains Chapter of Trout Unlimited, Inc.* v. *EPA*,
  630 F. Supp. 2d 295 (S.D.N.Y. 2009)................................................................5

*Cruz* v. *United States*,
  387 F. Supp. 2d 1057 (N.D. Cal. 2005) ...........................................................10

*Karaha Bodas Co., L.L.C.* v. *Perusahaan Pertambangan Minyak Dan Gas Bumi
  Negara*,
  465 F. Supp. 2d 283 (S.D.N.Y. 2006)..............................................................15

*Landis* v. *N. Am. Co.*,
  299 U.S. 248 (1936).....................................................................................1, 2

*Louis Vuitton Malletier S.A.* v. *LY USA, Inc.*,
  676 F.3d 83 (2d Cir. 2012)............................................................................1, 2

*In re Northwestern Airlines Corp.*,
  483 F.3d 160 (2d Cir. 2007)..............................................................................3

*Oliva* v. *Dep't of Justice*,
  433 F.3d 229 (2d Cir. 2005)............................................................................11

*Presbyterian Church of Sudan* v. *Talisman Energy Inc.*,
  244 F. Supp. 2d 289 (S.D.N.Y. 2003)..............................................................12

*Range* v. *480-486 Broadway, LLC*,
  810 F.3d 108 (2d Cir. 2015)..............................................................................5

*Samantar* v. *Yousuf*,
  560 U.S. 305 (2010)........................................................................................11

*SEC* v. *LaGuardia*,
  435 F. Supp. 3d 616 (S.D.N.Y. 2020)................................................................2

*In re Simon*,
  153 F.3d 991 (9th Cir. 1998) ..........................................................................10

*Sosa* v. *Alvarez-Machain*,
   542 U.S. 692 (2004)...................................................................................11, 12

*Sumitomo Corp.* v. *Parakopi Compania Maritima, S.A.*,
   477 F. Supp. 737 (S.D.N.Y. 1979) ......................................................................9

*Tarros S.p.A.* v. *United States*,
   982 F. Supp. 2d 325 (S.D.N.Y. 2013)................................................................11

*United States* v. *Yousef*,
   327 F.3d 56 (2d Cir. 2003)................................................................................12

**Statutes & Rules**

11 U.S.C. § 362............................................................................................................12

31 C.F.R. § 591.407........................................................................................................8

**Other Authorities**

*Argentine Necessity Case*, Bundesverfassungsgericht May 8, 2007 (Ger.),
   https://www.bundesverfassungsgericht.de/e/ms20070508_2bvm000103en.htm ...................13

*Cont. Cas. Co.* v. *Argentine Republic*, ICSID Case No. ARB/03/9, Award (Sept.
   5, 2008) ............................................................................................................10, 13

Debtwire, *Venezuela Interim Government Distributes Preliminary RFP for Debt
   Reconciliation Agent* (Mar. 4, 2020)..................................................................10

*Dresser-Rand Co.* v. *Petroleos de Venezuela, S.A.*,
   No. 19-civ-02689, ECF No. 78 (S.D.N.Y. May 29, 2020) .....................................15

*Dresser-Rand Co.* v. *Petroleos de Venezuela, S.A.*,
   No. 19-civ-02689, ECF No. 1-1 (S.D.N.Y. Mar. 26, 2019) ...................................15

Gabčíkovo-Nagymaros Project (Hungary/Slovakia), Judgment, 1997 I.C.J. Rep........................13

*LG&E Energy Corp.* v. *Argentine Republic*, ICSID Case No. ARB/02/1, Decision
   on Liability (Oct. 3, 2006) .................................................................................13

Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Venezuela's State-
   Owned Oil Company Petroleos de Venezuela, S.A.* (Jan. 28, 2019).........................8

August Reinisch & Christina Binder, *Debts and State of Necessity*, in Making
   Sovereign  Financing and Human Rights Work 115 (Juan Pablo Bohoslavsky
   & Jernei Letnar Cernic eds., 2014) ................................................................11, 13

Beate Rudolf & Nina Hüfken, *Joined Case Nos. 2 Bvm 1-5/03 & 2 Bvm 1-2/06*,
   101 Am. J. Int'l L. 857 (2007) ............................................................................13

Sabine Schlemmer-Schulte, *Fragmentation of International Law: The Case of International Finance & Investment Law Versus Human Rights Law*, 25 Pac. McGeorge Global Bus. & Dev. L.J. 409 (2012). ...................................................13

Statement of Interest of the United States, *Crystallex Int'l Corp.* v. *Bolivarian Republic of Venezuela*, No. 17-mc-00151, ECF No. 184 (D. Del. June 17, 2020) ....................................................................................................... *passim*

*State Responsibility*, 2001 Y.B. Int'l L. Comm'n 80, U.N. Doc. A/CN.4/.Ser.A/2001/Add.1 ....................................................................................11

*Tenaris S.A.* v. *Bolivarian Republic of Venezuela*, No. 18-cv-01371, ECF No. 29 (D.D.C. July 17, 2020) ....................................14, 15

*Tenaris S.A.* v. *Bolivarian Republic of Venezuela*, No. 18-cv-01371, ECF No. 1 (D.D.C. June 8, 2018)..............................................15

*Trinity Investments* v. *Republic of Argentina*, No. 15-cv-05886, ECF No. 88 (S.D.N.Y. July 7, 2020)..........................................15

U.S. Dep't of State, *Democratic Transition Framework for Venezuela* (Mar. 31, 2020) ......................................................................................................................4

Centro de Communicación Nacional, *Guaidó: "I am ordering the transfer of recovered resources to PAHO and the Red Cross to fight COVID-19 and protect health personnel* (July 15, 2020) ...................................................................7

Centro de Communicación Nacional, *President (E) of Venezuela Announces that This Week Begins the Registration for the Digital Wallet to Pay 'Héroes de la Salud'* (June 21, 2020) ...............................................................................................7

## INTRODUCTION

The Interim Government[1] is committed to honoring all valid debts through a consensual global restructuring of Venezuela's bona fide debt obligations.  The United States government emphatically supports that commitment and, through OFAC's Venezuelan sanctions regulations, has created the conditions that would allow for such a global restructuring.  But entry of judgment in this litigation now will significantly complicate those restructuring efforts, provide little if any benefit to Plaintiffs, and would be inconsistent with OFAC sanctions.  The Republic therefore respectfully requests a stay until democracy is restored in Venezuela and the Republic has had a reasonable opportunity to pursue a consensual restructuring, or until OFAC sanctions permit entry and enforcement of judgment, either through the lifting of sanctions or the granting of a specific license.

## ARGUMENT

### I.    The Court Should Exercise Its Inherent Power To Stay This Proceeding.

Plaintiffs do not and cannot dispute that this Court has broad discretion and ample authority to stay this proceeding.  *See Louis Vuitton Malletier S.A.* v. *LY USA, Inc.*, 676 F.3d 83, 96 (2d Cir. 2012) (the power "to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants") (quoting *Landis* v. *N. Am. Co.*, 299 U.S. 248, 254 (1936)).  It should exercise that authority here, where the interests of the Court, human rights concerns, the foreign policy interests of the U.S. government, and the OFAC sanctions regime all militate in favor of a stay.  While there is no strict test to determine whether a stay is appropriate, *Louis Vuitton*, 676

---

[1] Unless otherwise indicated, capitalized terms have the same meaning as in the Memorandum of the Bolivarian Republic of Venezuela in Support of the Republic's Motion for a Stay and in Opposition to Plaintiffs' Motion for Summary Judgment ("Mem."), ECF No. 69.

F.3d at 99, every factor typically considered by courts in this District weighs in favor of a stay.

### A.  The Court Has Broad Discretion To Fashion an Appropriate Stay

Plaintiffs claim that "stays must be strictly limited," and that the Republic's stay request is "improper" because it is not of a finite duration.[2]  They are wrong on both counts.  There are no bright-line rules or "strict" limitations on this Court's power to tailor a reasonable stay in this and the Related Cases.  Plaintiffs cite a single case, *Landis* v. *North American Co.*, that supposedly establishes these limits, but even in *Landis*, Justice Cardozo made clear that, while stays must be reasonably moderate given the facts of each specific case, the boundaries of reasonableness vary greatly depending on the circumstances.  299 U.S. at 256 ("We must be on our guard against depriving the processes of justice their suppleness of adaptation to varying conditions.").

In practice, courts in this District can and do impose stays of indeterminate duration, particularly where the stay implicates important questions involving foreign sovereigns.  For example, in *Bank of New York* v. *Yugoimport SDPR JP*, the district court granted a stay of indefinite duration in an interpleader action to allow certain claimants (the Republic of Croatia and the Republic of Slovenia) to refer their claims to a committee created by a Succession Agreement executed by the successor states to the former Republic of Yugoslavia.  2007 WL 1378426 at *10 (S.D.N.Y. May 11, 2007).  That stay remained in place for four years.  *Bank of New York* v. *Yugoimport SDPR JP*, 780 F. Supp. 2d 344, 354 (S.D.N.Y. 2011).   And courts in this district have similarly imposed indefinite stays in other circumstances.  *See, e.g.*, *SEC* v. *LaGuardia*, 435 F. Supp. 3d 616, 622 (S.D.N.Y. 2020) (staying civil case pending completion of related criminal

---

[2] Plaintiffs' Opposition to Defendant's Motion for a Stay and Reply in Further Support of Their Motion for Summary Judgment ("Pls.' Opp."), ECF No. 70, at 2.

proceeding); *In re Northwestern Airlines Corp.*, 483 F.3d 160, 168 (2d Cir. 2007) (authorizing court to enjoin union's self-help against bankrupt airline until "every reasonable effort" at reaching an agreement had been exhausted).[3]

   The stay sought by the Republic here, while indefinite in duration, is not unlimited, and is closely tailored to the extraordinary circumstances facing Venezuela: Plaintiffs cannot dispute the unprecedented political, humanitarian, and economic crises occurring in Venezuela, nor the existence of OFAC sanctions, all of which prevent the Republic from settling its external debt or pursuing a restructuring at this time.  Instead, Plaintiffs attempt to cast doubt on the Republic's intention to pursue a restructuring and on the U.S. government's support of the Republic and its eventual restructuring efforts.  (Pls.' Opp. at 3, 4.) Both suggestions are meritless. Since January 2019, the Interim Government has repeatedly and unequivocally affirmed that "it shall be the policy of [the Interim Government] to proceed with an orderly and consensual renegotiation of legacy private claims as soon as practicable" after the Maduro regime has ended and the United States lifts economic sanctions, and has laid out the principles that will guide it in doing so.[4]  And the United States has been unwavering in its support for the Interim Government

---

[3] *See also* Reply Memorandum of the Bolivarian Republic of Venezuela in Support of Cross-Motion for a Stay ("Related Case Reply") at 7, *Pharo Gaia Fund Ltd. et al.* v. *Bolivarian Republic of Venezuela*, No. 1:19-cv-03123, ECF No. 52 (S.D.N.Y. Mar. 3, 2020); *Casa Express Corp.* v. *Bolivarian Republic of Venezuela*, No. 1:18-cv-11940, ECF No. 73 (S.D.N.Y. Mar. 3, 2020) (gathering cases).

[4] *See* Office of the Special Attorney General of the Bolivarian Republic of Venezuela, *Guidelines for the Renegotiation of the Chávez/Maduro Era Legacy Public External Debt* 1 (July 1, 2019) ("Guidelines"), attached as Ex. A to Declaration of Joseph E. Neuhaus (the "Neuhaus Decl."); *see also* Memorandum of Law in Support of Bolivarian Republic of Venezuela's Motion for Relief Under Federal Rule of Civil Procedure 60(b) at 2, *Crystallex Int'l Corp.* v. *Bolivarian Republic of Venezuela*, No. 17-mc-00151, ECF No. 184 (D. Del. June 17, 2020), ("[T]he Guaidó Government is committed to a process for global restructuring of Venezuela's debt obligations.").

and its efforts to restore democracy in Venezuela, including in its recent Statement of Interest (the "U.S. Statement of Interest") filed in the *Crystallex* matter proceeding before Chief Judge Stark in the District of Delaware.[5]  In the U.S. Statement of Interest, the government reiterated that "U.S. policy toward Venezuela is to support the full restoration of democracy," and that "[t]he United States has strong foreign policy and national security interests in supporting the interim government's efforts to reconstruct the Venezuelan economy following the departure of Maduro." U.S. Stmt. of Interest at 3.  To that end, the State Department recently proposed a "Democratic Transition Framework" to resolve the political crisis in Venezuela.[6]  The framework also lays out "a viable pathway for lifting Venezuela-related U.S. sanctions."  U.S. Stmt. of Interest at 3.  And, as the government explained, "U.S. government agencies are planning for exactly this."[7]

In light of those interests, and while reaffirming that it was "not suggesting that Venezuela should be permitted to avoid payment of its lawful obligations[,]" the government urged Judge Stark not to proceed with establishing procedures for a sale of shares of one of Venezuela's

---

[5] *See Crystallex Int'l Corp.* v. *Bolivarian Republic of Venezuela*, No. 17-mc-00151, ECF No. 212 (D. Del. July 16, 2020), attached as Neuhaus Decl. Ex. B.

[6] *See* U.S. Dep't of State, *Democratic Transition Framework for Venezuela* (Mar. 31, 2020), https://www.state.gov/democratic-transition-framework-for-venezuela/.  Rather than cite to this framework, Plaintiffs misconstrue an article authored by Special Representative for Venezuela Elliot Abrams as evidence that "the U.S. government does not even support the Republic taking power."  (Pls.' Opp. at 3 (citing Elliot Abrams, *A New Path to Venezuelan Democracy*, Wall. St. J. (Mar. 31, 2020).))  That is incorrect.  As Mr. Abrams explains in that article, the framework itself, which calls for free and fair elections in Venezuela, was first proposed by "the team representing Mr. Guaidó and the National Assembly" as a "path forward toward the restoration of democracy."  Abrams, *supra*, at 1. And, in any event, the Republic has not requested a stay until Mr. Guaidó gains control in Venezuela, but rather until restoration of democratic rule.

[7] U.S. Stmt. of Interest at 3 (citing U.S. Dep't of Commerce, Remarks by U.S. Commerce Sec. Wilbur L. Ross at the Venezuelan Infrastructure Breakfast in Brasilia, Brazil (Aug. 1, 2019)), https://www.commerce.gov/news/speeches/2019/08/remarks-us-commerce-secretary-wilbur-l-ross-venezuela-infrastructure).

state-owned entities even though the creditor, Crystallex, had obtained a writ of attachment on those shares. *Id.* at 13 (stating that "matters of equity militate against" proceeding at this time "given the delicate and evolving political situation in Venezuela, the U.S. foreign policy and national security interests that are implicated, and the related economic sanctions"). For these same reasons, this Court should stay the proceedings here.

As noted in the Republic's opening brief, the Court could additionally require the parties to report periodically with respect to whether the conditions supporting the stay remain. (Mem. at 18 n.35.) Alternatively, if the Court is inclined to impose a stay of a finite period, the Republic respectfully suggests 120 days. *See* Related Case Reply at 8.

## B. Equity Favors a Stay.

In weighing whether to exercise its discretion to stay a matter on its docket, a district court should "examine the particular facts before it and determine the extent to which . . . a stay would work a hardship, inequity, or injustice to a party, the public or the court." *Range* v. *480-486 Broadway, LLC*, 810 F.3d 108, 113 (2d Cir. 2015) (internal quotation marks and citation omitted). Each factor this Court typically considers weighs in favor of a stay here. *See Catskill Mountains Chapter of Trout Unlimited, Inc.* v. *EPA*, 630 F. Supp. 2d 295, 304 (S.D.N.Y. 2009) (describing factors).

### 1. A Stay Would Not Prejudice Plaintiffs.

Plaintiffs concede that neither they, nor any other creditor, will be able to enforce a judgment against the Republic without a special license from OFAC. Plaintiffs do not dispute that they have not even sought such a license. Instead, they claim they are prejudiced vis-á-vis other creditors because "creditors with judgments may still apply for specific licenses" and some "have already begun the application process." (Pls.' Opp. at 6.) But nothing prevents Plaintiffs from seeking a specific license from OFAC now. Indeed, if Plaintiffs wish to proceed to judgment

now, they can and should approach OFAC to request a specific license to do so. *See* Related Case

Reply at 2 (arguing that the Court should not enter a judgment for the Pharo Plaintiffs unless and

until they produce an OFAC license). A stay would neither impede Plaintiffs from seeking a

license, nor prevent them from moving to lift a stay should they receive one.

### 2. Allowing This Case To Proceed Would Cause Tremendous Harm to the Republic.

By contrast, allowing this case to proceed would cause irreparable harm to the

Republic and the people of Venezuela by inviting an avalanche of additional proceedings that will

significantly challenge an eventual restructuring. Plaintiffs do not dispute that allowing this case

to proceed will lead to an onslaught of other proceedings, but argue only that "[b]eing required to

defend litigation, by itself, is not the sort of clear hardship or inequity that justifies a stay." (Pls.'

Opp. at 7.) But the Republic is not seeking a stay merely to avoid litigation costs. Rather, the

Republic seeks a stay here to avoid a "run on the bank" by other creditors jostling for a leg up in

the restructuring and the resultant difficulty presented to any attempt to resolve competing claims

in various stages of judicial resolution. Just as national bankruptcy proceedings stay litigation

until an equitable arrangement of creditors can be worked out, the courts, the debtor and all

claimants are best served by a temporary pause in litigation to allow for a fair distribution of

available assets.

Plaintiffs argue that devoting the Republic's scarce resources on litigation rather

than humanitarian relief "will have no effect on the Republic's ability to address problems" in

Venezuela because "the Republic does not control Venezuela." (*Id.* at 8.) That is wrong, and

underestimates the ingenuity of the Interim Government. The Interim Government has, for

example, recently announced that, after "many weeks of effort," it has arranged to use blocked

funds of the Republic outside Venezuela to provide aid to health workers fighting the coronavirus

pandemic in Venezuela in partnership with the Pan American Health Organization ("PAHO") and the American Red Cross.[8]  The Republic is also currently working on a "Health Heroes" Plan, which would similarly provide funds to doctors, nurses, and other health workers employed by Venezuelan public hospitals.[9]

Plaintiffs are also wrong that only enforcement, and not entry, of judgment would spark a scramble for the Republic's assets.  Plaintiffs clearly see an advantage in obtaining a judgment, in particular because of their contention that the entry of judgment will nullify Venezuela's rights under the collective action clauses of the bonds.  (Pls.' Opp. at 22.)  There is little doubt that, if this and the Related Cases proceed to judgment, many more creditors will feel compelled to press their claims against the Republic, which will undoubtedly complicate an orderly restructuring.

### 3.   A Stay Would Preserve Valuable Judicial Resources.

Entry of judgment here would also waste valuable judicial resources by inviting ever more cases from creditors who, like Plaintiffs here, will seek to secure judgments they cannot in any event enforce.  It would hardly be efficient for this Court to "dispose of up to three cases on [its] docket" (Pls.' Opp. at 9), while inviting countless others.[10]  Such piecemeal litigation would

---

[8] *See* Centro de Communicación Nacional, *Guaidó: "I am ordering the transfer of recovered resources to PAHO and the Red Cross to fight COVID-19 and protect health personnel"* (July 15, 2020), https://presidenciave.com/presidency/guaido-i-am-ordering-the-transfer-of-recovered-resources-to-paho-and-the-red-cross-to-fight-covid-19-and-protect-health-personnel/.

[9] *See* Centro de Communicación Nacional, *President (E) of Venezuela Announces that This Week Begins the Registration for the Digital Wallet to Pay 'Héroes de la Salud'* (June 21, 2020), https://presidenciave.com/presidency/president-e-of-venezuela-announces-that-this-week-begins-the-registration-for-the-digital-wallet-to-pay-heroes-de-la-salud/.

[10] Plaintiffs blatantly mischaracterize the Republic's argument in asserting that entering judgment would not "require devotion of resources to discovery" because discovery in this case is already complete.  (Pls.' Opp. at 9.) The Republic expressly stated that "*each additional case*

7

be far less efficient than a comprehensive, consensual restructuring.

A stay would also allow the Court to ensure that it does not grant Plaintiffs relief that OFAC has forbidden them from obtaining. *See infra* at 15; Mem. at 18-24. Thus, at a minimum, the Court should stay this litigation unless or until Plaintiffs demonstrate that they have received a specific license from OFAC to proceed.

### 4.   A Stay Promotes Non-Party Humanitarian and Public Interests.

A stay would also further the interests of the United States, which has imposed sanctions with the express purpose of "preserv[ing] these assets for the people of Venezuela."[11]  In the face of the U.S. government's clear statements, Plaintiffs contend that a stay would conflict with the United States' generalized interest "in ensuring the . . . enforceability of foreign debts owed to United States lenders."  (Pls.' Opp. at 9 (citing *Pravin Banker Assocs., Ltd.* v. *Banco Popular Del Peru*, 109 F.3d 850, 855 (2d Cir. 1997)).)  But the Executive Branch has already resolved these competing interests and has determined that its national security and foreign policy interests are best served by *barring* actions that would affect the Republic's interests in blocked property and the enforcement of any judgments against the Republic.  *See* 31 C.F.R. § 591.407. As the government recently reiterated, the United States has "strong foreign policy and national security interests in supporting the interim government's efforts to reconstruct the Venezuelan economy following the departure of Maduro."  U.S. Stmt. of Interest at 3.

Importantly, entering a stay would not, as Plaintiffs suggest (Pls.' Opp. at 10),

---

will require devotion of resources to discovery and evaluation," not this one.  (Mem. at 11 (emphasis added).)  Plaintiffs offer no response to the argument the Republic actually made.

[11] Press Release, U.S. Dep't of Treasury, Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A. (Jan. 28, 2019), https://home.treasury.gov/news/pressreleases/sm594 ("Treasury Sanctions Venezuela's State-Owned Oil Company").

permit Venezuela to avoid its valid obligations.  The Republic has never sought to repudiate its valid debts, and certainly is not doing so by seeking a stay of this litigation.  Rather, the Republic seeks only the time necessary to move forward with a consensual restructuring that will make good on its debts while also creating a path to recovery and economic prosperity for its people.

**II.    A Stay Is Warranted Under Principles of International Comity and Necessity.**

As the Republic observed in the Related Case briefing, "the Republic faces an unparalleled humanitarian and economic crisis; a dictator who will not leave; and U.S. government sanctions to address what two Presidents from different parties have deemed 'an unusual and extraordinary threat to the national security and foreign policy of the United States.'"  (Related Case Reply at 12 (citing Exec. Order No. 13692, 80 Fed. Reg. 12,747 (Mar. 8, 2015) and Exec. Order No. 13884, 84 Fed. Reg. 38,843 (Aug. 7, 2019).)  Given these exceptional circumstances, a stay is also justified under principles of international comity and the customary international law doctrine of necessity.

**A.  Comity-Based Abstention Is Appropriate.**

Like the plaintiffs in the Related Cases, Plaintiffs here contend that comity cannot apply because the Republic has not yet begun its debt restructuring.  (Pls.' Opp. at 10-11.)  But Plaintiffs identify no authority outlining such a bright-line rule, relying instead on citations to inapposite cases that bear no resemblance to the question presented here.  For example, in *Sumitomo Corp.* v. *Parakopi Compania Maritima, S.A.*, a private defendant sought a stay or dismissal of a proceeding in the Southern District of New York "in deference to [a] pending litigation in Greece."  477 F. Supp. 737, 741 (S.D.N.Y. 1979).  But unlike here—where the democratically elected Venezuelan National Assembly has publicly committed to a debt restructuring, laid out the principles that will guide it in that process, and solicited proposals for a

reconciliation agent[12]—the Greek litigation had not proceeded beyond "the filing of a complaint." 477 F. Supp. at 742.   And in *Cruz* v. *United States*, the defendants sought *dismissal* of claims pending in the United States based on a pending investigation in Mexico, not a *temporary stay* such as the Republic seeks here.  387 F. Supp. 2d 1057, 1070 (N.D. Cal. 2005).[13]

Likewise, the mere fact that U.S. policy in general "favors enforcing debts owed by foreign debtors to U.S. lenders" (Pls.' Opp. at 12) is beside the point here, where, as discussed above, the U.S. government has affirmatively and unambiguously taken action to protect the Republic's interests in blocked property and  has repeatedly expressed its support for the Interim Government and its restructuring efforts.  *See, e.g.*, U.S. Stmt. of Interest at 3.

## B.  A Stay Is Justified Under the International Law Doctrine of Necessity.

The extraordinary challenges facing the Republic also justify a stay under the customary international law doctrine of necessity, which offers a state "flexibility in the application of international obligations" in light of the "necessity to protect national interests of a paramount importance" that "may justify setting aside or suspending an obligation."  *Cont. Cas. Co.* v. *Argentine Republic*, ICSID Case No. ARB/03/9, Award, ¶ 168 (Sept. 5, 2008).   That flexibility does not permanently extinguish liability, but rather allows a state to temporarily defer

---

[12] *See* Guidelines, Ex. A (setting forth principles for restructuring); Debtwire, *Venezuela Interim Government Distributes Preliminary RFP for Debt Reconciliation Agent* (Mar. 4, 2020), https://www.debtwire.com/intelligence/view/prime-2996157?searchTerm=venezuela.

[13] Likewise, in *In re Simon*, 153 F.3d 991 (9th Cir. 1998), a creditor argued that considerations of comity supported a modification of an injunction issued by the U.S. bankruptcy court to allow the creditor to pursue litigation in Hong Kong against the debtor.  The *Simon* court concluded that international comity did not require it to discharge an injunction that "[did] not apply to the Hong Kong courts at all."  *Id.* at 999.  That decision bears no relevance here, where a foreign sovereign that is recognized and supported by U.S. courts seeks a temporary stay in order to proceed with a restructuring for which the U.S. government has expressed unequivocal support.

its financial obligations.[14]

Plaintiffs raise three arguments against the applicability of the necessity doctrine, none of which is persuasive.  *First*, the Court does not lack authority to apply international law here.  (Pls.' Opp. at 13.)  Plaintiffs' own cited cases confirm what U.S. courts repeatedly have affirmed "[f]or two centuries," namely, that "the domestic law of the United States recognizes the law of nations."  *Sosa* v. *Alvarez-Machain*, 542 U.S. 692, 729-30 (2004); *Tarros S.p.A.* v. *United States*, 982 F. Supp. 2d 325, 338 n.12 (S.D.N.Y. 2013) ("Even after *Erie*, '[i]nternational law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination.'") (citing *Sosa*, 542 U.S. at 730).  And, while Congress certainly can "preclude the application of customary international law to a particular situation 'by treaties or statutes that occupy the field,'" *Oliva* v. *Dep't of Justice*, 433 F.3d 229, 234 (2d Cir. 2005) (citing *Sosa*, 542 U.S. at 731), it has not done so here.  To the contrary, the Supreme Court has recognized that a purpose of the FSIA was "codification of international law at the time of the FSIA's enactment," and therefore has "examined the relevant common law and international practice when interpreting the FSIA."  *Samantar* v. *Yousuf*, 560 U.S. 305, 320 (2010) (citing *Permanent Mission of India to United Nations* v. *City of New York*, 551 U.S. 193, 199 & 200-01 (2007)).  This Court should do

---

[14] *See State Responsibility*, 2001 Y.B. Int'l L. Comm'n 80, *available at* https://legal.un.org/ilc /publications/yearbooks/english/ilc_2001_v2_p2.pdf (noting that the necessity doctrine applies in "those exceptional cases where the only way a State can safeguard an essential interest . . . is, *for the time being*, not to perform some other international obligation" (emphasis added)); *see also* August Reinisch & Christina Binder, *Debts and State of Necessity*, in Making Sovereign Financing and Human Rights Work 115, 124 (Juan Pablo Bohoslavsky & Jernei Letnar Cernic eds., 2014); *available at* https://deicl.univie.ac.at/fileadmin/user_upload/i_deicl/VR/VR_ Personal/Reinisch/Publikationen/DebtsstateNecessity_Bohoslavsky_2014.pdf ("A state of necessity brings temporary relief in the form of a suspension of the wrongfulness of non-payment, but not cancellation or partial cancellation of the original obligation.").

the same.

In particular, the FSIA's objective of holding foreign sovereigns "liable in the same manner and to the same extent as a private individual under like circumstances" should be interpreted in light of international standards, and the temporary relief afforded by the doctrine of necessity is fully consistent with that objective. *Cf. United States* v. *Yousef*, 327 F.3d 56, 93 (2d Cir. 2003) (courts cannot disregard customary international law on the basis of "ambiguous or 'general'" statutory language). Affording the Republic a stay to pursue a debt restructuring would as a practical matter put the Republic on similar footing to private individuals who, unlike foreign sovereigns, can avail themselves of bankruptcy statutes and the automatic stays they provide. *See* 11 U.S.C. § 362. It is also fully consistent with the approach adopted by the Executive branch, which Plaintiffs concede prevents them from executing on any judgment. (Pls.' Opp. at 8 ("OFAC regulations bar judgment enforcement without a specific license.").) Under these circumstances, the Court can and should draw on international law in staying these proceedings.[15]

*Second*, Plaintiffs are wrong that the "'necessity' defense is not part of international law." (Pls.' Opp. at 15.) Its place in customary international law has long been recognized by the

---

[15] Plaintiffs incorrectly contend that, as a general matter, international law can be recognized in U.S. courts only if the party seeking to introduce it can demonstrate that the norm is "specific, universal, and obligatory." (Pls.' Opp. at 14 (citing *Sosa*, 542 U.S. at 732).) That standard has been applied only in the context of determining which causes of action are cognizable under the Alien Tort Statute, s*ee Sosa*, 542 U.S. at 732, but Plaintiffs cite no authority that it is a universal requirement for recognition of international law more generally. Rather, U.S. courts regularly pursue the recognized methods of determining international law, with no heightened standards of proof. *See, e.g.*, *Aquamar S.A.* v. *Del Monte Fresh Produce N.A.*, 179 F.3d 1279, 1295 (11th Cir. 1999) ("We look to a number of sources to ascertain principles of international law, including international conventions, international customs, treatises, and judicial decisions rendered in this and other countries."); *Presbyterian Church of Sudan* v. *Talisman Energy Inc.*, 244 F. Supp. 2d 289, 304-05 (S.D.N.Y. 2003) (listing "authoritative" sources).

International Court of Justice and other tribunals,[16] and it has been codified by the U.N. International Law Commission in its *Articles on State Responsibility*.  *See also* Reinisch & Binder, *supra* n.14, at 115-16 (necessity doctrine is a "state responsibility concept developed by international jurisprudence as a rule of customary international law").

  *Third*, as set out in the Related Case Briefing, the necessity doctrine can apply to a sovereign's obligations to other states and to private parties alike.  (*See* Related Cases Reply at 16.)  Plaintiffs' only authority stating otherwise – the German Federal Constitutional Court's divided decision in the *Argentine Necessity Case*,[17] – has been widely dismissed by scholars as "unpersuasive"[18] and made "in complete ignorance of long-standing practice for over three decades."[19]  *See* Reinisch & Binder, *supra* n.14, at 118 (describing decision as "widely criticized, not only by an outspoken dissenter on the Court itself, but also by many commentators.").[20]

---

[16] *See, e.g.,* Gabčíkovo-Nagymaros Project (Hungary/Slovakia), Judgment, 1997 I.C.J. Rep., 7, ¶ 51 ("the state of necessity" is "recognized by customary international law")*; Cont. Cas. Co*, ICSID Case No. ARB/03/9, Award at ¶ 168; *LG&E Energy Corp*. v. *Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, ¶ 246 (Oct. 3, 2006).

[17] BVerfG,  2 BvM 1-5/03, 1, 2/06, May 8, 2007, https://www.bundesverfassungsgericht.de/e/ms20070508_2bvm000103en.html.

[18] Beate Rudolf & Nina Hüfken, *Joined Case Nos. 2 Bvm 1-5/03 & 2 Bvm 1-2/06*, 101 Am. J. Int'l L. 857, 859–60, 862–64 (2007).

[19] Sabine Schlemmer-Schulte, *Fragmentation of International Law: The Case of International Finance & Investment Law Versus Human Rights Law*, 25 Pac. McGeorge Global Bus. & Dev. L.J. 409, 413 (2012).

[20] Plaintiffs' final two arguments, (Pls.' Opp. at 16-17), are also unpersuasive.  The "grave and imminent peril" facing the Republic is not entry of judgment in this and the Related Cases, but the extraordinary economic and humanitarian disaster gripping Venezuela.  And Plaintiffs are also incorrect that, "by selecting New York law, the Bonds and FAAs exclude the possibility of invoking defenses under . . . international law."  (Pls.' Opp. at 17.)  As explained in the Related Case briefing, because "international law . . . *is* federal law" it "supersedes inconsistent State law."  (Related Case Reply at 15 (alterations and emphasis in original).)

### C.  A Stay Is Justified Because the Republic Currently Is Unable to Access Resources Necessary To Perform or Settle Its Financial Obligations.

Plaintiffs do not dispute that the Republic lacks the resources it would need to perform or settle its debts at this time.  Instead, they emphasize that, as a matter of New York contract law, a party's inability to pay its debts does not excuse liability on the merits.  (Pls.' Opp. at 17.)  But that is beside the point.  The Republic is not seeking to be excused from liability; it is requesting a temporary stay of this litigation while it is unable to access the money that would be needed to settle its financial obligations and reach a consensual resolution with its external creditors.  Such a stay is amply justified here.

## III.    A Stay Is Warranted in Light of OFAC Sanctions.

As explained in the Republic's opening brief, Plaintiffs seek through a judgment here to alter the Republic's interest in the CACs and other contract provisions of the Bonds.  (Mem. at 23-24.)  OFAC sanctions bar any such judgment.  (*Id.*)  Accordingly, the Court can and should deny summary judgment on that basis alone.  Alternatively, the Court could avoid ruling on these difficult issues by staying the litigation until Plaintiffs come forward with a specific license authorizing them to obtain a judgment that alters Venezuela's interest in the Bonds.   That procedure would properly place these important questions of foreign policy and national security before the Executive Branch.  *Cf.* U.S. Stmt. of Interest at 9 (interpretive question concerning OFAC sanctions "implicate[d] significant U.S. foreign policy and national security interests that are rightly before the Executive Branch in the Crystallex license application").  Such a stay would not prejudice Plaintiffs, who could not enforce a judgment without an OFAC license in any event.

Nor would a stay be inconsistent with judgments entered in other cases against the Republic under sanctions currently in force.  Plaintiffs cite to two such decisions, *Tenaris S.A.* v. *Bolivarian Republic of Venezuela*, No. 18-cv-01371, ECF No. 29 (D.D.C. July 17, 2020), and

*Dresser-Rand Co.* v. *Petroleos de Venezuela, S.A.*, No. 19-civ-02689, ECF No. 78 (S.D.N.Y. May 29, 2020), and claim that, "under the Republic's theory," those judgments "would violate OFAC sanctions" merely because they are money judgments. (Pls.' Opp. at 18-19 & n.6.) That grossly mischaracterizes the Republic's position[21]:  the Republic certainly does not contend that any judgment awarding money damages to a creditor of the Republic violates OFAC sanctions. Rather, the judgment Plaintiffs seek here would, by their own theory, extinguish the Republic's interest in certain of the contract provisions of the Bonds, such as the CACs.  No similar circumstances were present in *Tenaris*, which was an action to confirm an arbitral award, nor *Dresser-Rand*, which involved a note rather than a bond and therefore did not contain any CACs or similar provisions. *See Tenaris*, 18-cv-01371, ECF No. 1 (June 8, 2018); *Dresser-Rand*, 19-cv-02689, ECF No. 1-1 (Mar. 26, 2019).[22]

## CONCLUSION

For the foregoing reasons, the Court should grant the Republic's motion for a stay and deny the Plaintiffs' motion for summary judgment.

---

[21] Plaintiffs further claim (incorrectly) that "[u]nder the Republic's theory, no creditor could ever sue without violating the collective-action clauses." (Pls.' Opp. at 22.) But the problem here is not the enforceability of the CACs, but rather OFAC sanctions that block the property at issue and bar Plaintiffs from seeking a self-executing judgment that alters the Republic's interests in that blocked property.

[22] Plaintiffs also urge the Court, if it declines to order a stay, not to establish fraud and error prevention mechanisms upon entry of judgment, but fail entirely to acknowledge that courts in this district have routinely included such a mechanism under similar circumstances. *See, e.g.*, Judgment, *Trinity Investments* v. *Republic of Argentina*, No. 15-cv-05886, ECF No. 88 (S.D.N.Y. July 7, 2020). Courts have ample power to protect the integrity of their own judgments. *See, e.g.*, *Karaha Bodas Co., L.L.C.* v. *Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 465 F. Supp. 2d 283, 295 (S.D.N.Y. 2006) (granting anti-suit injunction and noting that, "a court may freely protect the integrity of its judgments by preventing their evasion through vexatious or oppressive relitigation" (quoting *Laker Airways Ltd.* v. *Sabena Belgian World Airlines,* 731 F.2d 909, 928 (D.C. Cir.1984)).

Dated:  August 10, 2020

SULLIVAN & CROMWELL LLP

*/s/ Joseph E. Neuhaus*

Joseph E. Neuhaus
Sergio J. Galvis
James L. Bromley
125 Broad Street
New York, New York 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
neuhausj@sullcrom.com
galviss@sullcrom.com
bromleyj@sullcrom.com

Angela N. Ellis
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W. Suite 700
Washington, D.C.  20006-5215
Telephone:  202-956-7500
Facsimile:  202-293-6330
ellisan@sullcrom.com

*Attorneys for Defendant Bolivarian Republic of Venezuela*