# Exhibit A

1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -
   CRYSTALLEX INTERNATIONAL CORP.,
4                                        :   MISCELLANEOUS ACTION
              Plaintiff ,                :
5    v                                   :
                                         :
6    BOLIVARIAN REPUBLIC OF VENEZUELA,   :
                                         :   NO. 17-151-LPS
7             Defendant.
                               - - -
8
                         Wilmington, Delaware
9                     Thursday, September 17, 2020
                      *Telephonic Oral Argument*
10
                               - - -
11
   BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge
12
   APPEARANCES:                    - - -
13
                RICHARDS LAYTON & FINGER, P.A.
14              BY:  JEFFERY L. MOYER, ESQ., and
                     TYLER CRAIG, ESQ.
15
                     and
16
                GIBSON, DUNN & CRUTCHER, LLP
17              BY:  ROBERT L. WEIGEL, ESQ.
                     (New York, New York)
18
                     and
19
                GIBSON, DUNN & CRUTCHER, LLP
20              BY:  MIGUEL A. ESTRADA, ESQ.
                     (Washington, District of Columbia)
21
                        Counsel for Crystallex
22                      International Corp.

23

24
                             Brian P. Gaffigan
25                           Official Court Reporter

```
1    APPEARANCES:   (Continued)

2

3              ABRAMS & BAYLISS
              BY:  A. THOMPSON BAYLISS, ESQ.

4                    and

5              MUNGER TOLLES & OLSON, LLP
              BY:  DONALD B. VERRILLI, JR., ESQ.
6                  (Washington, District of Columbia)

7                      Counsel for Bolivarian Republic of
                      Venezuela
8

9              MORRIS NICHOLS ARSHT & TUNNELL, LLP
              BY:  KENNETH J. NACHBAR, ESQ.
10

11                   and

12             EIMER STAHL, LLP
              BY:  NATHAN P. EIMER, ESQ.

13                     Counsel for PDV Holdings, Inc.,
                      CITGO Holding, Inc., and CITGO
14                    Petroleum Corporation

15

16             ROSS ARONSTAM & MORITZ, LLP
              BY:  GARRETT MORITZ, ESQ.

17                   and

18             KOBRE & KIM, LLP
              BY:  MARCUS A. GREEN, ESQ.
19                 (New York, New York)

20                   and

21             WACHTEL LIPTON ROSEN & KATZ
              BY:  AMY R. WOLF, ESQ.
22                 (New York, New York)

23                     Counsel for ConocoPhillips Petrozuata B.V.,
                      Phillips Petroleum Company Venezuela
24                    Limited, ConocoPhillips Gulf of Paria
                      B.V., and ConocoPhillips Hamaca B.V.
25
```

1    APPEARANCES:   (Continued)

2

3                     UNITED STATES DEPARTMENT OF JUSTICE
                     BY:   JOSEPH J. DeMOTT, ESQ.
4                         Assistant Attorney General
                         (Washington, District of Columbia)
5
                                 Counsel on behalf of the United States
6

7

8

9

10

11

12

13

14

15

16

17

18                              - oOo -

19                     P R O C E E D I N G S

20              (REPORTER'S NOTE:   The following telephonic oral

21    argument was held remotely, beginning at 9:07 a.m.)

22              THE COURT:   Good morning, everybody.   This is

23    Judge Stark.   I hope you can hear me.

24              If so, then tell me who is there for Crystallex,

25    please.

1            MR. MOYER:  Good morning, Your Honor.  It's Jeff

2    Moyer of Richards Layton on behalf of Crystallex.  I have

3    with me this morning Tyler Craig from my firm and our

4    co-counsel, Miguel Estrada and Robert Weigel from Gibson

5    Dunn & Crutcher.

6            MR. ESTRADA:  Good morning, Your Honor.

7            THE COURT:  Good morning.  And by implication,

8    it seems you can hear me and I can hear you.  That's all

9    very good.

10           Who is there for the Republic of Venezuela,

11   please?

12           MR. BAYLISS:  Good morning, Your Honor.  Tom

13   Bayliss on behalf of the Bolivarian Republic of Venezuela.

14   It's my pleasure to introduce Don Verrilli of Munger, Tolles

15   & Olson, with Your Honor's permission will be making the

16   argument on behalf of the Republic.

17           THE COURT:  Good morning; and permission

18   granted.

19           MR. VERRILLI:  Good morning, Your Honor.

20           THE COURT:  Good morning.

21           Who is there for any of the PDVSA or related

22   moving parties?

23           MR. NACHBAR:  Good morning, Your Honor.  It's

24   Kenneth --

25           MR. HIRZEL:  Good morning, Your Honor.  Sam

1    Hirzel on behalf of PDVSA.

2              MR. NACHBAR:  And on behalf of PDV Holding,

3    Kenneth Nachbar and (inaudible) from Morris Nichols Arsht &

4    Tunnell.  With us on the line is Nate Eimer of Eimer Stahl.

5    With Your Honor's permission, Mr. Eimer who will be arguing

6    on behalf of PDV Holding.

7              THE COURT:  Sure.  Good morning to all of you,

8    and that permission is granted as well.

9              MR. EIMER:  Thank you, Your Honor.  Good

10   morning.

11             THE COURT:  Thank you.  Good morning.

12             And is the United States on the call?

13             MR. DeMOTT:  Yes.  Good morning, Your Honor.

14   This is Joseph DeMott from the U.S. Department of Justice

15   representing the United States.

16             THE COURT:  Okay.  Good morning to you.

17             Anybody else that wants to note an appearance on

18   this proceeding?

19             MR. MORITZ:  Good morning, Your Honor.  This is

20   Garrett Moritz from Ross Aronstam on behalf of

21   ConocoPhillips.  I'm joined on the line by Marcus Green of

22   Kobre & Kim, and Amy Wolf of Wachtel, Lipton, Rosen & Katz.

23             And as noted at the last hearing in this matter,

24   with the Court's permission, Mr. Green is available to

25   address ConocoPhillips' interest in the matter in the

1  Court's discretion on how to run the sale, and Ms. Wolf will

2  be available to address ConocoPhillips' specific

3  recommendations for running the sale.

4          Thank you, Your Honor.

5          THE COURT:  Okay.  Good morning to all of you.

6  And I do expect we will get to that today in that

7  ConocoPhillips will have a chance to be heard.

8          Anybody else here that wants to note an

9  appearance?

10          (Pause.)

11          THE COURT:  Okay.  Well, thank you all for that,

12  and thank you for arranging for what I think will be a

13  technological solution to some of the issues we ran into in

14  July when we were last together for argument.

15          Let me note for the court reporter's benefit and

16  the record that this is our case of Crystallex International

17  Corporation versus Bolivarian Republic of Venezuela.  It is

18  our Miscellaneous Action 17-151-LPS, and here is how I

19  intend to use our time together this morning.

20          Given that we did order and receive supplemental

21  briefing after the July discussion, which does relate, at

22  least in part, to the motions that were argued in July, the

23  motion under Rule 60, as well as the motion to quash, I want

24  to begin by giving all of you a chance to touch briefly on

25  those motions' specific issues, and I'll have some questions

1    for you.

2              We'll hear from Crystallex first, then the

3    Republic of Venezuela, then the PDVSA and related moving

4    parties.   Then I'll give the United States a chance to be

5    heard if they wish, and then a brief chance for all of you

6    to have rebuttal.

7              After that, and I promise it will happen, we

8    will move on and focus on the sale procedures on the

9    assumption that I may get to that issue in my decision tree.

10   Though I do want to hear argument and the parties' thoughts

11   on that, on that one I intend to follow basically the same

12   order.   I'll hear from Crystallex, and then the Republic,

13   and any of the PDVSA related parties, then ConocoPhillips

14   will have a chance to be heard and the United States if they

15   wish, and time permitting, you all will get a chance to

16   speak again.

17             Could I ask that you put me on mute, whoever is

18   making the noise there?

19             Thank you.

20             And when we get to the sales procedures, what I

21   envision is when I call on you, it's fair game to talk about

22   all of the sales procedures that have been proposed or

23   opposed by anybody.   You are not limited just to talk about

24   only what you have proposed as the case may be.

25             Again, just technical matters, if when you are

 1    not speaking you can keep us on mute throughout, that will

 2    be helpful.

 3              Please identify yourself when you begin

 4    speaking.

 5              And I do remind everyone on the call that, of

 6    course, this is a federal court proceeding, and it is

 7    strictly prohibited to record any portion of the proceeding

 8    and also strictly prohibited to broadcast any portion of

 9    this proceeding.

10              So with that, let me turn the floor over

11    initially to Crystallex, principally to talk about the

12    accused relating to the pending motions of Venezuela and the

13    PDVSA and related parties.

14              Go ahead, whoever is going to cover that.

15              MR. ESTRADA:  Good morning, Your Honor.  Can you

16    hear me?

17              THE COURT:  I can hear you and good morning,

18    Mr. Estrada.

19              MR. ESTRADA:  Okay.  Thank you.  I was going

20    to identify myself.  You know, the technology is not my

21    forte.  It's a good thing I found something else to do for

22    a living.

23              This is Miguel Estrada is from Gibson Dunn.  And

24    just let me sort of deal quickly with the issues that have

25    occurred after our last hearing.

1          We had briefing ostensibly on the issues raised

2     by the government's statement of interest.  I would just

3     sort of make a number of brief points, and I am happy to

4     answer any other questions that remain after our last

5     hearing on all of the issues that were outstanding then.

6          Just to give you a little bit of a roadmap

7     about how Mr. Weigel, my partner and I intend to deal with

8     the issues that you may have today.  I intend to address the

9     issues that were discussed last time, the motion to quash

10    and the government's arguments.

11         And Mr. Weigel will deal with the issues that

12    were intended I think mainly for this hearing having to do

13    with the procedures for the potential sale.

14         If there are any issues that come up with

15    respect to sanctions, I probably will take those as well.

16         And so I hope that that is helpful for the

17    Court, and we do apologize for foisting two lawyers on you.

18         I will sort of quickly, with respect to the

19    government's statement of interest, as I think is clear

20    from our last submission, just to hear a little bit of the

21    underbrush, didn't address at all the motion to quash that

22    had been filed; and they purported to express no interest

23    in it other than to note it has been filed and that it may

24    render mute anything else which, of course, is true, but not

25    particularly informative in the interest the government

1   might have.

2            They do not make any statement with respect to

3   the scope, the meaning, or interpretation, or anything that

4   supports any of the contentions that the Republic or PDVSA

5   has made with respect to sanctions.

6            And with respect to the questions that have been

7   raised on the legal issues, on the Rule 60(b), the post --

8   postjudgment motion, it does seem to us that our reading of

9   their post-hearing brief is that they are not, as they say,

10  taking any actual firm position; they're expressing a policy

11  view of the United States.  And so they're not actually

12  embracing any of the actual legal arguments about the

13  meaning of Rule 60(b)(5) or Rule 60(b)(6).

14           For the reasons I think we have addressed in our

15  briefing and in the argument last time, we don't actually

16  think that either of these rules supports the arguments the

17  Republic is making.

18           (b)(5) for the short form reason that this is a

19  final legal judgment rather than an equitable judgment that

20  is subject to prospective effect.

21           And I think the Third Circuit cases are

22  unanimously of the view that the rule's intended for the

23  prospective effect of equity courts rather than for the

24  alternation of final legal judgments.  And I can go through

25  the cases if that would be useful.  I think we've covered

1    them.

2             For (b)(6), again, you know, the catch-all is

3    any other reason that justifies a relief.  But the case law,

4    again, in the Third Circuit, *Budget Blinds*, *Coltec* and all

5    those cases, are very clear that the rule requires truly

6    extraordinary circumstances and a demonstration of extreme

7    unexpected hardship.  But that is almost never existing when

8    the purported hardship results from the moving party's own

9    voluntary choices.

10             And nothing could be more voluntary that the

11    course of expropriation and litigation choices that have led

12    the Republic to the point where it currently is today.

13             And so I just don't think that even if either of

14    these rules were available to the Republic as an equitable

15    matter, that is to say, to a litigant just simply refuses

16    to pay a lawfully final judgment, either of them would be

17    available by its terms, but in terms of the government's

18    position, I don't read any of what the government has said

19    as addressing the tribunal requirements of either rule or

20    lending support to the Venezuela's arguments under any case

21    from the Third Circuit, or of any other circuit under the

22    meaning of either rule.

23             It is simply a statement of the policy of the

24    United States to support the Guaidó regime.

25             With respect to the latter, as I think we have

1    made clear in both our letters, we appreciate that the

2    administration has a policy of supporting Mr. Guaidó.  I

3    think Congress has made it clear decades ago that questions

4    of immunity, especially with respect to judgments are

5    already final, are not to be made on an ad hoc basis.

6          All of the questions of immunity that were

7    relevant in this case have long been adjudicated and are not

8    perpetually to be reopened whenever the executive comes into

9    court to say that he would like to have a different outcome.

10   It is, after all, a final, legal judgment.

11         But in any event, even if the case were a new

12   filed -- a newly filed case -- a newly filed case, excuse

13   me, the established understanding of the FSIA is that we

14   don't do this on an ad hoc basis any more.  And there is a

15   number of cases from that, and I think in *Altman* and a

16   number of other cases, the Supreme Court has told the

17   executive that these arguments are to be made to Congress,

18   not to it.

19         I think that, you know, in the main what we have

20   to say about the state in the briefing about that, I should

21   add sort of a larger, more in terms of the policy, you know,

22   we do have a policy of an independent judiciary in this

23   country, and my client has spent a decade seeking justice

24   for what an independent arbitrable panel in the courts of

25   our country have determined was a horrible injustice done to

1    it.

2              We're not a banana republic.  We don't get to

3    have the executive come into independent courts to say that

4    it doesn't like the outcome of our judgments and it would

5    not like them to be enforced.  And it may be that there

6    may be a corporate avenues in the context of licenses and

7    whatnot, which, you know, remain to be seen and tested, but,

8    you know, courts do not take dictation, they do not sort of

9    follow the policy of the executor, and judgments are

10   judgments and they usually follow their own courses.

11             And when the policy is actually irrelevant to

12   a legal question, I do not dispute that the views of the

13   executive warrant the respectful hearing.  But there has

14   not been a demonstration that there is any policy that is

15   relevant to any legal question that remains in this case.

16             And for that reason, we do not think that the

17   intervention of the government in this case throws any light

18   that is helpful.

19             And I think that is what I have to say for the

20   time being.  I am, of course, happy to answer any questions

21   that the Court may have.

22             THE COURT:  Okay.  I do.  Thank you very much.

23             In the government's statement of interest and

24   follow-up post-hearing brief, they make reference, at least

25   at times, not just to foreign policy but to national

security interests.  And at times, they suggest that what

is happening in this case may or could or will imperil or

implicate U.S. national security interests.

           And I know we talked last time about the

government filed statements of interest in all sorts of

cases, and we have looked at some of those, but to the

extent I can find in what the government is telling me here

a sense of "Watch out, Court, what you do may imperil the

United States national security," if that is, in fact, what

they're saying, regardless of whether that relates to, you

know, a legal issue in front of me, just that sort of

warning, is that something that you think I should find or

would find in any of the other statements of interest that

have been presented to me?

           And regardless of that, don't I have an

obligation to think carefully about what the government is

perhaps warning me about the implications of what I do

here?

           MR. ESTRADA:  Well, I think we all have an

obligation to take our national security seriously as

interest, but we also have an obligation to take skeptically

what the government says.

           And I think, again, when a question is relevant

to a case, is perfectly appropriate to take all available

evidence, if necessary, under our corporate terms of

1    secrecy.

2         "National security" is a term that is very

3    easily used to cover all sorts of things.  You know, the

4    government actually sort of made no specific claim with

5    respect to how the national security of our country could be

6    affected by whether or not this company is sold, or they

7    have said that specific that they would like to support the

8    public image of what we say with a little bit of irony.

9    It's basically a Potemkin foreign leader.

10        And it may be that our national interest in the

11   term -- in the sense of having some of our prestige involved

12   in backing somebody who ends up losing is involved, I think

13   that is -- that is less, you know -- that is a national

14   interest but not a question of national security.

15        In cases in which national security is at issue,

16   as I'm sure Your Honor is aware, there are established

17   mechanisms, or two questions of national security to be

18   placed before our courts.

19        There are doctrines of state secrets, there

20   are doctrines that allow the government to actually put its

21   money where its mouth is and to make a presentation to a

22   court that allows a court independently and in camera to

23   actually see what the government is saying.  And to make an

24   independent judgment that this is, in fact, something that

25   warrants, you know, the type of deference that the

1    government is claiming, if the deference is even relevant to

2    the issue in the case.

3                  I mean, these issues tend to come up say, for

4    example, when the government watches the Court trying to

5    prevent, you know, the publication of a manuscript.  You

6    know, we had a fight over this when Mr. Bolton recently

7    tried to publish his book, and there were claims that there

8    were excerpts of classified information and whatnot that

9    could damage our national security.

10                 Now, a claim like that, I suppose on the

11   surface, I think is a little bit more plausible than a

12   general allegation in a letter by a line attorney in the

13   Department of Justice saying that our national security is

14   implicated by the sale of an oil company of a deadbeat

15   debtor.

16                 But on the surface of things, having a final

17   judgment in hand that is subject of the ordinary enforcement

18   of the courts, a bare-naked claim that this might implicate

19   national security is something that seems to us to be viewed

20   with skepticism and to be given no more weight in the

21   absence of some specific demonstration in accordance to the

22   usual court processes that govern these things.

23                 And with an actual demonstration that the claim

24   of national security is actually germane to the issues in

25   the case.

1          THE COURT:  Okay.  In your most recent brief

2     filed in the month of September, I think it was at page 4,

3     you wrote, and I think this is a quote, "The government

4     refuses to reaffirm President Trump's continuing support for

5     Guaidó."  That is the end of the quote.

6          What do you mean by that?  Is that just a

7     summary of the newspaper articles that you have cited to

8     me, or do you have some other basis to say the government

9     is refusing to reaffirm what the president has said?

10          MR. ESTRADA:  No, I'm just pointing out that

11    the president is the -- is the head of the executive branch,

12    you know.  Even the attorney general just made a speech

13    yesterday saying that he has lots of line attorneys claiming

14    to know better than he.  And, you know, if you have a line

15    attorney of the Department of Justice making representations

16    about what the interest of the executive branch are, I will

17    go to the horse's mouth and look at what the executive is

18    saying.

19          And, you know, I will just -- you know, I have

20    nothing other -- I meant nothing other than to say that

21    there is a little bit of divergence beginning with the

22    government disclaiming in court and what the party that

23    they actually represent, that is to say, the executive is

24    actually saying in public.

25          And that, therefore, there is some basis for

1    skepticism about the strength of what they're saying,

2    including, you know, the national interest and the

3    likelihood that the policy that they claim to be backing

4    will be one of long duration.

5            I mean, you know, in the end it doesn't really

6    matter because whether we have a change in administration or

7    whether this administration changes its own view, none of

8    these issues of, you know, a policy to buff up the image of

9    somebody who would like to become a foreign leader are truly

10   pertinent to our independent courts.

11           But my purpose in saying that was a little bit

12   of hypothetically, "Okay, I will play."  You're not actually

13   right even on your own terms because you are representing

14   the executive branch, the head of which doesn't seem to be

15   singing from your own missive.

16           THE COURT:  Okay.  Another issue, and I know

17   we've talked about it a little bit before, but I would like

18   to make sure I fully understand Crystallex's position is,

19   you know, as of today with the motions in front of me, what

20   is the pertinent date that I look to for the alter ego

21   analysis?

22           And as I read your papers, you've set out a

23   number of different possibilities:  Perhaps the date that

24   Crystallex's property was expropriated; perhaps the date

25   that your judgment was registered in court; perhaps the

1   date --

2                   MR. ESTRADA:  Ah --

3                   THE COURT:  Are you there, Mr. Estrada?

4                   MR. ESTRADA:  Yes, I am.  Can you hear me?  Or

5   are we having issues?

6                   THE COURT:  No, no.  I can hear you.  I didn't

7   know if you were interrupting or not or if you had an

8   issue.

9                   MR. ESTRADA:  No, no, no.  No, no, no.  God

10  forbid.

11                  THE COURT:  I was just listing some of the

12  different options for what the pertinent date might be

13  because I want to make sure I understand your position.

14                  But you probably know the list.  So anyway what

15  I'm interested in --

16                  MR. ESTRADA:  Yes.

17                  THE COURT:  -- what is the pertinent date?

18                  MR. ESTRADA:  It seems to me that the two

19  pertinent dates -- and let me see if I can understand

20  whether these two are the date that we filed our motion and

21  the day that you rule for us.

22                  And the reason I say this is, is as follows:

23                  We had a judgment against a judgment debtor

24  that is the Republic of Venezuela.  We came into your

25  court asserting that in your District, there was property

1    belonging to Venezuela.  And that assertion had to be

2    proven.  We filed the motion.  And that assertion had to be

3    due when you granted the motion.

4              And as a result of that, it seems to me that

5    those are the relevant dates because this was a collection

6    action in which our right to be in your court and our right

7    to try to block the property, depending on the truthfulness

8    of the assertion that at the time we came to your court and

9    at the time you restrained the property, the property

10   belonged to the debtor.

11             And it seems to me that after we established

12   that on the date of our motion and after it was still true

13   on the date you granted the motion, what may have occurred

14   afterwards, given that the point of the attachment was to

15   restrain the property so that it will not be affected by

16   later events and to keep it safe for the benefit of the

17   creditor, is somewhat relevant.

18             And, you know, once the property was attached

19   and held for the benefit of the creditor, who successfully

20   established that it belonged to the debtor, the debtor could

21   not more change the legal status of the property by changing

22   his own conduct than it could by purporting to sell it to

23   Sweden.

24             And so it seems to me that the facts with

25   respect to the expropriation and all of those things were

1    relevant to your finding historically as to whether PDVSA

2    was the alter-ego of Venezuela.  But the ultimately

3    historical fact that I needed -- that we needed to establish

4    was that taken into consideration that entire history, the

5    full sweep of it, on the day we filed our motion and on the

6    day you granted it, PDVSA and Venezuela were one and the

7    same such that in seeking to collect on the judgment against

8    Venezuela, I could seize this property.

9                 THE COURT:  All right.  Thank you for that.

10                Another -- well, so Venezuela does respond to

11   that argument by saying that the cases you rely on for

12   that being the pertinent date or dates are ones that we're

13   relying on the alter-ego doctrine to impose liability,

14   not, instead, to attach property; and you all have been

15   insistent that we're in the latter category here and not

16   the former.

17                What is your response to that distinction they

18   purport to find in the cases?

19                MR. ESTRADA:  I think, you know, the distinction

20   is one that we found in the cases to fight off their claims

21   that we needed to file a separate alter-ego lawsuit.  I

22   don't understand what the relevance is of that distinction.

23   You know, the distinction was relevant simply, excuse me,

24   for the proposition of whether we had to file a separate

25   lawsuit.

1          But at the -- you know, the only thing that --

2    the only thing the distinction gets you is whether in

3    establishing the alter-ego for purposes of collecting on

4    this particular property, we were establishing alter-ego

5    for purposes of this property only or establishing the

6    liability of PDVSA.

7          And where we have said from the beginning,

8    contrary to their argument, is that we were not seeking to

9    establish that PDVSA was an alter-ego for all purposes,

10   which would make us entitled to go after their assets in

11   Sweden or in Venezuela or in the Netherlands, and so the

12   distinction is one that we live with and really has nothing

13   to do with the argument that they're making now.

14          I don't even understand how they think they can

15   turn this against us.

16          Our distinction was we are making, you know,

17   the distinction between these two types of alter-egos to

18   show we're engaging in limiting -- excuse me, in a limited

19   use of it for collection purposes and not imposing a

20   liability on PDVSA for the judgment.  That is -- that has

21   nothing strictly to do logically which was -- with what date

22   you pick for anything.

23          We picked the -- you know, we had to establish

24   that this was property of Venezuela when we came into your

25   court; otherwise, the motion that we filed would not be well

1     founded.  And if the property had been sold in the interim,

2     I think you could not have -- you could not have properly

3     granted our motion because it was no longer property of the

4     debtor.

5              And so it seems to me those are the only two

6     dates, and whether our theory of alter-ego was limited or

7     more extensive seems to me has no relevant on which date you

8     pick.

9              THE COURT:  All right.  And then it seems that

10    the Republic is now maybe making a further distinction not

11    just about what the pertinent date is but also perhaps the

12    pertinent geographic location.  I think they're suggesting

13    now that maybe you proved at a certain point that PDVSA was

14    the alter-ego of Venezuela; maybe in Venezuela, but not

15    necessarily in the United States.  And that the alter-ego

16    determination could come out differently at different

17    physical spaces.

18             Do you understand them to be making that

19    argument?  Do they cite any authority for it?  And what is

20    your response to it?

21             MR. ESTRADA:  I don't -- well, I mean, I

22    understand them to be making any "Hail Mary" argument that

23    will -- that they think will make them.

24             I think the version of the argument to which

25    you are alluding, Your Honor, if I am not mistaken, is that

1    since Mr. Guaidó came into office, wearing the white hat, he

2    has established what he claims to be independent governance

3    with respect to the companies that are in the United States

4    and that that is relevant somehow.

5          I don't think that that can be dissociated from

6    the temporal argument in the sense that his coming into

7    office happened after the relevant events.  And so the fact

8    that he has been able to get approval in the United States,

9    which he claims is now clean as a whistle, which as we

10   pointed out in our footnote is actually not a fact in

11   evidence, it's something that has been asserted and which

12   the government in its own unique way says has no reason

13   to doubt, has no relevance because it still is not the

14   relevant date.  It is a change of conduct that postdated

15   the judgment.

16         But at the time that this was all litigated, the

17   company was not segmented, there were not multiple people

18   claiming to be the President of Venezuela, and so this is a

19   distinction that has been manufactured by the intercession

20   of later events, has no legal significance on its own.

21         And I don't think it's separable from the

22   temporal distinction in the fact it is a claim that they can

23   make by dent of the fact that they came in later and tried

24   to put things in order, they say, again, by assertion, in a

25   small part of this company that they control.

| | |
|---|---|
| 1 | THE COURT:  Okay.  Thank you very much.  We'll |
| 2 | turn it over now to the Republic. |
| 3 | MR. VERRILLI:  Good morning, Your Honor.  This |
| 4 | is Don Verrilli; and thank you for giving us time this |
| 5 | morning to address these issues again. |
| 6 | I'd like to make a few affirmative points here |
| 7 | based on what the United States has said and what we heard |
| 8 | from Mr. Estrada this morning.  And I will try to address |
| 9 | from our perspective some of Your Honor's questions and |
| 10 | then, of course, answering any questions Your Honor might |
| 11 | have. |
| 12 | First, my friend Mr. Estrada has, in the papers |
| 13 | and this morning, cast aspersion quite liberally on the |
| 14 | status of the Guaidó government on the legitimacy of the |
| 15 | actions that the Guaidó government has taken, and on the |
| 16 | relationship between the Guaidó government and the United |
| 17 | States. |
| 18 | What I would say about that, though, is that |
| 19 | they haven't introduced any evidence to support anything |
| 20 | that they have said. |
| 21 | We, on the other hand, have submitted |
| 22 | declarations that support unequivocally the legal |
| 23 | positions that we're arguing with respect to the status |
| 24 | of the Guaidó government and the steps that the Guaidó |
| 25 | government has taken to ensure that the separateness, |

1  corporate separateness, has been appropriately

2  reestablished.

3          So that is the record before the Court, and

4  whatever aspersions Mr. Estrada and his client want to

5  cast on the Guaidó government, they haven't introduced any

6  evidence at all.

7          Now, the United States can speak for itself,

8  but what the United States has done, it seems to me, is to

9  verify the two key points on which our claim of

10  extraordinary circumstances under Rule 60(b) rests.

11         First, the recognition by the United States

12  that the Guaidó government is a legitimate government of

13  Venezuela.  And, again, whatever aspersions my friend on the

14  other side wants to cast on that, that is an official act

15  of the United States government.  And that is an act that

16  is binding on the federal courts.  That when the executive

17  recognizes a foreign sovereign, that is binding; and that

18  we have cited numerous Supreme Court authority for that

19  proposition in our papers.

20         And second, with respect to the establishment of

21  corporate separateness, again, we have -- these aren't just

22  general good intentions, these are laws enacted by the

23  General Assembly of Venezuela and implemented in fact on the

24  ground in the United States with concrete steps which have

25  all been documented in our declarations.

1          So that's the record before the Court.

2          Now, what the United States has said is that

3    it agrees with us with respect to both of those changed

4    circumstances.  And when the United States says it has no

5    reason to doubt what the submissions of the Republic of

6    Venezuela with respect to these changed circumstances

7    insofar as the status of PDVSA is concerned and corporate

8    separateness, the United States is not some uninformed

9    bystander.  The United States has a very elaborate and

10   well-established foreign policy establishment that acts on

11   the basis of fact and gathers fact, and they would not make

12   an uninformed submission to the Court on a matter of such

13   consequence.

14          So I think the idea that it can be disparaged in

15   the way that my friend on the other side has suggested it

16   can is just wrong.

17          Now, with respect to the question before the

18   Court under Rule 60(b), what I would say is this:  And,

19   again, my friend on the other side has tried to characterize

20   the position of the United States as simply a claim that

21   there are overriding foreign policy interests here that

22   dictate the result under Rule 60(b), and then he argues

23   that, well, but the whole point of enacting the FSIA was to

24   substitute law prescribed by Congress and enforced by the

25   courts for that kind of free-wheeling analysis.

1          We don't disagree with that, but the issue

2     before the Court here is whether there is an exception to

3     the statutory immunity of the FSIA for a foreign sovereign

4     and foreign instrumentality that would justify the Court's

5     exercise of jurisdiction.  That's a legal question.  That's

6     the legal question we're addressing in our 60(b) motion.

7          And with respect to that legal question, the

8     question before the Court is whether the combination of the

9     invocation of the enforcement of arbitrable award exception

10    and the application of *Bancec* in a manner as this Court

11    described it previously to -- in the nature of a garnishment

12    to attach the property, whether the changed circumstances

13    that we have identified bear on that judgment in such a

14    matter that it requires it to be revisited or that it ought

15    to be revisited.

16          So I think it's just quite wrong to suggest that

17    what is going on here is that the United States, with

18    respect to the question of the analysis, 60(b) analysis

19    before the Court, is asking you to substitute a generalized

20    policy judgment for a legal analysis, this is a question of

21    law.  This is a question of whether this exemption to

22    immunity continues to provide a basis for a jurisdiction.

23          And that does come down, as Your Honor indicated

24    in his questions, to whether -- using the phrase that we

25    used in our last hearing -- whether the circumstances are

1      frozen in amber, either at the time that Crystallex filed

2      its suit or the time that this Court issued its ruling.

3                   And Crystallex has made a very strong argument

4      that they -- strongly put argument, at least, that it has to

5      be frozen in amber, but I think the very paragraphs in the

6      Third Circuit opinion to which they pointed in their papers

7      say the opposite.  You know, the paragraph -- this is at

8      page 144, the Court's opinion that we discussed at length

9      last time -- you know, it says the Court is going to follow

10     standard practice of not considering anything that isn't in

11     the record.  But then says, on remand, Venezuela may direct

12     the District Court to credible arguments to expand the

13     record with later events.

14                   Well, if later events were categorically

15     irrelevant as a matter of law, which is the position my

16     friend is taking before this Court, then there would have

17     been no reason for the Third Circuit to include that

18     language.  It seems to me, well, that language isn't

19     dispositive of the issue before this Court by any means,

20     and we don't intend to suggest that it is, it does seem to

21     me to be quite inconsistent with the position my friend is

22     taking with respect to the nature of the property and the

23     relevant date.

24                   And with respect to that, I would point out

25     that -- with respect to his answer to Your Honor's question

1    as to what the relevant date is, in terms of the status of

2    the property, I think it can't possibly be right that the

3    property -- because this Court found on the basis of the

4    alter-ego principles that a garnishment was appropriate at

5    the time, that that property is for all time and for all

6    purposes to be considered as the property of Venezuela no

7    matter what intervening events occur.

8              Because if that were the case, that would mean

9    that with respect to anything that comes before this Court

10   now or in the future, there would be no basis to consider

11   the fact that there is a different government in place, that

12   there is corporate separateness, that it is being respected,

13   as I said all of which is clearly, clearly established in

14   the record, and that just can't possibly be right.

15             Now, with respect to the national security

16   issue that Your Honor raised, I think the key point there

17   is that -- and this will bleed over a little bit into the

18   sales process argument, and if Your Honor wants to keep it

19   more tightly confined, please tell me.

20             But I think the one thing that the United States

21   has said is that the fact of establishing a sales process

22   now when there is no need to do so, because there is no

23   license to justify a sale, would have both these foreign

24   relations and national security implications, and the United

25   States has explained why.

1                   And you can describe it if you want that the

2      statement of a line attorney at the Department of Justice,

3      but as Mr. Estrada knows from his long service in the

4      government and as I know from mine, that is not at all how

5      something like this occurs.  A statement of interest like

6      this is vetted thoroughly and at the highest level and

7      represents the considered judgment of the United States

8      as I'm sure the United States will explain to you.

9                   When the United States tell you that the step

10     like establishing a sales process could have national

11     security implications, that really needs to be taken

12     seriously.  And, of course, it is self-evident why it should

13     be taken seriously.

14                  They have provided a very cogent explanation

15     as to what kind of problems could ensue; that it could

16     grievously damage the credibility of the current government

17     in the eyes of the people of Venezuela, which could -- could

18     set back the progress that the United States is trying to

19     achieve along with the Guaidó government considerably.

20                  That is a self-evidently serious, serious issue.

21     And frankly, if this Court were ever to use language

22     anywhere near what my friend Mr. Estrada suggested, that the

23     Guaidó government is a Potemkin leadership, that Venezuela

24     should be considered a deadbeat, imagine the foreign policy

25     and national security effects such statements would have.

1          And I realize he is engaging in vigorous

2    advocacy here, but it does point up, it seems to me, the

3    cavalier nature in which my friend on the other side is

4    treating what are very serious and grave issues.

5          So just to sum up, the record is clear.  The

6    United States, we think, provides strong support for what

7    we have said about changed circumstances.  We are making a

8    legal argument.  The United States is not suggesting this

9    Court make a free-wheeling policy judgment.  We believe the

10    legal argument needs to be made on the basis of present

11    circumstances, which are if anything, they're extraordinary

12    circumstances, it seems to me these are, and the fact

13    that we have had such extraordinary hearings with such

14    weighty issues being debated tells you that this is a

15    unique case.

16          And then with respect -- and I won't belabor

17    the point on the sales process because I know that that is

18    going to be the subject of later discussion, but it seems

19    quite clear to me that the national security interest of the

20    United States, when they tell you they're implicated by a

21    step of setting up a sales process now, I would think that

22    that really needs to be taken seriously.

23          And I'm happy to answer any questions Your Honor

24    has.

25          THE COURT:  Yes, I do have some.  Thank you.

1              So one thing that Crystallex wrote, this is in

2       their August 14th brief at page 12, and the argument has

3       been alluded to today, but one of the quotes here is

4       "Circumstances in Venezuela remain fluid, and the executive

5       policy views could change at any minute," by which they mean

6       the United States executive policy views could change at any

7       minute.

8              Aren't they correct that things could change in

9       Venezuela and could change here in the U.S.?  And if those

10      are realities, how do I account for that possibility in

11      making a decision now?

12              MR. VERRILLI:  So with respect to the

13      possibility of change, I think no one can -- no one can

14      conclusively eliminate the possibility of change.  But in

15      terms of those realities, I think the -- assuming that we

16      are correct, that this analysis isn't frozen in amber, that

17      the United States Government has taken a weighty step by

18      recognizing the Guaidó government.

19              And, again, as my friend cast aspersions on

20      that, but that was an official act of the United States

21      Government, and it has very significant legal consequences.

22      It was a step -- a legal step taken by the United States,

23      and the fact that that circumstances might change in the

24      future in a way that would lead to a different legal step by

25      the United States seems to me not something that would be

1    appropriate for the Court to consider because the United

2    States has made a judgment to recognize the Guaidó

3    government, and it was considered judgment that I assume,

4    and I'm sure the United States will address this, takes into

5    account all of the factors that my friend, Mr. Estrada,

6    identified and that Your Honor's question has identified.

7              So I think with respect to that, the possibility

8    for changed circumstances, I don't think that that can

9    properly bear on the analysis given the steps that the

10   United States has taken.

11             THE COURT:  All right.  So in terms of the

12   pertinent date, what is the best articulation of the

13   Republic's view?  Is it today?  Is it the day I get my

14   decision done in this case?  Is it -- and I guess relatedly,

15   why isn't it the day that we would maybe conduct a sale

16   or have a post-sale hearing to confirm the results of the

17   sale?

18             What is the pertinent date and why is it, you

19   know, why is it not just frozen at some prior time?

20             MR. VERRILLI:  What I think, Your Honor, and the

21   right way I think to think about that is when the Court

22   renders its judgment on the Rule 60(b) motion, the judgment

23   should be rendered based on the facts and circumstances that

24   exist when that -- when the Court enters judgment.

25             The point of Rule 60(b), of course, is to allow

 1    for reconsideration of final judgments in extraordinary

 2    circumstances.  And I think we have amply demonstrated that

 3    these are extraordinary circumstances and that it would be

 4    at that period.

 5              Now, I suppose if something dramatic happened

 6    after the Court entered judgment, there would be some

 7    possibility that that would need to be revisited.  But I do

 8    think as a matter of law, it would be when the Court enters

 9    its rulings on the 60(b) that that is the right temporal

10    frame of reference here.

11              THE COURT:  All right.  And then what about this

12    sense I got from your papers that perhaps in addition to a

13    question of what is the pertinent date, maybe I'm being

14    asked to decide what is the pertinent geographic location

15    for the alter-ego inquiry, is that a different argument from

16    the date argument; and if so, do you have any authority for

17    it?

18              MR. VERRILLI:  So we, we view that -- the reason

19    we made that point, Your Honor, was to refute the argument

20    being made by my friends on the other side; that because of

21    the situation on the ground in Venezuela, no credence should

22    be given to the legitimacy of the corporate separateness

23    that has been enacted and implemented -- has been enacted

24    by the legislature and implemented in the United States.

25              And our point is whether or not the actions of

1    the general assembly have been sufficiently implemented in

2    Venezuela itself, they have undisputedly, and the record is

3    100 percent clear on this, been implemented and respected in

4    the United States and therefore the general argument that

5    they are making about conditions in Venezuela being a basis

6    for disregarding the corporate separateness that has been

7    created in the United States are incorrect.

8              So it was offered as not so much as the need to

9    make a separate argument about geographic scope as to refute

10   their argument as to why the Court shouldn't consider the

11   separateness.

12              THE COURT:  Okay.  Thank you very much.

13              We will come back to you, I'm sure, at a certain

14   point.

15              But let me turn now to PDVSA and those parties.

16              Is there anything you want to add based on the

17   new filings or what you have heard this morning?

18              MR. EIMER:  Your Honor, good morning.  It's Nate

19   Eimer.

20              I don't think we have anything to add on the

21   Rule 60(b) motion.  If Your Honor has any questions on the

22   Rule 69 motion, I'd be glad to answer those.

23              THE COURT:  No, I don't have any questions at

24   this point.

25              Nothing to add on your own on that?

1            MR. EIMER:  Your Honor, no, nothing new because

2   the United States didn't really address the motion to quash.

3            The only thing that I might want to clarify,

4   because some of our discussion, I think, was somewhat

5   interrupted by the difficulty we had on the phone, is that I

6   think the very clear issue, and Your Honor raised this

7   question with me I think as we were first interrupted, as

8   to whether Your Honor had already decided the issue of

9   rule -- essentially the Rule 69 issue when it decided the

10  FSIA question, and whether or not there had been

11  respectively a collateral estoppel on that.

12           And I think that is where we were first

13  interrupted.  So if I may come back to that.

14           I think the Third Circuit opinion and Your

15  Honor's opinion were very clear that what you are deciding

16  was the FSIA question.  That question is very much separate

17  from the Rule 69 issue that we raised in our motion.  The

18  Rule 69 -- Rule 69 makes it very clear that the state law

19  has to apply in determining the ownership of the property or

20  the propriety of attachment.

21           Delaware law actually takes a two-step approach

22  to ownership of property which is the hallmark under

23  Section 324 of the Delaware Code.

24           The only property that can be attached or the

25  only stock that can be attached is stock in which the debtor

1    is the owner.   PDVSA -- I'm sorry, Crystallex has been very

2    clear throughout this proceeding, and was clear again today

3    in Mr. Estrada's comments, that they have never sought to

4    make PDVSA liable under the underlying judgment.   Their

5    claim was only that the stock of PDV Holding belonged to the

6    Republic.   And as such, the question of ownership of stock

7    had never been litigated before this Court.   This Court

8    never decided that question.

9            In fact, PDVSA made clear in trying to avoid

10   that litigation that the question of the propriety of the

11   attachment was something that should be litigated later,

12   and that the only issue the Court should decide was the FSIA

13   question, which is what the Court did decide.

14           The resolution of the FSIA question under *Bancec*

15   is not the same as the resolution of the ownership of

16   Delaware stock under Delaware law.   That is a two-step

17   analysis.

18           The first step is alter-ego.   And whether or not

19   the *Bancec* analysis is the same alter-ego analysis of the

20   Delaware law analysis, we passed by.   We didn't really argue

21   that.

22           But the second step, really the Court actually

23   wound up deciding it in our favor and against Crystallex

24   because the Court decided that there was no fraud.

25           And the second step really is a requirement that

the alter-ego be used as an instrumentality to create -- to

commit a fraud.  And that never happened in this case.  The

Court found that that never happened.

And so as a result, the attachment itself does

not comply with Delaware law because the owner of this

property is PDVSA, and there is no basis under Delaware law

for piercing the veil to get to PDVSA because that -- those

two entities were never used to commit a fraud in using the

instrumentality.

The only case that Crystallex cited to say that

there, in fact, was compliance with Delaware law was

Magistrate Burke's decision in the *Harrison* case.  But they

truncated Magistrate Burke's analysis because they say,

well, there was some in justice here because PDVSA wound up

with some of the stock at some point -- I'm sorry, with some

of the ownership of the gold mine at some point.  But that

is not what Magistrate Burke said in his opinion.

He said:  "Delaware law requires that the

fraud or injustice be found in the defendant's use of the

corporate form itself."  And that is not what happened here

at all.  There is no allegation.  In fact, this Court found

that there was no form of fraud in the use of a corporate

forum.

So we think to the extent there is any estoppel

here, it really goes against Crystallex because this Court

1    already resolved the fraud question, and therefore now

2    litigating for the first time the Rule 69 issue, we think

3    the motion to quash should have been granted.

4              THE COURT:  All right.  I think one of their

5    arguments is that this issue either was raised or could have

6    been raised in some of the earlier litigation that predated

7    today.

8              Isn't it true that you could have raised it?

9    And if so, why is that not dispositive?

10             MR. EIMER:  It's not dispositive because, first

11   of all, it wasn't raised, and PDVSA had every right not to

12   raise it.  And that is the reason that it had an immediate

13   right to appeal the FSIA question which is exactly what it

14   did once the Court ruled on FSIA.

15             That was the question that was appealed, and it

16   never litigated further the question of the propriety under

17   Rule 69 of the attachment.

18             And so that was not part of the litigation

19   before this Court, nor was it required to be part of the

20   litigation before this Court.

21             THE COURT:  All right.  Thank you, Mr. Eimer.

22             Were you speaking for all of the moving parties

23   on the motion to quash just now?

24             MR. EIMER:  I believe so.

25             THE COURT:  Okay.  All right.  Well, then, let

1    me turn to the government and see what, if anything, you

2    might like to add.

3                    MR. DeMOTT:   Thank you, Your Honor.   Can you

4    hear me?

5                    THE COURT:   Yes, I can hear you.   Thank you.

6                    MR. DeMOTT:   I don't do much to add on the Rule

7    60(B) motion, Your Honor, but I do want to respond to a few

8    things Mr. Estrada said.

9                    First, there is no merit to his suggestion that

10   the executive branch is improperly interfering with the

11   judiciary or somehow undermining public confidence in the

12   courts.

13                   To be clear, the United States is not asking the

14   Court to grant the Rule 60(B) motion out of deference to

15   U.S. foreign policy concerns.   Rather, as Mr. Verrilli

16   explained, the United States' filings verify two key factual

17   points underlying Venezuela's argument.

18                   First, the executive branch has recognized that

19   the Guaidó regime is the legitimate government of Venezuela,

20   and that's binding on U.S. courts as the cases cite in our

21   brief indicate.

22                   And second, as a result of dramatically changed

23   circumstances over the past two years since this Court's

24   August 2018 alter-ego decision, fundamental premises

25   underlying that prior ruling no longer hold true.

1          There is nothing remotely inappropriate about

2     the United States weighing in on those points in response to

3     this Court's express invitation.

4          I also want to push back against Mr. Estrada's

5     suggestion that the statement of interest and the

6     supplemental brief reflect the views of DOJ line attorneys

7     rather than the considered views of the United States.

8          The filings are authorized and signed by the

9     acting assistant attorney general for the civil division.

10    They are not expressing my personal views or the views of

11    my colleague, Mr. Borson, who signs the briefs, and its

12    special representative Elliott Abrams, who has said the

13    situation in Venezuela is worrying for U.S. national

14    security in his letter to this Court, which is Exhibit 2 to

15    our statement of interest.

16         As Special Representative Abrams letter details,

17    a forced sale of PDVSA shares could grievously damage the

18    credibility of the legitimate Guaidó government which could

19    have serious implications for U.S. national security.

20         And so, you know, there is no merit whatsoever

21    to the idea that this is line attorneys going out on a

22    whim.

23         Finally, and this goes more to the proposed

24    steps toward a sale, but I want to mention it here in

25    response to what Mr. Estrada said, Crystallex is totally

1    wrong to ask the Court to second guess the expressed foreign

2    policy views of the United States.

3              Crystallex's filings speculate that Guaidó's

4    claim to power is weakening, and that the United States

5    might withdraw its recognition of his government, and

6    Mr. Estrada continued to speculate about that this morning.

7              But there is no authority for the notion that

8    courts are supposed to independently evaluate the

9    persuasiveness of the government's foreign policy,

10    particularly on the basis of news articles curated by the

11    plaintiff and speculation by plaintiff's counsel.

12              Crystallex may not agree with the foreign policy

13    judgment set forth in the letter by Special Representative

14    Abrams, but those judgments reflect the position of the

15    United States Government and are therefore are entitled to

16    deference.

17              I think that is all I have on the 60(b) point

18    for now, unless Your Honor has any questions of the United

19    States.

20              THE COURT:  I do have some questions.  Thank

21    you.

22              So as you noted probably from my questioning,

23    I have noticed a distinction in some of the language the

24    government has used throughout its filings.  And I am

25    grateful to the government, as you indicated, I have been

1   inviting the government to provide its views for some

2   time, and I was grateful you all appeared just before the

3   last hearing and have continued to do so.

4            But I assume you have chosen your language

5   carefully, and that it's the result of the vetting process

6   that you described a little bit ago.

7            So I want to make sure I understand.

8            Does the government mean something different

9   when it says "foreign policy interests" and when it says

10  "national security interest"?  And relatedly, sometimes

11  you say that one or both of these interests would be

12  "needlessly imperiled"; other times you say they "could be

13  imperiled."  Sometimes you say it seems to me that "they are

14  imperiled."

15           And it may be that you didn't intend any

16  distinctions here.  And it may be that if you did intend

17  distinctions, that they don't really make a difference to

18  anything I have to decide.  But I really do want to make

19  sure I don't misunderstand what the government's view is.

20           So if you could help me on that, that would be

21  great.

22           MR. DeMOTT:  Absolutely, Your Honor.

23           And I would direct you to the letter from

24  Special Representative Abrams.  You know, he repeatedly

25  mentions foreign policy.  He also mentions U.S. national

1    security at the bottom of the first page.  And I think

2    there is a distinction between those two ideas, although,

3    you know, perhaps some concerns overlap in some ways.

4         I think that the letter is very clear and

5    we'll likely get into this more in the second part of this

6    morning's hearing, but I think the letter is very clear that

7    the steps Crystallex is proposing toward a potential forced

8    sale, any of those steps are of concern to the United States

9    interests here.

10        And I would just direct you to Special

11   Representative Abrams letter for the details of that.

12        You know, he, he mentions that, "Taking" -- and

13   this is on the top of the final page of his letter.  He

14   mentions that "Taking immediate steps toward a conditional

15   sale of PDVSA's U.S.-based assets, including PDVH and Citgo

16   would be detrimental to U.S. policy and the interim

17   government's priorities."

18        And so, you know, I would just direct you to his

19   letter, I think, for the specifics.

20        THE COURT:  Okay.  Well, I guess it raises in my

21   mind a question of if national security, by which I think

22   you want me to understand national security of the United

23   States, if the national security of the United States is

24   implicated by what I might do, help me understand better why

25   it is that the government did wait so long to make its views

1    known in this case.

2              MR. DeMOTT:   Sure, Your Honor.

3              Well, I think the United States was watching

4    this case very closely and obviously there is a rapidly

5    evolving situation on the ground in Venezuela.   There are a

6    number of different competing government interests at stake.

7              And so, you know, it took some time to see first

8    whether the Supreme Court was going to weigh in; and then,

9    you know, we wanted to see the parties' briefs and make sure

10   we developed -- you know, it went through the full process

11   of developing the statement of interest, you know, getting

12   input from all interested components of the government.

13             You know, I don't want to overstate the

14   potential -- the potential risks for U.S. national security,

15   but, you know, that is mentioned in the Abrams letter.   And

16   I think the, the potential foreign policy implications of

17   moving forward are what the government is primarily

18   concerned about, and potential national security

19   implications of a sale.

20             THE COURT:   All right.   And I suppose this

21   question may lead more into the sales process, but let me

22   just ask you:

23             Are you going to be able to shed any light on

24   the status of Crystallex's OFAC application when, if at all,

25   we may expect a decision on it?

1          And regardless of the interest to those, why

2    should I not come to the conclusion that the United States

3    interest that you are here to express will be adequately

4    preserved and protected through the OFAC process, and

5    therefore maybe I don't need to really weigh or evaluate

6    them in connection with the issues I have to decide?

7          MR. DeMOTT:  Well, Your Honor, I think they

8    will.  I mean, the OFAC process is certainly the backstop

9    for protecting U.S. interest.  And as stated in our filings,

10   the government's primary request here is that the courts

11   refrain temporarily from authorizing the potentially

12   damaging prefatory steps that Crystallex has proposed.

13          As for how long OFAC anticipates needing to

14   adjudicate the license, it is very difficult to say because

15   there are so many factors that go into the decision.

16          As indicated in the letter from Andrea Gacki,

17   the director of OFAC, which is Exhibit 2 to our statement of

18   interests, these include the rapidly involving political and

19   economic situation in Venezuela, developments in the

20   U.S.-Venezuela sanctions regime, other license applications

21   that implicate the PDVH shares, you know, potentially this

22   Court's resolution of the pending motions to dissolve the

23   writ, which, as noted, you know, could moot -- could moot

24   some issues, and the legal claims of other creditors against

25   Venezuela arising from the corruption of the Chavez and

1    Maduro regimes.

2              As Your Honor may be aware, the United States

3    filed a statement of interest last night in a case in the

4    Southern District of New York involving the PDVSA 2020

5    bondholders' litigation.

6              So there is just a lot -- a lot of different

7    things that go into the decision.  And as Director Gacki

8    indicates in her letter, there is an interagency review

9    process that is currently underway, but, unfortunately, I'm

10   not -- I'm not really in a position to provide a firm

11   timeline.

12             THE COURT:  Okay.  Thank you very much for that.

13             Let's just briefly run through and give you each

14   a chance to add anything further on these issues before I

15   move on to more of a focus on the sales process.

16             Mr. Estrada.

17             MR. ESTRADA:  Yes, Your Honor.  Yes, Your Honor.

18   Thank you again.  This is Miguel Estrada.

19             I have, as is probably evidence from my

20   interaction, a great deal of affection and respect for

21   counsel for the Republic, Mr. Verrilli.  He and I have known

22   each other for decades.

23             But I think I can fairly summarize his frozen in

24   amber argument, it can't possibly be that I'm wrong.  And I

25   think that is what we call a bootstrap argument.

1          I haven't really heard any actual logical

2    explanation to how it is that once the Court restrains the

3    property for the benefit of the creditor, the purported

4    conduct of the debtor afterwards that supposedly changed

5    everything is different from their purportedly selling the

6    property to Sweden.

7          And so that we're all clear, there is no logical

8    basis for the Republic to identify any subsequent dates

9    other than the convenience of the Republic in seeking to

10   avoid the payment of a lawful judgment.

11         When you asked Mr. Verrilli the question as to

12   what the date was, his answer was sort of illuminating.  He

13   said, "When I filed my motion."

14         If that is not entitled convenience, I don't

15   know what it is.

16         I would applaud that the date was when we sought

17   to restrain, you know, the property, and we contend that it

18   was, you know, the property of the debtor.

19         Counsel for the Republic also said that, you

20   know, there is a legal question here.  There is a question

21   of sovereign immunity.  I think we should have lose, lose

22   sight of the fact that this is not a new case just being

23   filed on the Court's civil docket.  There is a final

24   judgment.  So the question of sovereign immunity has been

25   litigated to a fair-the-well all the way to the Supreme

1      Court, and litigation in which, you know, the Republic

2      failed to get a single win along the way.

3              Rule 60(b) in either of the subsections the

4      Republic has invoked does not permit the relitigation of

5      purely legal issues that have been adjudicated and final

6      judgments.  That is what the *Coke vs. Virgin Islands* has

7      said.

8              I would also like to highlight for your

9      attention, you know, the comfort case from the Third

10     Circuit -- I mean, the First Circuit, excuse me, is

11     basically *Comfort, C-o-m-f-o-r-t, vs. Lynn School Committee*,

12     which is an en banc ruling from the First Circuit, which

13     is -- which makes this point in a very compelling way.

14             You know, the First Circuit had ruled on one of

15     the school desegregation cases on a question that was

16     adverse to one of the parties.

17             Shortly thereafter, you know, the Supreme Court

18     issued, you know, the ruling in *Parents United* would seem to

19     contradict what the First Circuit had done.

20             And then somebody brought up 60(b) motion

21     saying, well, you can't do that because the Supreme Court

22     just said you can't do this.

23             And the First Circuit interpretation of

24     Rule 60(b) is like, look, you cannot get around res judicata

25     by trying endlessly questions that had been adjudicated.

1    So your arguments are very interesting, but we don't keep

2    playing litigation of the same legal question until the

3    losing party wins.  This is not what Rule 60(b) is for.

4                With respect to the government's contentions, I

5    want to be clear that I don't mean to disparage Mr. Guaidó.

6    I wish him, you know, the very best.  Our contention is

7    actually very different, which is, we have never disputed

8    and we accept today that our government has recognized, and

9    as the lawful President of Venezuela, nor have we disputed

10   that to the extent it is relevant to anything in this case,

11   you have to accept them as the President of Venezuela.

12               That means, for example, that if Nicolás Maduro

13   and Guaidó are both trying to file brief in your court, you

14   have to take that Guaidó as the government of Venezuela.

15   But it doesn't mean anything else.

16               It doesn't make things fall off course, it

17   doesn't change historical facts, it doesn't, you know,

18   revive final judgments.

19               It doesn't sort of change what our laws are

20   either.

21               It is only a recognition that he is the lawful

22   ruler of a foreign country, in that country.

23               It doesn't rule our country.

24               There is this question as to what the government

25   has backed, you know, Venezuela on.  What Venezuela has

 1   brought is still a motion that is controlled by two rules:

 2   60(b)(5) and 60(b)(6).

 3          We have explained at great length while the case

 4   law under each of these rules does not backup what Venezuela

 5   is arguing for, and I'm going to repeat that, I haven't

 6   heard any articulation citing any case from this circuit or

 7   any other circuit that explains how the language of either

 8   rule actually can be used to realize the two purported

 9   facts cited by the government to undo a final judgment

10   that has gone all the way to the Supreme Court and has cert

11   denied.

12          And finally, on these questions, you asked the

13   question about national security.  And I just want to make

14   it clear to follow-up on my earlier answer, that I think

15   what we heard is confirmation of the proposition that

16   national security, as used in the representations of the

17   government here, is basically a stock phrase that has been

18   used for effect in this case.

19          You know, you were basically told to look at the

20   Abrams letter, and there is not any elaboration, any more

21   factual detail other than, we think our interests are served

22   by continuing to back Mr. Guaidó.

23          Now, with respect to the statements that we made

24   about the situation of Venezuela, all we have pointed out to

25   you is that President Trump, whether people like it or not,

1    is the head of the executive branch, and he has said certain

2    things about what he thinks about the situation in

3    Venezuela.  I don't doubt that Mr. Abrams is a high

4    official.  You know, Mr. Bolton was, too.

5              And I think before a federal court puts its

6    processes on hold on the representation of an incumbent

7    administration, that it is current policy to do something,

8    it has to search for an actual legal basis to do that.  And

9    it also has to consider whether this is a policy that is

10   well grounded or anything or it might change; especially

11   with respect to litigation that has been ongoing for a

12   decade, and in which one of the parties has done an

13   injustice that cries out for a resolution.

14             With respect to the national, you know, security

15   question, too, and with respect to the pending motion, I

16   will say again what should be obvious.  You know, the Guaidó

17   government has the backing of the U.S. Government and has

18   access to funds from the U.S. companies.  All of these

19   questions could be avoided if Venezuela would comply with

20   the lawful judgments of our courts.  They continue to be

21   in front of our courts trying to evade payment of our

22   judgments.

23             I continue to fail to see how they're entitled

24   to any sympathy or to help from any equitable arm of the

25   courts.  They could pay the judgment and none of these

1    issues would arise.  And they have control Citgo and the

2    U.S. assets of PDVSA, and they could pay the judgment.

3              They simply do not want to pay, and they want

4    our courts to aid them in evading our judgments.  I just

5    don't see how that is a good legal argument.

6              I will speak briefly to what Mr. Eimer said.  I

7    don't think those issues that were significantly covered.

8              I think that there is a question that was not

9    fully answered with respect to why they didn't raise these

10   issues.  I think as a practical matter, there is already,

11   you know, the law of the case that established that these

12   questions are governed by the FSIA and they lost on them.

13             Rule 69 governs the process of the writs that

14   we have to issue, but I don't think even they would contend

15   under Rule 69 be would be entitled to conduct a judicial

16   sale without complying with the FSIA or just go to the

17   marshals and sell the thing on the courthouse steps.

18             Regardless, they were supposed to raise all of

19   these arguments when they were fighting, you know, the

20   issuance of the writ.

21             There is something that I think I should remind

22   the Court that I want to get into it.  Because I know

23   Mr. Eimer is not personally responsible, but his client,

24   PDVSA is very much responsible.

25             Throughout the course of the pendency of the

1    litigation, counsel for PDVSA, which was then doing the

2    bidding of the Maduro administration and then turned its

3    coats to serve the Guaidó administration, repeatedly made,

4    you know, representations to the Court that are flat out

5    inconsistent with the arguments now made out in the motion

6    to quash.

7              And, you know, PDVSA has tried its best to say

8    that they never, you know, represented that the writ would

9    be eternal, sort of like love, but the fact is I can refer

10   the courts to the record.  They affirmatively, factually

11   represented, in order to dispense with the bond, that the

12   writ was effectual to give us security, and that we would

13   have recourse to the shares to sell.  And that was what

14   would justify our getting a bond during the pendency of the

15   appeal.

16             And all of the arguments they made on the motion

17   to quash are flat out inconsistent with the arguments we

18   made in the motion to quash in which they were successful.

19             They are completely estoped from these

20   arguments, and I expect that, you know, the reason why all

21   of the counsel who made these arguments were disappeared

22   from the docket in advance of our last hearing is because

23   they were not very well disposed to answer the uncomfortable

24   questions I would ask if I were a federal court judge who

25   had been made all of these, you know, representations and

1    had the same party show up in front of me with the audacity

2    to make the statements they are making now.

3            THE COURT:  Okay.  Thank you very much,

4    Mr. Estrada.

5            Mr. Verrilli.

6            MR. VERRILLI:  Thank you, Your Honor.  A few

7    points.

8            First, with respect to the legal issue before

9    the Court, I think the source of the dispute here traces

10   back to the fact that Crystallex took the position before

11   this Court previously that it was not invoking the alter-ego

12   theory to hold PDVSA liable for the -- for the actions of

13   Venezuela, but that it was solely seeking to garnish

14   particular property.

15           And so that, that -- and it seems to me really

16   what we're experiencing now is that, that Crystallex is

17   seeking to treat that judgment, that garnishment, as though

18   it were a judgment that PDVSA is liable as alter-ego for the

19   actions of Venezuela.  But it isn't and it wasn't.

20           And because it was a garnishment which was

21   dependent on the status of the property as a result of the

22   alter-ego analysis that occurred back when that judgment was

23   rendered, that's the only basis for the attachment; is that

24   it was garnishment based on a conclusion that it was -- that

25   it was -- that should be deemed the property of Venezuela.

1          Well, this Court -- and that is what provides

2     the basis, the jurisdiction, for overcoming the FSIA

3     immunity that would otherwise attach here.

4          Well, this Court is being asked to exercise

5     its authority now to take certain steps, to order a sales

6     process and eventually to order a sale.  Those are further

7     orders of the Court that depend on a conclusion that -- that

8     taking those steps is consistent with the FSIA and its grant

9     of immunity because the -- because the exception continues

10     to apply.

11          But given that the exception is dependent

12     entirely on the claim that the property ought to be treated

13     as the property of Venezuela, it seems to us the fact that

14     the circumstances have changed as dramatically as they have

15     in a manner that bears directly on the question of whose

16     property this is, it isn't just a change of government, it's

17     the fact that the new government has enacted laws that

18     require corporate separateness and that those laws have been

19     implemented.

20          Those are undisputed facts.

21          And the suggestion that they -- that this Court

22     can ignore those facts and continue to exercise its

23     jurisdiction under the FSIA seems to me to be just quite

24     wrong.

25          That is not me saying so.  That's the

1    consequence of the decision that they made to approach this

2    in the manner that they did.  And that's what raises the

3    question.

4             Now, just a couple of other points here.

5             With respect to the question of the national

6    security interest of the United States, you know, my friend

7    Mr. Estrada is giving them the back of the hand.  The

8    government did address this some, but I would -- I don't

9    want to burn up all the Court's time by reading it, but if

10   one looks at the third paragraph of Mr. Abrams' letter, this

11   isn't boilerplate.  This is specific.

12            "Five million refugees destabilizing surrounding

13   countries.  The Maduro regime's relationship with Russia,

14   China, and most recently Iran gives those hostile nations a

15   foothold in the Western Hemisphere that they wouldn't

16   otherwise have, and that those include military and

17   intelligent aspect that make them even more worrying for

18   U.S. national security."

19            That is not boilerplate.  That is concrete

20   fact-specific statements about the risk to U.S. national

21   security.

22            And then finally, with respect to this question

23   about Venezuela and what the Republic is trying to do here,

24   we have acknowledged again and again, in our papers and in

25   the argument previously before this Court, that we -- that

1    Venezuela is responsible to pay the judgment to Crystallex.

2    But Crystallex is pretending as though that's the only

3    judgment, that's the only potential liability that Venezuela

4    faces, and that Venezuela simply is a deadbeat because it is

5    trying to avoid paying that judgment.

6              What we are trying to do is to deal with a

7    situation that poses enormous pressure on the regime because

8    there are numerous judgments and trying to manage that

9    process effectively in a way that respects our obligations

10   to pay these judgments but does so in a manner that allows

11   for the survival of the Republic's assets and interest is

12   perfectly legitimate.

13             And characterizing it in the way my friend has

14   it seems to me is completely inappropriate, and I will stop

15   with that.

16             Thank you.

17             THE COURT:  All right.  Just one question.

18             In your August brief, page 3, maybe page 11

19   also, the Republic stated something to the effect of "OFAC

20   is unlikely to grant Crystallex a license."

21             Is the Republic telling me something different

22   or in addition to what I am hearing from the United States?

23   Do you have some information that would back up your view

24   that OFAC is unlikely to grant the license?

25             MR. VERRILLI:  No, nothing.  No information

1   other than it was before the court already.

2                But we are particularly thinking -- referring

3   there, Your Honor, to the paragraph, penultimate paragraph

4   on page 2 of the Treasury Department's letter, which was

5   included in the government's statement of interest, where it

6   seems to us Treasury is indicating that it takes very

7   seriously the point that "Any action or sale of PDVH's

8   shares at this time would undermine current U.S. foreign

9   policy interest on Venezuela and absent a change in the

10  above considerations, those factors will weigh heavily

11  in OFAC's license determination and could prove to be

12  dispositive in adjudicating its license application."

13               So it was that language we were focused on in

14  making those statements in our brief, and this Court will,

15  obviously, make its own judgment about what the United

16  States is saying here, but that seems to me to be, you know,

17  neon lights -- the government seems to me to be saying in

18  neon lights that it has great doubts about the wisdom of

19  issuing a license any time soon.

20               THE COURT:  Okay.  Thank you very much.

21               Mr. Eimer, anything you wanted to add?

22               (Pause.)

23               THE COURT:  Mr. Eimer, are you there?

24               MR. EIMER:  Yes, Your Honor.  I was still muted.

25  I'd just like to make --

1              THE COURT:  Go ahead.

2              MR. EIMER:  Yes, I'm sorry.

3         I'd like to make just two points.

4              Mr. Estrada at the end of his remarks was

5    referring to what we previously discussed as judicial

6    estoppel.  And if Your Honor will recall that in the motion

7    to quash, there were two arguments made.

8              One, that Rule 69 required the attachment to be

9    quashed;

10             And the other, the fact that PDV Holding was not

11   in possession of certificates also required the attachment

12   to be quashed.

13             Your Honor asked Mr. Estrada at the last hearing

14   whether his argument about judicial estoppel based on

15   representations made by PDVSA applied to both arguments.

16             And on page 94 and 95 of the transcript,

17   Mr. Estrada was very clear that this argument that he raised

18   this morning did not apply to the Rule 69 argument but only

19   applied to the Section 324 argument about PDV Holding not

20   being in possession of the stock.

21             So I think that argument is really of no force

22   with respect to the Rule 69 argument that has already been

23   conceded by Mr. Estrada.

24             I'd like to talk a little bit more about the

25   judicial -- the collateral estoppel argument that he made,

1    and cite the Court back to your August opinion on page 425

2    where the Court talks about "next steps," and expressly

3    quotes Crystallex in terms of the next steps.

4              And Crystallex representing to the Court that

5    PDVSA, as well as perhaps PDVH -- meaning PDV Holding -- and

6    Venezuela, they have the right to come back in and challenge

7    the writ."

8              Noting further from Crystallex, in Your Honor's

9    opinion, that "PDVSA may, of course, seek to challenge the

10   writ on non-jurisdictional grounds by a motion to quash

11   brought after the writ was issued and before the Court

12   allows the execution process to commence."

13             And that is exactly what is happening here.

14             PDVSA and now PDVH and Citgo have come back to

15   the Court challenging the writ on non-jurisdictional

16   grounds, something that has not been resolved by this Court.

17             And I might note that PDV Holding and Citgo were

18   not parties to the proceeding at that time.  In fact, Citgo

19   tried to intervene long afterwards in PTV Holding just

20   recently.

21             So neither -- my two clients weren't even

22   parties to the proceedings at that point.  So I don't see

23   how they could be estopped.

24             And PDVSA exclusively was advised that they

25   could come back and challenge the writ on non-jurisdictional

1    grounds, which is exactly what it is doing here.

2                    And that is all I have, Your Honor.

3                    THE COURT:   Okay.   Thank you very much.

4                    Mr. DeMott, anything you want to add?

5                    MR. DeMOTT:   Nothing under the Rule 60(b)

6    motion, Your Honor.

7                    THE COURT:   Okay.   Thank you.

8                    Well, let's move on at long last to a little

9    more focused on the sale procedures.

10                   We'll hear from Crystallex first on that, and I

11   believe it will be Mr. Weigel.

12                   MR. WEIGEL:   Yes, Your Honor.   Thank you.

13                   Can you hear me?

14                   THE COURT:   I can, yes.   Good morning.

15                   MR. WEIGEL:   Good morning.

16                   We are proposing, in terms of the sales process,

17   what we think is a very straightforward process.

18                   Section 324, the corporate code, tells the Court

19   how one sells shares of stock.   It's a public sale.   You

20   advertise in a newspaper, twice.   You also do -- the last

21   publication has to be ten days before the -- before the

22   proposed sale date.

23                   And the Delaware Supreme Court in the *Deibler*

24   case made it quite clear that:   Following the procedures set

25   forth in subchapter 5 of chapter 49 and title 10, that it

1    affords due process to judgment of debtors while being

2    reasonably efficient from the public point of view.

3              And what we're asking, Your Honor, is simply to

4    follow the standard procedure in Delaware for selling stock.

5    And we recognize that this is a lot of stock or an important

6    asset.

7              But the courts have been quite clear that it is

8    important to follow the statutory procedures.  Not only

9    *Deibler* and Delaware Supreme Court, but the U.S. Supreme

10   Court in the *BFP* case have recognized that when you follow

11   the established state law procedures for selling an asset,

12   you get reasonably equivalent value; recognizing, of course,

13   that it's a forced sale and that a forced sale yields a

14   different price than if the parties had not been required to

15   sell.

16             But I would like to point out, of course, that

17   at no point in time is Venezuela required to allow us to

18   sell.  They can pay our judgment at any point in time up

19   until the date the gavel comes down on the sale and we go

20   away.

21             So this is really in their hands.  If they pay

22   us off, if they pay the judgment that they owe that has been

23   adjudicated, and they have no possible excuse for not paying

24   it, then we don't have a sale.

25             But assuming they're not going to do that, the

1    *Deibler* case makes it quite clear that even in *Deibler,* it

2    was skeletal notice.  Basically all that was done was --

3    said that they're going to sell X number of shares of the

4    XYZ corporation without any explanation of what that company

5    did.

6              And even in that circumstance, the Delaware

7    Supreme Court held that that was due process and would not

8    upset the sale.

9              We're, of course, not proposing anything like

10   that.  We are proposing to give supplemental advertisements

11   in the Wall Street Journal and Oil and Gas.  And obviously,

12   as Your Honor is well aware, everything that this Court

13   does in this action is reported in the financial press, and

14   I would imagine that very shortly after Your Honor issues

15   whatever order you issue in this matter, that it will be in

16   all the major financial publications.

17             But we are proposing to pay for supplemental

18   advertising.  We have proposed to give supplemental notice

19   to 32 major companies that our financial advisor has advised

20   us might be interested.

21             We're also proposing to set up a dataroom, and

22   there already is substantial public information that's out

23   there about the value of these companies.

24             Just this spring, in the middle of COVID,

25   Citgo raised over $1.25 billion in an offering that was

1    oversubscribed.  And we have that offering circular.  It

2    contains up-to-date financial information as of that time.

3              And according to their own press release, it was

4    significantly oversubscribed and from a broad and diverse

5    group of investors.  In their press release they go on to

6    say, "Our ability to raise additional funds at attractive

7    pricing despite the unprecedented economic environment

8    surrounding COVID and global oil supplies demonstrates the

9    market's overall confidence in Citgo."

10             So there is going to be a fair sale.  The

11   statute requires that we sell only as many shares as

12   necessary to satisfy our judgment.

13             And what we propose is that the Court have the

14   marshals start out offering 10 percent of the shares.  And

15   if somebody bids the full amount of our judgment to -- for

16   that 10 percent of the shares, that's absolutely terrific.

17   And we can repeat that all the way up until if nobody is

18   willing to bid the full amount of our judgment, for less

19   than 100 percent of the shares, then we would propose

20   that the marshal then conduct an ordinary auction of the

21   100 percent of the shares to get the best price possible

22   which will then be credited against our judgment.

23             We have some very practical aspects that we

24   think makes sense.

25             One is that we should, in light of COVID, and

1    this is something that has come up in various UCC shares

2    in New York, we should allow for participation by Internet

3    so that people don't have to travel to Delaware if they're

4    interested but are not inclined to take the health risk.

5          We think there should be a $10 million good

6    faith deposit that would, of course, be refundable to

7    everybody but the winning bidder.

8          And that is just to discourage people who are

9    not legitimate bidders but would seek to disrupt the

10   process.

11         We also think that the winning bidders should be

12   allowed, at their option, to have six months to get whatever

13   regulatory approvals they would like, but we would suggest

14   that they be required to place down a nonrefundable good

15   faith deposit of 10 percent of their bid or $50 million,

16   whichever is less, to ensure that somebody doesn't come in

17   and just simply take a free option.  In other words, win the

18   bid and then wait six months, see how it plays out, and if

19   they -- if oil prices move against them, that that they

20   would walk away from the deal.

21         So we would like to make sure that the winning

22   bidder does have an incentive to go forward.

23         We would propose that we -- the Court give them

24   six months to get their regulatory approval subject to

25   renewal by the Court if there is good cause to do that.

1          If, in fact, the winning bidder does not get

2    regulatory approval, we would propose that the marshals

3    offer the deal to the second-highest bidder.  And if they

4    are unprepared to go forward, that the marshals

5    re-auction -- conduct a re-auction.

6          There has been some assertion that we're

7    trying to get some sort of a bargain here or we're trying to

8    gain control of Citgo.  Nothing could be farther from the

9    truth.

10          We have no interest in owning an oil company or

11   running an oil company.  If we had to take control of the

12   company, if we had to be the winning bidder in order to

13   protect the value of our judgment, we would do it.  But it

14   is far less than preferable.  We would hire competent people

15   to run it.

16          But what we would like most of all is simply to

17   get paid.  And, again, at any point in time in this process,

18   up until the gavel comes down, Venezuela can pay us off and

19   stop the whole process.

20          Conoco proposes that we do this with a receiver,

21   but that's really -- when you read their arguments, you can

22   see it is sort of jury-rigged and they're trying to

23   extrapolate from various cases that maybe a receiver could

24   be appointed here and so forth.

25          But, you know, as Wright and Miller says, "The

1      appointment of a receiver is considered to be an extra-

2      ordinary remedy that should be employed with the upmost

3      caution and granted only in cases of clear necessity to

4      protect plaintiff's interest in the property."

5              Here, the Supreme Court, the Delaware Supreme

6      Court, has already held that the procedures that are set

7      forth in the Delaware Code for doing this -- and they

8      include not only the advertisement that is in 324 but there

9      are also other requirements in 49 -- Section 4972 requiring

10     posting.  And they might seem somewhat archaic, one has to

11     post five times around the area and so forth, but these are

12     the procedures that the legislature has set forth.

13              They're -- you know, as the Delaware court

14     noted, there is the interest of getting a fair price, but

15     there is also the interest of public convenience.  The

16     notion the marshals are -- should not be put in the

17     possession to evaluate competing bids because that's not

18     really within their bailiwick.  It should simply be an

19     auction.  Which is -- this is a large auction, but it is a

20     pretty straightforward one.

21              And there is really no possibility that we

22     will steal this asset as people keep accusing us of.  If

23     Venezuela is right, and that the asset is worth far more

24     than our judgment, and in fact that somebody is going to

25     not require 100 percent of the shares, then we will be

1    out -- we will be outbid and we will be paid off, and only

2    a portion of Citgo will be sold.  Or PDV -- the shares of

3    PDVH.

4             Conoco claims that their interest will be

5    protected by a receiver, but Conoco is a huge company.  It

6    has $32.5 billion in revenue last year, with a "B."

7             In *Deibler*, the Supreme Court says that, you

8    know, if somebody through poverty can't advertise or --

9    because *Deibler* really puts the burden on the judgment

10   debtor; that the judgment debtor is the party with the

11   information, the judgment debtor is the party that can get

12   it cheaply.

13            But here also Conoco can advertise.  Nothing

14   prevents Conoco -- they criticize the 32 companies we

15   picked.  Well, they can pick the next 32.  It's really quite

16   simple for them to do that.

17            They can do whatever supplemental advertising

18   they want.  And they can outbid us on the sale.  Because if

19   truly they come behind us, as they assert, and I have no

20   reason to doubt it, everything above our judgment in value

21   will go to them.

22            So they can outbid us at the sale, and they can

23   own Citgo, and we would be very happy for that.

24            So we think the best course of the Court is to

25   follow the standard Delaware procedure that has been

1    approved by the Delaware Supreme Court, supplemented by

2    whatever advertisement -- well, by advertisement we propose,

3    and whatever else -- additional advertisements and whatever

4    additional processes that Conoco or Venezuela or anyone else

5    wants to do.  There is nothing that prevents anybody who

6    wants to from hiring an investment banker and beating the

7    bushes to find new potential purchasers.

8            I don't think there's any possible chance that

9    everybody who possibly would be interested in this company

10   will not know about the sale very shortly after Your Honor

11   rules.

12           But there is one point that I would like to

13   make here because as Your Honor -- as Your Honor knows, we

14   have been told over and over again that we didn't need a

15   bond and they didn't have to post the bond for the stays

16   because our -- we were well protected and that we had a

17   lien.

18           Now, there is a problem, however, in that

19   Delaware Code, 10 Delaware Code 1581, has a three-year

20   limit in it for the value of our lien.  And because of the

21   extensive stays that have been requested, by Venezuela, we

22   are now within sight of that.

23           This Court issued its ruling and the marshals

24   served the -- served the writ, it was either late August or

25   early September, two years ago.  And while we think -- we

1    believe that this Court's order staying the action worked to

2    effectuate a stay of that three-year period.  And that even

3    if they didn't, that that Court has the equitable power to

4    stay that period.

5                    And there's additional writs that we can -- we

6    can move for that we believe extend the period.

7                    So we think it is extendible.

8                    But we're also certain, as this hearing has

9    pointed out, that the issue will be extensively litigated,

10   and then will be taken up on appeal, and we will start this

11   cycle again.

12                   So what we would propose is that we really want

13   to get this done before it becomes an issue.

14                   And there just is not a lot of law on this.  As

15   Your Honor knows, the ordinary course would be that we would

16   get a bond if they get a stay during appeal.  And when we

17   won, we won in the Supreme Court, we would just collect

18   against the bond and we would all be done.

19                   But because of the representations that were

20   made by the other side, that we were adequately secured

21   and adequately protected, we don't have a bond here.  And

22   there is just not a lot of Delaware case law dealing with

23   extending the three-year period because it just doesn't

24   come up very often.

25                   So while we believe that Your Honor has

1    effectively done that, and certainly can do it, it's going

2    to involve an enormous amount of judicial resources to

3    resolve the issue if we come up against it.

4            And given that, we do think that any prospective

5    purchaser will want time to get their own regulatory

6    approval.  It's not something we raised, you know, when

7    Your Honor first issued it because we had three years, and

8    it's not something we raised last November when we were in

9    front of you because we still had two years.  But now we

10   have, you know, pretty much ten months.

11           And what we would ask the Court to do is to

12   set a target sale date of the week of January 11th at the

13   Court's convenience and the marshals' convenience, and that

14   we would ask that the Court schedule a hearing some time

15   later this fall where we can bring the Court up to date.

16           But we -- Your Honor has already ruled in

17   your -- in your May order that there are no regulations or

18   orders that prohibit the Court from moving forward and

19   determining how the shares will be sold.

20           And you also agreed with our statement that

21   preparing for a sale now will help maximize the value of

22   PDVH and its subsidiary while reducing the prejudice that

23   unnecessary delay will cause to Crystallex.

24           So we would ask at this point in time that we

25   actually do move forward here.

1          We recognize that OFAC is an issue, and we will

2   have to deal with that, but hopefully if Your Honor sets a

3   target date, then we will be able to go to OFAC and say, you

4   know, please decide our motion -- I mean, our request for a

5   license.

6          And we think that is the way that will protect

7   Crystallex, which has vigorously litigated this case, and

8   no one can certainly accuse us of not being diligent, and

9   it will also protect the public's confidence in the court

10  system.  That after we have gone through an arbitration,

11  we've gone through a process in this Court, we've gone

12  through the Third Circuit and indeed all the way up to the

13  Supreme Court, that at this point in time, that should not

14  all be negated by the passage of time that was at no fault

15  of ours.

16          So to reiterate, Your Honor, we think Your Honor

17  should follow the procedures set forth in Delaware Code.

18          We think it should be done with whatever

19  supplemental advertising that anybody wants to do.  We

20  propose certain supplemental advertising.

21          We propose setting the dataroom, and there is

22  no reason we can't do that now and get that information

23  together.  Venezuela can put into that dataroom any

24  information that they think is relevant and will help

25  maximize the value of the company.

1           And we can get going with this process so that

2    all of the -- all of the litigation, all of the Court's

3    efforts, all the Third Circuit's efforts are not for naught.

4           Thank you.

5           THE COURT:  Thank you.  I do have some questions

6    for you.

7           So in terms of the other procedures that are

8    proposed by some of the others on the phone, it seems to

9    me, but I want to make sure I understand it correctly,

10   Crystallex's position is you don't want the Court to order

11   any of those, but you also are not asking me to preclude

12   anyone from taking some of those steps, you know, that a

13   private party could take.

14          Do I understand that correctly?

15          MR. WEIGEL:  Yes.  Absolutely.

16          You know, the Court in *Deibler* (long e) --

17   or *Deibler* (long I) says, "Judgment debtors are free to

18   supplement such motions as notice as the sheriff may

19   disseminate.  As the owner of the property, they not

20   only have the economic interest rationally to extend the

21   appropriate level of resources and notice, but also have

22   the fullest and cheapest access to the relevant information.

23          "Thus, a relevant allegation of cost and burden

24   to this process, as well as the flexible requirements of

25   due process of law, certainly can take into account and rely

1    upon this superior active of information and superior

2    incentives of judgment debtors."

3              So yes, we would be -- we welcome.  I mean, we

4    genuinely want to get the highest price for these benefits,

5    and we would welcome whatever additional advertisement

6    people want.

7              We welcome anybody hiring investment bankers if

8    they want to do that.

9              We support Venezuela or Citgo or putting

10   whatever information they want to put into a dataroom.

11             What we don't support is delaying this process

12   while PDVSA chooses to sell it by itself because its had

13   plenty of opportunity to do that.  I mean, we won our

14   judgment back in 2017.  It was affirmed by the D.C. Circuit

15   in February of 2019.

16             Your Honor's order in December of 2019 told

17   Venezuela that if the Supreme Court didn't disturb the Third

18   Circuit's ruling, then you were going to proceed to cause

19   the sale.  "If the Supreme Court proceeding do not alter a

20   Third Circuit's instruction to this Court, the Court intends

21   to proceed to selling those shares."

22             That Mr. Verrilli is a skilled advocate is

23   undisputable, but they had to have known at that point in

24   time that the odds of the Supreme Court taking cert are

25   just not that great because that's just -- that's just the

1    numbers.  And they certainly knew by May of this year that

2    the Supreme Court had denied cert.

3              So if they wanted to sell the -- some or all

4    of the assets, they could do so.  And if they could find a

5    buyer, and that buyer will pay money to -- enough money to

6    get our judgment satisfied, God bless, they can do it.  And

7    they can do it at any point in time up until the sale

8    happens.  But they have no real interest in selling this.

9              And so unless this Court, you know -- and

10   just as they have no interest in paying our judgment.

11             So this is a forced sale.  I mean, there is

12   no -- and a forced sale doesn't yield the same amount of

13   money necessarily as a sale that's -- has a willing,

14   uncompelled seller.

15             But that's just a function of the fact that they

16   haven't paid their judgment.

17             THE COURT:  Okay.  So if they did want to sell,

18   and you keep reiterating that they could, is it your view

19   that they would need an OFAC license to do so?

20             MR. WEIGEL:  I suspect they would need an OFAC

21   license to effectuate a sale.

22             But if the sale was -- if the sale was going to

23   pay us off, we would certainly support it.  It's not at all

24   clear whether OFAC would oppose that.  I mean, I would think

25   that they would be very happy to have a resolution of this

```
 1    matter.

 2               THE COURT:  Right.  Okay.

 3               But it at least raises some uncertainty and

 4    possible delay.  You are not suggesting they could tomorrow

 5    just go ahead with a sale and then pay you off; right?

 6               MR. WEIGEL:  No.  No.  Absolutely not, Your

 7    Honor.

 8               I'm saying that they've had since 2017 to

 9    anticipate and deal with this.  And even if they had some

10    hope that they would get overturned on appeal, they've had

11    since early 2019 to try and deal about this issue, and they

12    have made no steps to do it; and they really have no

13    interest in doing so.  But --

14               THE COURT:  Okay.  Yes.  I got that.  I have a

15    bunch of questions for you so let's try to -- we'll try to

16    move them through a little quickly.

17               What, if anything, can you tell me about where

18    you are with respect to your OFAC license application?  Is

19    there -- is there anything you can say about the progress or

20    the delay there?

21               MR. WEIGEL:  We know -- we filed it, as Your

22    Honor is aware, and we, we continue to wait.  We do not know

23    anything about the process.  They have not given us any

24    indication of when they're going to rule.

25               THE COURT:  Okay.  There was a statement in one
```

1    of your briefs that it could happen any day.  That's just

2    speculation; right?  You don't know that.

3                MR. WEIGEL:  Right.  As Your Honor knows, Connor

4    Capital did get a license very early in this process, and

5    that took two months.  And this has been pending for much

6    longer than that.  But we don't know.

7                THE COURT:  There is a suggestion in a number of

8    the briefs, maybe including yours, that if you are unhappy

9    with the OFAC decision whenever it ultimately comes, there

10   are steps you could take, I think to litigate it, some sort

11   of probably APA challenge or something, but is that your

12   view?  That OFAC may not be the last word here whenever we

13   hear from them?

14               MR. WEIGEL:  Well, Your Honor, we have not fully

15   explored what our options will be if OFAC turns us down, but

16   we obviously will consider them if, if they do.  We're

17   hopeful that they will allow the sale.

18               If not, you know, if there is a taking of our

19   property, then we will figure out the appropriate way of

20   dealing with that.

21               THE COURT:  All right.  In terms of the

22   discretion that I have to supplement the procedures set

23   out in the Delaware statute as recognized by the Delaware

24   Supreme Court, I, I think I now fully understand if I have

25   such discretion, you would prefer that I not exercise it

1    other than to just not prohibit some of these other steps

2    that other interested parties might take.

3              Do you actually dispute that I would have the

4    discretion to, for instance, appoint a receiver or a Special

5    Master or some sort of expert to help me and help the

6    marshals and more generally, do you dispute that I have the

7    discretion to do any of the things that anyone else here has

8    proposed I consider doing?

9              MR. WEIGEL:  Well, I think that encompasses a

10   bunch of things.

11             We do oppose simply leaving it in the hands of

12   Venezuela and allowing them to voluntarily try and sell it

13   without any prospect of a -- of a judicial sale under 324.

14             In terms of appointing a Special Master, yes,

15   the Court could certainly do that if that made the Court

16   feel comfortable and we would not oppose that.

17             We think a receivership is not really the right

18   vehicle here because it would -- you know, it -- typically a

19   receiver takes control of the company and has certain

20   obligations of the Court which would effectively leave the

21   Court running Citgo for a period of time.

22             We don't think that that is appropriate.  We do

23   thing that a Special Master would help aid the process,

24   would be perfectly fine.

25             THE COURT:  All right.  And in terms -- there

1    is some dispute about whether this is ultimately an

2    execution sale or a judicial sale.  Did your answer turn at

3    all on whether this is an execution sale or a judicial sale?

4    That is, is my discretion different under one regime than

5    another?

6              MR. WEIGEL:  I don't believe so, Your Honor.

7    I've always thought of those two terms as synonymous.

8              It is most definitely an execution sale because

9    we have a judgment.  There are other cons -- other -- there

10   are other situations where someone can -- where a court can

11   sell an asset that is not subject to judgment.

12             So this an execution sale, but I don't know that

13   it -- absent sort of a bankruptcy-type situation, which I do

14   believe is completely different, I'm, I'm not sure there is

15   an enormous difference between the two.

16             THE COURT:  Okay.  One of your criticisms of

17   Conoco's suggestion of a receiver, and it may apply even to

18   a Special Master, you can help me understand what your view

19   is, but the concern that you raised is that I, I might find

20   myself where the receiver or the other individual decided to

21   subordinate Crystallex's interest to the level of unsecured

22   interest or presumably to any level, I'm not quite sure why

23   one would follow from the other.

24             If I do appoint a Special Master, even a

25   receiver, couldn't I just direct them that the priority

1     issue is already resolved or that they -- maybe I need a

2     recommendation on the priority issue?

3               Does the subordination of your interest

4     necessarily follow from me taking steps to appoint the

5     receiver or the like?

6               MR. WEIGEL:  No.  I think Your Honor can

7     certainly make it clear we are not subordinated and we --

8     if you choose to do that, I think we would ask that you do

9     that.

10              We think that that is essentially what was

11    argued all the way up to, you know, in the Third -- before

12    this Court and then the Third Circuit.

13              And the priority rules are pretty clear.  We

14    certainly don't want to have a whole another litigation and

15    create -- you know, and have a whole another dispute with a

16    receiver or somebody about this issue and then have to come

17    back to this Court and spend even further judicial

18    resources.

19              So I, I -- we would -- if Your Honor chooses to

20    do that, we think that -- we think you should specify that.

21    But a Special Master to simply aid the Court in setting up a

22    dataroom and making sure that notices go out to, you know,

23    relevant people and so forth, we don't have an objection to

24    that as long as it doesn't delay the process enormously.

25              THE COURT:  Okay.  There was a reference to some

1    discovery requests you had made.  Has that been proceeding?

2    Is that anything that you anticipate ripening into a dispute

3    I might have to be concerned with?

4                MR. WEIGEL:  Well, Your Honor, because I think

5    Your Honor -- what we would ask the Court simply is that --

6    you know, Venezuela itself has said that it has the best

7    access to the information, and that is certainly the point

8    that the Delaware Supreme Court made in *Deibler*.

9                When we set up a dataroom, we would ask that the

10   Court order them to put the information that they think is

11   relevant in that dataroom by a date certain.  We would

12   suggest perhaps, you know, within a month.

13               We have discovery requests we could serve them

14   on them, but I think that, as the Court in *Deibler* points

15   out, they have the incentive to make information available.

16   And so -- I mean, if they flat out refuse to provide

17   information, we do have subpoena power, but it's really

18   their job, as the Court made clear, to provide whatever

19   supplemental information they think will help maximize the

20   value.  And since they have it and they have the incentive

21   to do it, we expect they're just going to provide it.

22               THE COURT:  Okay.  And then on the three-year

23   issue, which have you raised now, if -- let's just play out

24   from your perspective, you know, maybe not worst case but a

25   bad scenario, let's just say time moves on and for whatever

1    reason we get past three years and there is -- it turns out

2    there is no way to extend or protect you in any other way.

3                    Would you be able to move for a writ of

4    attachment again?  I recognize we spent a lot of time

5    talking about what would be the pertinent date and all that,

6    but just as a matter of Delaware law, is there anything to

7    stop you from, you know, moving for a writ of attachment

8    again?

9                    MR. WEIGEL:  Your Honor, I have not -- I don't

10   think we have contemplated getting to that point for several

11   reasons.

12                    One is that we think that your tolling probably

13   tolls that statute.  Certainly it has been no fault of ours

14   in terms of trying to move this thing forward that we are at

15   the place we're at.

16                    I believe the three-year rule was put in there

17   to ensure that secured creditors are diligent in pursuing

18   things, and we certainly have done that.

19                    We also think that equitable tolling would

20   apply.  That if what you have already done is not

21   sufficient, we believe that Your Honor could toll that

22   statute, and we certainly will make a motion to do that if

23   we start to get close.

24                    Finally, there is another writ, and it's

25   essentially a writ of sale.  It doesn't -- I -- it's --

 1     it doesn't have a fancy name like FSIA, but that we will

 2     understand will extend the period while the sale is -- in

 3     other words, it's an order directing the marshal or the

 4     sheriff to conduct the sale.

 5             So we think that those processes can extend the

 6     lien.

 7             If, in fact, all of those processes are

 8     exhausted and are unsuccessful, then we would certainly

 9     contemplate whether we could do -- we could file another

10     attachment.  But there are issues with that, and priority is

11     determined by when we filed.

12             So we, we're diligent.  We did get our

13     attachment.  And we, we think that if they're allowed to

14     undo that after all of the Court process we have gone

15     through, it would make a mockery of our judicial system.

16             THE COURT:  Okay.  Thank you very much.

17             I want to turn now to the Venezuela parties.

18     How many folks should I expect to hear from on behalf of

19     Venezuela, PDVSA, et cetera?

20             MR. EIMER:  Your Honor, it's Nate Eimer.  I

21     think I will be the spokesperson for this side of the

22     argument.

23             THE COURT:  Okay.  Great.

24             Go ahead then, please.

25             MR. EIMER:  Okay.  Thank you, Your Honor.

1          I think one thing Mr. Weigel didn't address and

2     seemed to assume is there can be some sort of a sale.

3          If there is one thing that is undisputed in this

4     case in its long history, there's not much that has been

5     undisputed, is that Crystallex doesn't have a license, there

6     is no indication if or when it will have a license, and no

7     sale can occur until it has a license.

8          So it seems to us that the exercise that

9     Mr. Weigel wants to put us through now is a fruitless

10    exercise-designed sale process that might never occur, and

11    that might very well be inappropriate at the time any sale

12    is to occur because of changed circumstances.

13         Whether or not OFAC regulations prevent doing

14    the things that Mr. Weigel has proposed, and I think several

15    of the things, such as setting a sale date, is probably

16    precluded by OFAC regulations, if not everything he has

17    asked for.

18         The Court certainly has discretion as to whether

19    it wants to take the step now of designing a hypothetical

20    sale process for a sale that may never happen.

21         And I think in exercising that discretion, the

22    Court first, I think, needs to look at whether it needs to

23    defer to the United States' position that nothing worse

24    should happen.

25         I will leave the United States to address that.

1              But at least the Court needs to balance the

2    interest of the party here, and I think we probably can

3    group them into three.

4              There is the United States' stated position.

5              There is the Venezuela position.

6              And there's Crystallex.

7              And, in fact, here the United States has taken

8    the extraordinary position that moving forward now, even

9    with the steps that had been proposed, the more limited

10   steps that were much more limited until today, the more

11   limited steps that Crystallex proposed in its brief would

12   cause harm to foreign policy and national security

13   interests.

14             And those interests were aligned with the

15   interest that the government of Venezuela presented.  And

16   I know Mr. Estrada likes to talk about the Guaidó

17   administration as the Potemkin government, but in this

18   country, it is the government of Venezuela and it is

19   entitled to the respect of foreign sovereign that might --

20   its position might be more successful in a court in Caracas

21   right now but not in this court.

22             And the position of the government of Venezuela

23   that it would cause injury to the government to go forward

24   even with these prefatory steps has been supported by

25   Ambassador Abrams in his very clear statement.

1        And I think his statement has been reflected

2    already in the discussion that Mr. Verrilli gave the Court

3    and repeated by the United States in its statement of

4    interest.

5        The prefatory steps that Crystallex proposes

6    implicate significant U.S. foreign policy and national

7    security interests that are rightly before the executive

8    branch in conjunction with Crystallex's license

9    application.

10        And I might answer a question Your Honor posed

11   earlier with respect to whether or not the OFAC process duly

12   protects the interest of the United States, and it clearly

13   does not because Crystallex wants to move forward before

14   that process even takes effect and before the United States

15   has an opportunity to make a decision.

16        And the United States has advised the Court that

17   the prefatory steps that Crystallex proposes now in and

18   itself, before the license application is decided, injure

19   U.S. foreign policy and national security.

20        And so the licensing process does not fully

21   protect the interests of the United States.

22        So I, I don't see how, given that position of

23   the United States and the government of Venezuela, balance

24   against the interest of Crystallex.  This Court can move

25   forward because Crystallex can really point to no harm to

1    it from waiting -- from waiting until there is a license.

2    Nothing is changing.   There is no indication that it's going

3    to be harmed in any way.   It hasn't given this Court any

4    indication on how it could be harmed.

5            The question of whether the three years expires

6    or not, I think, Your Honor has addressed that adequately.

7    But the three years may well expire without anything

8    happening because of the license application.

9            And so I agree with Crystallex that probably the

10   stay protects them on that.

11           But that is not -- that is not going to be

12   solved by putting these procedures into place.   That's

13   solved by when the license is granted, and there is no

14   indication the license is going to be granted.

15           OFAC, I think, in a response to a question by

16   the Court, advised Your Honor that taking the steps that

17   Crystallex has proposed towards an auction doesn't in any

18   way facilitate OFAC issuing a license.   OFAC doesn't need to

19   know what the procedures are for the sale of the stock, if

20   it ever is to occur.

21           And so there is no point from OFAC's point of

22   view in establishing these procedures.   So OFAC is yet

23   another party who has indicated there is no point in going

24   forward with this process.

25           And so we're left really with only, on the other

1    side, Crystallex; and Crystallex, without any enunciated

2    harm that could come to it in not having these procedures

3    put in place.

4              So let me turn briefly to the procedures that

5    they've proposed because they're wholly inadequate for this.

6              Now today they seem to have changed and say they

7    want to incorporate, or are willing to incorporate anybody's

8    procedures into the process.  And that was good to hear

9    because the procedures that they proposed are wholly

10   inadequate.

11             I might also point out that I agree that in the

12   *Deibler* case, the *Deibler* case gives this Court great

13   latitude in putting procedures in place that expressly says

14   that sale of closely -- stock in a closely-held company is

15   co plicated and requires Court attention.

16             And it does put the burden of the sale on the

17   debtor which is exactly what the debtor here has said.

18             It's true Venezuela or PDVSA -- neither PDVSA

19   or Venezuela have gone out and tried to sell the stock.

20   But why would it?  It has been resisting even today the

21   propriety of selling the PDVH stock to satisfy Crystallex 's

22   debt.

23             And until that is resolved, there would be no

24   reason for them to go out and satisfy the debt because they

25   don't believe that it is appropriate for that stock to be

1   used to satisfy the obligation of Venezuela.

2            Once that is determined, if it's determined

3   adversely, then as the *Deibler* court found, and as

4   Mr. Weigel has said, and as we've said, then those parties,

5   the debtor, whoever is going to do it, has every incentive

6   to make the process work, to minimize the amount of stock

7   that it sold, and to maximize the effectiveness of the sale.

8            And so there is no reason to move forward at

9   this time.  But if the Court does want to structure that,

10  it's structured in the process in mind with the debtor being

11  the focus.

12           I might also note that the assumption seems to

13  be that Delaware law requires that the marshals sell the

14  stock.

15           But actually, that is not quite accurate.

16           I might point out to the Court that title 10,

17  chapter 49, subchapter 5 of the Delaware Code sets out

18  procedures for an execution sale.  And Section 4975 refers

19  to the "officer conducting the sale as a sheriff, constable,

20  or other person."

21           And so it appears that under Delaware law,

22  anyone can conduct the sale.  Anyone appointed by the Court.

23           So I would think that that could reasonably

24  happen.

25           In response to the Court's questions about the

1    receiver, first of all, a receiver is inappropriate under

2    Delaware law because PDVSA is not insolvent.  That would be

3    a requirement under Section 291 of the code.

4              But it would also violate OFAC regulations.  Any

5    transfer is -- under Section 31 CFR 591-407 is defined also

6    as the "appointment of any agent, trustee, or fiduciary for

7    the conduct of the sale."

8              And that is in 591.310.

9              So I don't believe the Court has the authority

10   without a license to appoint a receiver at this point or any

11   agent to sell the stock.  And so I think that is unavailing

12   as well since there is no license for that either.

13             So in sum, I think our position, Your Honor, is

14   that there is no purpose at this point designing a sale

15   process.

16             The United States, through the statement of

17   interest, has indicated that it would cause injury to the

18   national security and the foreign policy interest of the

19   United States.

20             The government of Venezuela has asked the Court

21   not to do it because it would cause injury to its standing

22   in Venezuela.

23             And Crystallex basically can say nothing as to

24   what would happen to it in the interim.

25             And no sale can occur so I would think in

1    exercising its discretion, which the Court apparently has, I

2    think the Court should do so clearly weighing the interest

3    in favor of, at this point, standing down until there is a

4    license.

5              Thank you.

6              THE COURT:  Thank you, Mr. Eimer.  I have some

7    questions for you.

8              I guess starting on this three-year point and

9    the Delaware statute that Crystallex has now drawn my

10   attention to.

11             You said I think in passing that you probably

12   agree that the time for that has been tolled at various

13   times by the stay orders.

14             Is that something -- I don't know if you are

15   prepared to speak to it, but is that something that any of

16   your clients or the Republic might be willing to stipulate

17   to?

18             I think you can appreciate the situation for me

19   is you are arguing there is no harm.  But if, in fact, ten

20   months from now is an important date, that potentially does

21   create harm plus some urgency to this case that may or may

22   not otherwise be viewed as existing.

23             So anything you can say on that at this point?

24             MR. EIMER:  That issue is new to me this

25   morning, Your Honor.  I haven't heard that before.

1          I think we have all assumed that the

2    effectiveness of the attachment, if it were valid, would

3    continue until there was some resolution.

4          I, of course, always want to check with the

5    client, but at this point I don't see any reason we would

6    object to continuing effectiveness of the attachment in

7    light -- in spite of the three-year statute, and would

8    suggest that as Mr. Weigel has suggested to the Court, that

9    the stay the Court -- the stays that the Court had entered

10   were effective.

11          THE COURT:  Okay.  And I'm sure you recognize,

12   this discussion is all -- for principally for my benefit if

13   I do reach these issues.  I have not made a decision on the

14   issues that were argued this morning and the motions.

15          But if I were to reach these issues, address

16   the argument that PDVSA and the other parties on your side,

17   you do have an incentive to maximize the value recovered at

18   a sale and to limit the number of shares sold that -- I

19   mean, that seems to me, and its seems to me correct, and

20   therefore if that is a correct statement of your incentive,

21   why would the procedure proposed by Crystallex, which could

22   be supplemented by whatever additional procedures you might

23   all want to undertake, why wouldn't that be most likely to

24   lead to a fair outcome here?

25          MR. EIMER:  Well, a couple things.

1           As I understood Mr. Weigel today, he really

2    has no procedure that -- he is essentially suggesting some

3    minimum procedure that can be expanded to whatever the

4    parties think are required.

5           If that is the case, that's fine.  Because then

6    there are no procedures that he is requiring that the Court

7    is going to dictate are the limit.  And so long as it is not

8    the limit, that's fine.

9           I do think, and I was surprised to hear that

10   Mr. Weigel wants a January sale date even if there could be

11   a sale, I do think this is a complicated process.  I know

12   Your Honor would be familiar with the sales -- I think it's

13   very clear there -- we can't at least, and so no one else

14   has, been able to find any kind of execution sale like this,

15   certainly not in the district.

16          We've talked to the Marshal's Office, we've

17   talked actually to the Sheriff's Office, and I had forgotten

18   it was a couple hundred thousand dollars was the most

19   anybody has ever sold in a sale like this.

20          But there is some sort of precedent in this in

21   Bankruptcy Court as Your Honor, I'm sure, is familiar with.

22          And these sales are not done in three months.

23          So my biggest concern with what my friend has

24   said this morning is that kind of a time limit on this

25   process.  This is the sale of shares in an enormously

1    complex enterprise which is going to require onsite

2    inspection of the assets, discussions with management,

3    interviews with employees, and maybe one or two rounds of

4    bidders.

5         I'm not saying this is going to stretch out

6    forever, but if you set a schedule today, I'm certain it

7    can't be done in 90 days.  So I do have a serious concern

8    about the time limit that you proposed.

9         But in terms of having an open-ended process,

10   that can be supplement in any way because we do have the

11   incentive to maximize value, yes.

12        Another complicating fact here is it is fairly

13   clear to me, based on the valuations I have seen, that if

14   there's ever a sale, it is going to be a minority interest,

15   which is going to involve rather complex negotiations of

16   minority rights in any stock that is sold.  That will

17   clearly involve extended negotiations between -- I don't

18   know what "extended" means, and I don't want to imply to

19   the Court we're trying to put this off forever.  I know the

20   Court is impatient with me already probably, but I think

21   in order to do this in a way that the Court would be

22   satisfied, those steps will have to be taken.

23        THE COURT:  All right.  This dispute between

24   whether it is an execution sale or judicial sale, is that

25   something that if I were to reach these issues I need to

1    resolve from your perspective?

2              MR. EIMER:  No.  I think Conoco raised those in

3    order to work its way around to getting away from a sale by

4    the marshal into having a sale by a receiver.

5              I think no matter how Your Honor looks at it --

6    and I don't think you are ever going to want to put the

7    marshal in charge of this sale.  I think that's unfair to

8    the Marshal's Office and I think an impossible situation

9    here, given the size and complexity of this sale if it ever

10   were to go forward.

11             THE COURT:  Do you have any --

12             MR. EIMER:  That is my answer.

13             THE COURT:  Right.  Go ahead.  Did I interrupt

14   you?

15             MR. EIMER:  No, I'm sorry.  I was just repeating

16   my answer was no, because I didn't want to get lost.

17             THE COURT:  Okay.  In terms of a Special

18   Master to assist me and whoever, do you have any objection

19   to that?

20             MR. EIMER:  I think it depends on what the role

21   of the Special Master is.

22             I think the interest of the debtor in making

23   sure the sale goes forward and in conducting the

24   negotiations over the sale documents, I think so long as

25   that is in the hands of the debtor and not a Special Master,

1    no, I don't have a problem with that.

2              If the role of the -- so long as the role of the

3    Special Master is to facilitate the Court's oversight of the

4    process, then no.  I view that as just another judicial

5    officer which, of course, I expect will happen.

6              THE COURT:  All right.  And then there has been

7    repeated suggestion, I'm quite sure you heard it, that

8    you -- you could just turn around and sell some portion of

9    the company at any point to pay your debt.

10             I hear you that, you know, you have the motion

11   pending that were argued again this morning.

12             If we just put that aside for the moment, do you

13   agree it is correct if that day arrives or those motions

14   were done with, that one option your side has here, I guess,

15   with an OFAC license, if you can get it, is to sell some of

16   the company and pay off the debt and be done with it.

17             MR. EIMER:  I think that the OFAC issue has got

18   to be overcome.  I assume, if all of these motions that are

19   currently pending are resolved adversely to the -- to this

20   side, I would think, then, essentially it's the same outcome

21   as having the execution sale.  Right?  And effectively there

22   is a debt, the Court is ordering us to pay the debt, and the

23   question is, how is it going to get paid?  And from these

24   assets.

25             So I don't -- I don't see that as being anything

1    different than going through the process the Court has

2    already been ordered.

3                THE COURT:  Okay.  Yes.  Thank you very much.

4                Okay.  Well, let me turn to ConocoPhillips to

5    say what you would like to say.

6                MR. GREEN:  Hi.  Yes, this is Marcus Green from

7    Kobre & Kim on behalf of ConocoPhillips.

8                You know, I think the Court's initial

9    introduction this morning about -- introduction this morning

10   about --

11               THE COURT:  Mr. Green, is that you speaking

12   still?

13               MR. GREEN:  Yes.

14               THE COURT:  There is some interference.

15               Mr. Green, I'm not able to understand you.

16               MR. GREEN:  Yes.

17               THE COURT:  "Mr. Green, I'm not able to

18   understand you."

19               Try again.

20               MR. GREEN:  Judge Stark, is this better?

21               "Judge Stark, is this better?"

22               THE COURT:  I'm sorry.  Did you say something?

23               "I'm sorry.  Did you say something?"

24               Mr. Green, are you there?

25               MR. GREEN:  Yes, I'm here.  Can you hear me?

1          "Yes, I'm here.  Can you hear me?"

2          THE COURT:  It seems as if there is an echo

3     playing back after you and I speak.

4          "It seems as if there is an echo after you and I

5     speak."

6          MR. GREEN:  Okay.  Let me see if my, my

7     co-counsel, Amy Wolf, has the same problem.  I'll try to

8     turn it over to her in case it's not.

9          THE COURT:  Okay.

10          "Okay."

11          MS. WOLF:  Your Honor, this is Amy Wolf from

12     Wachtel Lipton Rosen and Katz.  I had intended to pick this

13     up from Mr. Green after he made a few remarks.  Hopefully

14     we'll figure out the technical problems on our end so I can

15     turn it back to him.

16          But --

17          THE COURT:  Ms. Wolf, will you tell --

18          Excuse me.

19          MS. WOLF:  -- ConocoPhillips --

20          THE COURT:  Ms. Wolf.  Ms. Wolf.

21          MS. WOLF:  Yes.

22          THE COURT:  Unfortunately --

23          "Unfortunately --"

24          It sounds like you have the same echo as well.

25          Let me move on to the government and see --

```
 1                    "Let me move on and see" --

 2                    -- see if there is anything you can do on your

 3       end and I'll see if I have a problem with anyone else.

 4                    "And I'll see if I have a problem with anyone

 5       else."

 6                    Mr. DeMott, are you there?

 7                    MR. DeMOTT:  I am, Your Honor.  Unfortunately, I

 8       am hearing the echo from ConocoPhillips.  It appears to be

 9       speakerphone, but I'm going to have the same issue as

10       counsel for ConocoPhillips did.

11                    THE COURT:  And I was hearing the echo as well.

12       Although not now.

13                    Mr. DeMott, say something again.

14                    MR. DeMOTT:  Sure.  Yes, Your Honor.  I'm ready

15       to move forward if there is no echo or we could try to go

16       back to ConocoPhillips.  Maybe the issue has been resolved

17       overall.

18                    THE COURT:  Okay.  I'm not hearing the echo.

19                    Let's just stick with what we might have,

20       Mr. DeMott.  You go, and then we'll try to hear from

21       ConocoPhillips after you go.

22                    Go ahead and add whatever you would like on the

23       sales procedures.

24                    MR. DeMOTT:  Thank you, Your Honor.

25                    From the United States' perspective, no one
```

1      disputes that this Court has discretion to decide when and

2      how to proceed toward the contemplated sale, and no one

3      disputes that an OFAC license is necessary to carry out the

4      sale.

5              And while the United States was not asking for

6      deference to its foreign policy views and potential national

7      security interests on the Rule 60(b) issue, it is asking for

8      deference to its expressed interest on this -- on this issue

9      of moving forward towards the sale.

10             And as Your Honor is aware, that view is that

11     moving forward in the manner Crystallex suggests would

12     detrimental.

13             I'm not even sure the extent to which

14     Crystallex is disputing whether deference is appropriate on

15     this latter issue.  There are some suggestions of that in

16     their brief, but I didn't hear Mr. Weigel assert that point

17     this morning.

18             But in any event, as the government's briefs

19     explain, courts routinely give this sort of case-specific

20     deference to the government's expressed interest,

21     particularly in the foreign policy realm.

22             And this kind of deference can lead to outright

23     dismissal of an action in some cases.  It certainly

24     justifies the lesser remedy the United States is requesting

25     here, which is temporarily postponing judicial action to

1    allow OFAC to adjudicate the pending license application.

2              So I don't think there is really any serious

3    question that if the Court denies the pending motion to

4    dissolve or quash the writ of attachment, which Your Honor

5    said you haven't yet decided, that if you deny those

6    motions, it would be proper for the Court to consider the

7    expressed interest of the United States when deciding when

8    and how to move forward toward a potential sale.

9              Now, setting a sale date, as Mr. Weigel

10   suggested, is exactly the kind of thing Special

11   Representative Abrams has said, speaking for the United

12   States, would imperil U.S. foreign policy interests.  And

13   Crystallex hasn't offered any persuasive reason to move

14   forward with that sort of step before it has obtained the

15   necessary OFAC license.

16             I mean, on the one hand you have these weighty

17   foreign policy interests and the United States' formal

18   representation that moving forward in the manner Crystallex

19   suggests at this time would imperil those interests, and

20   also on this side, moving forward before OFAC acts wouldn't

21   make a lot of sense because OFAC has discretion not only to

22   grant or deny the license, but also to grant it in part or

23   grant it under certain conditions or even bifurcate the

24   license request and sequence the authorization of actions in

25   the future.  This is explained in the letter from Director

1    Gacki.

2              And on the other hand, Crystallex's suggestion

3    of a sale date that's less than four months from today

4    shows that the prefatory steps they suggest aren't expected

5    to take that long.

6              So, I mean, if and when Crystallex gets the

7    necessary OFAC license, it should be able to move forward

8    expeditiously.  But if the Court authorizes Crystallex to

9    move forward right now without a license and then OFAC

10   denies the license after some steps have occurred, U.S.

11   foreign policy interests will needlessly have been imperiled

12   and the sale will be blocked and those damages and the

13   prefatory steps would have served no purpose.

14             So to avoid that, the United States is

15   respectfully asking the Court not to move forward toward the

16   contemplated sale unless and until Crystallex has in hand

17   the OFAC license that all parties agree is necessary.

18             That is really our position in a nutshell.

19             And with that, I'm happy to take any questions

20   Your Honor may have.

21             THE COURT:  Sure.  Just a couple.

22             Is it the government's view that a license is

23   required before the Court would establish sales procedures

24   or only when we would start to follow those sales procedures

25   or at some other time?

1          MR. DeMOTT:  Well, your Honor, I think OFAC has

2     tried to draw a distinction in FAQs 808 and 809 between, you

3     know, whether there is -- whether it is imposing limitation

4     on what Your Honor can do and what Crystallex can do.  So

5     the United States hasn't taken the position that Your Honor

6     is blocked from moving forward.  You know, the Court can do

7     whatever it wants.

8          However, OFAC -- the Executive Orders and the

9     OFAC regulations and the FAQs cited in Director Gacki's

10    letter make clear that Crystallex might well be in violation

11    of OFAC regulations if it takes these proposed steps.

12         THE COURT:  Okay.  That was my only question.

13    Thank you very much.

14         Mr. Green, I'm willing to try again.

15         Are you there?

16         MR. GREEN:  Yes, I am.  Thank you.

17         Can you hear me normally?

18         THE COURT:  I think I can.  So go right ahead.

19         MR. GREEN:  Okay.  Thank you.

20         So what Your Honor sort of started out this

21    morning with an image of a decision tree, you know, sort of

22    where can I go, how far can we go without prejudice to what

23    I decide along the tree I think is helpful, particularly

24    because at the end of every branch of the tree, even maybe

25    some of the thinnest ones -- right? -- is ConocoPhillips.

1    Because the Rule 60 motion doesn't have any bearing on

2    ConocoPhillips, and then all the subbranches within that,

3    the temporal or the spatial, if there is such a thing,

4    arguments about -- that go to that alter-ego determination

5    don't have any bearing.

6         So considering that and understanding that, you

7    know, we want to give input conditionally based upon the

8    Court's decision, if the Court wants to go forward with

9    planning for a sale, obviously we should -- we have views to

10   express because, you know, back to the decision tree, if the

11   Rule 60 motion -- right? -- is if the Republic prevails,

12   will be the senior present creditor at the time.

13        If the action does not prevail, we'll be, you

14   know, second in line to Crystallex.  And I think it is

15   common ground that if the U.S. government, through OFAC is

16   going to permit any kind of sale or even concrete prefatory

17   steps of a sale to go forward, that they would, you know --

18   they would also permit other creditors like ConocoPhillips,

19   besides Crystallex, to give effect to their Delaware

20   property law rights, you know, if either sanctions are

21   removed or if license are given.

22        So that's ConocoPhillips's position.

23        We're not advocating for a date, but,

24   conditionally, if the Court wants to plan for this sale, we

25   have some views on how to maximize value for that.

1                    So to that end, and with the Court's permission,

2        I would introduce Amy Wolf, co-counsel, to discuss some of

3        those features or elements of a sale if the Court was

4        interested in pursuing a sale, given the U.S. Government's

5        position, that we would advocate for in the interest of

6        maximizing value.

7                    THE COURT:  All right.  Well, let me do this.  I

8        am only going to be able to give your, you or Ms. Green, you

9        know, a few minutes, maybe five or so.  I do have some

10       questions for you all.

11                   So let me throw my three or four questions out,

12       and I don't know which one of you wants to answer them, but

13       I'll try to sit quietly for a good five minutes or so and

14       let you answer them and add whatever else you want.  Because

15       as you point out, there are a lot of decisions that have to

16       be made before I would factor in ConocoPhillips's views on

17       the sales process.

18                   And I think your proposal is well set out in

19       your papers.

20                   But my questions that I would like you all to

21       touch on, that is you or Ms. Wolf, if I were to appoint a

22       receiver, who were you envisioning would pay the expenses

23       for that receiver or for any other experts you would have me

24       hire?

25                   You are the ones who take the position that this

1   would be a judicial sale as opposed to an execution sale.

2   Is it your view I need to make a decision on that; and, if

3   so, what is at stake?

4            And have you all applied for an OFAC license;

5   and if so, what is the status?  And if not, why not?

6            So, you know, run with those questions and

7   whatever else you want to add for the next five minutes or

8   so.

9            Mr. Green or Ms. Wolf, either one.

10           MR. GREEN:  Yes.  So I'll address parts of that,

11   if not all of it.

12           You know, we're -- we are happy to hear that

13   there is common ground, it seems, amongst the parties that

14   if this should go forward, that the Court is authorized to

15   have some kind of Special Master or some kind of officer

16   with some debate around the scope of their powers, you

17   know, advising or answering to the Court or conducting the

18   sale.

19           I think that if there are fees to be paid for

20   professionals, if possible, they would come out of the

21   proceeds of any transaction, for one.

22           If -- on the question of a judicial versus

23   execution sale, I also think we don't really have a dispute

24   on that point any longer as it seems like all the parties at

25   least are in agreement that it, it sort of doesn't matter

1    because the Court, by virtue of a federal or Delaware law,

2    can appoint what I think everyone agrees should be some

3    professional to play the part that would otherwise be played

4    in a -- in a plain courthouse steps sale by the U.S. Marshal

5    or in the case of Delaware, by a sheriff.

6            So I don't know that there is any dispute on

7    that.

8            On the fees, you know, I think that goes to the

9    timing of a transaction in some respects because, you know,

10   our position, our overriding position is that this sale

11   should be conducted in a manner at a time that will fetch

12   the highest price.  That time may or may not be now or when

13   Crystallex proposes it happen in January because of the

14   uncertainties and the elements that we have all been

15   discussing:  The press, the universe of potential bidders,

16   and the ultimate price.

17           THE COURT:  All right.  OFAC license.

18           MR. GREEN:  We've requested -- ConocoPhillips

19   has requested licenses, and it has been in dialogue with

20   OFAC throughout all of ConocoPhillips's applications for

21   its, you know, the registration of the SDNY judgment, the

22   request for the writ, and also to participate in any

23   judicial execution sale if there is one.  We don't have any

24   special, you know -- any special knowledge about whether and

25   when OFAC may grant those licenses.

1            And we acknowledge the statement of interest in

2    the supporting statements by the director of OFAC in the

3    Crystallex case that it may not -- that these licenses or

4    any kind of authorization for a sheriff sale is not likely

5    to be forthcoming.

6            But we do have pending requests.

7            THE COURT:  Okay.  Thank you for that.

8            Briefly, Ms. Wolf, did you have anything to add?

9    Ms. Wolf?

10           (Pause.)

11           THE COURT:  Mr. Green, do you know if she is

12   there?

13           MR. GREEN:  She was.

14           MS. WOLF:  Your Honor?

15           THE COURT:  Ms. Wolf.  Yes, I can hear you now.

16           MS. WOLF:  I'm sorry.  I didn't press star 6.

17           So I think that there's clearly less daylight

18   now than we thought there was on the issues we raised, which

19   is, there needs to be somebody to run the process.  That's

20   what we meant when we said the Court should appoint a

21   receiver.  We're not suggesting that a receiver should run

22   Citgo.  Not, not by a long shot.  But this is a very

23   complicated process that needs real expertise, and it can't

24   be sort of you choose five people to advertise to and I'll

25   choose six and I will get an investment banker for myself.

1          We think it is critical that there be a

2     court-appointed official, whatever Your Honor wants to call

3     that person, and we do think that there is authority to call

4     that person a receiver; and that is the Sixth Circuit case

5     that we cited in our -- in our papers.

6          But I would like briefly to also respond to the

7     judicial sale/execution sale.  Not to make it a problem for

8     us, but I do -- I would recommend to Your Honor the case we

9     cited, Third Circuit case, *Branch Coal*, which I think makes

10    the point that the Court has the discretion to treat any

11    sale as a judicial sale if it so chooses.  And doing that,

12    it then has all of the discretion created in Rule 69 and

13    in Section 2001 and 2004 of the judicial code to create

14    whatever procedures it wants to make this -- to make the

15    sale make sense.

16         So I -- the Court had asked that question of

17    several people, and I, I actually think that *Branch Coal*

18    does speak to -- precisely to that question.  And I would

19    recommend that we follow the -- or that the Court follows

20    *Branch Coal's* indication that you're free to call this a

21    judicial sale and then take advantage of the discretion the

22    U.S. Code gives you, the Judicial Code gives you.

23         Thanks very much for your time.

24         THE COURT:  Okay.  Thank you very much.

25         Mr. Weigel, I can give you a couple of minutes

1     if you want to respond to anything.

2              MR. WEIGEL:  Sure.  I'll be very brief, and I

3     think Mr. Estrada may respond to the government, if that is

4     okay.

5              But basically, Your Honor, we think that the

6     Delaware statute in the *Deibler* case give the Court a lot of

7     discretion as to how to go forward, and it gives the parties

8     a lot of discretion.  But we certainly believe that this --

9     that the process set forth in 324 and in chapter 49 of the

10    Delaware Code should be followed; that there should be a

11    public sale; and that it makes -- if it makes the Court feel

12    more comfortable, and I don't see a real downside to having

13    a Special Master appointed to help supervise the process,

14    that would be great.  But we do think that the requirements

15    of the statute in terms of the advertising and the posting,

16    the bear minimum set forth in the statute should be met to

17    give us the protection of the -- following the judicial

18    procedures.

19              I take issue with what Mr. Eimer said about he

20    wants the negotiations to be in the hands of the judgment

21    debtor.

22              Well, that would make sense if he is going to

23    try and have a private sale before the judicial sale or

24    before the execution sale takes place.  But he does not

25    control the execution sale.  The time for them to sell their

1    own property, you know, has really come and gone.  They

2    still could do it, if they can, but in terms of leaving

3    PDVSA in charge of the process, that's not the way this

4    works.

5              I would just note I think that the FAQs suggest

6    that OFAC would look kindly upon a settlement and so if

7    they're able to construct a sale where they can -- they can

8    sell it to some or all of the company to a third party and

9    we would agree then to release our lien upon payment, that

10   it -- certainly OFAC has given an indication that they would

11   find that acceptable.

12             And then I guess just the last point I wanted

13   to make, Your Honor, is that we did cite in our papers 5081

14   and the three-year rule.  So I was a little surprised that

15   Mr. Eimer said he had not considered the issue, but I'm

16   gratified that he says he probably agrees that we are

17   protected by the Court's stay orders.

18             But if the Court is going to rely on that, I

19   would respectfully ask that we get that commitment more

20   firmly.

21             And with that, I will let Mr. Estrada speak.

22             THE COURT:  Sure.  Go ahead, Mr. Estrada.

23             MR. ESTRADA:  Thank you, Your Honor.

24             Thank you, Your Honor.  This is, again, Miguel

25   Estrada.

1           I wanted to say something very quickly about the

2    issues that were raised by government counsel and especially

3    with respect to the sanctions issues and OFAC's role.

4           I just want to sort of highlight one

5    significant, you know, distinction that I think should be

6    clear with the underlying legal issues.

7           There is a government regulation at issue here

8    that deals with what can and cannot be done with the

9    property of Venezuela.

10          And what the regulation says -- this is 35 CFR

11   591.407 -- is that what needs a license and cannot go

12   forward without the license is the enforcement of a lien,

13   judgment, award, decree, or other order through judicial

14   process according to transfer the interest in property, or

15   effecting the interest in property.  And that ultimately

16   means the actual sale.

17          So what the sanctions regulation actually deals

18   with and what actually requires, you know, the license is

19   the actual sale.

20          In our view that you should have a dataroom and

21   have a process that leads to a target date is consistent

22   with the regulation.  Now, there was reference made to FAQs

23   808 and 809.  Frequently asked questions are things that are

24   published on the website of the Treasury that are, as they

25   say, intended to answer public questions.

1          Now, under administrative law principles,

2     these are treated as potentially entitled to something

3     called Auer deference.  A-u-e-r.  And the Supreme Court

4     just last year in a case called *Kisor vs. Willkie,* K-i-s-o-r,

5     139 S.Ct. 2400, considered whether that deference even

6     should ever apply and/or to overrule deference.

7          The government stayed with its license, Supreme

8     Court, 5-4, but the Supreme Court severely limited when

9     these sorts of FAQ types sort of statements can never be

10    given deference, and the first, you know, requirement that

11    there be an ambiguity that has to be construed in the

12    applicable regulation.

13         And the reason that I'm actually getting to all

14    of this is there is no ambiguity in the regulation.  What is

15    subject to licensing is the sale.

16         FAQ 809 purports to say that anything you do to

17    get ready for it might also be forbidden.  But under the

18    governing *Kisor vs Wilkie* case, that is a view of somebody

19    at the Treasury that is entitled to zero administrative

20    deference.  That is a legal point that I wanted to get in.

21         I'm happy to develop it, but I think the *Kisor*

22    opinion from the Supreme Court is self-explanatory.

23         You know, the point was made in arguing,

24    essentially, for a postjudgment indefinite stay, that we are

25    not injured by this at all.  And that, you know, this can be

1    essentially be put off forever.

2              I think, you know, I will simply point out that

3    our property was taken a long time ago, and that not being

4    made whole is injurious.  People don't litigate for sport.

5              And as we pointed out in our own papers, we have

6    this ongoing insolvency proceeding in Canada in which people

7    expect to be paid eventually and be made whole.

8              As my partner Mr. Weigel says, we're happy to

9    have Venezuela's concession in tolling.  We think it is

10   correct.  It doesn't mean, given our past experience, that

11   they will not come back in a year and try to take it back,

12   nor does it mean that other creditors will not have us, you

13   know, litigate the same question even if we ultimately win

14   it.

15             So we're still being injured by the absence of

16   a process which we think should be put forth by the Court.

17             As I said sort of just now, I think the

18   regulation itself is consistent with the Court outlining a

19   process of a dataroom and a target sale, which will, of

20   course, happen if we don't get a license.

21             But I think given that everything has been, you

22   know, litigated to death.  If you ultimately do deny the

23   pending legal motions, it is high time that there be a

24   process so that my client can see some hope in getting paid.

25             And I thank the Court for your indulgence.

1                    THE COURT:  Thank you.

2                    Mr. Eimer, briefly, anything you want to add?

3                    MR. EIMER:  Just one thing on the point that

4      Mr. Estrada just made.

5                    He correctly refers to our deference in the

6      Supreme Court's opinion last year limiting it to

7      ambiguities.

8                    And where I disagree with Mr. Estrada,

9      unfortunately, is that there is an ambiguity in the

10     regulation itself because the regulation prohibits taking

11     action that affects the property.  And what that precisely

12     means is explained in FAQ 808 and 809 and, therefore,

13     under the current deference rules from the Supreme Court,

14     this Court is required to give credence to those -- that

15     interpretation of the regulation itself because it's not

16     clear at all what "affecting" the property means.

17                    It clearly does not mean something more than

18     just the sale of the property which is provided for

19     elsewhere in the regulation.

20                    And that's the only -- and, again, Mr. Estrada

21     points to no harm to Crystallex from not going ahead now and

22     establishing procedures.  The concern he has was over the

23     inability to sell the product -- the stock right now.  That

24     is not the issue before the Court.  That is subject to OFAC

25     license, and that is what we all agree to.

1               Those are the only points I had, Your Honor.

2               THE COURT:  Thank you.

3               Mr. --

4               MR. ESTRADA:  Your Honor.

5               THE COURT:  Hold on.

6               Mr. DeMott, anything briefly you want to add?

7               MR. DeMOTT:  I was largely going to make the two

8       points that Mr. Eimer made.

9               You know, just to be clear, OFAC does not agree

10      with Mr. Estrada's interpretation of 31 CFR 591.407; that

11      that is only limited to the sale.

12              As Mr. Eimer said, it talks about not doing

13      anything that could alter or affect property or interest in

14      property that are blocked, as these shares clearly are under

15      the sanctions regime.

16              But, I mean, we don't really see a need to

17      litigate exactly how far toward a sale, if at all, you know,

18      Crystallex could go under the regulations because the harm

19      Mr. Estrada is complaining about is the ultimate sale, and

20      no one disputes that that can't happen without an OFAC

21      license.

22              So, again, Crystallex just doesn't have a

23      persuasive reason for pressing ahead immediately,

24      imperilling U.S. foreign policy interests when everyone

25      agrees they can't move forward unless and until they get the

1    OFAC license.

2               THE COURT:  Okay.  Thank you.

3               I'll let Crystallex have the last word just very

4    briefly.

5               MR. ESTRADA:  Thank you, Your Honor.

6               I recommend, you know, the *Kisor* case.  One

7    of the things Justice Kagan did in barely keeping the

8    doctrine alive was to say that one of the ways in which an

9    agency does not get deference is where things are just not

10   within its bailiwick.

11              So just as the -- as the -- you know, the

12   interpretation of common law terms, things like property and

13   the things affects government, you know, properties terms,

14   things that actually, say, fall more naturally into a

15   judge's bailiwick, I think, you know, the judicial process

16   and the enforcement of property rights I think are things

17   for the Court.

18              The second thing that she said does not get

19   deference is convenience litigating positions or things that

20   are made posthoc for particular cases.  And I think, you

21   know, the history of 808 or 809, which were basically issued

22   in the aftermath of Venezuela's loss of their hearing en

23   banc in the Third Circuit, really shows that this is the

24   type of litigating position that was exactly which I was

25   thinking of where the government comes in with a letter that

1    was intended to effect a specific case, and *Kisor* makes

2    clear that that is just not entitled to any deference, even

3    if you could otherwise meet, you know, the requirements of

4    the case, which I don't think this does.

5              And so I recommend the case to your attention in

6    light of the very specific reading of the language of the

7    regulation.

8              THE COURT:  All right.  Thank you very much.

9              We are just about done.  I just need to say a

10   few things.

11             First, thank you to all of you.  This was very

12   helpful for me.

13             Also, thank you for eliminating most of the

14   technical difficulties that we encountered last time.  Today

15   certainly went smoother, and I appreciate that.

16             I will be taking everything under advisement.  I

17   recognize there is a lot in front of me, and you all have

18   provided me a lot of input.

19             I have one, I suppose, colloquially homework

20   assignment for those who are represented on the call, and it

21   relates to the three-year Delaware statute that Mr. Weigel

22   emphasized in his argument today and have cited in the

23   briefs as well.

24             I do want to have the parties' positions after

25   you have a chance to consider them and talk to one another.

```
 1              I would like your positions on the record,
 2   and so I'm directing that the plaintiff here file a status
 3   report on behalf of not just Crystallex but the Republic and
 4   PDVSA, PDVH, Citgo.  I would like the United States to
 5   indicate whether they have a position as well, and I would
 6   like ConocoPhillips to indicate if they have a position.
 7              A week from today what I'm looking for is
 8   essentially how much does anyone think I need to worry about
 9   this three-year provision.  Do you have is a view on whether
10   the timing has been tolled?  Or if it hasn't been tolled, if
11   you are agreeable to me tolling it?  And does it have any
12   implications for anybody's priority status?
13              I would like that feedback as I evaluate how to
14   move forward and some of the arguments that Crystallex is
15   making about harm.
16              Any questions about what I'm looking for from
17   you a week from today?
18              Mr. Weigel?
19              MR. WEIGEL:  No, Your Honor.
20              THE COURT:  Okay.  Anybody else on the call have
21   a question about that?
22              (Pause.)
23              THE COURT:  All right.  I'm going to take that
24   silence as a "no."
25              Thank you all again.  Everybody stay safe and
```

1    healthy.   I appreciate very much the argument and have a

2    good rest of the day.   Bye-bye.

3                    (The attorneys respond, "Thank you, Your

4    Honor.")

5                    (Telephonic oral argument ends at 12:05 p.m.)

6

7         I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

8

9                             /s/ Brian P. Gaffigan
                             Official Court Reporter
10                            U.S. District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$1.25** [1] - 65:25
**$10** [1] - 67:5
**$50** [1] - 67:15

**/**

**/s** [1] - 122:9

**1**

**10** [6] - 63:25, 66:14, 66:16, 67:15, 71:19, 91:16
**100** [4] - 36:3, 66:19, 66:21, 69:25
**11** [1] - 59:18
**11th** [1] - 73:12
**12** [1] - 33:2
**12:05** [1] - 122:5
**139** [1] - 115:5
**144** [1] - 29:8
**14th** [1] - 33:2
**1581** [1] - 71:19
**17** [1] - 1:9
**17-151-LPS** [2] - 1:6, 6:18

**2**

**2** [3] - 42:14, 47:17, 60:4
**2001** [1] - 111:13
**2004** [1] - 111:13
**2017** [2] - 76:14, 78:8
**2018** [1] - 41:24
**2019** [3] - 76:15, 76:16, 78:11
**2020** [2] - 1:9, 48:4
**2400** [1] - 115:5
**291** [1] - 92:3

**3**

**3** [1] - 59:18
**31** [2] - 92:5, 118:10
**32** [3] - 65:19, 70:14, 70:15
**32.5** [1] - 70:6
**324** [6] - 37:23, 61:19, 63:18, 69:8, 80:13, 112:9
**35** [1] - 114:10

**4**

**4** [1] - 17:2
**425** [1] - 62:1
**49** [4] - 63:25, 69:9, 91:17, 112:9
**4972** [1] - 69:9
**4975** [1] - 91:18

**5**

**5** [2] - 63:25, 91:17
**5-4** [1] - 115:8
**5081** [1] - 113:13
**591-407** [1] - 92:5
**591.310** [1] - 92:8
**591.407** [2] - 114:11, 118:10

**6**

**6** [1] - 110:16
**60** [3] - 6:23, 106:1, 106:11
**60(B** [2] - 41:7, 41:14
**60(b** [17] - 10:7, 26:10, 27:18, 27:22, 28:6, 28:18, 34:22, 34:25, 35:9, 36:21, 43:17, 50:3, 50:20, 50:24, 51:3, 63:5, 102:7
**60(b)(5** [2] - 10:13, 52:2
**60(b)(6)** [2] - 10:13, 52:2
**69** [13] - 36:22, 37:9, 37:17, 37:18, 40:2, 40:17, 54:13, 54:15, 61:8, 61:18, 61:22, 111:12

**8**

**808** [4] - 105:2, 114:23, 117:12, 119:21
**809** [5] - 105:2, 114:23, 115:16, 117:12, 119:21

**9**

**90** [1] - 96:7
**94** [1] - 61:16
**95** [1] - 61:16
**9:07** [1] - 3:21

**A**

**a-u-e-r** [1] - 115:3
**a.m** [1] - 3:21
**ability** [1] - 66:6
**able** [10] - 24:8, 46:23, 74:3, 84:3, 95:14, 99:15, 99:17, 104:7, 107:8, 113:7
**ABRAMS** [1] - 2:2
**Abrams** [10] - 42:12, 42:16, 43:14, 44:24, 45:11, 46:15, 52:20, 53:3, 87:25, 103:11
**Abrams'** [1] - 58:10
**absence** [2] - 16:21, 116:15
**absent** [2] - 60:9, 81:13
**absolutely** [4] - 44:22, 66:16, 75:15, 78:6
**accept** [2] - 51:8, 51:11
**acceptable** [1] - 113:11
**access** [3] - 53:18, 75:22, 83:7
**accordance** [1] - 16:21
**according** [2] - 66:3, 114:14
**account** [3] - 33:10, 34:5, 75:25
**accurate** [2] - 91:15, 122:7
**accuse** [1] - 74:8
**accused** [1] - 8:12
**accusing** [1] - 69:22
**achieve** [1] - 31:19
**acknowledge** [1] - 110:1
**acknowledged** [1] - 58:24
**act** [3] - 26:14, 26:15, 33:20
**acting** [1] - 42:9
**Action** [1] - 6:18
**ACTION** [1] - 1:4
**action** [8] - 20:6, 60:7, 65:13, 72:1, 102:23, 102:25, 106:13, 117:11
**actions** [5] - 25:15, 35:25, 56:12, 56:19, 103:24
**active** [1] - 76:1
**acts** [2] - 27:10, 103:20
**actual** [7] - 10:10, 10:12, 16:23, 49:1,

**ad** [2] - 12:5, 12:14
**add** [15] - 12:21, 36:16, 36:20, 36:25, 41:2, 41:6, 48:14, 60:21, 63:4, 101:22, 107:14, 108:7, 110:8, 117:2, 118:6
**addition** [2] - 35:12, 59:22
**additional** [6] - 66:6, 71:3, 71:4, 72:5, 76:5, 94:22
**address** [13] - 5:25, 6:2, 9:8, 9:21, 25:5, 25:8, 34:4, 37:2, 58:8, 86:1, 86:25, 94:15, 108:10
**addressed** [2] - 10:14, 89:6
**addressing** [2] - 11:19, 28:6
**adequately** [4] - 47:3, 72:20, 72:21, 89:6
**adjudicate** [2] - 47:14, 103:1
**adjudicated** [4] - 12:7, 50:5, 50:25, 64:23
**adjudicating** [1] - 60:12
**administration** [7] - 12:2, 18:6, 18:7, 53:7, 55:2, 55:3, 87:17
**administrative** [2] - 115:1, 115:19
**advance** [1] - 55:22
**advantage** [1] - 111:21
**adverse** [1] - 50:16
**adversely** [2] - 91:3, 98:19
**advertise** [4] - 63:20, 70:8, 70:13, 110:24
**advertisement** [4] - 69:8, 71:2, 76:5
**advertisements** [2] - 65:10, 71:3
**advertising** [5] - 65:18, 70:17, 74:19, 74:20, 112:15
**advised** [4] - 62:24, 65:19, 88:16, 89:16
**advisement** [1] - 120:16
**advising** [1] - 108:17
**advisor** [1] - 65:19
**advocacy** [1] - 32:2
**advocate** [2] - 76:22, 107:5
**advocating** [1] -

**106:23**
**affect** [1] - 118:13
**affected** [2] - 15:6, 20:15
**affecting** [1] - 117:16
**affection** [1] - 48:20
**affects** [2] - 117:11, 119:13
**affirmatively** [1] - 55:10
**affirmed** [1] - 76:14
**affords** [1] - 64:1
**aftermath** [1] - 119:22
**afterwards** [3] - 20:14, 49:4, 62:19
**agency** [1] - 119:9
**agent** [2] - 92:6, 92:11
**ago** [4] - 12:3, 44:6, 71:25, 116:3
**agree** [9] - 43:12, 89:9, 90:11, 93:12, 98:13, 104:17, 113:9, 117:25, 118:9
**agreeable** [1] - 121:11
**agreed** [1] - 73:20
**agreement** [1] - 108:25
**agrees** [4] - 27:3, 109:2, 113:16, 118:25
**ahead** [10] - 8:14, 61:1, 78:5, 85:24, 97:13, 101:22, 105:18, 113:22, 117:21, 118:23
**aid** [3] - 54:4, 80:23, 82:21
**aligned** [1] - 87:14
**alive** [1] - 119:8
**allegation** [3] - 16:12, 39:21, 75:23
**allow** [6] - 15:20, 34:25, 64:17, 67:2, 79:17, 103:1
**allowed** [2] - 67:12, 85:13
**allowing** [1] - 80:12
**allows** [3] - 15:22, 59:10, 62:12
**alluded** [1] - 33:3
**alluding** [1] - 23:25
**almost** [1] - 11:7
**alter** [23] - 18:20, 21:2, 21:13, 21:21, 22:3, 22:4, 22:9, 22:17, 23:6, 23:14, 23:15, 30:4, 35:15, 38:18, 38:19, 39:1, 41:24, 56:11, 56:18, 56:22, 76:19, 106:4, 118:13
**alter-ego** [19] - 21:2,

21:13, 21:21, 22:3, 22:4, 22:9, 23:6, 23:14, 23:15, 30:4, 35:15, 38:18, 38:19, 39:1, 41:24, 56:11, 56:18, 56:22, 106:4
**alter-egos** [1] - 22:17
**alternation** [1] - 10:24
**Altman** [1] - 12:15
**Ambassador** [1] - 87:25
**amber** [4] - 29:1, 29:5, 33:16, 48:24
**ambiguities** [1] - 117:7
**ambiguity** [3] - 115:11, 115:14, 117:9
**amount** [5] - 66:15, 66:18, 73:2, 77:12, 91:6
**amply** [1] - 35:2
**Amy** [4] - 5:22, 100:7, 100:11, 107:2
**AMY** [1] - 2:21
**analysis** [13] - 18:21, 27:25, 28:18, 28:20, 33:16, 34:9, 38:17, 38:19, 38:20, 39:13, 56:22
**AND** [1] - 1:2
**Andrea** [1] - 47:16
**answer** [15] - 9:4, 13:20, 29:25, 32:23, 36:22, 49:12, 52:14, 55:23, 81:2, 88:10, 97:12, 97:16, 107:12, 107:14, 114:25
**answered** [1] - 54:9
**answering** [2] - 25:10, 108:17
**anticipate** [2] - 78:9, 83:2
**anticipates** [1] - 47:13
**anyway** [1] - 19:14
**APA** [1] - 79:11
**apologize** [1] - 9:17
**appeal** [5] - 40:13, 55:15, 72:10, 72:16, 78:10
**appealed** [1] - 40:15
**appearance** [2] - 5:17, 6:9
**APPEARANCES** [3] - 1:12, 2:1, 3:1
**appeared** [1] - 44:2
**applaud** [1] - 49:16
**applicable** [1] - 115:12
**application** [8] -

28:10, 46:24, 60:12, 78:18, 88:9, 88:18, 89:8, 103:1
**applications** [2] - 47:20, 109:20
**applied** [3] - 61:15, 61:19, 108:4
**apply** [6] - 37:19, 57:10, 61:18, 81:17, 84:20, 115:6
**appoint** [2] - 80:4, 81:24, 82:4, 92:10, 107:21, 109:2, 110:20
**appointed** [4] - 68:24, 91:22, 111:2, 112:13
**appointing** [1] - 80:14
**appointment** [2] - 69:1, 92:6
**appreciate** [4] - 12:1, 93:18, 120:15, 122:1
**approach** [2] - 37:21, 58:1
**appropriate** [8] - 14:24, 30:4, 34:1, 75:21, 79:19, 80:22, 90:25, 102:14
**appropriately** [1] - 26:1
**approval** [4] - 24:8, 67:24, 68:2, 73:6
**approvals** [1] - 67:13
**approved** [1] - 71:1
**arbitrable** [2] - 12:24, 28:9
**arbitration** [1] - 74:10
**archaic** [1] - 69:10
**area** [1] - 69:11
**argue** [1] - 38:20
**argued** [4] - 6:22, 82:11, 94:14, 98:11
**argues** [1] - 27:22
**arguing** [5] - 5:5, 25:23, 52:5, 93:19, 115:23
**Argument** [1] - 1:9
**argument** [41] - 3:21, 4:16, 6:14, 7:10, 10:15, 21:11, 22:8, 22:13, 23:19, 23:22, 23:24, 24:6, 29:3, 29:4, 30:18, 32:8, 32:10, 33:2, 35:15, 35:16, 35:19, 36:4, 36:9, 36:10, 41:17, 48:24, 48:25, 54:5, 58:25, 61:14, 61:17, 61:18, 61:19, 61:21, 61:22, 61:25, 85:22, 94:16, 120:22, 122:1, 122:5

**arguments** [19] - 9:10, 10:12, 10:16, 11:20, 12:17, 29:12, 40:5, 51:1, 54:19, 55:5, 55:16, 55:17, 55:20, 55:21, 61:7, 61:15, 68:21, 106:4, 121:14
**arise** [1] - 54:1
**arising** [1] - 47:25
**arm** [1] - 53:24
**Aronstam** [1] - 5:20
**ARONSTAM** [1] - 2:15
**arranging** [1] - 6:12
**arrives** [1] - 98:13
**Arsht** [1] - 5:3
**ARSHT** [1] - 2:9
**articles** [2] - 17:7, 43:10
**articulation** [2] - 34:12, 52:6
**aside** [1] - 98:12
**aspect** [1] - 58:17
**aspects** [1] - 66:23
**aspersion** [1] - 25:13
**aspersions** [3] - 26:4, 26:13, 33:19
**assembly** [1] - 36:1
**Assembly** [1] - 26:23
**assert** [2] - 70:19, 102:16
**asserted** [1] - 24:11
**asserting** [1] - 19:25
**assertion** [5] - 20:1, 20:2, 20:8, 24:24, 68:6
**asset** [5] - 64:6, 64:11, 69:22, 69:23, 81:11
**assets** [7] - 22:10, 45:15, 54:2, 59:11, 77:4, 96:2, 98:24
**assignment** [1] - 120:20
**assist** [1] - 97:13
**Assistant** [1] - 3:4
**assistant** [1] - 42:9
**assume** [4] - 34:3, 44:4, 86:2, 98:18
**assumed** [1] - 94:1
**assuming** [2] - 33:15, 64:25
**assumption** [2] - 7:9, 91:12
**attach** [3] - 21:14, 28:12, 57:3
**attached** [3] - 20:18, 37:24, 37:25
**attachment** [15] - 20:14, 37:20, 38:11, 39:4, 40:17, 56:23, 61:8, 61:11, 84:4, 84:7, 85:10, 85:13,

94:2, 94:6, 103:4
**attention** [4] - 50:9, 90:15, 93:10, 120:5
**attorney** [5] - 16:12, 17:12, 17:15, 31:2, 42:9
**Attorney** [1] - 3:4
**attorneys** [4] - 17:13, 42:6, 42:21, 122:3
**attractive** [1] - 68:7
**auction** [6] - 66:20, 68:5, 69:19, 89:17
**audacity** [1] - 56:1
**Auer** [1] - 115:3
**August** [5] - 33:2, 41:24, 59:18, 62:1, 71:24
**authority** [7] - 23:19, 26:18, 35:16, 43:7, 57:5, 92:9, 111:3
**authorization** [2] - 103:24, 110:4
**authorized** [2] - 42:8, 108:14
**authorizes** [1] - 104:8
**authorizing** [1] - 47:11
**available** [6] - 5:24, 6:2, 11:14, 11:17, 14:24, 83:15
**avenues** [1] - 13:6
**avoid** [4] - 38:9, 49:10, 59:5, 104:14
**avoided** [1] - 53:19
**award** [2] - 28:9, 114:13
**aware** [4] - 15:16, 48:2, 65:12, 78:22, 102:10

---

### B

**b)(5** [1] - 10:18
**b)(6** [1] - 11:2
**B.V** [3] - 2:23, 2:24
**backed** [1] - 51:25
**backing** [3] - 15:12, 18:3, 53:17
**backstop** [1] - 47:8
**backup** [1] - 52:4
**bad** [1] - 83:25
**bailiwick** [3] - 69:18, 119:10, 119:15
**balance** [2] - 87:1, 88:23
**banana** [1] - 13:2
**banc** [2] - 50:12, 119:23
**Bancec** [3] - 28:10, 38:14, 38:19
**banker** [2] - 71:6,

110:25
**bankers** [1] - 76:7
**bankruptcy** [1] - 81:13
**Bankruptcy** [1] - 95:21
**bankruptcy-type** [1] - 81:13
**bare** [1] - 16:18
**bare-naked** [1] - 16:18
**barely** [1] - 119:7
**bargain** [1] - 68:7
**based** [7] - 25:7, 34:23, 36:16, 56:24, 61:14, 96:13, 106:7
**basis** [16] - 12:5, 12:14, 17:8, 17:25, 27:11, 28:22, 30:3, 30:10, 32:10, 36:5, 39:6, 43:10, 49:8, 53:8, 56:23, 57:2
**Bayliss** [1] - 4:13
**BAYLISS** [3] - 2:2, 2:3, 4:12
**bear** [3] - 28:13, 34:9, 112:16
**bearing** [2] - 106:1, 106:5
**bears** [1] - 57:15
**beating** [1] - 71:6
**become** [1] - 18:9
**becomes** [1] - 72:13
**BEFORE** [1] - 1:11
**begin** [2] - 6:24, 8:3
**beginning** [3] - 3:21, 17:21, 22:7
**behalf** [7] - 3:5, 4:2, 4:13, 4:16, 5:1, 5:2, 5:6, 5:20, 85:18, 99:7, 121:3
**behind** [1] - 70:19
**belabor** [1] - 32:16
**belonged** [3] - 20:10, 20:20, 38:5
**belonging** [1] - 20:1
**benefit** [5] - 6:15, 20:16, 20:19, 49:3, 94:12
**benefits** [1] - 76:4
**best** [6] - 34:12, 51:6, 55:7, 66:21, 70:24, 83:6
**better** [4] - 17:14, 45:24, 99:20, 99:21
**between** [7] - 22:17, 25:16, 45:2, 81:15, 96:17, 96:23, 105:2
**BFP** [1] - 64:10
**bid** [3] - 66:18, 67:15, 67:18
**bidder** [5] - 67:7, 67:22, 68:1, 68:3,

68:12
**bidders** [4] - 67:9, 67:11, 96:4, 109:15
**bidding** [1] - 55:2
**bids** [2] - 66:15, 69:17
**bifurcate** [1] - 103:23
**biggest** [1] - 95:23
**billion** [2] - 65:25, 70:6
**binding** [3] - 26:16, 26:17, 41:20
**bit** [10] - 9:6, 9:20, 15:8, 16:11, 17:21, 18:11, 18:17, 30:17, 44:6, 61:24
**bleed** [1] - 30:17
**bless** [1] - 77:6
**Blinds** [1] - 11:4
**block** [1] - 20:7
**blocked** [3] - 104:12, 105:6, 118:14
**boilerplate** [2] - 58:11, 58:19
**Bolivarian** [3] - 2:7, 4:13, 6:17
**BOLIVARIAN** [1] - 1:6
**Bolton** [2] - 16:6, 53:4
**bond** [7] - 55:11, 55:14, 71:15, 72:16, 72:18, 72:21
**bondholders'** [1] - 48:5
**book** [1] - 16:7
**bootstrap** [1] - 48:25
**Borson** [1] - 42:11
**bottom** [1] - 45:1
**Branch** [3] - 111:9, 111:17, 111:20
**branch** [8] - 17:11, 17:16, 18:14, 41:10, 41:18, 53:1, 88:8, 105:24
**Brian** [2] - 1:24, 122:9
**brief** [14] - 7:5, 9:3, 10:9, 13:24, 17:1, 33:2, 41:21, 42:6, 51:13, 59:18, 60:14, 87:11, 102:16, 112:2
**briefing** [4] - 6:21, 9:1, 10:15, 12:20
**briefly** [9] - 6:24, 48:13, 54:6, 90:4, 110:8, 111:6, 117:2, 118:6, 119:4
**briefs** [6] - 42:11, 46:9, 79:1, 79:8, 102:18, 120:23
**bring** [1] - 73:15
**broad** [1] - 66:4
**broadcast** [1] - 8:8
**brought** [3] - 50:20,

52:1, 62:11
**Budget** [1] - 11:4
**buff** [1] - 18:8
**bunch** [2] - 78:15, 80:10
**burden** [3] - 70:9, 75:23, 90:16
**Burke** [1] - 39:17
**Burke's** [2] - 39:12, 39:13
**burn** [1] - 58:9
**bushes** [1] - 71:7
**buyer** [2] - 77:5
**BY** [11] - 1:14, 1:17, 1:20, 2:3, 2:5, 2:9, 2:12, 2:16, 2:18, 2:21, 3:3
**bye** [2] - 122:2
**bye-bye** [1] - 122:2
**bystander** [1] - 27:9

---

## C

**camera** [1] - 15:22
**Canada** [1] - 116:6
**cannot** [3] - 50:24, 114:8, 114:11
**Capital** [1] - 79:4
**Caracas** [1] - 87:20
**carefully** [2] - 14:16, 44:5
**carry** [1] - 102:3
**case** [55] - 6:16, 7:24, 11:3, 11:20, 12:7, 12:11, 12:12, 13:15, 13:17, 14:2, 14:24, 16:2, 16:25, 30:8, 32:15, 34:14, 39:2, 39:10, 39:12, 46:1, 46:4, 48:3, 49:22, 50:9, 51:10, 52:3, 52:6, 52:18, 54:11, 63:24, 64:10, 65:1, 72:22, 74:7, 83:24, 86:4, 90:12, 93:21, 95:5, 100:8, 102:19, 109:5, 110:3, 111:4, 111:8, 111:9, 112:6, 115:4, 115:18, 119:6, 120:1, 120:4, 120:5
**case-specific** [1] - 102:19
**cases** [16] - 10:21, 10:25, 11:5, 12:15, 12:16, 14:6, 15:15, 21:11, 21:18, 21:20, 41:20, 50:15, 68:23, 69:3, 102:23, 119:20
**cast** [4] - 25:13, 26:5, 26:14, 33:19

**catch** [1] - 11:2
**catch-all** [1] - 11:2
**categorically** [1] - 29:14
**category** [1] - 21:15
**caution** [1] - 69:3
**cavalier** [1] - 32:3
**cert** [3] - 52:10, 76:24, 77:2
**certain** [10] - 23:13, 36:13, 53:1, 57:5, 72:8, 74:20, 80:19, 83:11, 96:6, 103:23
**certainly** [20] - 47:8, 73:1, 74:8, 75:25, 77:1, 77:23, 80:15, 82:7, 82:14, 83:7, 84:13, 84:18, 84:22, 85:8, 86:18, 95:15, 102:23, 112:8, 113:10, 120:15
**certificates** [1] - 61:11
**certify** [1] - 122:7
**cetera** [1] - 85:19
**CFR** [3] - 92:5, 114:10, 118:10
**challenge** [4] - 62:6, 62:9, 62:25, 79:11
**challenging** [1] - 62:15
**chance** [9] - 6:7, 6:24, 7:4, 7:5, 7:14, 7:15, 48:14, 71:8, 120:25
**change** [15] - 18:6, 20:21, 24:14, 33:5, 33:6, 33:8, 33:9, 33:13, 33:14, 33:23, 51:17, 51:19, 53:10, 57:16, 60:9
**changed** [10] - 27:3, 27:6, 28:12, 32:7, 34:8, 41:22, 49:4, 57:14, 86:12, 90:6
**changes** [1] - 18:7
**changing** [2] - 20:21, 89:2
**chapter** [3] - 63:25, 91:17, 112:9
**characterize** [1] - 27:19
**characterizing** [1] - 59:13
**charge** [2] - 97:7, 113:3
**Chavez** [1] - 47:25
**cheapest** [1] - 75:22
**cheaply** [1] - 70:12
**check** [1] - 94:4
**Chief** [1] - 1:11
**China** [1] - 58:14
**choices** [2] - 11:9,

11:11
**choose** [3] - 82:8, 110:24, 110:25
**chooses** [3] - 76:12, 82:19, 111:11
**chosen** [1] - 44:4
**Circuit** [18] - 10:21, 11:4, 11:21, 29:6, 29:17, 37:14, 50:10, 50:12, 50:14, 50:19, 50:23, 74:12, 76:14, 82:12, 111:4, 111:9, 119:23
**circuit** [3] - 11:21, 52:6, 52:7
**Circuit's** [3] - 75:3, 76:18, 76:20
**circular** [1] - 66:1
**circumstance** [1] - 65:6
**circumstances** [17] - 11:6, 26:10, 27:4, 27:6, 28:12, 28:25, 32:7, 32:11, 32:12, 33:23, 34:8, 34:23, 35:2, 35:3, 41:23, 57:14, 86:12
**Circumstances** [1] - 33:4
**cite** [4] - 23:19, 41:20, 62:1, 113:13
**cited** [8] - 17:7, 26:18, 39:10, 52:9, 105:9, 111:5, 111:9, 120:22
**CITGO** [2] - 2:13
**Citgo** [14] - 45:15, 54:1, 62:14, 62:17, 62:18, 65:25, 66:9, 68:8, 70:2, 70:23, 76:9, 80:21, 110:22, 121:4
**citing** [1] - 52:6
**civil** [2] - 42:9, 49:23
**claim** [11] - 15:4, 16:10, 16:18, 16:23, 18:3, 24:22, 26:9, 27:20, 38:5, 43:4, 57:12
**claiming** [3] - 16:1, 17:13, 24:18
**claims** [6] - 16:7, 21:20, 24:2, 24:9, 47:24, 70:4
**clarify** [1] - 37:3
**classified** [1] - 16:8
**clean** [1] - 24:9
**clear** [36] - 9:19, 11:5, 12:1, 12:3, 32:5, 32:19, 36:3, 37:6, 37:15, 37:18, 38:2, 38:9, 41:13, 45:4,

45:6, 49:7, 51:5, 52:14, 61:17, 63:24, 64:7, 65:1, 69:3, 77:24, 82:7, 82:13, 83:18, 87:25, 95:13, 96:13, 105:10, 114:6, 117:16, 118:9, 120:2
**clearly** [8] - 30:13, 88:12, 93:2, 96:17, 110:17, 117:17, 118:14
**client** [5] - 12:23, 26:4, 54:23, 94:5, 116:24
**clients** [2] - 62:21, 93:16
**close** [1] - 84:23
**closely** [1] - 46:4, 90:14
**closely-held** [1] - 90:14
**co** [4] - 4:4, 90:15, 100:7, 107:2
**co-counsel** [3] - 4:4, 100:7, 107:2
**Coal** [2] - 111:9, 111:17
**Coal's** [1] - 111:20
**coats** [1] - 55:3
**Code** [9] - 37:23, 69:7, 71:19, 74:17, 91:17, 111:22, 112:10
**code** [3] - 63:18, 92:3, 111:13
**cogent** [1] - 31:14
**Coke** [1] - 50:6
**collateral** [2] - 37:11, 61:25
**colleague** [1] - 42:11
**collect** [2] - 21:7, 72:17
**collecting** [1] - 22:3
**collection** [2] - 20:5, 22:19
**colloquially** [1] - 120:19
**Coltec** [1] - 11:4
**Columbia** [3] - 1:20, 2:6, 3:4
**combination** [1] - 28:8
**comfort** [1] - 50:9
**Comfort** [1] - 50:11
**COMFORT** [1] - 50:11
**comfortable** [2] - 80:16, 112:12
**coming** [1] - 24:6
**commence** [1] - 62:12
**comments** [1] - 38:3
**commit** [2] - 39:2, 39:8
**commitment** [1] -

113:19
**Committee** [1] - 50:11
**common** [3] - 106:15, 108:13, 119:12
**companies** [4] - 24:3, 53:18, 65:19, 65:23, 70:14
**Company** [1] - 2:23
**company** [16] - 15:6, 16:14, 24:17, 24:25, 65:4, 68:10, 68:11, 68:12, 70:5, 71:9, 74:25, 80:19, 90:14, 98:9, 98:16, 113:8
**compelling** [1] - 50:13
**competent** [1] - 68:14
**competing** [2] - 46:6, 69:17
**complaining** [1] - 118:19
**completely** [3] - 55:19, 59:14, 81:14
**complex** [2] - 96:1, 96:15
**complexity** [1] - 97:9
**compliance** [1] - 39:11
**complicated** [2] - 95:11, 110:23
**complicating** [1] - 96:12
**comply** [2] - 39:5, 53:19
**complying** [1] - 54:16
**components** [1] - 46:12
**conceded** [1] - 61:23
**concern** [5] - 45:8, 81:19, 95:23, 96:7, 117:22
**concerned** [3] - 27:7, 46:18, 83:3
**concerns** [2] - 41:15, 45:3
**concession** [1] - 116:9
**conclusion** [3] - 47:2, 56:24, 57:7
**conclusively** [1] - 33:14
**concrete** [3] - 26:24, 58:19, 106:16
**conditional** [1] - 45:14
**conditionally** [2] - 106:7, 106:24
**conditions** [2] - 36:5, 103:23
**conduct** [10] - 20:22, 24:14, 34:15, 49:4, 54:15, 66:20, 68:5, 85:4, 91:22, 92:7

**conducted** [1] - 109:11
**conducting** [3] - 91:19, 97:23, 108:17
**confidence** [3] - 41:11, 66:9, 74:9
**confined** [1] - 30:19
**confirm** [1] - 34:16
**confirmation** [1] - 52:15
**Congress** [3] - 12:3, 12:17, 27:24
**conjunction** [1] - 88:8
**connection** [1] - 47:6
**Connor** [1] - 79:3
**Conoco** [7] - 68:20, 70:4, 70:5, 70:13, 70:14, 71:4, 97:2
**Conoco's** [1] - 81:17
**ConocoPhillips** [18] - 2:23, 2:24, 2:24, 5:21, 6:7, 7:13, 99:4, 99:7, 100:19, 101:8, 101:10, 101:16, 101:21, 105:25, 106:2, 106:18, 109:18, 121:6
**ConocoPhillips'** [2] - 5:25, 6:2
**ConocoPhillips's** [3] - 106:22, 107:16, 109:20
**cons** [1] - 81:9
**consequence** [2] - 27:13, 58:1
**consequences** [1] - 33:21
**consider** [8] - 30:10, 34:1, 36:10, 53:9, 79:16, 80:8, 103:6, 120:25
**considerably** [1] - 31:19
**consideration** [1] - 21:4
**considerations** [1] - 60:10
**considered** [8] - 30:6, 31:7, 31:24, 34:3, 42:7, 69:1, 113:15, 115:5
**considering** [2] - 29:10, 106:6
**consistent** [3] - 57:8, 114:21, 116:18
**constable** [1] - 91:19
**construct** [1] - 113:7
**construed** [1] - 115:11
**contains** [1] - 66:2
**contemplate** [1] - 85:9
**contemplated** [3] -

84:10, 102:2, 104:16
**contend** [2] - 49:17, 54:14
**contention** [1] - 51:6
**contentions** [2] - 10:4, 51:4
**context** [1] - 13:6
**continue** [5] - 53:20, 53:23, 57:22, 78:22, 94:3
**Continued** [1] - 2:1
**continued** [3] - 3:1, 43:6, 44:3
**continues** [2] - 28:22, 57:9
**continuing** [3] - 17:4, 52:22, 94:6
**contradict** [1] - 50:19
**contrary** [1] - 22:8
**control** [6] - 24:25, 54:1, 68:8, 68:11, 80:19, 112:25
**controlled** [1] - 52:1
**convenience** [6] - 49:9, 49:14, 69:15, 73:13, 119:19
**CORP** [1] - 1:3
**Corp** [1] - 1:22
**corporate** [12] - 13:6, 14:25, 26:1, 26:21, 27:7, 30:12, 35:22, 36:6, 39:20, 39:22, 57:18, 63:18
**corporation** [1] - 65:4
**Corporation** [2] - 2:14, 6:17
**correct** [6] - 33:8, 33:16, 94:19, 94:20, 98:13, 116:10
**correctly** [2] - 75:9, 75:14, 117:5
**corruption** [1] - 47:25
**cost** [1] - 75:23
**Counsel** [4] - 1:21, 2:13, 2:23, 3:5
**counsel** [11] - 2:7, 4:4, 43:11, 48:21, 49:19, 55:1, 55:21, 100:7, 101:10, 107:2, 114:2
**countries** [1] - 58:13
**country** [7] - 12:23, 12:25, 15:5, 51:22, 51:23, 87:18
**couple** [5] - 58:4, 94:25, 95:18, 104:21, 111:25
**course** [19] - 8:6, 9:24, 11:11, 13:20, 25:10, 31:12, 34:25, 51:16, 54:25, 62:9, 64:12, 64:16, 65:9, 67:6,

70:24, 72:15, 94:4, 98:5, 116:20
**courses** [1] - 13:10
**Court** [173] - 1:25, 9:17, 12:16, 13:21, 14:8, 16:4, 26:3, 26:18, 27:1, 27:12, 27:18, 28:2, 28:8, 28:10, 28:19, 29:2, 29:9, 29:12, 29:16, 29:19, 30:3, 30:9, 31:21, 32:9, 34:1, 34:21, 34:24, 35:6, 35:8, 36:10, 38:7, 38:12, 38:13, 38:22, 38:24, 39:3, 39:21, 39:25, 40:14, 40:19, 40:20, 41:14, 42:14, 43:1, 46:8, 49:2, 50:1, 50:17, 50:21, 52:10, 54:22, 55:4, 56:9, 56:11, 57:1, 57:4, 57:7, 57:21, 58:25, 60:14, 62:1, 62:2, 62:4, 62:11, 62:15, 62:16, 63:18, 63:23, 64:9, 64:10, 65:7, 65:12, 66:13, 67:23, 67:25, 69:5, 69:6, 70:7, 70:24, 71:1, 71:23, 72:3, 72:17, 73:11, 73:14, 73:15, 73:18, 74:11, 74:13, 75:10, 75:16, 76:17, 76:19, 76:20, 76:24, 77:2, 77:9, 79:24, 80:15, 80:20, 80:21, 82:12, 82:17, 82:21, 83:5, 83:8, 83:10, 83:14, 83:18, 85:14, 86:18, 86:22, 87:1, 88:2, 88:16, 88:24, 89:3, 89:16, 90:12, 90:15, 91:9, 91:16, 91:22, 92:9, 92:20, 93:1, 93:2, 94:8, 94:9, 95:6, 95:21, 96:19, 96:20, 96:21, 98:22, 99:1, 102:1, 103:3, 103:6, 104:8, 104:15, 104:23, 105:6, 106:8, 106:24, 107:3, 108:14, 108:17, 109:1, 110:20, 111:10, 111:16, 111:19, 112:6, 112:11, 113:18, 115:3, 115:8, 115:22, 116:16, 116:18, 116:25, 117:13,

117:14, 117:24, 119:17, 122:9, 122:10
**COURT** [91] - 1:1, 3:22, 4:7, 4:17, 4:20, 5:7, 5:11, 5:16, 6:5, 6:11, 8:17, 13:22, 17:1, 18:16, 19:3, 19:6, 19:11, 19:17, 21:9, 23:9, 25:1, 32:25, 34:11, 35:11, 36:12, 36:23, 40:4, 40:21, 40:25, 41:5, 43:20, 45:20, 46:20, 48:12, 56:3, 59:17, 60:20, 60:23, 61:1, 63:3, 63:7, 63:14, 75:5, 77:17, 78:2, 78:14, 78:25, 79:7, 79:21, 80:25, 81:16, 82:25, 83:22, 85:16, 85:23, 93:6, 94:11, 96:23, 97:11, 97:13, 97:17, 98:6, 99:3, 99:11, 99:14, 99:17, 99:22, 100:2, 100:9, 100:17, 100:20, 100:22, 101:11, 101:18, 104:21, 105:12, 105:18, 107:7, 109:17, 110:7, 110:11, 110:15, 111:24, 113:22, 117:1, 118:2, 118:5, 119:2, 120:8, 121:20, 121:23
**court** [23] - 6:15, 8:6, 12:9, 15:22, 16:22, 17:22, 18:25, 19:25, 20:6, 20:8, 22:25, 51:13, 53:5, 55:24, 60:1, 69:13, 74:9, 81:10, 87:20, 87:21, 91:3, 111:2
**Court's** [19] - 5:24, 6:1, 28:4, 29:8, 41:23, 42:3, 47:22, 49:23, 58:9, 72:1, 73:13, 75:2, 91:25, 98:3, 99:8, 106:8, 107:1, 113:17, 117:6
**court-appointed** [1] - 111:2
**courthouse** [2] - 54:17, 109:4
**courts** [20] - 10:23, 12:24, 13:3, 13:8, 15:18, 16:18, 18:10, 26:16, 27:25, 41:12, 41:20, 43:8, 47:10, 53:20, 53:21, 53:25,

54:4, 55:10, 64:7, 102:19
**cover** [2] - 8:14, 15:3
**covered** [2] - 10:25, 54:7
**COVID** [3] - 65:24, 66:8, 66:25
**Craig** [1] - 4:3
**CRAIG** [1] - 1:14
**create** [4] - 39:1, 82:15, 93:21, 111:13
**created** [2] - 36:7, 111:12
**credence** [2] - 35:21, 117:14
**credibility** [2] - 31:16, 42:18
**credible** [1] - 29:12
**credited** [1] - 66:22
**creditor** [4] - 20:17, 20:19, 49:3, 106:12
**creditors** [4] - 47:24, 84:17, 106:18, 116:12
**cries** [1] - 53:13
**critical** [1] - 111:1
**criticisms** [1] - 81:16
**criticize** [1] - 70:14
**CRUTCHER** [2] - 1:16, 1:19
**Crutcher** [1] - 4:5
**CRYSTALLEX** [1] - 1:3
**Crystallex** [64] - 1:21, 3:24, 4:2, 6:16, 7:2, 7:12, 8:11, 29:1, 29:3, 33:1, 38:1, 38:23, 39:10, 39:25, 42:25, 43:12, 45:7, 47:12, 56:10, 56:16, 59:1, 59:2, 59:20, 62:3, 62:4, 62:8, 63:10, 73:23, 74:7, 86:5, 87:6, 87:11, 88:5, 88:13, 88:17, 88:24, 88:25, 89:9, 89:17, 90:1, 90:21, 92:23, 93:9, 94:21, 102:11, 102:14, 103:13, 103:18, 104:6, 104:8, 104:16, 105:4, 105:10, 106:14, 106:19, 109:13, 110:3, 117:21, 118:18, 118:22, 119:3, 121:3, 121:14
**Crystallex's** [8] - 18:18, 18:24, 43:3, 46:24, 75:10, 81:21, 88:8, 104:2

**curated** [1] - 43:10
**current** [4] - 31:16, 53:7, 60:8, 117:13
**cycle** [1] - 72:11

# D

**D.C** [1] - 76:14
**damage** [3] - 16:9, 31:16, 42:17
**damages** [1] - 104:12
**damaging** [1] - 47:12
**dataroom** [9] - 65:21, 74:21, 74:23, 76:10, 82:22, 83:9, 83:11, 114:20, 116:19
**date** [37] - 18:20, 18:23, 18:24, 19:1, 19:12, 19:17, 19:20, 20:12, 20:13, 21:12, 22:21, 23:7, 23:11, 24:14, 29:23, 30:1, 34:12, 34:18, 35:13, 35:16, 49:12, 49:16, 63:22, 64:19, 66:2, 73:12, 73:15, 74:3, 83:11, 84:5, 86:15, 93:20, 95:10, 103:9, 104:3, 106:23, 114:21
**dates** [5] - 19:19, 20:5, 21:12, 23:6, 49:8
**daylight** [1] - 110:17
**days** [2] - 63:21, 96:7
**deadbeat** [3] - 16:14, 31:24, 59:4
**deal** [10] - 8:24, 9:7, 9:11, 48:20, 59:6, 67:20, 68:3, 74:2, 78:9, 78:11
**dealing** [2] - 72:22, 79:20
**deals** [2] - 114:8, 114:17
**death** [1] - 116:22
**debate** [1] - 108:16
**debated** [1] - 32:14
**debt** [6] - 90:22, 90:24, 98:9, 98:16, 98:22
**debtor** [19] - 16:15, 19:23, 20:10, 20:20, 23:4, 37:25, 49:4, 49:18, 70:10, 70:11, 90:17, 91:5, 91:10, 97:22, 97:25, 112:21
**debtors** [3] - 64:1, 75:17, 76:2
**decade** [2] - 12:23, 53:12
**decades** [2] - 12:3,

48:22
**December** [1] - 76:16
**decide** [8] - 35:14, 38:12, 38:13, 44:18, 47:6, 74:4, 102:1, 105:23
**decided** [7] - 37:8, 37:9, 38:8, 38:24, 81:20, 88:18, 103:5
**deciding** [3] - 37:15, 38:23, 103:7
**decision** [16] - 7:9, 33:11, 34:14, 39:12, 41:24, 46:25, 47:15, 48:7, 58:1, 79:9, 88:15, 94:13, 105:21, 106:8, 106:10, 108:2
**decisions** [1] - 107:15
**declarations** [2] - 25:22, 26:25
**decree** [1] - 114:13
**deemed** [1] - 56:25
**Defendant** [1] - 1:7
**defendant's** [1] - 39:19
**defer** [1] - 86:23
**deference** [19] - 15:25, 16:1, 41:14, 43:16, 102:6, 102:8, 102:14, 102:20, 102:22, 115:3, 115:5, 115:6, 115:10, 115:20, 117:5, 117:13, 119:9, 119:19, 120:2
**defined** [1] - 92:5
**definitely** [1] - 81:8
**Deibler** [14] - 63:23, 64:9, 65:1, 70:7, 70:9, 75:16, 75:17, 83:8, 83:14, 90:12, 91:3, 112:6
**DELAWARE** [1] - 1:2
**Delaware** [39] - 1:8, 37:21, 37:23, 38:16, 38:20, 39:5, 39:6, 39:11, 39:18, 63:23, 64:4, 64:9, 65:6, 67:3, 69:5, 69:7, 69:13, 70:25, 71:1, 71:19, 72:22, 74:17, 79:23, 83:8, 84:6, 91:13, 91:17, 91:21, 92:2, 93:9, 106:19, 109:1, 109:5, 112:6, 112:10, 120:21
**delay** [4] - 73:23, 78:4, 78:20, 82:24
**delaying** [1] - 76:11
**demonstrated** [1] -

35:2
**demonstrates** [1] - 66:8
**demonstration** [4] - 11:6, 13:14, 16:21, 16:23
**DeMott** [19] - 3:3, 5:13, 5:14, 41:3, 41:6, 44:22, 46:2, 47:7, 63:4, 63:5, 101:6, 101:7, 101:13, 101:14, 101:20, 101:24, 105:1, 118:6, 118:7
**denied** [2] - 52:11, 77:2
**denies** [2] - 103:3, 104:10
**dent** [1] - 24:23
**deny** [3] - 103:5, 103:22, 116:22
**Department** [4] - 5:14, 16:13, 17:15, 31:2
**DEPARTMENT** [1] - 3:3
**Department's** [1] - 60:4
**dependent** [2] - 56:21, 57:11
**deposit** [2] - 67:6, 67:15
**describe** [1] - 31:1
**described** [2] - 28:11, 44:6
**desegregation** [1] - 50:15
**designed** [1] - 86:10
**designing** [2] - 86:19, 92:14
**despite** [1] - 66:7
**destabilizing** [1] - 58:12
**detail** [1] - 52:21
**details** [2] - 42:16, 45:11
**determination** [3] - 23:16, 60:11, 106:4
**determined** [4] - 12:25, 85:11, 91:2
**determining** [2] - 37:19, 73:19
**detrimental** [2] - 45:16, 102:12
**develop** [1] - 115:21
**developed** [1] - 46:10
**developing** [1] - 46:11
**developments** [1] - 47:19
**dialogue** [1] - 109:19
**dictate** [2] - 27:22, 95:7

**dictation** [1] - 13:8
**difference** [2] - 44:17, 81:15
**different** [17] - 12:9, 18:23, 19:12, 23:16, 30:11, 33:24, 35:15, 44:8, 46:6, 48:6, 49:5, 51:7, 59:21, 64:14, 81:4, 81:14, 99:1
**differently** [1] - 23:16
**difficult** [1] - 47:14
**difficulties** [1] - 120:14
**difficulty** [1] - 37:5
**diligent** [3] - 74:8, 84:17, 85:12
**direct** [5] - 29:11, 44:23, 45:10, 45:18, 81:25
**directing** [2] - 85:3, 121:2
**directly** [1] - 57:15
**Director** [3] - 48:7, 103:25, 105:9
**director** [2] - 47:17, 110:2
**disagree** [2] - 28:1, 117:8
**disappeared** [1] - 55:21
**disclaiming** [1] - 17:22
**discourage** [1] - 67:8
**discovery** [2] - 83:1, 83:13
**discretion** [16] - 6:1, 79:22, 79:25, 80:4, 80:7, 81:4, 86:18, 86:21, 93:1, 102:1, 103:21, 111:10, 111:12, 111:21, 112:7, 112:8
**discuss** [1] - 107:2
**discussed** [3] - 9:9, 29:8, 61:5
**discussing** [1] - 109:15
**discussion** [5] - 6:21, 32:18, 37:4, 88:2, 94:12
**discussions** [1] - 96:2
**dismissal** [1] - 102:23
**disparage** [1] - 51:5
**disparaged** [1] - 27:14
**dispense** [1] - 55:11
**disposed** [1] - 55:23
**dispositive** [4] - 29:19, 40:9, 40:10, 60:12
**dispute** [10] - 13:12,

56:9, 80:3, 80:6, 81:1, 82:15, 83:2, 96:23, 108:23, 109:6
**disputed** [2] - 51:7, 51:9
**disputes** [3] - 102:1, 102:3, 118:20
**disputing** [1] - 102:14
**disregarding** [1] - 36:6
**disrupt** [1] - 67:9
**disseminate** [1] - 75:19
**dissociated** [1] - 24:5
**dissolve** [2] - 47:22, 103:4
**distinction** [15] - 21:17, 21:19, 21:22, 21:23, 22:2, 22:12, 22:16, 22:17, 23:10, 24:19, 24:22, 43:23, 45:2, 105:2, 114:5
**distinctions** [2] - 44:16, 44:17
**DISTRICT** [2] - 1:1, 1:2
**district** [1] - 95:15
**District** [7] - 1:20, 2:6, 3:4, 19:25, 29:12, 48:4, 122:10
**disturb** [1] - 76:17
**divergence** [1] - 17:21
**diverse** [1] - 66:4
**division** [1] - 42:9
**docket** [2] - 49:23, 55:22
**doctrine** [2] - 21:13, 119:8
**doctrines** [2] - 15:19, 15:20
**documented** [1] - 26:25
**documents** [1] - 97:24
**DOJ** [1] - 42:6
**dollars** [1] - 95:18
**Don** [2] - 4:14, 25:4
**DONALD** [1] - 2:5
**done** [12] - 12:25, 26:8, 34:14, 50:19, 53:12, 65:2, 72:13, 72:18, 73:1, 74:18, 84:18, 84:20, 95:22, 96:7, 98:14, 98:16, 114:8, 120:9
**doubt** [4] - 24:13, 27:5, 53:3, 70:20
**doubts** [1] - 60:18
**down** [6] - 28:23, 64:19, 67:14, 68:18, 79:15, 93:3
**downside** [1] - 112:12
**dramatic** [1] - 35:5

**dramatically** [2] - 41:22, 57:14
**draw** [1] - 105:2
**drawn** [1] - 93:9
**due** [4] - 20:3, 64:1, 65:7, 75:25
**duly** [1] - 88:11
**DUNN** [2] - 1:16, 1:19
**Dunn** [2] - 4:5, 8:23
**duration** [1] - 18:4
**during** [2] - 55:14, 72:16

**E**

**early** [3] - 71:25, 78:11, 79:4
**easily** [1] - 15:3
**echo** [7] - 100:2, 100:4, 100:24, 101:8, 101:11, 101:15, 101:18
**economic** [3] - 47:19, 66:7, 75:20
**effect** [7] - 10:20, 10:23, 52:18, 59:19, 88:14, 106:19, 120:1
**effecting** [1] - 114:15
**effective** [1] - 94:10
**effectively** [4] - 59:9, 73:1, 80:20, 98:21
**effectiveness** [3] - 91:7, 94:2, 94:6
**effects** [1] - 31:25
**effectual** [1] - 55:12
**effectuate** [2] - 72:2, 77:21
**efficient** [1] - 64:2
**efforts** [2] - 75:3
**ego** [20] - 18:20, 21:2, 21:13, 21:21, 22:3, 22:4, 22:9, 23:6, 23:14, 23:15, 30:4, 35:15, 38:18, 38:19, 39:1, 41:24, 56:11, 56:18, 56:22, 106:4
**egos** [1] - 22:17
**EIMER** [19] - 2:11, 2:12, 5:9, 36:18, 37:1, 40:10, 40:24, 60:24, 61:2, 85:20, 85:25, 93:24, 94:25, 97:2, 97:12, 97:15, 97:20, 98:17, 117:3
**Eimer** [16] - 5:4, 5:5, 36:19, 40:21, 54:6, 54:23, 60:21, 60:23, 85:20, 93:6, 112:19, 113:15, 117:2, 118:8, 118:12
**either** [14] - 10:16,

11:13, 11:16, 11:19, 11:22, 29:1, 40:5, 50:3, 51:20, 52:7, 71:24, 92:12, 106:20, 108:9
**elaborate** [1] - 27:9
**elaboration** [2] - 52:20
**elements** [2] - 107:3, 109:14
**eliminate** [1] - 33:14
**eliminating** [1] - 120:13
**Elliott** [1] - 42:12
**elsewhere** [1] - 117:19
**embracing** [1] - 10:12
**emphasized** [1] - 120:22
**employed** [1] - 69:2
**employees** [1] - 96:3
**en** [2] - 50:12, 119:22
**enacted** [4] - 26:22, 35:23, 57:17
**enacting** [1] - 27:23
**encompasses** [1] - 80:9
**encountered** [1] - 120:14
**end** [7] - 17:5, 18:5, 61:4, 100:14, 101:3, 105:24, 107:1
**ended** [1] - 96:9
**endlessly** [1] - 50:25
**ends** [2] - 15:12, 122:5
**enforced** [2] - 13:5, 27:24
**enforcement** [4] - 16:17, 28:9, 114:12, 119:16
**engaging** [2] - 22:18, 32:1
**enormous** [3] - 59:7, 73:2, 81:15
**enormously** [2] - 82:24, 95:25
**ensue** [1] - 31:15
**ensure** [3] - 25:25, 67:16, 84:17
**entered** [2] - 35:6, 94:9
**enterprise** [1] - 96:1
**enters** [2] - 34:24, 35:8
**entire** [1] - 21:4
**entirely** [1] - 57:12
**entities** [1] - 39:8
**entitled** [9] - 22:10, 43:15, 49:14, 53:23, 54:15, 87:19, 115:2, 115:19, 120:2
**enunciated** [1] - 90:1
**environment** [1] - 66:7

**envision** [1] - 7:21
**envisioning** [1] - 107:22
**equitable** [5] - 10:19, 11:14, 53:24, 72:3, 84:19
**equity** [1] - 10:23
**equivalent** [1] - 64:12
**especially** [3] - 12:4, 53:10, 114:2
**ESQ** [12] - 1:14, 1:14, 1:17, 1:20, 2:3, 2:5, 2:9, 2:12, 2:16, 2:18, 2:21, 3:3
**essentially** [8] - 37:9, 82:10, 84:25, 95:2, 98:20, 115:24, 116:1, 121:8
**establish** [4] - 21:3, 22:9, 22:23, 104:23
**established** [9] - 12:13, 15:16, 20:11, 20:20, 24:2, 27:10, 30:13, 54:11, 64:11
**establishing** [7] - 22:3, 22:4, 22:5, 30:21, 31:10, 89:22, 117:22
**establishment** [2] - 26:20, 27:10
**estopped** [2] - 55:19, 62:23
**estoppel** [5] - 37:11, 39:24, 61:6, 61:14, 61:25
**Estrada** [30] - 4:4, 8:18, 8:23, 19:3, 25:8, 25:12, 26:4, 31:3, 31:22, 34:5, 41:8, 42:25, 43:6, 48:16, 48:18, 56:4, 58:7, 61:4, 61:13, 61:17, 61:23, 87:16, 112:3, 113:21, 113:22, 113:25, 117:4, 117:8, 117:20, 118:19
**ESTRADA** [17] - 1:20, 4:6, 8:15, 8:19, 14:19, 17:10, 19:2, 19:4, 19:9, 19:16, 19:18, 21:19, 23:21, 48:17, 113:23, 118:4, 119:5
**Estrada's** [3] - 38:3, 42:4, 118:10
**et** [1] - 85:19
**eternal** [1] - 55:9
**evade** [1] - 53:21
**evading** [1] - 54:4
**evaluate** [4] - 43:8,

47:5, 69:17, 121:13
**event** [2] - 12:11, 102:18
**events** [6] - 20:16, 24:7, 24:20, 29:13, 29:14, 30:7
**eventually** [2] - 57:6, 116:7
**evidence** [5] - 14:25, 24:11, 25:19, 26:6, 48:19
**evident** [1] - 31:12
**evidently** [1] - 31:20
**evolving** [1] - 46:5
**exactly** [7] - 40:13, 62:13, 63:1, 90:17, 103:10, 118:17, 119:24
**example** [2] - 16:4, 51:12
**exception** [4] - 28:2, 28:9, 57:9, 57:11
**excerpts** [1] - 16:8
**exclusively** [1] - 62:24
**excuse** [6] - 12:12, 21:23, 22:18, 50:10, 64:23, 100:18
**execution** [14] - 62:12, 81:2, 81:3, 81:8, 81:12, 91:18, 95:14, 96:24, 98:21, 108:1, 108:23, 109:23, 112:24, 112:25
**Executive** [1] - 105:8
**executive** [16] - 12:8, 12:17, 13:3, 13:13, 17:11, 17:16, 17:17, 17:23, 18:14, 26:16, 33:4, 33:6, 41:10, 41:18, 53:1, 88:7
**executor** [1] - 13:9
**exemption** [1] - 28:21
**exercise** [6] - 28:5, 57:4, 57:22, 79:25, 86:8, 86:10
**exercise-designed** [1] - 86:10
**exercising** [2] - 86:21, 93:1
**exhausted** [1] - 85:8
**Exhibit** [2] - 42:14, 47:17
**exist** [1] - 34:24
**existing** [2] - 11:7, 93:22
**expand** [1] - 29:12
**expanded** [1] - 95:3
**expect** [7] - 6:6, 46:25, 55:20, 83:21, 85:18, 98:5, 116:7
**expected** [1] - 104:4

**expeditiously** [1] - 104:8
**expenses** [1] - 107:22
**experience** [1] - 116:10
**experiencing** [1] - 56:16
**expert** [1] - 80:5
**expertise** [1] - 110:23
**experts** [1] - 107:23
**expire** [1] - 89:7
**expires** [1] - 89:5
**explain** [2] - 31:8, 102:19
**explained** [5] - 30:25, 41:16, 52:3, 103:25, 117:12
**explains** [1] - 52:7
**explanation** [3] - 31:14, 49:2, 65:4
**explanatory** [1] - 115:22
**explored** [1] - 79:15
**express** [4] - 9:22, 42:3, 47:3, 106:10
**expressed** [4] - 43:1, 102:8, 102:20, 103:7
**expressing** [2] - 10:10, 42:10
**expressly** [2] - 62:2, 90:13
**expropriated** [1] - 18:24
**expropriation** [2] - 11:11, 20:25
**extend** [5] - 72:6, 75:20, 84:2, 85:2, 85:5
**extended** [2] - 96:17, 96:18
**extendible** [1] - 72:7
**extending** [1] - 72:23
**extensive** [2] - 23:7, 71:21
**extensively** [1] - 72:9
**extent** [4] - 14:7, 39:24, 51:10, 102:13
**extra** [1] - 69:1
**extraordinary** [7] - 11:6, 26:10, 32:11, 32:13, 35:1, 35:3, 87:8
**extrapolate** [1] - 68:23
**extreme** [1] - 11:6
**eyes** [1] - 31:17

**F**

**faces** [1] - 59:4
**facilitate** [2] - 89:18,

98:3
**fact** [32] - 14:9, 15:24, 21:3, 24:7, 24:10, 24:22, 24:23, 26:23, 27:11, 30:11, 30:21, 32:12, 33:23, 38:9, 39:11, 39:21, 49:22, 55:9, 56:10, 57:13, 57:17, 58:20, 61:10, 62:18, 68:1, 69:24, 77:15, 85:7, 87:7, 93:19, 96:12
**fact-specific** [1] - 58:20
**factor** [1] - 107:16
**factors** [3] - 34:5, 47:15, 60:10
**facts** [6] - 20:24, 34:23, 51:17, 52:9, 57:20, 57:22
**factual** [2] - 41:16, 52:21
**factually** [1] - 55:10
**fail** [1] - 53:23
**failed** [1] - 50:2
**fair** [5] - 7:21, 49:25, 66:10, 69:14, 94:24
**fair-the-well** [1] - 49:25
**fairly** [2] - 48:23, 96:12
**faith** [2] - 67:6, 67:15
**fall** [3] - 51:16, 73:15, 119:14
**familiar** [2] - 95:12, 95:21
**fancy** [1] - 85:1
**FAQ** [3] - 115:9, 115:16, 117:12
**FAQs** [4] - 105:2, 105:9, 113:5, 114:22
**far** [4] - 68:14, 69:23, 105:22, 118:17
**fault** [2] - 74:14, 84:13
**favor** [2] - 38:23, 93:3
**features** [1] - 107:3
**February** [1] - 76:15
**federal** [5] - 8:6, 26:16, 53:5, 55:24, 109:1
**feedback** [1] - 121:13
**fees** [2] - 108:19, 109:8
**fetch** [1] - 109:11
**few** [6] - 25:6, 41:7, 56:6, 100:13, 107:9, 120:10
**fiduciary** [1] - 92:6
**fight** [2] - 16:6, 21:20
**fighting** [1] - 54:19
**figure** [2] - 79:19, 100:14

**file** [5] - 21:21, 21:24, 51:13, 85:9, 121:2
**filed** [17] - 9:22, 9:23, 12:12, 14:5, 17:2, 19:20, 20:2, 21:5, 22:25, 29:1, 48:3, 49:13, 49:23, 78:21, 85:11
**filings** [6] - 36:17, 41:16, 42:8, 43:3, 43:24, 47:9
**final** [12] - 10:19, 10:24, 11:16, 12:5, 12:10, 16:16, 35:1, 45:13, 49:23, 50:5, 51:18, 52:9
**finally** [4] - 42:23, 52:12, 58:22, 84:24
**financial** [4] - 65:13, 65:16, 65:19, 66:2
**fine** [3] - 80:24, 95:5, 95:8
**FINGER** [1] - 1:13
**firm** [3] - 4:3, 10:10, 118:24
**firmly** [1] - 113:20
**First** [5] - 50:10, 50:12, 50:14, 50:19, 50:23
**first** [19] - 7:2, 25:12, 26:11, 37:7, 37:12, 38:18, 40:2, 40:10, 41:9, 41:18, 45:1, 46:7, 56:8, 63:10, 73:7, 86:22, 92:1, 115:10, 120:11
**five** [6] - 58:12, 69:11, 107:9, 107:13, 108:7, 110:24
**flat** [3] - 55:4, 55:17, 83:16
**flexible** [1] - 75:24
**floor** [1] - 8:10
**fluid** [1] - 33:4
**focus** [3] - 7:8, 48:15, 91:11
**focused** [2] - 60:13, 63:9
**foisting** [1] - 9:17
**folks** [1] - 85:18
**follow** [15] - 7:11, 13:9, 13:10, 13:24, 29:9, 52:14, 64:4, 64:8, 64:10, 70:25, 74:17, 81:23, 82:4, 104:24, 111:19
**follow-up** [2] - 13:24, 52:14
**followed** [1] - 112:10
**following** [2] - 3:20, 112:17

**Following** [1] - 63:24
**follows** [2] - 19:22, 111:19
**foothold** [1] - 58:15
**footnote** [1] - 24:10
**FOR** [1] - 1:2
**forbid** [1] - 19:10
**forbidden** [1] - 115:17
**force** [1] - 61:21
**forced** [6] - 42:17, 45:7, 64:13, 77:11, 77:12
**foregoing** [1] - 122:7
**foreign** [30] - 13:25, 15:9, 18:9, 26:17, 27:10, 27:21, 28:3, 28:4, 30:23, 31:24, 41:15, 43:1, 43:9, 43:12, 44:9, 44:25, 46:16, 51:22, 60:8, 87:12, 87:19, 88:6, 88:19, 92:18, 102:6, 102:21, 103:12, 103:17, 104:11, 118:24
**forever** [3] - 96:6, 96:19, 116:1
**forgotten** [1] - 95:17
**form** [3] - 10:18, 39:20, 39:22
**formal** [1] - 103:17
**former** [1] - 21:16
**forte** [1] - 8:21
**forth** [11] - 43:13, 63:25, 68:24, 69:7, 69:11, 69:12, 74:17, 82:23, 112:9, 112:16, 116:16
**forthcoming** [1] - 110:5
**forum** [1] - 39:23
**forward** [32] - 46:17, 67:22, 68:4, 73:18, 73:25, 84:14, 87:8, 87:23, 88:13, 88:25, 89:24, 91:8, 97:10, 97:23, 101:15, 102:9, 102:11, 103:8, 103:14, 103:18, 103:20, 104:7, 104:9, 104:15, 105:6, 106:8, 106:17, 108:14, 112:7, 114:12, 118:25, 121:14
**founded** [1] - 23:1
**four** [2] - 104:3, 107:11
**frame** [1] - 35:10
**frankly** [1] - 31:21

**fraud** [6] - 38:24, 39:2, 39:8, 39:19, 39:22, 40:1
**free** [5] - 27:25, 32:9, 67:17, 75:17, 111:20
**free-wheeling** [2] - 27:25, 32:9
**frequently** [1] - 114:23
**friend** [13] - 25:12, 26:13, 27:15, 27:19, 29:16, 29:21, 31:22, 32:3, 33:19, 34:5, 58:6, 59:13, 95:23
**friends** [1] - 35:20
**front** [6] - 14:11, 18:19, 53:21, 56:1, 73:9, 120:17
**frozen** [5] - 29:1, 29:5, 33:16, 34:19, 48:23
**fruitless** [1] - 86:9
**FSIA** [15] - 12:13, 27:23, 28:3, 37:10, 37:16, 38:12, 38:14, 40:13, 40:14, 54:12, 54:16, 57:2, 57:8, 57:23, 85:1
**full** [4] - 21:5, 46:10, 66:15, 66:18
**fullest** [1] - 75:22
**fully** [5] - 18:18, 54:9, 79:14, 79:24, 88:20
**function** [1] - 77:15
**fundamental** [1] - 41:24
**funds** [2] - 53:18, 66:6
**future** [3] - 30:10, 33:24, 103:25

**G**

**Gacki** [3] - 47:16, 48:7, 104:1
**Gacki's** [1] - 105:9
**Gaffigan** [2] - 1:24, 122:9
**gain** [1] - 68:8
**game** [1] - 7:21
**garnish** [1] - 56:13
**garnishment** [5] - 28:11, 30:4, 56:17, 56:20, 56:24
**GARRETT** [1] - 2:16
**Garrett** [1] - 5:20
**Gas** [1] - 65:11
**gathers** [1] - 27:11
**gavel** [2] - 64:19, 68:18
**general** [6] - 16:12, 17:12, 26:22, 36:1, 36:4, 42:9
**General** [2] - 3:4,

26:23
**generalized** [1] -
28:19
**generally** [1] - 80:6
**genuinely** [1] - 76:4
**geographic** [3] -
23:12, 35:14, 36:9
**germane** [1] - 16:24
**GIBSON** [2] - 1:16,
1:19
**Gibson** [2] - 4:4, 8:23
**given** [17] - 6:20,
16:20, 20:14, 34:9,
35:22, 57:11, 73:4,
78:23, 88:22, 89:3,
97:9, 106:21, 107:4,
113:10, 115:10,
116:10, 116:21
**glad** [1] - 36:22
**global** [1] - 66:8
**God** [2] - 19:9, 77:6
**gold** [1] - 39:16
**govern** [1] - 16:22
**governance** [1] - 24:2
**governed** [1] - 54:12
**governing** [1] - 115:18
**government** [69] -
9:25, 11:18, 13:17,
14:5, 14:7, 14:16,
14:22, 15:4, 15:20,
15:23, 16:1, 16:4,
17:3, 17:8, 17:22,
24:12, 25:14, 25:15,
25:16, 25:24, 25:25,
26:5, 26:12, 26:15,
30:11, 31:4, 31:16,
31:19, 31:23, 33:18,
34:3, 41:1, 41:19,
42:18, 43:5, 43:24,
43:25, 44:1, 44:8,
45:25, 46:6, 46:12,
46:17, 51:8, 51:14,
51:24, 52:9, 52:17,
53:17, 57:16, 57:17,
58:8, 60:17, 87:15,
87:17, 87:18, 87:22,
87:23, 88:23, 92:20,
100:25, 106:15,
112:3, 114:2, 114:7,
115:7, 119:13,
119:25
**Government** [4] -
33:17, 33:21, 43:15,
53:17
**Government's** [1] -
107:4
**government's** [14] -
9:2, 9:10, 9:19,
11:17, 13:23, 43:9,
44:19, 45:17, 47:10,
51:4, 60:5, 102:18,

102:20, 104:22
**governs** [1] - 54:13
**grant** [8] - 41:14, 57:8,
59:20, 59:24,
103:22, 103:23,
109:25
**granted** [10] - 4:18,
5:8, 20:3, 20:13,
21:6, 23:3, 40:3,
69:3, 89:13, 89:14
**grateful** [2] - 43:25,
44:2
**gratified** [1] - 113:16
**grave** [1] - 32:4
**great** [8] - 44:21,
48:20, 52:3, 60:18,
76:25, 85:23, 90:12,
112:14
**GREEN** [12] - 2:18,
99:6, 99:13, 99:16,
99:20, 99:25, 100:6,
105:16, 105:19,
108:10, 109:18,
110:13
**green** [7] - 99:11,
99:15, 99:24,
100:13, 107:8,
108:9, 110:11
**Green** [5] - 5:21, 5:24,
99:6, 99:17, 105:14
**grievously** [2] - 31:16,
42:17
**ground** [5] - 26:24,
35:21, 46:5, 106:15,
108:13
**grounded** [1] - 53:10
**grounds** [3] - 62:10,
62:16, 63:1
**group** [2] - 66:5, 87:3
**Guaidó** [24] - 11:24,
12:2, 17:5, 24:1,
25:14, 25:15, 25:16,
25:24, 26:5, 26:12,
31:19, 31:23, 33:18,
34:2, 41:19, 42:18,
51:5, 51:13, 51:14,
52:22, 53:16, 55:3,
87:16
**Guaidó's** [1] - 43:3
**guess** [6] - 34:14,
43:1, 45:20, 93:8,
98:14, 113:12
**Gulf** [1] - 2:24

## H

**Hail** [1] - 23:22
**hallmark** [1] - 37:22
**Hamaca** [1] - 2:24
**hand** [6] - 16:17,
25:21, 58:7, 103:16,

104:2, 104:16
**hands** [4] - 64:21,
80:11, 97:25, 112:20
**happy** [9] - 9:3, 13:20,
32:23, 70:23, 77:25,
104:19, 108:12,
115:21, 116:8
**hardship** [2] - 11:7,
11:8
**harm** [8] - 87:12,
88:25, 90:2, 93:19,
93:21, 117:21,
118:18, 121:15
**harmed** [2] - 89:3,
89:4
**Harrison** [1] - 39:12
**hat** [1] - 24:1
**head** [3] - 17:11,
18:14, 53:1
**health** [1] - 67:4
**healthy** [1] - 122:1
**hear** [7] - 3:23, 4:8,
7:2, 7:10, 7:12, 8:16,
8:17, 9:20, 19:4,
19:6, 41:4, 41:5,
63:10, 63:13, 79:13,
85:18, 90:8, 95:9,
98:10, 99:25, 100:1,
101:20, 102:16,
105:17, 108:12,
110:15
**heard** [10] - 6:7, 7:5,
7:14, 25:7, 36:17,
49:1, 52:6, 52:15,
93:25, 98:7
**hearing** [20] - 5:23,
8:25, 9:5, 9:12, 10:9,
13:13, 13:24, 28:25,
34:16, 44:3, 45:6,
55:22, 59:22, 61:13,
72:8, 73:14, 101:8,
101:11, 101:18,
119:22
**hearings** [1] - 32:13
**heavily** [1] - 60:10
**held** [5] - 3:21, 20:19,
65:7, 69:6, 90:14
**help** [11] - 44:20,
45:24, 53:24, 73:21,
74:24, 80:5, 80:23,
81:18, 83:19, 112:13
**helpful** [5] - 8:2, 9:16,
13:18, 105:23,
120:12
**Hemisphere** [1] -
58:15
**hereby** [1] - 122:7
**Hi** [1] - 99:6
**high** [2] - 53:3, 116:23
**highest** [4] - 31:6,
68:3, 76:4, 109:12

**highlight** [2] - 50:8,
114:4
**hire** [2] - 68:14,
107:24
**hiring** [2] - 71:6, 76:7
**HIRZEL** [1] - 4:25
**Hirzel** [1] - 5:1
**historical** [2] - 21:3,
51:17
**historically** [1] - 21:1
**history** [3] - 21:4,
86:4, 119:21
**hoc** [2] - 12:5, 12:14
**hold** [4] - 41:25, 53:6,
56:12, 118:5
**Holding** [9] - 2:13, 5:2,
5:6, 38:5, 61:10,
61:19, 62:5, 62:17,
62:19
**Holdings** [1] - 2:13
**homework** [1] -
120:19
**Honor** [100] - 4:1, 4:6,
4:12, 4:19, 4:23,
4:25, 5:9, 5:13, 5:19,
6:4, 8:15, 15:16,
23:25, 25:3, 25:10,
28:23, 30:16, 30:18,
32:23, 34:20, 35:19,
36:18, 36:21, 37:1,
37:6, 37:8, 41:3,
41:7, 43:18, 44:22,
46:2, 47:7, 48:2,
48:17, 56:6, 60:3,
60:24, 61:6, 61:13,
63:2, 63:6, 63:12,
64:3, 65:12, 65:14,
71:10, 71:13, 72:15,
72:25, 73:7, 73:16,
74:2, 74:16, 78:7,
78:22, 79:3, 79:14,
81:6, 82:6, 82:19,
83:4, 83:5, 84:9,
84:21, 85:20, 85:25,
88:10, 89:6, 89:16,
92:13, 93:25, 95:12,
95:21, 97:5, 100:11,
101:7, 101:14,
101:24, 102:10,
103:4, 104:20,
105:1, 105:4, 105:5,
105:20, 110:14,
111:2, 111:8, 112:5,
113:13, 113:23,
113:24, 118:1,
118:4, 119:5,
121:19, 122:4
**Honor's** [8] - 4:15, 5:5,
25:9, 29:25, 34:6,
37:15, 62:8, 76:16
**HONORABLE** [1] -
1:11

**highlight** column continues:

**hope** [4] - 3:23, 9:16,
78:10, 116:24
**hopeful** [1] - 79:17
**hopefully** [2] - 74:2,
100:13
**horrible** [1] - 12:25
**horse's** [1] - 17:17
**hostile** [1] - 58:14
**huge** [1] - 70:5
**hundred** [1] - 95:18
**hypothetical** [1] -
86:19
**hypothetically** [1] -
18:12

## I

**idea** [2] - 27:14, 42:21
**ideas** [1] - 45:2
**identified** [3] - 28:13,
34:6
**identify** [3] - 8:3, 8:20,
49:8
**ignore** [1] - 57:22
**illuminating** [1] -
49:12
**image** [3] - 15:8, 18:8,
105:21
**imagine** [2] - 31:24,
65:14
**immediate** [2] - 40:12,
45:14
**immediately** [1] -
118:23
**immunity** [8] - 12:4,
12:6, 28:3, 28:22,
49:21, 49:24, 57:3,
57:9
**impatient** [1] - 96:20
**imperil** [4] - 14:2,
14:8, 103:12, 103:19
**imperiled** [4] - 44:12,
44:13, 44:14, 104:11
**imperilling** [1] -
118:24
**implemented** [6] -
26:23, 35:23, 35:24,
36:1, 36:3, 57:19
**implicate** [4] - 14:3,
16:18, 47:21, 88:6
**implicated** [3] - 16:14,
32:20, 45:24
**implication** [1] - 4:7
**implications** [7] -
14:17, 30:24, 31:11,
42:19, 46:16, 46:19,
121:12
**imply** [1] - 96:18
**important** [3] - 64:5,
64:8, 93:20

**impose** [1] - 21:13
**imposing** [2] - 22:19,
105:3
**impossible** [1] - 97:8
**improperly** [1] - 41:10
**IN** [2] - 1:1, 1:2
**inability** [1] - 117:23
**inadequate** [2] - 90:5,
90:10
**inappropriate** [4] -
42:1, 59:14, 86:11,
92:1
**inaudible** [1] - 5:3
**Inc** [2] - 2:13, 2:13
**incentive** [1] - 67:22,
83:15, 83:20, 91:5,
94:17, 94:20, 96:11
**incentives** [1] - 76:2
**inclined** [1] - 67:4
**include** [4] - 29:17,
47:18, 58:16, 69:8
**included** [1] - 60:5
**including** [3] - 18:2,
45:15, 79:8
**inconsistent** [3] -
29:21, 55:5, 55:17
**incorporate** [2] - 90:7
**incorrect** [1] - 36:7
**incumbent** [1] - 53:6
**indeed** [1] - 74:12
**indefinite** [1] - 115:24
**independent** [6] -
12:22, 12:24, 13:3,
15:24, 18:10, 24:2
**independently** [2] -
15:22, 43:8
**indicate** [3] - 41:21,
121:5, 121:6
**indicated** [5] - 28:23,
43:25, 47:16, 89:23,
92:17
**indicates** [1] - 48:8
**indicating** [1] - 60:6
**indication** [7] - 78:24,
86:6, 89:2, 89:4,
89:14, 111:20,
113:10
**individual** [1] - 81:20
**indulgence** [1] -
116:25
**information** [16] -
16:8, 59:23, 59:25,
65:22, 66:2, 70:11,
74:22, 74:24, 75:22,
76:1, 76:10, 83:7,
83:10, 83:15, 83:17,
83:19
**informative** [1] - 9:25
**initial** [1] - 99:8
**injure** [1] - 88:18
**injured** [2] - 115:25,

116:15
**injurious** [1] - 116:4
**injury** [3] - 87:23,
92:17, 92:21
**injustice** [1] - 12:25,
39:19, 53:13
**input** [3] - 46:12,
106:7, 120:18
**inquiry** [1] - 35:15
**insistent** [1] - 21:15
**insofar** [1] - 27:7
**insolvency** [1] - 116:6
**insolvent** [1] - 92:2
**inspection** [1] - 96:2
**instance** [1] - 80:4
**instead** [1] - 21:14
**instruction** [1] - 76:20
**instrumentality** [3] -
28:4, 39:1, 39:9
**intelligent** [1] - 58:17
**intend** [7] - 6:19, 7:11,
9:7, 9:8, 29:20,
44:15, 44:16
**intended** [5] - 9:12,
10:22, 100:12,
114:25, 120:1
**intends** [1] - 76:20
**intentions** [1] - 26:22
**interaction** [1] - 48:20
**interagency** [1] - 48:8
**intercession** [1] -
24:19
**interest** [57] - 5:25,
9:2, 9:19, 9:22, 9:25,
13:23, 14:5, 14:13,
14:21, 15:10, 15:14,
17:16, 18:2, 31:5,
32:19, 42:5, 42:15,
44:10, 46:11, 47:1,
47:3, 47:9, 48:3,
58:6, 59:11, 60:5,
60:9, 68:10, 69:4,
69:14, 69:15, 70:4,
75:20, 77:8, 77:10,
78:13, 81:21, 81:22,
82:3, 87:2, 87:15,
88:4, 88:12, 88:24,
92:17, 92:18, 93:2,
96:14, 97:22, 102:8,
102:20, 103:7,
107:5, 110:1,
114:14, 114:15,
118:13
**interested** [7] - 19:15,
46:12, 65:20, 67:4,
71:9, 80:2, 107:4
**interesting** [1] - 51:1
**interests** [19] - 14:1,
14:3, 27:21, 44:9,
44:11, 45:9, 46:6,
47:18, 52:21, 87:13,

87:14, 88:7, 88:21,
102:7, 103:12,
103:17, 103:19,
104:11, 118:24
**interference** [1] -
99:14
**interfering** [1] - 41:10
**interim** [3] - 23:1,
45:16, 92:24
**INTERNATIONAL** [1] -
1:3
**International** [2] -
1:22, 6:16
**Internet** [1] - 67:2
**interpretation** [5] -
10:3, 50:23, 117:15,
118:10, 119:12
**interrupt** [1] - 97:13
**interrupted** [3] - 37:5,
37:7, 37:13
**interrupting** [1] - 19:7
**intervene** [1] - 62:19
**intervening** [1] - 30:7
**intervention** [1] -
13:17
**interviews** [1] - 96:3
**introduce** [2] - 4:14,
107:2
**introduced** [2] -
25:19, 26:5
**introduction** [2] - 99:9
**investment** [3] - 71:6,
76:7, 110:25
**investors** [1] - 66:5
**invitation** [1] - 42:3
**inviting** [1] - 44:1
**invocation** [1] - 28:9
**invoked** [1] - 50:4
**invoking** [1] - 56:11
**involve** [3] - 73:2,
96:15, 96:17
**involved** [2] - 15:11,
15:12
**involving** [2] - 47:18,
48:4
**Iran** [1] - 58:14
**irony** [1] - 15:8
**irrelevant** [2] - 13:11,
29:15
**Islands** [1] - 50:6
**issuance** [1] - 54:20
**issue** [40] - 7:9, 14:11,
15:15, 16:2, 18:16,
19:8, 28:1, 29:19,
30:16, 31:20, 37:6,
37:8, 37:9, 37:17,
38:12, 40:2, 40:5,
54:14, 56:8, 65:15,
72:9, 72:13, 73:3,
74:1, 78:11, 82:1,
82:2, 82:16, 83:23,

93:24, 98:17, 101:9,
101:16, 102:7,
102:8, 102:15,
112:19, 113:15,
114:7, 117:24
**issued** [6] - 29:2,
50:18, 62:11, 71:23,
73:7, 119:21
**issues** [34] - 6:13,
6:25, 8:24, 9:1, 9:5,
9:8, 9:9, 9:11, 9:14,
10:7, 16:3, 16:24,
18:8, 19:5, 25:5,
32:4, 32:14, 47:6,
47:24, 48:14, 50:5,
54:1, 54:7, 54:10,
65:14, 85:10, 94:13,
94:14, 94:15, 96:25,
110:18, 114:2,
114:3, 114:6
**issuing** [2] - 60:19,
89:18
**itself** [10] - 26:7, 36:2,
39:4, 39:20, 76:12,
83:6, 88:18, 116:18,
117:10, 117:15

**J**

**January** [3] - 73:12,
95:10, 109:13
**Jeff** [1] - 4:1
**JEFFERY** [1] - 1:14
**job** [1] - 83:18
**joined** [1] - 5:21
**JOSEPH** [1] - 3:3
**Joseph** [1] - 5:14
**Journal** [1] - 65:11
**JR** [1] - 2:5
**judge** [1] - 55:24
**Judge** [4] - 1:11, 3:23,
99:20, 99:21
**judge's** [1] - 119:15
**judgment** [59] - 10:19,
11:16, 12:10, 15:24,
16:17, 18:25, 19:23,
21:7, 22:20, 24:15,
28:13, 28:20, 31:7,
32:9, 34:2, 34:3,
34:22, 34:24, 35:6,
38:4, 43:13, 49:10,
49:24, 52:9, 53:25,
54:2, 56:17, 56:18,
56:22, 59:1, 59:3,
59:5, 60:15, 64:1,
64:18, 64:22, 66:12,
66:15, 66:18, 66:22,
68:13, 69:24, 70:9,
70:10, 70:11, 70:20,
76:2, 76:14, 77:6,
77:10, 77:16, 81:9,

81:11, 109:21,
112:20, 114:13
**Judgment** [1] - 75:17
**judgments** [14] -
10:24, 12:4, 13:4,
13:9, 13:10, 35:1,
43:14, 50:6, 51:18,
53:20, 53:22, 54:4,
59:8, 59:10
**judicata** [1] - 50:24
**Judicial** [1] - 111:22
**judicial** [24] - 54:15,
61:5, 61:14, 61:25,
73:2, 80:13, 81:2,
81:3, 82:17, 85:15,
96:24, 98:4, 102:25,
108:1, 108:22,
109:23, 111:7,
111:11, 111:13,
111:21, 112:17,
112:23, 114:13,
119:15
**judiciary** [2] - 12:22,
41:11
**July** [3] - 6:14, 6:21,
6:22
**jurisdiction** [4] - 28:5,
28:22, 57:2, 57:23
**jurisdictional** [3] -
62:10, 62:15, 62:25
**jury** [1] - 68:22
**jury-rigged** [1] - 68:22
**JUSTICE** [1] - 3:3
**justice** [2] - 12:23,
39:14
**Justice** [5] - 5:14,
16:13, 17:15, 31:2,
119:7
**justifies** [2] - 11:3,
102:24
**justify** [3] - 28:4,
30:23, 55:14

**K**

**Kagan** [1] - 119:7
**KATZ** [1] - 2:21
**Katz** [2] - 5:22, 100:12
**keep** [6] - 8:1, 20:16,
30:18, 51:1, 69:22,
77:18
**keeping** [1] - 119:7
**KENNETH** [1] - 2:9
**Kenneth** [2] - 4:24, 5:3
**key** [2] - 26:9, 30:16,
41:16
**Kim** [2] - 5:22, 99:7
**KIM** [1] - 2:18
**kind** [10] - 27:25,
31:15, 95:14, 95:24,
102:22, 103:10,

106:16, 108:15,
110:4
**kindly** [1] - 113:6
**Kisor** [5] - 115:4,
115:18, 115:21,
119:6, 120:1
**KISOR** [1] - 115:4
**knowledge** [1] -
109:24
**known** [3] - 46:1,
48:21, 76:23
**knows** [4] - 31:3,
71:13, 72:15, 79:3
**KOBRE** [1] - 2:18
**Kobre** [2] - 5:22, 99:7

**L**

**language** [8] - 29:18,
31:21, 43:23, 44:4,
52:7, 60:13, 120:6
**large** [1] - 69:19
**largely** [1] - 118:7
**larger** [1] - 12:21
**last** [24] - 5:23, 6:14,
8:25, 9:4, 9:9, 9:20,
10:15, 14:4, 28:25,
29:9, 44:3, 48:3,
55:22, 61:13, 63:8,
63:20, 70:6, 73:8,
79:12, 113:12,
115:4, 117:6, 119:3,
120:14
**late** [1] - 71:24
**latitude** [1] - 90:13
**latter** [3] - 11:25,
21:15, 102:15
**law** [27] - 11:3, 27:24,
28:21, 29:15, 35:8,
37:18, 37:21, 38:16,
38:20, 39:5, 39:6,
39:11, 39:18, 52:4,
54:11, 64:11, 72:14,
72:22, 75:25, 84:6,
91:13, 91:21, 92:2,
106:20, 109:1,
115:1, 119:12
**lawful** [4] - 49:10,
51:9, 51:21, 53:20
**lawfully** [1] - 11:16
**laws** [4] - 26:22,
51:19, 57:17, 57:18
**lawsuit** [2] - 21:21,
21:25
**lawyers** [1] - 9:17
**Layton** [1] - 4:2
**LAYTON** [1] - 1:13
**lead** [4] - 33:24, 46:21,
94:24, 102:22
**leader** [2] - 15:9, 18:9
**leadership** [1] - 31:23

**leads** [1] - 114:21
**least** [7] - 6:22, 13:24,
29:4, 78:3, 87:1,
95:13, 108:25
**leave** [2] - 80:20,
86:25
**leaving** [2] - 80:11,
113:2
**led** [1] - 11:11
**left** [1] - 89:25
**legal** [30] - 10:7,
10:12, 10:19, 10:24,
12:10, 13:12, 13:15,
14:11, 20:21, 24:20,
25:22, 28:5, 28:6,
28:7, 28:20, 32:8,
32:10, 33:21, 33:22,
33:24, 47:24, 49:20,
50:5, 51:2, 53:8,
54:5, 56:8, 114:6,
115:20, 116:23
**legislature** [2] - 35:24,
69:12
**legitimacy** [2] - 25:14,
35:22
**legitimate** [5] - 26:12,
41:19, 42:18, 59:12,
67:9
**lending** [1] - 11:20
**length** [2] - 29:8, 52:3
**LEONARD** [1] - 1:11
**less** [6] - 15:13, 66:18,
67:16, 68:14, 104:3,
110:17
**lesser** [1] - 102:24
**letter** [19] - 16:12,
42:14, 42:16, 43:13,
44:23, 45:4, 45:6,
45:11, 45:13, 45:19,
46:15, 47:16, 48:8,
52:20, 58:10, 60:4,
103:25, 105:10,
119:25
**letters** [1] - 12:1
**level** [4] - 31:6, 75:21,
81:21, 81:22
**liability** [4] - 21:13,
22:6, 22:20, 59:3
**liable** [3] - 38:4, 56:12,
56:18
**liberally** [1] - 25:13
**license** [8] - 30:23,
47:14, 47:20, 59:20,
59:24, 60:11, 60:12,
60:19, 74:5, 77:19,
77:21, 78:18, 79:4,
86:5, 86:6, 86:7,
88:8, 88:18, 89:1,
89:8, 89:13, 89:14,
89:18, 92:10, 92:12,
93:4, 98:15, 102:3,

103:1, 103:15,
103:22, 103:24,
104:7, 104:9,
104:10, 104:17,
104:22, 106:21,
108:4, 109:17,
114:11, 114:12,
114:18, 115:7,
116:20, 117:25,
118:21, 119:1
**licenses** [4] - 13:6,
109:19, 109:25,
110:3
**licensing** [2] - 88:20,
115:15
**lien** [5] - 71:17, 71:20,
85:6, 113:9, 114:12
**light** [5] - 13:17,
46:23, 66:25, 94:7,
120:6
**lights** [2] - 60:17,
60:18
**likelihood** [1] - 18:3
**likely** [3] - 45:5, 94:23,
110:4
**limit** [6] - 71:20, 94:18,
95:7, 95:8, 95:24,
96:8
**limitation** [1] - 105:3
**Limited** [1] - 2:24
**limited** [8] - 7:23,
22:18, 23:6, 87:9,
87:10, 87:11, 115:8,
118:11
**limiting** [2] - 22:18,
117:6
**line** [9] - 5:4, 5:21,
16:12, 17:13, 17:14,
31:2, 42:6, 42:21,
106:14
**LIPTON** [1] - 2:21
**Lipton** [2] - 5:22,
100:12
**list** [1] - 19:14
**listing** [1] - 19:11
**litigant** [1] - 11:15
**litigate** [4] - 79:10,
116:4, 116:13,
118:17
**litigated** [8] - 24:16,
38:7, 38:11, 40:16,
49:25, 72:9, 74:7,
116:22
**litigating** [3] - 40:2,
119:19, 119:24
**litigation** [12] - 11:11,
38:10, 40:6, 40:18,
40:20, 48:5, 50:1,
51:2, 53:11, 55:1,
75:2, 82:14
**live** [1] - 22:12

**living** [1] - 8:22
**LLP** [7] - 1:16, 1:19,
2:5, 2:9, 2:11, 2:15,
2:18
**location** [2] - 23:12,
35:14
**logical** [2] - 49:1, 49:7
**logically** [1] - 22:21
**look** [6] - 17:17, 18:20,
50:24, 52:19, 86:22,
113:6
**looked** [1] - 14:6
**looking** [2] - 121:7,
121:16
**looks** [2] - 58:10, 97:5
**lose** [1] - 49:21
**losing** [2] - 15:12,
51:3
**loss** [1] - 119:22
**lost** [2] - 54:12, 97:16
**love** [1] - 55:9
**Lynn** [1] - 50:11

**M**

**Maduro** [4] - 48:1,
51:12, 55:2, 58:13
**Magistrate** [2] - 39:12,
39:13, 39:17
**main** [1] - 12:19
**major** [2] - 65:16,
65:19
**manage** [1] - 59:8
**management** [1] -
96:2
**manner** [7] - 28:10,
57:15, 58:2, 59:10,
102:11, 103:18,
109:11
**manufactured** [1] -
24:19
**manuscript** [1] - 16:5
**Marcus** [2] - 5:21, 99:6
**MARCUS** [1] - 2:18
**market's** [1] - 66:9
**Marshal** [1] - 109:4
**marshal** [4] - 66:20,
85:3, 97:4, 97:7
**Marshal's** [2] - 95:16,
97:8
**marshals** [8] - 54:17,
66:14, 68:2, 68:4,
69:16, 71:23, 80:6,
91:13
**marshals'** [1] - 73:13
**Mary** [1] - 23:22
**Master** [12] - 80:5,
80:14, 80:23, 81:18,
81:24, 82:21, 97:18,
97:21, 97:25, 98:3,

108:15, 112:13
**matter** [15] - 5:23,
5:25, 11:15, 18:6,
27:12, 28:14, 29:15,
30:7, 35:8, 54:10,
65:15, 78:1, 84:6,
97:5, 108:25
**matters** [1] - 7:25
**maximize** [7] - 73:21,
74:25, 83:19, 91:7,
94:17, 96:11, 106:25
**maximizing** [1] -
107:6
**mean** [24] - 16:3, 17:6,
18:5, 23:21, 30:8,
33:5, 44:8, 47:8,
50:10, 51:5, 51:15,
74:4, 76:3, 76:13,
77:11, 77:24, 83:16,
94:19, 103:16,
104:6, 116:10,
116:12, 117:17,
118:16
**meaning** [4] - 10:3,
10:13, 11:22, 62:5
**means** [6] - 29:19,
51:12, 96:18,
114:16, 117:12,
117:16
**meant** [2] - 17:20,
110:20
**mechanisms** [1] -
15:17
**meet** [1] - 120:3
**mention** [1] - 42:24
**mentioned** [1] - 46:15
**mentions** [4] - 44:25,
45:12, 45:14
**merit** [2] - 41:9, 42:20
**met** [1] - 112:16
**middle** [1] - 65:24
**might** [29] - 10:1,
16:18, 19:12, 25:10,
33:23, 37:3, 41:2,
43:5, 45:24, 53:10,
62:17, 65:20, 69:10,
80:2, 81:19, 83:3,
86:10, 86:11, 87:19,
87:20, 88:10, 90:11,
91:12, 91:16, 93:16,
94:22, 101:19,
105:10, 115:17
**MIGUEL** [1] - 1:20
**Miguel** [4] - 4:4, 8:23,
48:18, 113:24
**military** [1] - 58:16
**Miller** [1] - 68:25
**million** [3] - 58:12,
67:5, 67:15
**mind** [2] - 45:21,
91:10

**mine** [2] - 31:4, 39:16
**minimize** [1] - 91:6
**minimum** [2] - 95:3, 112:16
**minority** [2] - 96:14, 96:16
**minute** [2] - 33:5, 33:7
**minutes** [4] - 107:9, 107:13, 108:7, 111:25
**Miscellaneous** [1] - 6:18
**MISCELLANEOUS** [1] - 1:4
**missive** [1] - 18:15
**mistaken** [1] - 23:25
**misunderstand** [1] - 44:19
**mockery** [1] - 85:15
**moment** [1] - 98:12
**money** [4] - 15:21, 77:5, 77:13
**month** [2] - 17:2, 83:12
**months** [8] - 67:12, 67:18, 67:24, 73:10, 79:5, 93:20, 95:22, 104:3
**moot** [2] - 47:23
**MORITZ** [3] - 2:15, 2:16, 5:19
**Moritz** [1] - 5:20
**morning** [39] - 3:22, 4:1, 4:3, 4:6, 4:7, 4:12, 4:17, 4:19, 4:20, 4:23, 4:25, 5:7, 5:10, 5:11, 5:13, 5:16, 5:19, 6:5, 6:19, 8:15, 8:17, 25:3, 25:5, 25:8, 25:13, 36:17, 36:18, 43:6, 61:18, 63:14, 63:15, 93:25, 94:14, 95:24, 98:11, 99:9, 102:17, 105:21
**morning's** [1] - 45:6
**MORRIS** [1] - 2:9
**Morris** [1] - 5:3
**most** [7] - 17:1, 58:14, 68:16, 81:8, 94:23, 95:18, 120:13
**motion** [39] - 6:23, 9:9, 9:21, 10:8, 19:20, 20:2, 20:3, 20:12, 20:13, 21:5, 22:25, 23:3, 28:6, 34:22, 36:21, 36:22, 37:2, 37:17, 40:3, 40:23, 41:7, 41:14, 49:13, 50:20, 52:1, 53:15, 55:5, 55:16,

55:18, 61:6, 62:10, 63:6, 74:4, 84:22, 98:10, 103:3, 106:1, 106:11
**motions** [10] - 6:22, 8:12, 18:19, 47:22, 75:18, 94:14, 98:13, 98:18, 103:6, 116:23
**motions'** [1] - 6:25
**mouth** [2] - 15:21, 17:17
**move** [22] - 7:8, 48:15, 63:8, 67:19, 72:6, 73:25, 78:16, 84:3, 84:14, 88:13, 88:24, 91:8, 100:25, 101:1, 101:15, 103:8, 103:13, 104:7, 104:9, 104:15, 118:25, 121:14
**moves** [1] - 83:25
**moving** [13] - 4:22, 7:3, 11:8, 40:22, 46:17, 73:18, 84:7, 87:8, 102:9, 102:11, 103:18, 103:20, 105:6
**MOYER** [2] - 1:14, 4:1
**Moyer** [1] - 4:2
**MR** [84] - 4:1, 4:6, 4:12, 4:19, 4:23, 4:25, 5:2, 5:9, 5:13, 5:19, 8:15, 8:19, 14:19, 17:10, 19:2, 19:4, 19:9, 19:16, 19:18, 21:19, 23:21, 25:3, 33:12, 34:20, 35:18, 36:18, 37:1, 40:10, 40:24, 41:3, 41:6, 44:22, 46:2, 47:7, 48:17, 56:6, 59:25, 60:24, 61:2, 63:5, 63:12, 63:15, 75:15, 77:20, 78:6, 78:21, 79:3, 79:14, 80:9, 81:6, 82:6, 83:4, 84:9, 85:20, 85:25, 93:24, 94:25, 97:2, 97:12, 97:15, 97:20, 98:17, 99:6, 99:13, 99:16, 99:20, 99:25, 100:6, 101:7, 101:14, 101:24, 105:1, 105:16, 105:19, 108:10, 109:18, 110:13, 112:2, 113:23, 117:3, 118:4, 118:7, 119:5, 121:19
**MS** [5] - 100:11, 100:19, 100:21, 110:14, 110:16

**multiple** [1] - 24:17
**MUNGER** [1] - 2:5
**Munger** [1] - 4:14
**mute** [3] - 7:17, 8:1, 9:24
**muted** [1] - 60:24

## N

**NACHBAR** [3] - 2:9, 4:23, 5:2
**Nachbar** [1] - 5:3
**naked** [1] - 16:18
**name** [1] - 85:1
**Nate** [3] - 5:4, 36:18, 85:20
**NATHAN** [1] - 2:12
**national** [41] - 13:25, 14:3, 14:9, 14:20, 15:2, 15:5, 15:10, 15:13, 15:14, 15:15, 15:17, 16:9, 16:13, 16:19, 16:24, 18:2, 30:15, 30:24, 31:10, 31:25, 32:19, 42:13, 42:19, 44:10, 44:25, 45:21, 45:22, 45:23, 46:14, 46:18, 52:13, 52:16, 53:14, 58:5, 58:18, 58:20, 87:12, 88:6, 88:19, 92:18, 102:6
**nations** [1] - 58:14
**naturally** [1] - 119:14
**nature** [3] - 28:11, 29:22, 32:3
**naught** [1] - 75:3
**near** [1] - 31:22
**necessarily** [3] - 23:15, 77:13, 82:4
**necessary** [6] - 14:25, 66:12, 102:3, 103:15, 104:7, 104:17
**necessity** [1] - 69:3
**need** [14] - 30:22, 35:7, 36:8, 47:5, 71:14, 77:19, 77:20, 82:1, 89:18, 96:25, 108:2, 118:16, 120:9, 121:8
**needed** [3] - 21:3, 21:21
**needing** [1] - 47:13
**needlessly** [2] - 44:12, 104:11
**needs** [9] - 31:11, 32:10, 32:22, 86:22, 87:1, 110:19, 110:23, 114:11
**negated** [1] - 74:14

**negotiations** [4] - 96:15, 96:17, 97:24, 112:20
**neon** [2] - 60:17, 60:18
**Netherlands** [1] - 22:11
**never** [13] - 11:7, 38:3, 38:7, 38:8, 39:2, 39:3, 39:8, 40:16, 51:7, 55:8, 86:10, 86:20, 115:9
**new** [8] - 1:17, 12:11, 36:17, 37:1, 49:22, 57:17, 71:7, 93:24
**New** [7] - 1:17, 2:19, 2:22, 48:4, 67:2
**newly** [2] - 12:12
**news** [1] - 43:10
**newspaper** [2] - 17:7, 63:20
**next** [4] - 62:2, 62:3, 70:15, 108:7
**Nichols** [1] - 5:3
**NICHOLS** [1] - 2:9
**Nicolás** [1] - 51:12
**night** [1] - 48:3
**NO** [1] - 1:6
**nobody** [1] - 66:17
**noise** [1] - 7:18
**non** [3] - 62:10, 62:15, 62:25
**non-jurisdictional** [1] - 62:10, 62:15, 62:25
**none** [2] - 18:7, 53:25
**nonrefundable** [1] - 67:14
**normally** [1] - 105:17
**NOTE** [1] - 3:20
**note** [5] - 5:17, 6:8, 6:15, 9:23, 62:17, 91:12, 113:5
**noted** [4] - 5:23, 43:22, 47:23, 69:14
**notes** [1] - 122:7
**nothing** [16] - 11:10, 17:20, 22:12, 22:21, 36:25, 37:1, 42:1, 59:25, 63:5, 68:8, 70:13, 71:5, 86:23, 89:2, 92:23
**notice** [4] - 65:2, 65:18, 75:18, 75:21
**noticed** [1] - 43:23
**notices** [1] - 82:22
**noting** [1] - 62:8
**notion** [2] - 43:7, 69:16
**November** [1] - 73:8
**number** [8] - 9:3, 12:15, 12:16, 18:23,

46:6, 65:3, 79:7, 94:18
**numbers** [1] - 77:1
**numerous** [2] - 26:18, 59:8
**nutshell** [1] - 104:18

## O

**object** [1] - 94:6
**objection** [2] - 82:23, 97:18
**obligation** [4] - 14:16, 14:20, 14:21, 91:1
**obligations** [2] - 59:9, 80:20
**obtained** [1] - 103:14
**obvious** [1] - 53:16
**obviously** [5] - 46:4, 60:15, 65:11, 79:16, 106:9
**occur** [6] - 30:7, 86:7, 86:10, 86:12, 89:20, 92:25
**occurred** [4] - 8:25, 20:13, 56:22, 104:10
**occurs** [1] - 31:5
**odds** [1] - 76:24
**OF** [3] - 1:2, 1:6, 3:3
**OFAC** [50] - 46:24, 47:4, 47:8, 47:13, 47:17, 59:19, 59:24, 74:1, 74:3, 77:19, 77:20, 77:24, 78:18, 79:9, 79:12, 79:15, 86:13, 86:16, 88:11, 89:15, 89:18, 89:22, 92:4, 98:15, 98:17, 102:3, 103:1, 103:15, 103:20, 103:21, 104:7, 104:9, 104:17, 105:1, 105:8, 105:9, 105:11, 106:15, 108:4, 109:17, 109:20, 109:25, 110:2, 113:6, 113:10, 117:24, 118:9, 118:20, 119:1
**OFAC's** [3] - 60:11, 89:21, 114:3
**offer** [1] - 68:3
**offered** [2] - 36:8, 103:13
**offering** [3] - 65:25, 66:1, 66:14
**office** [2] - 24:1, 24:7
**Office** [3] - 95:16, 95:17, 97:8
**officer** [3] - 91:19, 98:5, 108:15

**official** [4] - 26:14, 33:20, 53:4, 111:2
**Official** [2] - 1:25, 122:9
**often** [1] - 72:24
**oil** [5] - 16:14, 66:8, 67:19, 68:10, 68:11
**Oil** [1] - 65:11
**OLSON** [1] - 2:5
**Olson** [1] - 4:15
**once** [4] - 20:18, 40:14, 49:2, 91:2
**one** [48] - 7:11, 18:4, 21:6, 21:20, 22:12, 30:20, 33:1, 33:3, 33:13, 40:4, 44:11, 50:14, 50:16, 53:12, 58:10, 59:17, 61:8, 63:19, 66:25, 69:10, 69:20, 71:12, 74:8, 78:25, 81:4, 81:16, 81:23, 84:12, 86:1, 86:3, 95:13, 96:3, 98:14, 101:25, 102:2, 103:16, 107:12, 108:9, 108:21, 109:23, 114:4, 117:3, 118:20, 119:6, 119:8, 120:19, 120:25
**ones** [3] - 21:12, 105:25, 107:25
**ongoing** [2] - 53:11, 116:6
**onsite** [1] - 96:1
**oOo** [1] - 3:18
**open** [1] - 96:9
**open-ended** [1] - 96:9
**opinion** [9] - 29:6, 29:8, 37:14, 37:15, 39:17, 62:1, 62:9, 115:22, 117:6
**opportunity** [2] - 76:13, 88:15
**oppose** [3] - 77:24, 80:11, 80:16
**opposed** [2] - 7:23, 108:1
**opposite** [1] - 29:7
**option** [3] - 67:12, 67:17, 98:14
**options** [2] - 19:12, 79:15
**oral** [2] - 3:20, 122:5
**Oral** [1] - 1:9
**order** [17] - 6:20, 7:12, 24:24, 55:11, 57:5, 57:6, 65:15, 68:12, 72:1, 73:17, 75:10, 76:16, 83:10, 85:3,

96:21, 97:3, 114:13
**ordered** [1] - 99:2
**ordering** [1] - 98:22
**Orders** [1] - 105:8
**orders** [4] - 57:7, 73:18, 93:13, 113:17
**ordinary** [4] - 16:17, 66:20, 69:2, 72:15
**ostensibly** [1] - 9:1
**otherwise** [6] - 22:25, 57:3, 58:16, 93:22, 109:3, 120:3
**ought** [2] - 28:14, 57:12
**outbid** [3] - 70:1, 70:18, 70:22
**outcome** [4] - 12:9, 13:4, 94:24, 98:20
**outlining** [1] - 116:18
**outright** [1] - 102:22
**outstanding** [1] - 9:5
**overall** [2] - 66:9, 101:17
**overcome** [1] - 98:18
**overcoming** [1] - 57:2
**overlap** [1] - 45:3
**overriding** [2] - 27:21, 109:10
**overrule** [1] - 115:6
**oversight** [1] - 98:3
**overstate** [1] - 46:13
**oversubscribed** [2] - 66:1, 66:4
**overturned** [1] - 78:10
**owe** [1] - 64:22
**own** [15] - 11:8, 13:10, 18:7, 18:13, 18:15, 20:22, 24:12, 24:20, 36:25, 60:15, 66:3, 70:23, 73:5, 113:1, 116:5
**owner** [3] - 38:1, 39:5, 75:19
**ownership** [5] - 37:19, 37:22, 38:6, 38:15, 39:16
**owning** [1] - 68:10

---

### P

**P.A** [1] - 1:13
**p.m** [1] - 122:5
**page** [10] - 17:2, 29:8, 33:2, 45:1, 45:13, 59:18, 60:4, 61:16, 62:1
**paid** [7] - 68:17, 70:1, 77:16, 98:23, 108:19, 116:7, 116:24

**panel** [1] - 12:24
**papers** [10] - 18:22, 25:12, 26:19, 29:6, 35:12, 58:24, 107:19, 111:5, 113:13, 116:5
**paragraph** [4] - 29:7, 58:10, 60:3
**paragraphs** [1] - 29:5
**Parents** [1] - 50:18
**Paria** [1] - 2:24
**part** [7] - 6:22, 24:25, 40:18, 40:19, 45:5, 103:22, 109:3
**participate** [1] - 109:22
**participation** [1] - 67:2
**particular** [3] - 22:4, 56:14, 119:20
**particularly** [5] - 9:25, 43:10, 60:2, 102:21, 105:23
**parties** [20] - 4:22, 7:4, 7:13, 8:13, 36:15, 40:22, 50:16, 53:12, 62:18, 62:22, 64:14, 80:2, 85:17, 91:4, 94:16, 95:4, 104:17, 108:13, 108:24, 112:7
**parties'** [5] - 7:10, 46:9, 120:24
**partner** [2] - 9:7, 116:8
**parts** [1] - 108:10
**party** [9] - 17:22, 51:3, 56:1, 70:10, 70:11, 75:13, 87:2, 89:23, 113:8
**party's** [1] - 11:8
**passage** [1] - 74:14
**passed** [1] - 38:20
**passing** [1] - 93:11
**past** [3] - 41:23, 84:1, 116:10
**pause** [4] - 6:10, 60:22, 110:10, 121:22
**pay** [18] - 11:16, 53:25, 54:2, 54:3, 59:1, 59:10, 64:18, 64:21, 64:22, 65:17, 68:18, 77:5, 77:23, 78:5, 98:9, 98:16, 98:22, 107:22
**paying** [3] - 59:5, 64:23, 77:10
**payment** [3] - 49:10, 53:21, 113:9
**PDV** [9] - 2:13, 5:2, 5:6, 38:5, 61:10,

61:19, 62:5, 62:17, 70:2
**PDVH** [8] - 45:15, 47:21, 62:5, 62:14, 70:3, 73:22, 90:21, 121:4
**PDVH's** [1] - 60:7
**PDVSA** [42] - 4:21, 5:1, 7:3, 7:13, 8:13, 10:4, 21:1, 21:6, 22:6, 22:9, 22:20, 23:13, 27:7, 36:15, 38:1, 38:4, 38:9, 39:6, 39:7, 39:14, 40:11, 42:17, 48:4, 54:2, 54:24, 55:1, 55:7, 56:12, 56:18, 61:15, 62:5, 62:9, 62:14, 62:24, 76:12, 85:19, 90:18, 92:2, 94:16, 113:3, 121:4
**PDVSA's** [1] - 45:15
**pendency** [2] - 54:25, 55:14
**pending** [10] - 8:12, 47:22, 53:15, 79:5, 98:11, 98:19, 103:1, 103:3, 110:6, 116:23
**penultimate** [1] - 60:3
**people** [13] - 24:17, 31:17, 52:25, 67:3, 67:8, 68:14, 69:22, 76:6, 82:23, 110:24, 111:17, 116:4, 116:6
**percent** [7] - 36:3, 66:14, 66:16, 66:19, 66:21, 67:15, 69:25
**perfectly** [1] - 14:24, 59:12, 80:24
**perhaps** [9] - 14:17, 18:23, 18:24, 18:25, 23:11, 35:12, 45:3, 62:5, 83:12
**period** [7] - 35:4, 72:2, 72:4, 72:6, 72:23, 80:21, 85:2
**permission** [6] - 4:15, 4:17, 5:5, 5:8, 5:24, 107:1
**permit** [3] - 50:4, 106:16, 106:18
**permitting** [1] - 7:15
**perpetually** [1] - 12:8
**person** [3] - 91:20, 111:3, 111:4
**personal** [1] - 42:10
**personally** [1] - 54:23
**perspective** [4] - 25:9, 83:24, 97:1, 101:25
**persuasive** [2] - 103:13, 118:23

**persuasiveness** [1] - 43:9
**pertinent** [13] - 18:10, 18:20, 19:12, 19:17, 19:19, 21:12, 23:11, 23:12, 34:12, 34:18, 35:13, 35:14, 84:5
**Petroleum** [2] - 2:14, 2:23
**Petrozuata** [1] - 2:23
**Phillips** [1] - 2:23
**phone** [2] - 37:5, 75:8
**phrase** [2] - 28:24, 52:17
**physical** [1] - 23:17
**pick** [4] - 22:22, 23:8, 70:15, 100:12
**picked** [2] - 22:23, 70:15
**piercing** [1] - 39:7
**place** [7] - 30:11, 67:14, 84:15, 89:12, 90:3, 90:13, 112:24
**placed** [1] - 15:18
**plain** [1] - 109:4
**Plaintiff** [1] - 1:4
**plaintiff** [2] - 43:11, 121:2
**plaintiff's** [2] - 43:11, 69:4
**plan** [1] - 106:24
**planning** [1] - 106:9
**plausible** [1] - 16:11
**play** [3] - 18:12, 83:23, 109:3
**played** [1] - 109:3
**playing** [2] - 51:2, 100:3
**plays** [1] - 67:18
**pleasure** [1] - 4:14
**plenty** [1] - 76:13
**plicated** [1] - 90:15
**plus** [1] - 93:21
**point** [53] - 11:12, 20:14, 23:13, 27:23, 29:24, 30:16, 32:2, 32:17, 34:25, 35:19, 35:25, 36:14, 36:24, 39:15, 39:16, 43:17, 50:13, 60:7, 62:22, 64:2, 64:16, 64:17, 64:18, 68:17, 71:12, 73:24, 74:13, 76:23, 77:7, 83:7, 84:10, 88:25, 89:21, 89:23, 90:11, 91:16, 92:10, 92:14, 93:3, 93:8, 93:23, 94:5, 98:9, 102:16, 107:15, 108:24, 111:10, 113:12, 115:20,

115:23, 116:2, 117:3
**pointed** [5] - 24:10, 29:6, 52:24, 72:9, 116:5
**pointing** [1] - 17:10
**points** [12] - 9:3, 25:6, 26:9, 41:17, 42:2, 56:7, 58:4, 61:3, 83:14, 117:21, 118:1, 118:8
**policy** [39] - 10:10, 11:23, 12:2, 12:21, 12:22, 13:9, 13:11, 13:14, 13:25, 18:3, 18:8, 27:10, 27:21, 28:20, 31:24, 32:9, 33:5, 33:6, 41:15, 43:2, 43:9, 43:12, 44:9, 44:25, 45:16, 46:16, 53:7, 53:9, 60:9, 87:12, 88:6, 88:19, 92:18, 102:6, 102:21, 103:12, 103:17, 104:11, 118:24
**political** [1] - 47:18
**portion** [4] - 8:7, 8:8, 70:2, 98:8
**posed** [1] - 88:10
**poses** [1] - 59:7
**position** [29] - 10:10, 11:18, 18:18, 19:13, 27:20, 29:15, 29:21, 43:14, 48:10, 56:10, 75:10, 86:23, 87:4, 87:5, 87:8, 87:20, 87:22, 88:22, 92:13, 104:18, 105:5, 106:22, 107:5, 107:25, 109:10, 119:24, 121:5, 121:6
**positions** [4] - 25:23, 119:19, 120:24, 121:1
**possession** [3] - 61:11, 61:20, 69:17
**possibilities** [1] - 18:23
**possibility** [6] - 33:10, 33:13, 33:14, 34:7, 35:7, 69:21
**possible** [5] - 64:23, 66:21, 71:8, 78:4, 108:20
**possibly** [4] - 30:2, 30:14, 48:24, 71:9
**post** [6] - 10:7, 10:9, 13:24, 34:16, 69:11, 71:15
**post-hearing** [2] - 10:9, 13:24
**post-sale** [1] - 34:16

**postdated** [1] - 24:14
**posthoc** [1] - 119:20
**posting** [2] - 69:10, 112:15
**postjudgment** [2] - 10:8, 115:24
**postponing** [1] - 102:25
**Potemkin** [3] - 15:9, 31:23, 87:17
**potential** [11] - 9:13, 45:7, 46:14, 46:16, 46:18, 59:3, 71:7, 102:6, 103:8, 109:15
**potentially** [4] - 47:11, 47:21, 93:20, 115:2
**poverty** [1] - 70:8
**power** [3] - 43:4, 72:3, 83:17
**powers** [1] - 108:16
**practical** [2] - 54:10, 66:23
**practice** [1] - 29:10
**precedent** [1] - 95:20
**precisely** [2] - 111:18, 117:11
**preclude** [1] - 75:11
**precluded** [1] - 86:16
**predated** [1] - 40:6
**prefatory** [7] - 47:12, 87:24, 88:5, 88:17, 104:4, 104:13, 106:16
**prefer** [1] - 79:25
**preferable** [1] - 68:14
**prejudice** [2] - 73:22, 105:22
**premises** [1] - 41:24
**prepared** [1] - 93:15
**preparing** [1] - 73:21
**prescribed** [1] - 27:24
**present** [2] - 32:10, 106:12
**presentation** [1] - 15:21
**presented** [2] - 14:14, 87:15
**preserved** [1] - 47:4
**President** [5] - 17:4, 24:18, 51:9, 51:11, 52:25
**president** [2] - 17:9, 17:11
**press** [5] - 65:13, 66:3, 66:5, 109:15, 110:16
**pressing** [1] - 118:23
**pressure** [1] - 59:7
**prestige** [1] - 15:11
**presumably** [1] - 81:22

**pretending** [1] - 59:2
**pretty** [3] - 69:20, 73:10, 82:13
**prevail** [1] - 106:13
**prevails** [1] - 106:11
**prevent** [2] - 16:5, 86:13
**prevents** [2] - 70:14, 71:5
**previously** [4] - 28:11, 56:11, 58:25, 61:5
**price** [6] - 64:14, 66:21, 69:14, 76:4, 109:12, 109:16
**prices** [1] - 67:19
**pricing** [1] - 66:7
**primarily** [1] - 46:17
**primary** [1] - 47:10
**principally** [2] - 8:11, 94:12
**principles** [2] - 30:4, 115:1
**priorities** [1] - 45:17
**priority** [5] - 81:25, 82:2, 82:13, 85:10, 121:12
**private** [2] - 75:13, 112:23
**problem** [6] - 71:18, 98:1, 100:7, 101:3, 101:4, 111:7
**problems** [2] - 31:15, 100:14
**procedure** [5] - 64:4, 70:25, 94:21, 95:2, 95:3
**procedures** [30] - 7:8, 7:20, 7:22, 9:13, 63:9, 63:24, 64:8, 64:11, 69:6, 69:12, 74:17, 75:7, 79:22, 89:12, 89:19, 89:22, 90:2, 90:4, 90:8, 90:9, 90:13, 91:18, 94:22, 95:6, 101:23, 104:23, 104:24, 111:14, 112:18, 117:22
**proceed** [3] - 76:18, 76:21, 102:2
**proceeding** [10] - 5:18, 8:6, 8:7, 8:9, 38:2, 62:18, 76:19, 83:1, 116:6, 122:7
**proceedings** [1] - 62:22
**proceeds** [1] - 108:21
**process** [60] - 30:18, 30:21, 31:10, 32:17, 32:21, 44:5, 46:10, 46:21, 47:4, 47:8,

48:9, 48:15, 54:13, 57:6, 59:9, 62:12, 63:16, 63:17, 64:1, 65:7, 67:10, 68:17, 68:19, 74:11, 75:1, 75:24, 75:25, 76:11, 78:23, 79:4, 80:23, 82:24, 85:14, 86:10, 86:20, 88:11, 88:14, 88:20, 89:24, 90:8, 91:6, 91:10, 92:15, 95:11, 95:25, 96:9, 98:4, 99:1, 107:17, 110:19, 110:23, 112:9, 112:13, 113:3, 114:14, 114:21, 116:16, 116:19, 116:24, 119:15
**processes** [5] - 16:22, 53:6, 71:4, 85:5, 85:7
**product** [1] - 117:23
**professional** [1] - 109:3
**professionals** [1] - 108:20
**progress** [2] - 31:18, 78:19
**prohibit** [2] - 73:18, 80:1
**prohibited** [2] - 8:7, 8:8
**prohibits** [1] - 117:10
**promise** [1] - 7:7
**proper** [1] - 103:6
**properly** [2] - 23:2, 34:9
**properties** [1] - 119:13
**property** [51] - 18:24, 19:25, 20:7, 20:9, 20:15, 20:18, 20:21, 21:8, 21:14, 22:4, 22:5, 22:24, 23:1, 23:3, 28:12, 29:22, 30:2, 30:3, 30:5, 30:6, 37:19, 37:22, 37:24, 39:6, 49:3, 49:6, 49:17, 49:18, 56:14, 56:21, 56:25, 57:12, 57:13, 57:16, 69:4, 75:19, 79:19, 106:20, 113:1, 114:9, 114:14, 114:15, 116:3, 117:11, 117:16, 117:18, 118:13, 118:14, 119:12, 119:16
**proposal** [1] - 107:18
**propose** [8] - 66:13, 66:19, 67:23, 68:2,

71:2, 72:12, 74:20, 74:21
**proposed** [17] - 7:22, 7:24, 42:23, 47:12, 63:22, 65:18, 75:8, 80:8, 86:14, 87:9, 87:11, 89:17, 90:5, 90:9, 94:21, 96:8, 105:11
**proposes** [4] - 68:20, 88:5, 88:17, 109:13
**proposing** [4] - 45:7, 63:16, 65:9, 65:10, 65:17, 65:21
**proposition** [3] - 21:24, 26:19, 52:15
**propriety** [4] - 37:20, 38:10, 40:16, 90:21
**prospect** [1] - 80:13
**prospective** [3] - 10:20, 10:23, 73:4
**protect** [6] - 68:13, 69:4, 74:6, 74:9, 84:2, 88:21
**protected** [5] - 47:4, 70:5, 71:16, 72:21, 113:17
**protecting** [1] - 47:9
**protection** [1] - 112:17
**protects** [2] - 88:12, 89:10
**prove** [1] - 60:11
**proved** [1] - 23:13
**proven** [1] - 20:2
**provide** [6] - 28:22, 44:1, 48:10, 83:16, 83:18, 83:21
**provided** [3] - 31:14, 117:18, 120:18
**provides** [2] - 32:6, 57:1
**provision** [1] - 121:9
**PTV** [1] - 62:19
**public** [9] - 15:8, 17:24, 41:11, 63:19, 64:2, 65:22, 69:15, 112:11, 114:25
**public's** [1] - 74:9
**publication** [2] - 16:5, 63:21
**publications** [1] - 65:16
**publish** [1] - 16:7
**published** [1] - 114:24
**purchaser** [1] - 73:5
**purchasers** [1] - 71:7
**purely** [1] - 50:5
**purport** [1] - 21:18
**purported** [4] - 9:22, 11:8, 49:3, 52:8

**purportedly** [1] - 49:5
**purporting** [1] - 20:22
**purports** [1] - 115:16
**purpose** [3] - 18:11, 92:14, 104:13
**purposes** [5] - 22:3, 22:5, 22:9, 22:19, 30:6
**pursuing** [2] - 84:17, 107:4
**push** [1] - 42:4
**put** [17] - 7:17, 15:20, 24:24, 29:4, 69:16, 74:23, 76:10, 83:10, 84:16, 86:9, 90:3, 90:16, 96:19, 97:6, 98:12, 116:1, 116:16
**puts** [2] - 53:5, 70:9
**putting** [3] - 76:9, 89:12, 90:13

**Q**

**quash** [12] - 6:23, 9:9, 9:21, 37:2, 40:3, 40:23, 55:6, 55:17, 55:18, 61:7, 62:10, 103:4
**quashed** [2] - 61:9, 61:12
**questioning** [1] - 43:22
**questions** [32] - 6:25, 9:4, 10:6, 12:3, 12:6, 13:20, 15:17, 25:9, 25:10, 28:24, 32:23, 36:21, 36:23, 43:18, 43:20, 50:25, 52:12, 53:19, 54:12, 55:24, 75:5, 78:15, 91:25, 93:7, 104:19, 107:10, 107:11, 107:20, 108:6, 114:23, 114:25, 121:16
**quickly** [4] - 8:24, 9:18, 78:16, 114:1
**quietly** [1] - 107:13
**quite** [12] - 25:13, 28:16, 29:21, 32:19, 57:23, 63:24, 64:7, 65:1, 70:15, 81:22, 91:15, 98:7
**quote** [2] - 17:3, 17:5
**quotes** [2] - 33:3, 62:3

**R**

**raise** [4] - 40:12, 54:9, 54:18, 66:6

**raised** [18] - 9:1, 10:7, 30:16, 37:6, 37:17, 40:5, 40:6, 40:8, 40:11, 61:17, 65:25, 73:6, 73:8, 81:19, 83:23, 97:2, 110:18, 114:2
**raises** [3] - 45:20, 58:2, 78:3
**ran** [1] - 6:13
**rapidly** [2] - 46:4, 47:18
**rather** [5] - 10:19, 10:23, 41:15, 42:7, 96:15
**rationally** [1] - 75:20
**re** [2] - 68:5
**re-auction** [2] - 68:5
**reach** [3] - 94:13, 94:15, 96:25
**read** [3] - 11:18, 18:22, 68:21
**reading** [3] - 10:8, 58:9, 120:6
**ready** [2] - 101:14, 115:17
**reaffirm** [2] - 17:4, 17:9
**real** [3] - 77:8, 110:23, 112:12
**realities** [2] - 33:10, 33:15
**realize** [2] - 32:1, 52:8
**really** [35] - 18:5, 22:12, 31:11, 32:22, 37:2, 38:20, 38:22, 38:25, 39:25, 44:17, 44:18, 47:5, 48:10, 49:1, 56:15, 61:21, 64:21, 68:21, 69:18, 69:21, 70:9, 70:15, 72:12, 78:12, 80:17, 83:17, 88:25, 89:25, 95:1, 103:2, 104:18, 108:23, 113:1, 118:16, 119:23
**realm** [1] - 102:21
**reason** [19] - 10:18, 11:3, 13:16, 19:22, 24:12, 27:5, 29:17, 35:18, 40:12, 55:20, 70:20, 74:22, 84:1, 90:24, 91:8, 94:5, 103:13, 115:13, 118:23
**reasonably** [3] - 64:2, 64:12, 91:23
**reasons** [2] - 10:14, 84:11
**rebuttal** [1] - 7:6
**receive** [1] - 6:20

**receiver** [20] - 68:20, 68:23, 69:1, 70:5, 80:4, 80:19, 81:17, 81:20, 81:25, 82:5, 82:16, 92:1, 92:10, 97:4, 107:22, 107:23, 110:21, 111:4
**receivership** [1] - 80:17
**recent** [1] - 17:1
**recently** [3] - 16:6, 58:14, 62:20
**recognition** [3] - 26:11, 43:5, 51:21
**recognize** [6] - 34:2, 64:5, 74:1, 84:4, 94:11, 120:17
**recognized** [4] - 41:18, 51:8, 64:10, 79:23
**recognizes** [1] - 26:17
**recognizing** [2] - 33:18, 64:12
**recommend** [4] - 111:8, 111:19, 119:6, 120:5
**recommendation** [1] - 82:2
**recommendations** [1] - 6:3
**reconsideration** [1] - 35:1
**record** [11] - 6:16, 8:7, 26:3, 27:1, 29:11, 29:13, 30:14, 32:5, 36:2, 55:10, 121:1
**recourse** [1] - 55:13
**recovered** [1] - 94:17
**reducing** [1] - 73:22
**reestablished** [1] - 26:2
**refer** [1] - 55:9
**reference** [4] - 13:24, 35:10, 82:25, 114:22
**referring** [1] - 60:2, 61:5
**refers** [1] - 91:18, 117:5
**reflect** [2] - 42:6, 43:14
**reflected** [1] - 88:1
**refrain** [1] - 47:11
**refugees** [1] - 58:12
**refundable** [1] - 67:6
**refuse** [1] - 83:16
**refuses** [2] - 11:15, 17:4
**refusing** [1] - 17:9
**refute** [2] - 35:19, 36:9
**regardless** [4] - 14:10,

14:15, 47:1, 54:18
**regime** [6] - 11:24, 41:19, 47:20, 59:7, 81:4, 118:15
**regime's** [1] - 58:13
**regimes** [1] - 48:1
**registered** [1] - 18:25
**registration** [1] - 109:21
**regulation** [12] - 114:7, 114:10, 114:17, 114:22, 115:12, 115:14, 116:18, 117:10, 117:15, 117:19, 120:7
**regulations** [7] - 73:17, 86:13, 86:16, 92:4, 105:9, 105:11, 118:18
**regulatory** [4] - 67:13, 67:24, 68:2, 73:5
**reiterate** [1] - 74:16
**reiterating** [1] - 77:18
**relate** [1] - 6:21
**related** [4] - 4:21, 7:3, 7:13, 8:13
**relatedly** [2] - 34:14, 44:10
**relates** [2] - 14:10, 120:21
**relating** [1] - 8:12
**relations** [1] - 30:24
**relationship** [2] - 25:16, 58:13
**release** [3] - 66:3, 66:5, 113:9
**relevance** [2] - 21:22, 24:13
**relevant** [20] - 12:7, 13:15, 14:23, 16:1, 20:5, 20:17, 21:1, 21:23, 23:7, 24:4, 24:7, 24:14, 29:23, 30:1, 51:10, 74:24, 75:22, 75:23, 82:23, 83:11
**relief** [1] - 11:3
**relitigation** [1] - 50:4
**rely** [3] - 21:11, 75:25, 113:18
**relying** [1] - 21:13
**remain** [3] - 9:4, 13:7, 33:4
**remains** [1] - 13:15
**remand** [1] - 29:11
**remarks** [2] - 61:4, 100:13
**remedy** [2] - 69:2, 102:24
**remind** [2] - 8:5, 54:21

**remotely** [2] - 3:21, 42:1
**removed** [1] - 106:21
**render** [1] - 9:24
**rendered** [2] - 34:23, 56:23
**renders** [1] - 34:22
**renewal** [1] - 67:25
**reopened** [1] - 12:8
**repeat** [2] - 52:5, 66:17
**repeated** [2] - 88:3, 98:7
**repeatedly** [2] - 44:24, 55:3
**repeating** [1] - 97:15
**report** [1] - 121:3
**reported** [1] - 65:13
**Reporter** [2] - 1:25, 122:9
**reporter's** [1] - 6:15
**REPORTER'S** [1] - 3:20
**represent** [1] - 17:23
**representation** [2] - 53:6, 103:18
**representations** [6] - 17:15, 52:16, 55:4, 55:25, 61:15, 72:19
**Representative** [5] - 42:16, 43:13, 44:24, 45:11, 103:11
**representative** [1] - 42:12
**represented** [3] - 55:8, 55:11, 120:20
**representing** [3] - 5:15, 18:13, 62:4
**represents** [1] - 31:7
**REPUBLIC** [1] - 1:6
**republic** [1] - 13:2
**Republic** [28] - 2:7, 4:10, 4:13, 4:16, 6:17, 7:3, 7:12, 10:4, 10:17, 11:12, 11:14, 19:24, 23:10, 25:2, 27:5, 38:6, 48:21, 49:8, 49:9, 49:19, 50:1, 50:4, 58:23, 59:19, 59:21, 93:16, 106:11, 121:3
**Republic's** [2] - 34:13, 59:11
**request** [4] - 47:10, 74:4, 103:24, 109:22
**requested** [3] - 71:21, 109:18, 109:19
**requesting** [1] - 102:24
**requests** [3] - 83:1, 83:13, 110:6

**require** [3] - 57:18, 69:25, 96:1
**required** [9] - 40:19, 61:8, 61:11, 64:14, 64:17, 67:14, 95:4, 104:23, 117:14
**requirement** [3] - 38:25, 92:3, 115:10
**requirements** [5] - 11:19, 69:9, 75:24, 112:14, 120:3
**requires** [7] - 11:5, 28:14, 39:18, 66:11, 90:15, 91:13, 114:18
**requiring** [2] - 69:9, 95:6
**res** [1] - 50:24
**resisting** [1] - 90:20
**resolution** [6] - 38:14, 38:15, 47:22, 53:13, 77:25, 94:3
**resolve** [2] - 73:3, 97:1
**resolved** [6] - 40:1, 62:16, 82:1, 90:23, 98:19, 101:16
**resources** [3] - 73:2, 75:21, 82:18
**respect** [40] - 9:15, 9:18, 10:2, 10:5, 10:6, 11:25, 12:4, 15:5, 20:25, 24:3, 25:23, 26:20, 27:3, 27:6, 27:17, 28:7, 28:18, 29:22, 29:24, 29:25, 30:9, 30:15, 32:16, 33:12, 34:7, 48:20, 51:4, 52:23, 53:11, 53:14, 53:15, 54:9, 56:8, 58:5, 58:22, 61:22, 78:18, 87:19, 88:11, 114:3
**respected** [2] - 30:12, 36:3
**respectful** [1] - 13:13
**respectfully** [2] - 104:15, 113:19
**respectively** [1] - 37:11
**respects** [2] - 59:9, 109:9
**respond** [6] - 21:10, 41:7, 111:6, 112:1, 112:3, 122:3
**response** [6] - 21:17, 23:20, 42:2, 42:25, 89:15, 91:25
**responsible** [3] - 54:23, 54:24, 59:1
**rest** [1] - 122:2
**restrain** [2] - 20:15, 49:17

**restrained** [1] - 20:9
**restrains** [1] - 49:2
**rests** [1] - 26:10
**result** [6] - 20:4, 27:22, 39:4, 41:22, 44:5, 56:21
**results** [2] - 11:8, 34:16
**revenue** [1] - 70:6
**review** [1] - 48:8
**revisited** [3] - 28:14, 28:15, 35:7
**revive** [1] - 51:18
**RICHARDS** [1] - 1:13
**Richards** [1] - 4:2
**rigged** [1] - 68:22
**rightly** [1] - 88:7
**rights** [3] - 96:16, 106:20, 119:16
**ripening** [1] - 83:2
**risk** [2] - 58:20, 67:4
**risks** [1] - 46:14
**roadmap** [1] - 9:6
**Robert** [1] - 4:4
**ROBERT** [1] - 1:17
**role** [4] - 97:20, 98:2, 114:3
**Rosen** [2] - 5:22, 100:12
**ROSEN** [1] - 2:21
**Ross** [1] - 5:20
**ROSS** [1] - 2:15
**rounds** [1] - 96:3
**routinely** [1] - 102:19
**Rule** [32] - 6:23, 10:7, 10:13, 26:10, 27:18, 27:22, 34:22, 34:25, 36:21, 36:22, 37:9, 37:17, 37:18, 40:2, 40:17, 41:6, 41:14, 50:3, 50:24, 51:3, 54:13, 54:15, 61:8, 61:18, 61:22, 63:5, 102:7, 106:1, 106:11, 111:12
**rule** [10] - 11:5, 11:19, 11:22, 19:21, 37:9, 51:23, 52:8, 78:24, 84:16, 113:14
**rule's** [1] - 10:22
**ruled** [3] - 40:14, 50:14, 73:16
**ruler** [1] - 51:22
**rules** [7] - 10:16, 11:14, 52:1, 52:4, 71:11, 82:13, 117:13
**ruling** [6] - 29:2, 41:25, 50:12, 50:18, 71:23, 76:18
**rulings** [1] - 35:9
**run** [6] - 6:1, 48:13,

68:15, 108:6, 110:19, 110:21
**running** [3] - 6:3, 68:11, 80:21
**Russia** [1] - 58:13

**S**

**S.Ct** [1] - 115:5
**safe** [2] - 20:16, 121:25
**sale** [125] - 6:1, 6:3, 7:8, 9:13, 16:14, 10:23, 34:15, 34:16, 34:17, 42:17, 42:24, 45:8, 45:15, 46:19, 54:16, 57:6, 60:7, 63:9, 63:19, 63:22, 64:13, 64:19, 64:24, 65:8, 66:10, 70:18, 70:22, 71:10, 73:12, 73:21, 76:19, 77:7, 77:11, 77:12, 77:13, 77:21, 77:22, 78:5, 79:17, 80:13, 81:2, 81:3, 81:8, 81:12, 84:25, 85:2, 85:4, 86:2, 86:7, 86:10, 86:11, 86:15, 86:20, 89:19, 90:14, 90:16, 91:7, 91:18, 91:19, 91:22, 92:7, 92:14, 92:25, 94:18, 95:10, 95:11, 95:14, 95:19, 95:25, 96:14, 96:24, 97:3, 97:4, 97:7, 97:9, 97:23, 97:24, 98:21, 102:2, 102:4, 102:9, 103:8, 103:9, 104:3, 104:12, 104:16, 106:9, 106:16, 106:17, 106:24, 107:3, 107:4, 108:1, 108:18, 108:23, 109:4, 109:10, 109:23, 110:4, 111:7, 111:11, 111:15, 111:21, 112:11, 112:23, 112:24, 112:25, 113:7, 114:16, 114:19, 115:15, 116:19, 117:18, 118:11, 118:17, 118:19
**sale/execution** [1] - 111:7
**sales** [17] - 7:20, 7:22, 30:18, 30:21, 31:10, 32:17, 32:21, 46:21,

48:15, 57:5, 63:16, 95:12, 95:22, 101:23, 104:23, 104:24, 107:17
**Sam** [1] - 4:25
**sanctions** [7] - 9:15, 10:5, 47:20, 106:20, 114:3, 114:17, 118:15
**satisfied** [2] - 77:6, 96:22
**satisfy** [4] - 66:12, 90:21, 90:24, 91:1
**scenario** [1] - 83:25
**schedule** [2] - 73:14, 96:6
**School** [1] - 50:11
**school** [1] - 50:15
**scope** [3] - 10:3, 36:9, 108:16
**SDNY** [1] - 109:21
**search** [1] - 53:8
**second** [9] - 26:20, 38:22, 38:25, 41:22, 43:1, 45:5, 68:3, 106:14, 119:18
**second-highest** [1] - 68:3
**secrecy** [1] - 15:1
**secrets** [1] - 15:19
**Section** [8] - 37:23, 61:19, 63:18, 69:9, 91:18, 92:3, 92:5, 111:13
**secured** [2] - 72:20, 84:17
**security** [39] - 14:1, 14:3, 14:9, 14:20, 15:2, 15:5, 15:14, 15:15, 15:17, 16:9, 16:13, 16:19, 16:24, 30:15, 30:24, 31:11, 31:25, 32:19, 42:14, 42:19, 44:10, 45:1, 45:21, 45:22, 45:23, 46:14, 46:18, 52:13, 52:16, 53:14, 55:12, 58:6, 58:18, 58:21, 87:12, 88:7, 88:19, 92:18, 102:7
**see** [22] - 15:23, 19:19, 41:1, 46:7, 46:9, 53:23, 54:5, 62:22, 67:18, 68:22, 88:22, 94:5, 98:25, 100:6, 100:25, 101:1, 101:2, 101:3, 101:4, 112:12, 116:24, 118:16
**seek** [2] - 62:9, 67:9
**seeking** [6] - 12:23,

21:7, 22:8, 49:9, 56:13, 56:17
**seem** [6] - 10:8, 18:14, 29:20, 50:18, 69:10, 90:6
**segmented** [1] - 24:17
**seize** [1] - 21:8
**self** [3] - 31:12, 31:20, 115:22
**self-evident** [1] - 31:12
**self-evidently** [1] - 31:20
**self-explanatory** [1] - 115:22
**sell** [20] - 20:22, 54:17, 55:13, 64:15, 64:18, 65:3, 66:11, 76:12, 77:3, 77:17, 80:12, 81:11, 90:19, 91:13, 92:11, 98:8, 98:15, 112:25, 113:8, 117:23
**seller** [1] - 77:14
**selling** [6] - 49:5, 64:4, 64:11, 76:21, 77:8, 90:21
**sells** [1] - 63:19
**senior** [1] - 106:12
**sense** [8] - 14:8, 15:11, 24:6, 35:12, 66:24, 103:21, 111:15, 112:22
**separable** [1] - 24:21
**separate** [4] - 21:1, 21:24, 36:9, 37:16
**separateness** [9] - 25:25, 26:1, 26:21, 27:8, 30:12, 35:22, 36:6, 36:11, 57:18
**September** [3] - 1:9, 17:2, 71:25
**sequence** [1] - 103:24
**serious** [6] - 31:20, 32:4, 42:19, 96:7, 103:2
**seriously** [5] - 14:20, 31:12, 31:13, 32:22, 60:7
**serve** [2] - 55:3, 83:13
**served** [4] - 52:21, 71:24, 104:13
**service** [1] - 31:3
**set** [15] - 18:22, 31:18, 43:13, 63:24, 65:21, 69:6, 69:12, 73:12, 74:17, 79:22, 83:9, 96:6, 107:18, 112:9, 112:16
**sets** [2] - 74:2, 91:17
**setting** [5] - 32:21,

74:21, 82:21, 86:15, 103:9
**settlement** [1] - 113:6
**several** [3] - 84:10, 86:14, 111:17
**severely** [1] - 115:8
**shares** [19] - 42:17, 47:21, 55:13, 60:8, 63:19, 65:3, 66:11, 66:14, 66:16, 66:19, 66:21, 67:1, 69:25, 70:2, 73:19, 76:21, 94:18, 95:25, 118:14
**shed** [1] - 46:23
**sheriff** [5] - 75:18, 85:4, 91:19, 109:5, 110:4
**Sheriff's** [1] - 95:17
**short** [1] - 10:18
**shortly** [3] - 50:17, 65:14, 71:10
**shot** [1] - 110:22
**show** [2] - 22:18, 56:1
**shows** [2] - 104:4, 119:23
**side** [12] - 26:14, 27:15, 27:19, 32:3, 35:20, 72:20, 85:21, 90:1, 94:16, 98:14, 98:20, 103:20
**sight** [2] - 49:22, 71:22
**signed** [1] - 42:8
**significance** [1] - 24:20
**significant** [3] - 33:21, 88:6, 114:5
**significantly** [2] - 54:7, 66:4
**signs** [1] - 42:11
**silence** [1] - 121:24
**simple** [1] - 70:16
**simply** [14] - 11:15, 11:23, 21:23, 27:20, 54:3, 59:4, 64:3, 67:17, 68:16, 69:18, 80:11, 82:21, 83:5, 116:2
**singing** [1] - 18:15
**single** [1] - 50:2
**sit** [1] - 107:13
**situation** [10] - 35:21, 42:13, 46:5, 47:19, 52:24, 53:2, 59:7, 81:13, 93:18, 97:8
**situations** [1] - 81:10
**six** [4] - 67:12, 67:18, 67:24, 110:25
**Sixth** [1] - 111:4
**size** [1] - 97:9
**skeletal** [1] - 65:2

**skeptically** [1] - 14:21
**skepticism** [2] - 16:20, 18:1
**skilled** [1] - 76:22
**small** [1] - 24:25
**smoother** [1] - 120:15
**sold** [8] - 15:6, 23:1, 70:2, 73:19, 91:7, 94:18, 95:19, 96:16
**solely** [1] - 56:13
**solution** [1] - 6:13
**solved** [2] - 89:12, 89:13
**someone** [1] - 81:10
**sometimes** [2] - 44:10, 44:13
**somewhat** [3] - 20:17, 37:4, 69:10
**soon** [1] - 60:19
**sorry** [7] - 38:1, 39:15, 61:2, 97:15, 99:22, 99:23, 110:16
**sort** [26] - 8:24, 9:3, 9:18, 12:21, 13:8, 14:11, 15:4, 49:12, 51:19, 55:9, 68:7, 68:22, 79:10, 80:5, 81:13, 86:2, 95:20, 102:19, 103:14, 105:20, 105:21, 108:25, 110:24, 114:4, 115:9, 116:17
**sorts** [3] - 14:5, 15:3, 115:9
**sought** [2] - 38:3, 49:16
**sounds** [1] - 100:24
**source** [1] - 56:9
**Southern** [1] - 48:4
**sovereign** [5] - 26:17, 28:3, 49:21, 49:24, 87:19
**spaces** [1] - 23:17
**spatial** [1] - 106:3
**speakerphone** [1] - 101:9
**speaking** [5] - 8:1, 8:4, 40:22, 99:11, 103:11
**Special** [17] - 42:16, 43:13, 44:24, 45:10, 80:4, 80:14, 80:23, 81:18, 81:24, 82:21, 97:17, 97:21, 97:25, 98:3, 103:10, 108:15, 112:13
**special** [3] - 42:12, 109:24
**specific** [10] - 6:2, 6:25, 15:4, 15:7, 16:21, 58:11, 58:20,

102:19, 120:1, 120:6
**specifics** [1] - 45:19
**specify** [1] - 82:20
**speculate** [2] - 43:3, 43:6
**speculation** [2] - 43:11, 79:2
**speech** [1] - 17:12
**spend** [1] - 82:17
**spent** [2] - 12:23, 84:4
**spite** [1] - 94:7
**spokesperson** [1] - 85:21
**sport** [1] - 116:4
**spring** [1] - 65:24
**STAHL** [1] - 2:11
**Stahl** [1] - 5:4
**stake** [2] - 46:6, 108:3
**standard** [3] - 29:10, 64:4, 70:25
**standing** [2] - 92:21, 93:3
**star** [1] - 110:16
**Stark** [3] - 3:23, 99:20, 99:21
**STARK** [1] - 1:11
**start** [4] - 66:14, 72:10, 84:23, 104:24
**started** [1] - 105:20
**starting** [1] - 93:8
**state** [4] - 12:20, 15:19, 37:18, 64:11
**statement** [21] - 9:2, 9:19, 10:2, 11:23, 13:23, 31:2, 31:5, 42:5, 42:15, 46:11, 47:17, 48:3, 60:5, 73:20, 78:25, 87:25, 88:1, 88:3, 92:16, 94:20, 110:1
**statements** [9] - 14:5, 14:13, 31:25, 52:23, 56:2, 58:20, 60:14, 110:2, 115:9
**STATES** [2] - 1:1, 3:3
**States** [78] - 3:5, 5:12, 5:15, 7:4, 7:14, 10:11, 11:24, 14:9, 23:15, 24:3, 24:8, 25:7, 25:17, 26:7, 26:8, 26:11, 26:15, 26:24, 27:2, 27:4, 27:8, 27:9, 27:20, 28:17, 30:20, 30:25, 31:7, 31:8, 31:9, 31:18, 32:6, 32:8, 32:20, 33:6, 33:17, 33:20, 33:22, 33:25, 34:2, 34:4, 34:10, 35:24, 36:4, 36:7, 37:2, 41:13, 42:2,

42:7, 43:2, 43:4, 43:15, 43:19, 45:8, 45:23, 46:3, 47:2, 48:2, 58:6, 59:22, 60:16, 86:25, 87:7, 88:3, 88:12, 88:14, 88:16, 88:21, 88:23, 92:16, 92:19, 102:5, 102:24, 103:7, 103:12, 104:14, 105:5, 121:4
**States'** [5] - 41:16, 86:23, 87:4, 101:25, 103:17
**status** [10] - 20:21, 25:14, 25:23, 27:7, 30:1, 46:24, 56:21, 108:5, 121:2, 121:12
**statute** [10] - 66:11, 79:23, 84:13, 84:22, 93:9, 94:7, 112:6, 112:15, 112:16, 120:21
**statutory** [2] - 28:3, 64:8
**stay** [9] - 72:2, 72:4, 72:16, 89:10, 93:13, 94:9, 113:17, 115:24, 121:25
**stayed** [1] - 115:7
**staying** [1] - 72:1
**stays** [3] - 71:15, 71:21, 94:9
**steal** [1] - 69:22
**stenographic** [1] - 122:7
**step** [13] - 31:9, 32:21, 33:17, 33:22, 33:24, 37:21, 38:16, 38:18, 38:22, 38:25, 86:19, 103:14
**steps** [2] - 25:24, 26:24, 34:9, 42:24, 45:7, 45:8, 45:14, 47:12, 54:17, 57:5, 57:8, 62:2, 62:3, 75:12, 78:12, 79:10, 80:1, 82:4, 87:9, 87:10, 87:11, 87:24, 88:5, 88:17, 89:16, 96:22, 104:4, 104:10, 104:13, 105:11, 106:17, 109:4
**stick** [1] - 101:19
**still** [8] - 20:12, 24:13, 52:1, 60:24, 73:9, 99:12, 113:2, 116:15
**stipulate** [1] - 93:16
**stock** [21] - 37:25, 38:5, 38:6, 38:16, 39:15, 52:17, 61:20,

63:19, 64:4, 64:5, 89:19, 90:14, 90:19, 90:21, 90:25, 91:6, 91:14, 92:11, 96:16, 117:23
**stop** [3] - 59:14, 68:19, 84:7
**straightforward** [2] - 63:17, 69:20
**Street** [1] - 65:11
**strength** [1] - 18:1
**stretch** [1] - 96:5
**strictly** [3] - 8:7, 8:8, 22:21
**strong** [2] - 29:3, 32:6
**strongly** [1] - 29:4
**structure** [1] - 91:9
**structured** [1] - 91:10
**subbranches** [1] - 106:2
**subchapter** [2] - 63:25, 91:17
**subject** [7] - 10:20, 16:17, 32:18, 67:24, 81:11, 115:15, 117:24
**submission** [2] - 9:20, 27:12
**submissions** [1] - 27:5
**submitted** [1] - 25:21
**subordinate** [1] - 81:21
**subordinated** [1] - 82:7
**subordination** [1] - 82:3
**subpoena** [1] - 83:17
**subsections** [1] - 50:3
**subsequent** [1] - 49:8
**subsidiary** [1] - 73:22
**substantial** [1] - 65:22
**substitute** [2] - 27:24, 28:19
**successful** [2] - 55:18, 87:20
**successfully** [1] - 20:19
**sufficient** [1] - 84:21
**sufficiently** [1] - 36:1
**suggest** [8] - 14:1, 28:16, 29:20, 67:13, 83:12, 94:8, 104:4, 113:5
**suggested** [4] - 27:15, 31:22, 94:8, 103:10
**suggesting** [5] - 23:12, 32:8, 78:4, 95:2, 110:21
**suggestion** [7] - 41:9, 42:5, 57:21, 79:7,

81:17, 98:7, 104:2
**suggestions** [1] -
102:15
**suggests** [2] - 102:11,
103:19
**suit** [1] - 29:2
**sum** [2] - 32:5, 92:13
**summarize** [1] - 48:23
**summary** [1] - 17:7
**superior** [2] - 76:1
**supervise** [1] - 112:13
**supplement** [3] -
75:18, 79:22, 96:10
**supplemental** [9] -
6:20, 42:6, 65:10,
65:17, 65:18, 70:17,
74:19, 74:20, 83:19
**supplemented** [2] -
71:1, 94:22
**supplies** [1] - 66:8
**support** [10] - 11:20,
11:24, 15:7, 17:4,
25:19, 25:22, 32:6,
76:9, 76:11, 77:23
**supported** [1] - 87:24
**supporting** [2] - 12:2,
110:2
**supports** [2] - 10:4,
10:16
**suppose** [4] - 16:10,
35:5, 46:20, 120:19
**supposed** [2] - 43:8,
54:18
**supposedly** [1] - 49:4
**Supreme** [29] - 12:16,
26:18, 46:8, 49:25,
50:17, 50:21, 52:10,
63:23, 64:9, 65:7,
69:5, 70:7, 71:1,
72:17, 74:13, 76:17,
76:19, 76:24, 77:2,
79:24, 83:8, 115:3,
115:7, 115:8,
115:22, 117:6,
117:13
**surface** [2] - 16:11,
16:16
**surprised** [2] - 95:9,
113:14
**surrounding** [2] -
58:12, 66:8
**survival** [1] - 59:11
**suspect** [1] - 77:20
**Sweden** [3] - 20:23,
22:11, 49:6
**sweep** [1] - 21:5
**sympathy** [1] - 53:24
**synonymous** [1] -
81:7
**system** [2] - 74:10,
85:15

## T

**talks** [2] - 62:2, 118:12
**target** [4] - 73:12,
74:3, 114:21, 116:19
**technical** [3] - 7:25,
100:14, 120:14
**technological** [1] -
6:13
**technology** [1] - 8:20
**telephonic** [2] - 3:20,
122:5
**Telephonic** [1] - 1:9
**temporal** [4] - 24:6,
24:22, 35:9, 106:3
**temporarily** [2] -
47:11, 102:25
**ten** [3] - 63:21, 73:10,
93:19
**tend** [1] - 16:3
**term** [2] - 15:2, 15:11
**terms** [22] - 11:17,
12:21, 14:25, 18:13,
30:1, 33:15, 34:11,
62:3, 63:16, 75:7,
79:21, 80:14, 80:25,
81:7, 84:14, 96:9,
97:17, 112:15,
113:2, 119:12,
119:13
**terrific** [1] - 66:16
**tested** [1] - 13:7
**THE** [92] - 1:1, 1:2,
3:22, 4:7, 4:17, 4:20,
5:7, 5:11, 5:16, 6:5,
6:11, 8:17, 13:22,
17:1, 18:16, 19:3,
19:6, 19:11, 19:17,
21:9, 23:9, 25:1,
32:25, 34:11, 35:11,
36:12, 36:23, 40:4,
40:21, 40:25, 41:5,
43:20, 45:20, 46:20,
48:12, 56:3, 59:17,
60:20, 60:23, 61:1,
63:3, 63:7, 63:14,
75:5, 77:17, 78:2,
78:14, 78:25, 79:7,
79:21, 80:25, 81:16,
82:25, 83:22, 85:16,
85:23, 93:6, 94:11,
96:23, 97:11, 97:13,
97:17, 98:6, 99:3,
99:11, 99:14, 99:17,
99:22, 100:2, 100:9,
100:17, 100:20,
100:22, 101:11,
101:18, 104:21,
105:12, 105:18,
107:7, 109:17,
110:7, 110:11,

110:15, 111:24,
113:22, 117:1,
118:2, 118:5, 119:2,
120:8, 121:20,
121:23
**theory** [2] - 23:6,
56:12
**thereafter** [1] - 50:17
**therefore** [7] - 17:25,
36:4, 40:1, 43:15,
47:5, 94:20, 117:12
**they've** [3] - 78:8,
78:10, 90:5
**thinking** [2] - 60:2,
119:25
**thinks** [1] - 53:2
**thinnest** [1] - 105:25
**third** [2] - 58:10, 113:8
**Third** [15] - 10:21,
11:4, 11:21, 29:6,
29:17, 37:14, 50:9,
74:12, 75:3, 76:17,
76:20, 82:11, 82:12,
111:9, 119:23
**THOMPSON** [1] - 2:3
**thoroughly** [1] - 31:6
**thoughts** [1] - 7:10
**thousand** [1] - 95:18
**three** [17] - 71:19,
72:2, 72:23, 73:7,
83:22, 84:1, 84:16,
87:3, 89:5, 89:7,
93:8, 94:7, 95:22,
107:11, 113:14,
120:21, 121:9
**three-year** [10] -
71:19, 72:2, 72:23,
83:22, 84:16, 93:8,
94:7, 113:14,
120:21, 121:9
**throughout** [5] - 8:1,
38:2, 43:24, 54:25,
109:20
**throw** [1] - 107:11
**throws** [1] - 13:17
**Thursday** [1] - 1:9
**tightly** [1] - 30:19
**timeline** [1] - 48:11
**timing** [2] - 109:9,
121:10
**title** [2] - 63:25, 91:16
**today** [19] - 6:6, 9:8,
11:12, 18:19, 33:3,
34:13, 38:2, 40:7,
51:8, 87:10, 90:6,
90:20, 95:1, 96:6,
104:3, 120:14,
120:22, 121:7,
121:17
**together** [3] - 6:14,
6:19, 74:23

**toll** [1] - 84:21
**tolled** [3] - 93:12,
121:10
**TOLLES** [1] - 2:5
**Tolles** [1] - 4:14
**tolling** [4] - 84:12,
84:19, 116:9, 121:11
**tolls** [1] - 84:13
**Tom** [1] - 4:12
**tomorrow** [1] - 78:4
**took** [3] - 46:7, 56:10,
79:5
**top** [1] - 45:13
**totally** [1] - 42:25
**touch** [2] - 6:24,
107:21
**toward** [7] - 42:24,
45:7, 45:14, 102:2,
103:8, 104:15,
118:17
**towards** [2] - 89:17,
102:9
**traces** [1] - 56:9
**transaction** [2] -
108:21, 109:9
**transcript** [2] - 61:16,
122:7
**transfer** [2] - 92:5,
114:14
**travel** [1] - 67:3
**Treasury** [4] - 60:4,
60:6, 114:24, 115:19
**treat** [2] - 56:17,
111:10
**treated** [2] - 57:12,
115:2
**treating** [1] - 32:4
**tree** [5] - 7:9, 105:21,
105:23, 105:24,
106:10
**tribunal** [1] - 11:19
**tried** [7] - 16:7, 24:23,
27:19, 55:7, 62:19,
90:19, 105:2
**true** [6] - 9:24, 20:12,
40:8, 41:25, 90:18,
122:7
**truly** [3] - 11:5, 18:9,
70:19
**Trump** [1] - 52:25
**Trump's** [1] - 17:4
**truncated** [1] - 39:13
**trustee** [1] - 92:6
**truth** [1] - 68:9
**truthfulness** [1] - 20:7
**try** [14] - 20:7, 25:8,
78:11, 78:15, 80:12,
99:19, 100:7,
101:15, 101:20,
105:14, 107:13,
112:23, 116:11

**trying** [15] - 16:4,
31:18, 38:9, 50:25,
51:13, 53:21, 58:23,
59:5, 59:6, 59:8,
68:7, 68:22, 84:14,
96:19
**Tunnell** [1] - 5:4
**TUNNELL** [1] - 2:9
**turn** [12] - 8:10, 22:15,
25:2, 36:15, 41:1,
81:2, 85:17, 90:4,
98:8, 99:4, 100:8,
100:15
**turned** [1] - 55:2
**turns** [2] - 79:15, 84:1
**twice** [1] - 63:20
**two** [25] - 9:17, 15:17,
19:18, 19:20, 22:17,
23:5, 26:9, 37:21,
38:16, 39:8, 41:16,
41:23, 45:2, 52:1,
52:8, 61:3, 61:7,
62:21, 71:25, 73:9,
79:5, 81:7, 81:15,
96:3, 118:7
**two-step** [2] - 37:21,
38:16
**TYLER** [1] - 1:14
**Tyler** [1] - 4:3
**type** [3] - 15:25, 81:13,
119:24
**types** [2] - 22:17,
115:9
**typically** [1] - 80:18

## U

**U.S** [28] - 5:14, 14:3,
33:9, 41:15, 41:20,
42:13, 42:19, 44:25,
45:16, 46:14, 47:9,
53:17, 53:18, 54:2,
58:18, 58:20, 60:8,
64:9, 88:6, 88:19,
103:12, 104:10,
106:15, 107:4,
109:4, 111:22,
118:24, 122:10
**U.S.-based** [1] - 45:15
**U.S.-Venezuela** [1] -
47:20
**UCC** [1] - 67:1
**ultimate** [2] - 109:16,
118:19
**ultimately** [6] - 21:2,
79:9, 81:1, 114:15,
116:13, 116:22
**unanimously** [1] -
10:22
**unavailing** [1] - 92:11
**uncertainties** [1] -

109:14
uncertainty [1] - 78:3
uncomfortable [1] -
55:23
uncompelled [1] -
77:14
under [30] - 6:23,
11:20, 11:21, 14:25,
26:10, 27:18, 27:22,
37:22, 38:4, 38:14,
38:16, 39:6, 40:16,
52:4, 54:15, 57:23,
63:5, 80:13, 81:4,
91:21, 92:1, 92:3,
92:5, 103:23, 115:1,
115:17, 117:13,
118:14, 118:18,
120:16
underbrush [1] - 9:21
underlying [4] - 38:4,
41:17, 41:25, 114:6
undermine [1] - 60:8
undermining [1] -
41:11
understood [1] - 95:1
undertake [1] - 94:23
underway [1] - 48:9
undisputable [1] -
76:23
undisputed [3] -
57:20, 86:3, 86:5
undisputedly [1] -
36:2
undo [2] - 52:9, 85:14
unequivocally [1] -
25:22
unexpected [1] - 11:7
unfair [1] - 97:7
unfortunately [5] -
48:9, 100:22,
100:23, 101:7, 117:9
unhappy [1] - 79:8
uninformed [2] - 27:8,
27:12
unique [2] - 24:12,
32:15
UNITED [2] - 1:1, 3:3
United [84] - 3:5, 5:12,
5:15, 7:4, 7:14,
10:11, 11:24, 14:9,
23:15, 24:3, 24:8,
25:7, 25:16, 26:7,
26:8, 26:11, 26:15,
26:24, 27:2, 27:4,
27:8, 27:9, 27:20,
28:17, 30:20, 30:24,
31:7, 31:8, 31:9,
31:18, 32:6, 32:8,
32:20, 33:6, 33:17,
33:20, 33:22, 33:25,
34:1, 34:4, 34:10,

35:24, 36:4, 36:7,
37:2, 41:13, 41:16,
42:2, 42:7, 43:2,
43:4, 43:15, 43:18,
45:8, 45:22, 45:23,
46:3, 47:2, 48:2,
50:18, 58:6, 59:22,
60:15, 86:23, 86:25,
87:4, 87:7, 88:3,
88:12, 88:14, 88:16,
88:21, 88:23, 92:16,
92:19, 101:25,
102:5, 102:24,
103:7, 103:11,
103:17, 104:14,
105:5, 121:4
universe [1] - 109:15
unless [4] - 43:18,
77:9, 104:16, 118:25
unlikely [2] - 59:20,
59:24
unnecessary [1] -
73:23
unprecedented [1] -
66:7
unprepared [1] - 68:4
unsecured [1] - 81:21
unsuccessful [1] -
85:8
up [31] - 9:14, 13:24,
15:12, 16:3, 18:8,
32:2, 32:5, 32:21,
38:23, 39:14, 50:20,
52:14, 56:1, 58:9,
59:23, 64:18, 65:21,
66:2, 66:17, 67:1,
68:18, 72:10, 72:24,
73:3, 73:15, 74:12,
77:7, 82:11, 82:21,
83:9, 100:13
up-to-date [1] - 66:2
upmost [1] - 69:2
upset [1] - 65:8
urgency [1] - 93:21
useful [1] - 10:25
usual [1] - 16:22

V

valid [1] - 94:2
valuations [1] - 96:13
value [12] - 64:12,
65:23, 68:13, 70:20,
71:20, 73:21, 74:25,
83:20, 94:17, 96:11,
106:25, 107:6
various [3] - 67:1,
68:23, 93:12
vehicle [1] - 80:18
veil [1] - 39:7
VENEZUELA [1] - 1:6

Venezuela [77] - 2:7,
2:23, 4:10, 4:13,
6:17, 7:3, 8:12,
19:24, 20:1, 21:2,
21:6, 21:8, 21:10,
22:11, 22:24, 23:14,
24:18, 26:13, 26:23,
27:6, 29:11, 30:6,
31:17, 31:23, 33:4,
33:9, 35:21, 36:2,
36:5, 41:19, 42:13,
46:5, 47:19, 47:25,
51:9, 51:11, 51:14,
51:25, 52:4, 52:24,
53:3, 53:19, 56:13,
56:19, 56:25, 57:13,
58:23, 59:1, 59:3,
59:4, 60:9, 62:6,
64:17, 68:18, 69:23,
71:4, 71:21, 74:23,
76:9, 76:17, 80:12,
83:6, 85:17, 85:19,
87:5, 87:15, 87:18,
87:22, 88:23, 90:18,
90:19, 91:1, 92:20,
92:22, 114:9
Venezuela's [4] -
11:20, 41:17, 116:9,
119:22
verify [2] - 26:9, 41:16
Verrilli [8] - 4:14, 25:4,
41:15, 48:21, 49:11,
56:5, 76:22, 88:2
VERRILLI [8] - 2:5,
4:19, 25:3, 33:12,
34:20, 35:18, 56:6,
59:25
version [1] - 23:24
versus [2] - 6:17,
108:22
vetted [1] - 31:6
vetting [1] - 44:5
view [19] - 10:11,
10:22, 18:7, 34:13,
35:18, 44:19, 59:23,
64:2, 77:18, 79:12,
81:18, 89:22, 98:4,
102:10, 104:22,
108:2, 114:20,
115:18, 121:9
viewed [2] - 16:19,
93:22
views [14] - 13:12,
33:5, 33:6, 42:6,
42:7, 42:10, 43:2,
44:1, 45:25, 102:6,
106:9, 106:25,
107:16
vigorous [1] - 32:1
vigorously [1] - 74:7
violate [1] - 92:4
violation [1] - 105:10

Virgin [1] - 50:6
virtue [1] - 109:1
voluntarily [1] - 80:12
voluntary [2] - 11:9,
11:10
vs [4] - 50:6, 50:11,
115:4, 115:18

W

Wachtel [2] - 5:22,
100:12
WACHTEL [1] - 2:21
wait [3] - 45:25, 67:18,
78:22
waiting [2] - 89:1
walk [1] - 67:20
Wall [1] - 65:11
wants [18] - 5:17, 6:8,
26:14, 30:18, 71:5,
71:6, 74:19, 86:9,
86:19, 88:13, 95:10,
105:7, 106:8,
106:24, 107:12,
111:2, 111:14,
112:20
warning [2] - 14:12,
14:17
warrant [1] - 13:13
warrants [1] - 15:25
Washington [3] -
1:20, 2:6, 3:4
Watch [1] - 14:8
watches [1] - 16:4
watching [1] - 46:3
ways [2] - 45:3, 119:8
weakening [1] - 43:4
wearing [1] - 24:1
website [1] - 114:24
week [3] - 73:12,
121:7, 121:17
WEIGEL [16] - 1:17,
63:12, 63:15, 75:15,
77:20, 78:6, 78:21,
79:3, 79:14, 80:9,
81:6, 82:6, 83:4,
84:9, 112:2, 121:19
Weigel [17] - 4:4, 9:7,
9:11, 63:11, 86:1,
86:9, 86:14, 91:4,
94:8, 95:1, 95:10,
102:16, 103:9,
111:25, 116:8,
120:21, 121:18
weigh [3] - 46:8, 47:5,
60:10
weighing [2] - 42:2,
93:2
weight [1] - 16:20
weighty [3] - 32:14,
33:17, 103:16

welcome [3] - 76:3,
76:5, 76:7
well-established [1] -
27:10
Western [1] - 58:15
whatnot [2] - 13:7,
16:8
whatsoever [1] -
42:20
wheeling [2] - 27:25,
32:9
whichever [1] - 67:16
whim [1] - 42:22
whistle [1] - 24:9
white [1] - 24:1
whole [6] - 27:23,
68:19, 82:14, 82:15,
116:4, 116:7
wholly [2] - 90:5, 90:9
Wilkie [1] - 115:18
willing [5] - 66:18,
77:13, 90:7, 93:16,
105:14
Willkie [1] - 115:4
Wilmington [1] - 1:8
win [3] - 50:2, 67:17,
116:13
winning [5] - 67:7,
67:11, 67:21, 68:1,
68:12
wins [1] - 51:3
wisdom [1] - 60:18
wish [3] - 7:5, 7:15,
51:6
withdraw [1] - 43:5
wolf [2] - 100:20,
108:9
Wolf [11] - 5:22, 6:1,
100:7, 100:11,
100:17, 100:20,
107:2, 107:21,
110:8, 110:9, 110:15
WOLF [6] - 2:21,
100:11, 100:19,
100:21, 110:14,
110:16
won [3] - 72:17, 76:13
word [2] - 79:12,
119:3
words [2] - 67:17,
85:3
works [1] - 113:4
worry [1] - 121:8
worrying [2] - 42:13,
58:17
worse [1] - 86:23
worst [1] - 83:24
worth [1] - 69:23
wound [2] - 38:23,
39:14
Wright [1] - 68:25

**writ** [16] - 47:23,
54:20, 55:8, 55:12,
62:7, 62:10, 62:11,
62:15, 62:25, 71:24,
84:3, 84:7, 84:24,
84:25, 103:4, 109:22
**writs** [2] - 54:13, 72:5
**wrote** [2] - 17:3, 33:1

## X

**XYZ** [1] - 65:4

## Y

**year** [15] - 70:6, 71:19,
72:2, 72:23, 77:1,
83:22, 84:16, 93:8,
94:7, 113:14, 115:4,
116:11, 117:6,
120:21, 121:9
**years** [7] - 41:23,
71:25, 73:7, 73:9,
84:1, 89:5, 89:7
**yesterday** [1] - 17:13
**yield** [1] - 77:12
**yields** [1] - 64:13
**York** [8] - 1:17, 2:19,
2:22, 48:4, 67:2
**yourself** [1] - 8:3

## Z

**zero** [1] - 115:19