UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CONTRARIAN CAPITAL MANAGEMENT,
L.L.C., CONTRARIAN CAPITAL FUND I, L.P.,
CONTRARIAN DOME DU GOUTER MASTER
FUND, LP, CONTRARIAN CAPITAL SENIOR
SECURED, L.P., CONTRARIAN EM II, LP,
CONTRARIAN EMERGING MARKETS, L.P.,
POLONIUS HOLDINGS, LLC, and
CONTRARIAN FUNDS, L.L.C.,

                                    Plaintiffs,

              -against-

BOLIVARIAN REPUBLIC OF VENEZUELA,

                                    Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  10/1/2020

19 Civ. 11018 (AT)

**ORDER**

ANALISA TORRES, District Judge:

        This is one of several cases in which bondholders seek to recover on sovereign bonds issued

by Defendant, the Bolivarian Republic of Venezuela.  In this action, Plaintiffs, Contrarian Capital

Management, L.L.C., Contrarian Capital Fund I, L.P., Contrarian Dome du Gouter Master Fund, LP,

Contrarian Capital Senior Secured, L.P., Contrarian EM II, LP, Contrarian Emerging Markets, L.P.,

Polonius Holdings, LLC, and Contrarian Funds, L.L.C., claim that over $432 million of bonds issued

by Defendant have been in default since October 2017.  Pl. Mem. at 1, ECF No. 64.

        Defendant does not contest liability, but, because of the ongoing political and economic crisis

in Venezuela, seeks a stay of this litigation until such time as the situation stabilizes and Defendant

can restructure its financial obligations.  Def. Mem. at 7–26, ECF No. 69; 56.1 Stmt., ECF No. 64-2

(stating that all facts related to liability are undisputed).

        Before the Court are Defendant's motion for a stay, ECF No. 68, and Plaintiffs' motion for

summary judgment, ECF No. 63.  For the reasons stated below, Defendant's motion is DENIED, and

Plaintiffs' motion is GRANTED.

## BACKGROUND[1]

I.     The Bonds

Contrarian Capital Management, L.L.C. ("Contrarian") is an investment adviser; the other

Plaintiffs are funds managed by Contrarian.  56.1 Stmt. ¶¶ 1–11.   Plaintiffs are current beneficial

owners of $432,862,156 principal amount of nine series of bonds (the "Bonds") issued by Defendant.

*Id.* ¶¶ 40, 41, 62, 77, 89, 101, 113, 125, 137, 146.  The following chart lists (1) the Bonds, designated

by their annual interest rate and year of maturity; (2) their identification number; (3) the principal

amount beneficially held by Plaintiffs; and (4) the dates in each year that coupon payments were due.

| Bond | Identification Number | Principal Amount | Payment Dates |
|------|----------------------|------------------|---------------|
| 13.625% 2018 (-AT) Bonds | US922646AT10 | $20,680,000 | Feb. 15; Aug. 15 |
| 13.625% 2018 RegS Bonds | USP9395PAA95 | $25,319,000 | Feb. 15; Aug. 15 |
| 7.00% 2018 Bonds | USP97475AD26 | $55,814,000 | June 1; Dec. 1 |
| 12.75% 2022 Bonds | USP17625AC16 | $49,703,673 | Feb. 23; Aug. 23 |
| 9.00% 2023 Bonds | USP17625AA59 | $1,672,583 | Nov. 7; May 7 |
| 8.25% 2024 Bonds | USP97475AP55 | $4,844,186 | Oct. 13; Apr. 13 |
| 11.75% 2026 Bonds | USP17625AE71 | $221,862,476 | Oct. 21; Apr. 21 |
| 9.25% 2028 Bonds | USP17625AB33 | $2,650,675 | Nov. 7; May 7 |
| 11.95% 2031 Bonds | USP17625AD98 | $50,315,563 | Feb. 5; Aug. 5 |

Schwartz Decl. ¶ 13, ECF No. 66; *see also id.* ¶ 14 (showing which bonds are owned by which

Plaintiffs, and the principal amount of beneficial ownership each Plaintiff holds).

All of the bonds were issued pursuant one of two fiscal agency agreements.  56.1 Stmt. ¶¶ 38,

39; 61; 75; 87; 99; 111; 123; 135.  Both of those agreements, among other things, provide that

---

[1] The following facts are drawn from the parties' pleadings and submissions, including the complaints and Plaintiffs' Rule 56.1 statement of undisputed fact, which Defendant does not contest.  *See* ECF No. 64-2.

Defendant waives its sovereign immunity with respect to claims arising out of the bonds, consents to be sued in the United States District Court for the Southern District of New York, and agrees that New York law will govern the agreements and the bonds. *Id.* ¶¶ 14–21 1998 Fiscal Agency Agreement §§ 12, 14, ECF No. 65-8; 2001 Fiscal Agency Agreement §§ 12, 14, ECF No. 65-9.

Since October 2017, Defendant has missed five coupon payments on the 13.625% 2018 (-AT) Bonds, 13.625% 2018 RegS Bonds, 7.00% 2018 Bonds, 12.75% 2022 Bonds, and 11.95% 2031 Bonds, and six coupon payments on the 9.00% 2023 Bonds, 8.25% 2024 Bonds, 11.75% 2026 Bonds, and 9.25% 2028 Bonds. Pl. Mem. at 7; 56.1 Stmt. ¶¶ 48–49, 68–69, 82–83, 94–95, 106–107, 118–119, 130–131, 142–143. In addition, on August 15, 2018, the 13.625% 2018 (-AT) Bonds and 13.625% 2018 RegS Bonds matured, *id.* ¶¶ 52, 55, and on December 1, 2018, the 7.00% 2018 Bonds matured, *id.* ¶ 71. Defendant has failed to pay the full principal amount of those bonds as required. *Id.* ¶¶ 53, 56, 72.

## II.   The Situation in Venezuela

The United States Department of State describes the current political status of Venezuela as follows:

> Venezuela is legally a multiparty, constitutional republic, but for more than a decade, political power has been concentrated in a single party with an authoritarian executive exercising significant control over the judicial, citizens' power (which includes the prosecutor general and ombudsman), and electoral branches of government, and standing up a parallel, illegitimate legislative body alongside the existing elected one. On January 10, [2019] the term of former president Nicolas Maduro ended. He sought to remain in power based on his claimed "victory" in the 2018 presidential elections widely condemned as neither free nor fair, a claim not accepted by the democratically elected National Assembly (AN). On January 23, Juan Guaido, as president of the National Assembly, assumed the role of interim president pursuant to the provisions of the constitution related to vacancies. Former president Maduro, with the backing of hundreds of Cuban security force members, refused to cede control over the instruments of state power, preventing interim president Guaido from exercising authority within the country. In the 2015 legislative elections, opposition political parties gained supermajority (two-thirds) control of the AN. The former Maduro regime, however, used its control over the Supreme Court (TSJ) to create the illegitimate Constituent National Assembly (ANC) that placed the AN in contempt,

usurped its constitutional role to legislate, and weakened the constitution's separation of powers principle.

U.S. Dep't of State, *2019 Country Reports on Human Rights Practices: Venezuela*,

https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/venezuela/; *see also*

U.S. Sec'y of State Mike Pompeo, U.S. Dep't of State, *U.S. Government Support for the*

*Democratic Aspirations of the Venezuelan People*, https://www.state.gov/u-s-government-support-

for-the-democratic-aspirations-of-the-venezuelan-people/.

The United States government recognizes Juan Guaidó as the legitimate president of

Venezuela, and the National Assembly as the legitimate legislature. *See U.S. Government Support*

*for the Democratic Aspirations of the Venezuelan People*. That determination is binding on this

Court. *See Guar. Tr. Co. of N.Y. v. United States*, 304 U.S. 126, 137–38 (1938); *see also, e.g.*,

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 135 n.2 (3d Cir. 2019), *cert.*

*denied*, 206 L. Ed. 2d 936 (May 18, 2020); *OI European Grp. B.V. v. Bolivarian Republic of*

*Venezuela*, No. 16 Civ. 1533, 2019 WL 2185040, at *5 (D.D.C. May 21, 2019) ("[B]ecause the

United States has recognized Juan Guaidó as the Interim President of Venezuela, the Court will

recognize the Guaidó government lawyers as the appropriate representatives of Venezuela.").

Venezuela is also in the midst of an economic, health, and human rights crisis. *See, e.g.*,

United Nations Office of the High Commissioner for Human Rights, *Venezuela Must Offer Concrete*

*Steps to End Humanitarian Crisis, Say UN experts* (May 6, 2020),

https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=25867&LangID=E

(detailing a "spiralling economic crisis" including "food shortages, hyperinflation, power and water

cuts and soaring unemployment," "many hospitals struggling to function without reliable electricity

or even running water," "a shortage of medical supplies, protective equipment and medicine," an

"education system [that] has lost thousands of teachers and [in which] many children no longer attend

school because of lack of energy due to not having food at home or because they cannot afford transportation," and "a third of the population [that] is food insecure"); Anatoly Kurmanaev, *Venezuela's Collapse Is the Worst Outside of War in Decades, Economists Say*, N.Y. Times (May 17, 2019), https://www.nytimes.com/2019/05/17/world/americas/venezuela-economy.html.

On July 1, 2019, President Guaidó's government issued a memorandum titled "Guidelines for the Renegotiation of the Chávez/Maduro Era Legacy Public External Debt" (the "Renegotiation Guidelines"). ECF No. 72-1. The Renegotiation Guidelines state that "public external debt renegotiation cannot begin [while] the usurpation by [the] regime of Nicolas Maduro has not ended and the economic sanctions imposed on said regime by the United States of America and other countries have not been lifted," but that "once these events have occurred, it shall be the policy of the [Venezuelan government] to proceed with an orderly and consensual renegotiation of legacy private claims as soon as practicable thereafter, in accordance with the Special Law to be passed by the National Assembly." *Id.* at 1. It then sets out terms that the administration intends to govern the renegotiation process. *Id.* at 1–3.

## DISCUSSION

I.   Stay of Proceedings

Defendant requests that the Court "stay this proceeding until democracy is restored in Venezuela and [Defendant] has had a reasonable opportunity to pursue a consensual restructuring." Def. Mem. at 7–8.

In an opinion filed on September 30, 2020 in *Casa Express Corp. v. Bolivarian Republic of Venezuela*, No. 18 Civ. 11940, and *Pharo Gaia Fund et al. v. Bolivarian Republic of Venezuela*, No. 19 Civ. 3123 (the "*Casa Express* Order"), this Court rejected an application from Defendant for a stay on the same grounds. No. 18 Civ. 11940, ECF No. 75 (S.D.N.Y. Sept. 30, 2020). As the Court explained, neither the traditional factors governing a stay of litigation, nor United States policy, nor

principles of customary international law, justify the open-ended stay Defendant seeks. *Id.* at 6–10.

Defendant's arguments in this case fail for the same reasons.

Here, Defendant also argues that a stay is required in order to assure compliance with

executive orders issued by President Donald J. Trump, and regulations issued by the Treasury

Department's Office of Foreign Assets Control ("OFAC").  Def. Mem. at 18–26.  On August 24,

2017, President Trump issued Executive Order No. 13808, which bars "transactions related to,

provision of financing for, and other dealings in . . . bonds issued by the Government of Venezuela."

82 Fed. Reg. 41,155, 41,155 (2017).  And on August 5, 2019, the president issued Executive Order

No. 13884, which provides that "*all* property and interests in property of the Government of

Venezuela that are in the United States . . . are blocked and may not be transferred, paid, exported,

withdrawn, or otherwise dealt in."  84 Fed. Reg. 38,843, 38,843 (2019) (emphasis added).  OFAC has

issued regulations applying those orders' terms to litigation against the Venezuelan government,

which provide that "the entry into a settlement agreement or the enforcement of any lien, judgment,

arbitral award, decree, or other order through execution, garnishment, or other judicial process

purporting to transfer or otherwise alter or affect property or interests in property blocked . . . is

prohibited unless authorized pursuant to a specific license issued by OFAC pursuant to this part."  31

C.F.R. § 591.407.

In further guidance, the agency has explained that "[a] specific license from OFAC is not

ordinarily required to initiate or continue U.S. legal proceedings against a person designated or

blocked pursuant to OFAC's Venezuela sanctions program, or for a U.S. court, or its personnel, to

hear such a case."  OFAC FAQ 808, *Frequently Asked Questions*, U.S. Dep't of the Treasury (Dec. 9,

2019), https://home.treasury.gov/policy-issues/financial-sanctions/faqs/topic/1581.  Rather, the

Treasury Department has determined that a license is required only for "the entry into a settlement

agreement or the enforcement of any lien, judgment, or other order through execution, garnishment,

or other judicial process purporting to transfer or otherwise alter or affect property or interests" blocked by the President's orders. *Id.* So, for example, a party is prohibited from seizing, attaching, encumbering, or freezing such assets to enforce a judgment. *Id.* But a party is not prohibited from litigating to obtain a judgment.

Defendant argues that Plaintiffs' obtaining a judgment would, itself, constitute a transfer of property prohibited without a license, because a judgment would alter Plaintiffs' rights and Defendant's obligations with respect to the bonds at issue in this case. Def. Mem. at 22–24. But, as OFAC's approval of unlicensed litigation against Defendant shows, a judicial determination of the parties' rights and obligations under a contract does not, in and of itself, cause any transfer of property. *See, e.g.*, *United States v. Pokerstars*, No. 11 Civ. 2564, 2016 WL 4411421, at *4 (S.D.N.Y. Aug. 19, 2016) ("An *in personam* judgment does not create an interest in specific property."), *aff'd sub nom. United States v. Cardroom Int'l, LLC*, 726 F. App'x 98 (2d Cir. 2018); *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 259 (S.D.N.Y. 2012) (dismissing unjust enrichment claim based on alleged improper securing of a judgment because the judgment alone did not constitute a transfer of property).

There is, therefore, no reason for the Court to enter a stay based on President Trump's executive orders or the Treasury Department's regulations. To the extent that the policy of the Executive Branch is to protect Defendant's property in light of the tumult in Venezuela, that interest is fully served in this case by the requirement that Plaintiff apply for an OFAC license before it can pursue Defendant's assets to satisfy any judgment the Court may issue.

Accordingly, Defendant's motion for a stay of proceedings is DENIED.

II.    Summary Judgment

The undisputed facts show that Plaintiffs are entitled to summary judgment on their claims. *See Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020) ("Summary judgment is appropriate

only when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." (internal quotation marks and citations omitted)).

### A.  Sovereign Immunity

Under the Foreign Sovereign Immunities Act (the "FSIA"), foreign states are immune from suit, but they can waive that immunity "either explicitly or by implication."  28 U.S.C. §§ 1604, 1605(a)(1).  In the fiscal agency agreements governing the bonds at issue here, Defendant expressly waived its sovereign immunity.  *See* 1998 Fiscal Agency Agreement § 14; 2001 Fiscal Agency Agreement § 14.  Accordingly, the Court has jurisdiction to consider Plaintiffs' claims.  *See EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 209 (2d Cir. 2012), *aff'd sub nom. Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134 (2014).

### B.  Liability

Plaintiffs, as beneficial owners authorized to bring suit by the registered holder of the bonds at issue, have contractual standing to bring this action.  *See Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires*, 415 F.3d 242, 245 (2d Cir. 2005); *Etevob v. Republic of Argentina*, 471 F. Supp. 2d 432, 443 (S.D.N.Y. 2007) ("[A]n owner of a beneficial interest . . . must receive authorization from the registered holder of the bond before it may sue."), *aff'd sub nom. Mazzini v. Republic of Argentina*, 282 F. App'x 907 (2d Cir. 2008); 56.1 Stmt. ¶¶ 150–168.

The undisputed evidence shows that Defendant has failed to make any of the coupon payments required by the bonds at issue in this action—that is, five coupon payments on the 13.625% 2018 (-AT) Bonds, 13.625% 2018 RegS Bonds, 7.00% 2018 Bonds, 12.75% 2022 Bonds, and 11.95% 2031 Bonds, and six coupon payments on the 9.00% 2023 Bonds, 8.25% 2024 Bonds, 11.75% 2026 Bonds, and 9.25% 2028 Bonds. 56.1 Stmt. ¶¶ 48–49, 68–69, 82–83, 94–95, 106–107, 118–119, 130–131, 142–143.  The undisputed evidence also demonstrates that Defendant has failed

to pay the principal amount of the 13.625% 2018 (-AT) Bonds, 13.625% 2018 RegS Bonds, and

7.00% 2018 Bonds, despite those bonds having matured in 2018. *Id.* ¶¶ 52–57, 71–73.

Defendant's failure to make payments required by the bonds' terms constitutes a breach of

contract. *See MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 517 (S.D.N.Y.) ("A

bond is, of course, a contract, and the obligations and rights of the parties are thus defined by the

terms of the bond."), *aff'd*, 719 F. App'x 47 (2d Cir. 2017); *Mun. Capital Appreciation Partners, I,*

*L.P. v. Page*, 181 F. Supp. 2d 379, 390 (S.D.N.Y. 2002) ("Under New York law, to establish a breach

of contract a plaintiff must plead and prove the following elements: (i) the existence of a contract; (ii)

breach by the other party; and (iii) damages suffered as a result of the breach."). And Defendant has

not put forward any defense to liability on Plaintiffs' breach of contract claims.

Accordingly, Plaintiffs are entitled to summary judgment on their breach of contract claims.

### C.  Damages

Plaintiffs seek $246,194,335.63, plus additional post-maturity interest payments required by

the bonds between the date of Plaintiffs' motion and the date of judgment, prejudgment interest in the

amount of $15,863,903.87, and attorney's fees. Pl. Mem. at 14–15. The undisputed evidence

supports Plaintiffs' damages calculations, and Defendant does not contest them, with one exception.

56.1 Stmt. ¶¶ 147–149. Defendant argues that the Court should not apply New York's prejudgment

interest rate and award the requested $15,863,903.87 in prejudgment interest. Def. Mem. at 26–29.

Under New York law, prejudgment interest on missed principal payments is governed by the

contract's terms, but a plaintiff is also entitled to prejudgment interest at a 9% statutory rate on any

interest payments required by the contract that the defendant has failed to make—sometimes referred

to as "interest on interest." *See NML Capital v. Republic of Argentina*, 435 F. App'x 41, 43 (2d Cir.

2011) ("[P]laintiffs were entitled to statutory pre-judgment interest on post-maturity and post-

acceleration contract interest payments from the date those payments became due.") (citing *NML*

*Capital v. Republic of Argentina*, 952 N.E.2d 482, 494–95 (N.Y. 2011)); N.Y. C.P.L.R. § 5004 ("Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute.").

Defendant claims that New York law does not apply to the calculation of prejudgment interest in this action, because the Court's jurisdiction in a case against a foreign sovereign is founded on federal law.  Def. Mem. at 26–27.  The Court rejected an identical argument from Defendant in the *Casa Express* Order, explaining that although the Court has jurisdiction over this action pursuant to the FSIA, the substantive law is the law of New York, and that plaintiffs are, consequently, entitled to interest at New York's statutory rate.  *Casa Express* Order at 13–14; *see* 1998 Fiscal Agency Agreement § 12; 2001 Fiscal Agency Agreement § 12; *see also* 28 U.S.C. § 1606 ("As to any claim for relief with respect to which a foreign state is not entitled to immunity . . . the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances."). The Court applies the same reasoning here.

Accordingly, the Court holds that a 9% rate of prejudgment interest applies to each of Defendant's missed interest payments, running from the date that those payments should have been made until the date of judgment.  Accordingly, the Court finds that Plaintiffs may recover $246,194,335.63 in damages and $15,863,903.87 in prejudgment interest, plus the value of any additional unmade post-maturity interest payments between the date of Plaintiffs' summary judgment motion and the date of judgment, and any additional prejudgment interest, at a 9% rate, that has accrued since the filing of Plaintiffs' summary judgment motion.

D.  Fraud and Error Prevention Mechanisms

Finally, Defendant asks that the Court "establish fraud and error prevention mechanisms" to prevent potential fraudulent claims that could arise if Plaintiffs transfer their beneficial interests in the bonds to another party after obtaining a judgment in this action.  Def. Mem. at 29–30.  As the Court

explained in the *Casa Express* Order, these concerns "may be addressed in the future by the federal securities laws, courts' inherent power to punish fraud on the court, and the rules of any restructuring process eventually established by Defendant," and Defendant has not presented the Court with authority for conditioning the entry of judgment on Plaintiffs' compliance with such a regime. *Casa Express* Order at 15. Accordingly, the Court declines to impose Defendant's proposed restrictions.

## CONCLUSION

For the reasons stated, Defendant's motion for a stay is DENIED, and Plaintiffs' motion for summary judgment is GRANTED.

It is ORDERED that by **October 8, 2020**, Plaintiffs shall submit a proposed judgment consistent with this order.

It is further ORDERED that by **October 30, 2020**, Plaintiffs shall submit their motion for attorney's fees. By **November 30, 2020**, Defendant shall file its opposition.

The Clerk of Court is directed to terminate the motions at ECF Nos. 63 and 68.

SO ORDERED.

Dated: October 1, 2020
       New York, New York

_____
       ANALISA TORRES
       United States District Judge

11